UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHELLE LYNNE KOSILEK, )<br><br>Plaintiff, )<br><br>v. )<br><br>KATHLEEN M. DENNEHY, )<br><br>Defendant. ) | C.A. No. 00-12455-MLW |

## PLAINTIFF'S OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The plaintiff, Michelle Lynne Kosilek ("Kosilek"), submits this opposition to the motion of defendant Kathleen M. Dennehy ("Defendant") for summary judgment.

## INTRODUCTION

Kosilek, an inmate at MCI-Norfolk, brought this civil rights action to enforce her Eighth Amendment right to adequate medical care. Specifically, Kosilek seeks treatment for gender identity disorder ("GID"), or transsexualism. Because the record on summary judgment creates genuine issues of material fact as to: (1) whether Kosilek's GID has been adequately treated; (2) whether the defendants have acted with deliberate indifference in failing to follow clinical recommendations to provide Kosilek with sexual reassignment surgery ("SRS") as treatment for GID; and (3) the validity or sincerity of the Defendant's "security concerns", Defendant's motion for summary judgment should be denied.

The Defendant asks this Court to reach conclusions that are simply not warranted by the factual record. First, the Defendant asks this Court to find that it is "undisputed" that Plaintiff

has received adequate medical care. *See* Defendant's Memo. at 12. On this issue, the "undisputed" facts are contradicted by: the sound clinical judgment of the clinicians immediately involved with treating Kosilek: Mark Burrows, Kosilek's treating mental health therapist; as well as the judgments of doctors Kevin Kapila, M.D., and Randi Kaufman, Psy.D., the outside experts at Fenway Community Health ("Fenway Clinic") retained by the Defendant's mental health provider University of Massachusetts Medical School ("UMMS"), and preapproved by Defendant's staff to evaluate Kosilek; The conclusions of the Fenway Clinic were endorsed by Arthur Brewer, M.D., the Medical Director of the UMMS Correctional Health Program and Kenneth Appelbaum, M.D., its Mental Health Director. UMMS is the provider of medical and mental health services at the Department of Corrections ("DOC"). In addition, Kosilek's three GID experts – George Brown, M.D., Marshall Forstein, M.D., and Randi Ettner, Ph.D. each concurs that Kosilek faces a substantial risk of serious harm if she does not receive SRS. The only opinions contrary to those recommending surgery are from the litigation experts retained by the Defendant to testify at trial.

Second, the Defendant asks this Court to find that she has not been deliberately indifferent to Kosilek's serious medical need. On this issue, the record demonstrates that the Defendant: 1) is subjectively aware of the substantial risk of serious harm to Kosilek by not providing treatment; 2) has disregarded the judgment of the very clinicians, Drs. Appelbaum and Brewer of UMMS, that Defendant retains to make such judgments; 3) has addressed Kosilek's treatment for GID solely as a legal or political matter and not as a medical issue, contrary to this Court's explicit instructions; 4) retained litigation experts "more sympathetic" to the DOC's

predisposed objection to providing SRS; and 5) has never seriously evaluated the security risks used to deny treatment.

Finally, the Defendant relies on hastily developed and shallowly conceived "security concerns" to deny Kosilek adequate treatment for a serious medical need. Particularly in the context of a failure to provide adequate medial care, the Supreme Court and other federal appellate and district courts have held that prison officials are not entitled to mechanical deference. Kosilek's right to adequate medical treatment is not a right that need necessarily be compromised for the sake of proper prison administration.

In short, the Defendant's position and conduct in this case, *Kosilek II*, are, to borrow from Yogi Berra, a "déjà vu all over again" replay of the defendant's position and conduct in *Kosilek v. Maloney*, 221 F. Supp.2d 161 ("*Kosilek I*"). The Defendant in this case is a new Commissioner, defendant Dennehy having replaced Commissioner Michael T. Maloney. The treatment sought is SRS, and not the totality of GID treatment sought at the first trial. In virtually all other respects, however, the factual record demonstrates that the DOC under defendant Dennehy is taking the same stance as under Commissioner Maloney. Once again, the DOC has disregarded the advice of its own clinicians, including Kosilek's mental health professional, the opinions of outside experts retained by the DOC to evaluate Kosilek, and the advice of the directors of the medical and mental health provider for the DOC, Arthur Brewer, M.D., and Kenneth Appelbaum, M.D., respectively. It has retained experts with views "sympathetic" to a preconceived position. In addition, the DOC is asserting ill-conceived and hastily developed security concerns as a pretext to disregard the clinical advice. Thus, the factual record establishes the DOC's continued entrenched and stubborn unwillingness to

provide treatment notwithstanding the astonishingly uniform advice of the clinicians.   This

conduct is the more remarkable because it disregards the guidance of this Court in *Kosilek I.*

## STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS A GENUINE ISSUE FOR TRIAL[1]

A.   **Legal History:** *Kosilek I*

1.     In 2002, this Court issued its landmark decision in *Kosilek I*, in which it found

that Kosilek's GID was a serious medical condition that had not been adequately treated.   *See*

*Kosilek I*, 221 F. Supp. 2d at 184-85.

2.     In *Kosilek I*, this Court put the DOC "on notice that Kosilek's severe gender

identity disorder constitutes a serious medical need.   Therefore, the DOC has a duty to provide

Kosilek with adequate treatment."   *Id.* at 193.

3.     Furthermore, this Court found that the DOC had not provided adequate treatment

for Kosilek's GID.

> The services now being offered to Kosilek are not sufficient to
> diminish his intense emotional distress, and the related risks of
> suicide and self-mutilation, to the point at which he would no
> longer be at a substantial risk of serious harm.   Therefore, Kosilek
> has not been offered adequate care for his serious medical need.

*Id.* at 185.

4.     This Court found that Commissioner Maloney was the appropriate defendant in

*Kosilek I*.   "Because Maloney removed from the professionals employed by the DOC their usual

discretion concerning Kosilek's medical needs and care, Maloney's conduct is properly the focus

---

[1] Pursuant to Local Rule 56.1, the plaintiff sets forth the following material facts as to which there exists a genuine issue to be tried. As required by Rule 56, Fed.R.Civ.P., and Local Rule 56.1, each of these facts is supported by a reference to the pleadings, answers to interrogatories, depositions and affidavits on which the plaintiff relies. The defendant has agreed that Kosilek's medical and institutional records can be used in support of this motion without further verification.

4

of this case." *Id.* at 160. Mental health professional had been retained by the Defendant for results-oriented purposes – not for treatment, but to support the Defendant's position in litigation.

> Qualified physicians have never evaluated Kosilek for the primary purpose of prescribing treatment. Rather, they have been employed as potential exert witness in this case. Because of the pendency of this case, Maloney as a practical matter removed from the medical personnel the DOC employs their usual authority to diagnose and treat Kosilek. Maloney, who is not qualified to make medical judgments, was prompted by this case to adopt a rigid, freeze-frame policy.

*Id.* at 161.

5.     This Court found a significant risk that Kosilek would attempt suicide, and likely succeed, if she were denied adequate treatment. In so finding, this Court expressly accepted the expert opinion of George Brown, M.D., who served as one of Kosilek's expert witness. "Dr. George Brown opined that if Kosilek does not receive hormone treatments, 'the likelihood is exceedingly close to one hundred percent that she will kill herself.'... [T]his court finds that absent adequate treatment, there is a significant risk that Kosilek will again attempt suicide and may, like some other inmates, succeed." *Id.* at 165.

6.     The DOC's employees most closely involved with Kosilek's treatment prior to *Kosilek I*, this Court found, concurred in Dr. Brown's assessment.

> The court notes that the DOC employees who are most directly responsible for Kosilek, Dr. Ira Packer, Gregory Hughes, and Mark Burrowes, agree with Kosilek's experts, Drs. Forstein and Brown, that there is a high risk that Kosilek will attempt suicide if he does not receive adequate treatment as a result of this case.

*Id.* n. 4.

7.      This Court squarely rejected the Defendant's position that Kosilek's risk of self-harm was manipulative. "Kosilek's stated intention to commit suicide is not merely a threat to manipulate the DOC or the court, but rather a sincere manifestation of his mental anguish. Kosilek will attempt, and perhaps succeed, in killing himself if he does not receive adequate treatment." *Id.* at 184.

8.      As noted by this Court, Commissioner Maloney decided -- prior to retaining a mental health expert to evaluate Kosilek -- that he did not intend to provide hormone treatment or SRS for Kosilek.

> In about April 2000, a meeting to discuss this case and the possible issuance of guidelines for dealing with inmates with gender identity disorders was planned. In anticipation of that meeting, Dr. Packer spoke with the attorneys for the DOC and others who worked for Maloney. As a result, he understood "from the get go" (meaning "immediately") that Maloney did not want to provide Kosilek or any other inmate hormones or sex reassignment surgery.

*Id.* at 169.

9.      Commissioner Maloney also retained a litigation expert to evaluate Kosilek who Maloney knew was sympathetic to his position against providing treatment. *Id.* at 189. The expert, Dr. Robert Dickey, had fixed and pre-conceived ideas regarding treatment and did not employ the Harry Benjamin International Gender Dysphoria Association's *Standards of Care*, Sixth Version (*"Standards of Care" or "Standards"*), which, the Court noted, "are regularly relied upon by experts in the United States and elsewhere for treating gender identity disorder." *Id.* at 173.

> Rather, Dr. Dickey and his colleagues impose more rigorous requirements before prescribing hormones or authorizing sex reassignment surgery. More specifically, Dr. Dickey and his colleagues require, at a minimum, a real life experience during

> which a person lives for a year in the community as a member of
> the opposite sex before prescribing hormones. In Dr. Dickey's
> opinion, it is impossible for a person to have a real life experience
> in prison. Dr. Dickey's approach would almost always preclude
> initiating hormones for an inmate for whom they had not been
> prescribed prior to incarceration.

*Id.*

10.    Commissioner Maloney did not call Marshall Forstein, M.D., who had been retained as an expert to evaluate Kosilek before Dr. Dickey was hired. Maloney terminated Dr. Forstein's relationship with the DOC after he provided an evaluation favorable to Kosilek. "When Dr. Forstein stated that his recommendations regarding what was required to treat Kosilek adequately were not altered by the fact that Kosilek was incarcerated, the DOC terminated its relationship with him." *Id.* at 173.

11.    This Court also found that Commissioner Maloney's attempt to treat Kosilek's GID with anti-depression medications did not amount to adequate treatment.

> [A]s Dr. Brown credibly explained, treating depression with drugs,
> without addressing the causes of it, may actually increase the risk
> of suicide by giving depressed individuals the energy to act that
> they lacked previously. The fact that Kosilek has once attempted
> suicide while taking Prozac in jail indicates the risk of relying on
> medical alone in his case."

*Id.* at 175.

12.    This Court ruled that costs are not a valid consideration for Maloney in evaluating Kosilek's right to adequate medical treatment. "[I]t would not be reasonable to deny an inmate adequate medical care because it would be expensive to do so. Lack of funds... cannot justify an unconstitutional lack of competent medical care and treatment for inmates." *Id.* at 182 (internal citation and quotation omitted).

13.     This Court further noted that "[a] major problem in this matter is that Kosilek's condition has been treated primarily as presenting legal issues rather than medical questions." *Id.* at 191.

> Maloney did not focus on Kosilek's medical needs. He acted as a defendant with a legal problem. He has been reluctant to allow Kosilek to receive hormones or sex reassignment surgery unless he was legally required to do so. His reluctance has been rooted in sincere security concerns, and in a fear of public and political criticism as well. Maloney has not been influenced by the possibility that treatment for Kosilek might be expensive. Rather, he has been concerned that any expenditure for hormones or sex reassignment surgery might be an inappropriate use of taxpayers' money."

*Id.* at 162.

14.     This Court instructed the DOC to apply its regular procedures for providing medical treatment in addressing Kosilek's GID. "[T]he court expects that the defendants will follow the DOC's *usual policy and practice* of allowing medical professionals to assess what is necessary to treat Kosilek." *Id.* at 193 (emphasis added).

15.     In *Kosilek I*, Commissioner Maloney cited security concerns as a primary reason for refusing to provide Ms. Kosilek with hormone therapy. *Id.* at 162 ("[The Defendant] has been reluctant to allow Kosilek to receive hormones or sex reassignment surgery unless he was legally required to do so. His reluctance has been rooted in sincere security concerns...").

16.     The Court placed explicit limits on Commissioner Maloney's use of security concerns to deny Kosilek adequate treatment.

> If Maloney, *in good faith, reasonably* decides that there is truly no way that he can discharge both his duty to protect safety and his duty to provide Kosilek with adequate medical care, and concludes that security concerns must trump the recommendations of

> qualified medical professionals, a court will have to decide
> whether the Eighth Amendment has been violated

*Id.* at 162 (emphasis added).

17.    Indeed, Commissioner Maloney had asserted during *Kosilek I* that the risks associated with security concerns were too great to permit hormone therapy for GID. In a reassessment, following *Kosilek I*, Commissioner Maloney's staff approved hormones for Kosilek after finding <u>no</u> security concerns relative to providing the treatment. *See* July 29, 2003 memorandum from Luis Spencer to Michael Maloney ("It is my understanding that Dr. Warth has given his approval for an estrogen patch and a lupron injection. I have reviewed the possible cause and effect as it relates to the security and operations of MCI-Norfolk and do not feel that there are any concerns at this time.") (Appendix Ex. 1).

18.    In conclusion, the Court anticipated the potential for judicial review of the precise decision by the Defendant now being challenged:

> If psychotherapy, hormones, and possibly psychopharmacology are not sufficient to reduce the anguish caused by Kosilek's gender identity disorder to the point that there is no longer a substantial risk of serious harm to him, SRS might be deemed medically necessary. If that occurs, Malony may consider whether security requirements make it truly necessary to deny Kosilek adequate care for his serious medical need. If and when he makes such a decision, *a court may have to determine again whether the Eighth Amendment has been violated.*

*Kosilek I* at 195 (emphasis added).

**B.    The Parties**

20.    The plaintiff is indigent, a transsexual prisoner serving a life sentence.

21.    As the Defendant acknowledges, she is the sole decision-maker relative to Kosilek's recommended SRS. Although the Defendant does not usually make decisions

regarding medical care, the decision whether Kosilek receives SRS – indeed, any decision regarding progressive treatment for GID -- rests squarely with her.[2]  *See* Dennehy Dep. at 268 (Appendix Ex. 2); Guidelines for Assessment and Treatment of Inmates with Gender Identity Disorders ¶ 3 ("Guidelines") (Def. Ex. 5).

**C.   SRS as Treatment for Gender Identity Disorder**

22.     The Harry Benjamin International Gender Dysphoria Association's *Standards of Care*, Sixth Version (February 2001) ("*Standards of Care*" or "*Standards*") "describe the generally accepted treatment for individuals with gender identity disorders in the community." 221 F. Supp. 2d at 166.[3]  The *Standards of Care* establish a triadic treatment sequence comprised of hormone therapy, a real-life experience living cross-gendered, and sex reassignment surgery. *Id.*  The Court cited to the *Standards* extensively in its decision in *Kosilek I*. *See Standards of Care* (Def. Ex. 16).

23.     This Court noted in *Kosilek I* that, under the *Standards of Care*, psychotherapy may provide adequate relief sometimes, while other individuals require hormone therapy in addition. *See Kosilek I*, 221 F. Supp. 2d at 158-59.  Still some patients require further treatment, as the Court explained. "*There are, however, some cases in which SRS is medically necessary and appropriate.*" *Id.* at 159 (emphasis added).

---

[2]  The Defendant was employed by the DOC at all times relevant to this action.  She served as Deputy Commissioner, the second highest level position at the DOC, from August 1997 through November 2003. *See* Dennehy Dep. at 42, 48.  She was appointed acting commissioner on December 1, 2003, and confirmed in her present position on March 16, 2004  *See* Dennehy Dep. at 48.

[3]  The Standards of Care and their significance were described in detail in *Kosilek I*, 221 F. Supp. 2d at 158, 166.

24.    According to the *Standards of Care*, an individual who is recommended to receive SRS must satisfy both an eligibility criteria and a readiness criteria. *See Standards of Care* at 20.

The eligibility criteria consists of:

    1,    Legal age of majority in the patient's nation;

    2.    Usually 12 months of continuous hormonal therapy for those without a medical contradindication;

    3.    12 months of successful continuous full time real-life experience. Periods of returning to the original gender may indicate ambivalence about proceeding and generally should not be used to fulfill this criterion;

    4.    If required by the mental health professional, regular responsible participation in psychotherapy throughout the real-life experience at a frequency determined jointly by the patient and the mental health professional. Psychotherapy per se is not an absolute eligibility criterion for surgery;

    5.    Demonstrable knowledge of the cost, required lengths of hospitalization, likely complications, and post surgical rehabilitation requirements of various surgical approaches; and

    6.    Awareness of different competent surgeons.

The readiness criteria consist of:

    1.    Demonstrable progress in consolidating one's gender identity; and

    2.    Demonstrable progress in dealing with work, family, and interpersonal issues resulting in a significantly better state of mental health; this implies satisfactory control of problems such as sociopathy, substance abuse, psychosis, suicidality, for instance.

*Standards of Care* at 20.

25.     SRS has proven to be effective in cases of profound GID. *Id.* at 18. "Such a therapeutic regimen, when prescribed or recommended by qualified practioners, is medically indicated and medically necessary. Sex reassignment is not 'experimental,' 'investigative,' 'elective,' 'cosmetic,' or optional in any meaningful sense. It constitutes very effective and appropriate treatment for transsexualism or profound GID." *Id.*

**D.     The Relevant DOC Policies Regarding Treatment of Prisoners with Gender Identity Disorder**

26.     The DOC contracts with UMMS to provide medical care and mental health care to inmates in the custody of the DOC.[4] *See* Addendum to the Contract Between the Department of Corrections and the University of Massachusetts Medical School ("Addendum") (Def. Ex. 4).

27.     In December 2002, following this Court's unequivocal ruling that decisions regarding Kosilek's treatment "must be based on an individualized medical evaluation of Kosilek rather than as a result of a blanket rule," *Kosilek I*, 221 F. Supp. 2d at 193 (internal quotations omitted), the DOC amended its contract with UMMS to replace the former freeze-frame policy that prevented inmates with GID, such as Kosilek, from receiving individualized treatment with a policy that allowed progressive or regressive levels of treatment upon appropriate clinical recommendations and approval from the Director of the Health Services Division ("HSD") and the Commissioner of Correction. *See* Addendum at 3; Dennehy Dep. at 107-108.

28.     The Addendum provides that the DOC "shall pay the cost of non-over-the-counter pharmaceuticals, including hormone therapy, necessary for the treatment of gender identity

---

[4] The program at UMMS that provides medical and mental health services to the DOC is sometimes referred to in communications as UMass Correctional Health, or UMCH. The University of Massachusetts Medical School, or UMMS, is used synonymously with UMass Correctional Health for the purposes of this Opposition.

disorder. The Department shall pay the cost of genital surgical procedures. [UMMS] shall be responsible for all other costs." Addendum at 3.

29.   Astonishingly, the DOC never sought to shift these costs to its provider. The language covering the cost of providing SRS was not negotiated between the parties. The DOC drafted the language in the addendum that requires the DOC rather than UMMS to pay the cost of hormone therapy and SRS. *See* Martin Dep. at 28-29 (Appendix Ex. 3). The Defendant testified that she is unaware of any negotiations between UMMS and the DOC with respect to UMMS assuming the cost of providing hormone therapy or SRS. *See* Dennehy Dep. at 114-15. The clear inference is that the DOC intended to retain control of all decisions relating to hormones and SRS and not to defer to the judgments of the clinicians.

30.   On November 21, 2003, the DOC issued a document, signed by Commissioner Michael T. Maloney, entitled "Guidelines for Assessment and Treatment of Inmates with Gender Identity Disorder" ("Guidelines"). The Guidelines provide that

> any recommendation for progressive or regressive changes in an inmate's level of treatment in effect at the time of incarceration ... shall be reviewed by the Mental Health Program Director. Upon the approval of the Mental Health Program Director, the proposed treatment changes shall be reviewed by the Medical Director. Prior to the implementation of any medically approved progressive or regressive changes in an inmate's treatment for a gender identity disorder, the Director of the Health Services Division and the Commissioner of Correction shall review said changes in treatment as to safety or security concerns that may be posed.

Guidelines.

As will be seen below, the record in this case creates a genuine issue of material fact as to whether this policy was followed. Specifically, the Commissioner and the DOC's Director of Health Services have not followed the recommendation or

clinical judgment of the Mental Health Program Director or the Medical Director, but retained their own GID "expert" even before receiving the clinical recommendations of UMMS.

31.    Around the same time that the Guidelines were issued, Commissioner Maloney directed that a process be implemented in writing specifically relating to treatment for GID to ensure that security reviews occurred for any additional treatment for GID. *See* Dennehy Dep. at 138.

32.    The document that was produced is a flow-chart that shows graphically the process by which treatment recommendations are reviewed by DOC and UMMS officials. *Id.*; GID Decision Points ("Decision Points") (Appendix Ex. 4). The flow chart placed responsibility for security reviews squarely with the Commissioner of Corrections. Notwithstanding that responsibility, the Defendant took no steps whatsoever to investigate security relative to providing SRS once she assumed her current role until this Court ordered her to do so.

33.    What ensued instead was a course of delay orchestrated by the Defendant and the DOC legal counsel designed to delay or forestall treatment.

34.    Moreover, no other medical or mental health condition is given a specialized review process for its treatment. *See* Brewer Dep. at 111, 152 (Appendix Ex. 5). GID is the only medical or mental health condition for which UMMS must always seek final approval from the DOC before providing treatment. *Id.* at 111; *see* July 11, 2003 Minutes from MCI-Norfolk Bay State Correctional Center Quarterly Meeting (Susan Martin stating that "everything needs security clearance (ie – only GID txmts – okay to order other txmts such as antidepressants [without] getting DOC clearance per Sue Martin") (Appendix Ex. 6).

35.    As Dr. Brewer testified, "Usually, we have an internal process that does not involve the Department of Corrections when we're considering recommendations of any kind of treatment for a patient." Brewer Dep. at 111.

> This is the only exception which we have to – once we've reviewed [treatment recommendations by outside consultants or specialists] and think it's appropriate to move forward, that we have to bring to you, the Department of Corrections ... *But there is no other circumstance in which we go to you after we reviewed [a recommendation from an outside specialist]."*

*Id.* at 112 (emphasis added).  Dr. Brewer explained further that the procedures for treating GID differ <u>in every way</u> from the treatment procedures for all other medical condition.

> Q.    ... [W]hat part of the GID review process, or approval process for treatment is unlike all other treatment processes?
>
> A.    Every step of it.

*Id.* at 153.

> Q.    [For example, y]ou received an evaluation by a specialist that an inmate needed a hip replacement and you approved of that evaluation, would you then proceed with providing that hip replacement...?
>
> A.    Yes, we would proceed.
>
> Q.    You wouldn't have to send your recommendation or your approval of the treatment from the specialist to the DOC for a final approval?
>
> A.    No.

*Id.* at 153-54.

36.    The Federal Bureau of Prisons, as part of a settlement in a similar case involving GID treatment, developed a policy whereby the <u>final</u> approval for hormone treatment was made

by the Bureau's <u>medical director</u>. *See Black v. Kendig*, No. 96-2508EGS/DA, 2003 WL

1477018, at *2 (D.D.C. March 18, 2003).

**E.     The Medical Professionals Retained to Diagnose and Treat Kosilek Recommended SRS.**

37.     The mental health experts retained by UMMS to evaluate Kosilek have

consistently recommended that she receive the full course of GID treatment according to the

*Standards*, including SRS. *See* Report of David Seil, M.D., Feb. 23, 2003 at 5 ("Seil") (Def. Ex.

6); Report of Kapila and Kaufman, Fenway Community Health, February 24, 2005 at 5-6

("Fenway Report") (Def. Ex. 9).

38.     Dr. Seil found that Kosilek's GID was intense and deep-rooted.

> It is clear that for her, the gender dysphoria is intense.  It is
> difficult to imagine an environment more suppressive to female
> identity than a male prison, and yet within that environment, Ms.
> Kosilek is living as a female to the greatest extent possible.  This in
> itself has provided some relief but serious distress remains not far
> under the surface.  She has done what she can to obtain relief but
> her basic disorder has been untreated for the years of her
> incarceration.

Seil at 4.

39.     Dr. Seil recommended a five-step treatment regime for Kosilek that would,

contingent upon a subsequent evaluation, culminate in SRS. *Id.* at 5-6.  Dr. Seil explicitly stated

that the evaluation for SRS should take place after the one-year real life experience had occurred.

> Such surgery is the final step in the treatment of GID.  As it is
> highly traumatic and painful surgery, and is irreversible, evaluation
> of its necessity must wait until the year of living as a female has
> occurred.  Ms. Kosilek has lived for many years as female, but not
> with the beneficial effect of hormone therapy and electrolysis.  A
> future assessment needs to be made by an experienced gender

> specialist with Ms. Kosilek after treatment with hormones for a
> year as to whether this step definitely need be taken.

*Id.* at 5.

40. Kosilek received hormone treatment beginning on August 26, 2003. *See* Oct. 29, 2004 email from Susan Martin to Ellen Kittredge, attached Kosilek Timeline ("Timeline") (Appendix Ex. 7). The DOC did not proceed with an evaluation for SRS until January 2005, after Kosilek had brought this case back to court. *See* Fenway Report.

41. After an evaluation, Drs. Kaufman and Kapila, the clinicians at the Fenway Clinic who evaluated Kosilek for SRS, unequivocally recommended SRS for Kosilek. "[I]t is the recommendation of these evaluators that Michelle be able to have sex reassignment surgery." Fenway Report at 6.

42. Drs. Kaufman and Kapila found that Kosilek's ability to live as a woman full-time in a male prison demonstrated her motivation to proceed with SRS, and that her ability to express herself as feminine was helpful in alleviating her distress. *Id.* at 5. They also found that she benefited from hormone treatment.

> She continues to have a strong, persistent cross-sex identification,
> and her desire to continue transitioning through surgery is clear.
> Her ability to live full-time as female in a male prison, as well as
> her record of good behavior and absence of conflict with others,
> suggests intense motivation, as well as real adaptability to her
> environment, despite obvious stressors. Her joy around being
> feminized through hormone therapy, facial and body hair removal,
> and her ability to have access and to dress in feminine attire and
> make-up is palpable. These responses further suggest that being
> able to express herself as female has been helpful in alleviating her
> gender dysphoria....

*Id.* at 5.

43.     Notwithstanding these improvements, Drs. Kapila and Kaufman found that Kosilek continued to experience ongoing significant distress regarding the lack of congruity between her physical and psychological gender.

> Michelle continues to feel quite distressed, both with having male genitalia, as well as not having female genitalia. She emphasized several times that her desire for surgery is not based on sexual interests, but rather a psychological need to bring her body into alignment with her gender identity as a female.

*Id.*

44.     Drs. Kapila and Kaufman concluded that only SRS will provide Kosilek full relief from her continued distress. "It appears likely that this surgery would allow Michelle to have full relief from the symptoms of gender dysphoria she has experienced over the course of her life, and may well increase her chance of survival." Fenway Report at 6.

45.     Drs. Kaufman and Kapila also alerted DOC officials to the likelihood that Kosilek will attempt suicide again if she is not provided with SRS. *Id.* at 5. "Given her previous suicide attempts, her ongoing distress, and the lack of other goals in her life, it is quite likely that Michelle will attempt suicide again if she is not able to change her anatomy." *Id.*

46.     Kosilek's regular therapist at the DOC, Mark Burrows, LMHC, believes that hormones have not alleviated her discomfort and that being refused SRS could increase the likelihood of Kosilek attempting suicide. *See* Burrowes Dep. at 39 (Appendix Ex. 8). "The hormonal treatment has alleviated some discomfort but Michelle is still pretty much bothered by the fact of her male genitalia and is very – it is painful for her to still have male genitalia... I believe [not providing SRS] can be detrimental to her, that not going forward with this could possibly further increase her risk of making an attempt on her life." *Id.* at 38-39.

**F.    Plaintiff's Three GID Experts Concluded That SRS Is Medically Necessary**

47.    Three expert GID consultants unequivocally recommend SRS for Kosilek. *See* Brown Report at 8 ("Brown") (Def. Ex. 11); Ettner Report at 11 ("Ettner") (Def. Ex. 12); Forstein Report at 6 ("Forstein") (Def. Ex. 13).

48.    Dr. Brown believes that denying SRS would result in a high likelihood of self-harm for Kosilek. "Risks of withholding the treatment far outweigh the clinical risks of providing it. For example, a return of depression, hopelessness, and despair that will likely be followed by attempts at autocastration and/or suicide can be predicted with a high degree of medical certainty." Brown at 7-8.

49.    Dr. Brown unequivocally recommends SRS for Kosilek:

> M.K. meets or exceeds all eligibility and readiness criteria for referral for the final stage of treatment for her severe GID, which is SRS. This treatment is not only appropriate at this time, but was probably appropriate in February, 2005 when she received the recommendations from two qualified mental health professionals at the Fenway Community Health Clinic. She now has three recommendations from doctoral level mental health care practitioners supporting the finalization of her treatment plan. Further delays in treatment are not clinically appropriate and should be strictly limited in the interests of resolving the suffering associated with severe GID in the "half male, half female" limbo that preoperative transsexuals must endure. This limbo is especially difficult for inmates who are frequently exposed to strip searches in front of other inmates and have a very limited degree of physical privacy.

*Id.* at 8.

50.    Indeed, Dr. Brown does not recommend SRS for every patient whom he evaluates.

> While some individuals with less severe forms of GID can reasonably accommodate to a plan that stops short of SRS (for

example, psychotherapy, hormones, and cross living to a greater or lesser extent), I have never seen a patient with this level of severe GID achieve resolution of gender dysphoria without SRS."

*Id.* at 7.

51.  Dr. Brown does not diagnose Kosilek with any other mental health conditions other than GID, only noting that she has antisocial traits by history but specifically stating that she has "no diagnosis of antisocial personality disorder." *Id.* at 5.

52.  Dr. Ettner, who has evaluated more than two hundred patients for surgical readiness, finds that Kosilek satisfies the readiness criteria for SRS.[5]  She also finds that that SRS "is the necessary medical treatment to relieve the profound distress of this disorder." Ettner at 10.  She concludes that Kosilek will face a greater risk of harm as she advances in age because "gender dysphoria intensifies over a lifetime." *Id.* at 11.

53.  Dr. Ettner administered the Minnesota Multiphasic Personality Inventory-2[6] to Kosilek in response to Cynthia Osborne's "peer review," though she does not administer psychological testing to her own GID patients.  *See* Ettner at 6.  The results are included in her report. *Id.* at 6-8.  Dr. Ettner found that the "test results are not consistent with any Axis I or Axis II disorders, and support the clinical findings." *Id.* at 8.

---

[5]  Dr. Ettner does not explicitly state that Kosilek satisfies the eligibility criteria.  She focuses on the readiness criteria, apparently because the determination of this criteria "rest[s] upon the *clinician's judgment*." Ettner Report at 9 (emphasis in original).

[6]  For information on the Minnesota Multiphasic Personality Inventory, better known as the MMPI-2, *see* Aff. of Randi Ettner at 1-2, filed on Nov. 15, 2005 with Plaintiff's Motion in Opposition to Defendant's Rule 35 Motion (Appendix Ex. 9).

54.     Dr. Forstein also recommends that Kosilek receive SRS. *See* Forstein at 5 ("I believe that this surgery is the next step in the medically necessary treatment of a lifelong Gender Identity Disorder."). As he explains, a denial of surgery will cause Kosilek to "self-destruct":

> I believe that Kosilek is prepared and would benefit from such surgery, and that to deny it in the context of lifetime incarceration would precipitate a concerted effort on her part to self-destruct. I do not think that she is suffering from a biological depression at this time, but rather that she is committed to the idea that living as a complete female is the only acceptable option. Thus, I believe that this surgery is the next step in the medically necessary treatment of a lifelong Gender Identity Disorder.

*Id.* at 4-5.

55.     Dr. Forstein diagnoses Kosilek only with GID. *See* Forstein at 4. He states that Kosilek's incarceration does not indicate a diagnosis of antisocial personality disorder.

> [M]ost of the earlier behavior which is assumed in Ms. Osborne's report to suggest such a diagnosis can be explained as well by a history of trauma, drug abuse, and the psychological impact of trying to avoid the conflicts brought about by a transgender identity and the attitudes of society.

*Id.* at 6.

56.     Dr. Forstein agrees with the opinion of Drs. Kapila and Kaufman at the Fenway Clinic that a diagnosis of antisocial personality disorder, even if present, would not rule out SRS. As he analogized, "[i]nmates who need dialysis, heart surgery, etc. would not be denied treatment based on the presence of antisocial personality disorder." *Id.*

57.     Dr. Forstein, Dr. Brown, and Dr. Forstein all reject the suggestion that Kosilek may be attempting to manipulate the DOC through her threats of suicide. *See* Brown at 3; Ettner at 10; Forstein at 7. As Dr. Brown states:

> As a psychiatrist who has spent much of his professional career dealing with patients who have much to gain by presenting themselves in a certain light, I am quite familiar with the issues of

> "secondary gain," "gaming the system," and other tactics
> employed by those who wish to use an evaluation to their
> advantage. In this case, the "secondary gain" would be to obtain
> treatment that includes irreversible surgical excision of the
> inmate's genitals. In the absence of a psychosis or another non-
> GID condition on Axis I, I am hard pressed to develop a rational
> explanation for which someone would work so fervently to obtain
> this serious, painful surgery other than as a part of a multimodal
> treatment for GID.

Brown at 3.

In Dr. Forstein's words: "In 24 years I have never met in a clinical situation any male who voluntarily wished to remove his genital organs to prove a point or manipulate a system."

Forstein at 7.

**G.    Delay in Providing Individualized Treatment Since *Kosilek I***

58.    The DOC and the Defendant were explicitly on notice as of the August 28, 2002 decision in *Kosilek I* that Kosilek required an "individualized medical evaluation." Following the decision, Kosilek was placed on a suicide watch and, as a result, could not shave her facial hair, giving her a more masculine appearance. This caused extreme anxiety and distress. Kosilek became increasingly frantic regarding treatment. *See* Burrowes Dep. at 66-67. On October 30, 2003, in an effort to jump start the treatment process, Kosilek's counsel filed an application for attorney fees for the prior trial. *See* Sept. 11, 2003, Memorandum and Order, *Kosilek I* (C.A. 92-12820-MLW) (Appendix Ex. 10).

59.    Only thereafter, in January 2003, did the DOC select a specialist to reevaluate Kosilek. *See* Timeline. Kosilek was evaluated by Dr. Seil on February 21, 2003, nearly six months after the decision in *Kosilek I*. *See* Seil.

60.    Following the *Standards of Care*, Dr. Seil's report recommended hormone therapy in combination with electrolysis, access to gender appropriate personal items, facial and

other feminizing procedures, and SRS contingent upon a further evaluation and Kosilek living

successfully for one year as a female. "A future assessment needs to be made by an experienced

gender specialist with Ms. Kosilek after treatment with hormones for a year as to whether this

step definitely need be taken." *Id.* at 5.

**H.     Delay in Implementing Dr. Seil's Unambiguous Clinical Recommendations**

61.     On April 29, 2003, Kosilek attended her first scheduled appointment with Dr.

Maria Warth, an endocrinologist, in anticipation of hormone treatment. After two subsequent

appointments with Dr. Warth, Kosilek began hormone treatment on August 26, 2003. *See*

Timeline.

62.     Contrary to Dr. Seil's recommendations that hormone therapy be implemented "in

combination" with electrolysis, the DOC and the Defendant required Kosilek to wait six months

after hormone therapy had begun before she was considered for electrolysis or laser hair

removal. *See* April 10, 2003 email from Greg Hughes to Christopher Mitchell (Appendix Ex.

11).

63.     Rather than reviewing the security concerns with providing Kosilek with laser

hair removal or electrolysis immediately after commencing her hormone therapy, so that she

could receive the laser hair removal or electrolysis after the six months interval as determined by

the DOC, the DOC's mental health staff did not approve laser hair removal until April 2004, and

did not begin the security review until that time. *See* April 7, 2004 email from Greg Hughes to

Luis Spencer (Appendix Ex. 12).

64.     Because the DOC did not begin the security review for Kosilek's laser hair

removal or electrolysis in a timely manner, the review was not completed until July 2004. *See*

Timeline. Kosilek did not receive her first treatment for laser hair removal until November 1 2004, 20 months after Dr. Seil's evaluation. *See* Nov. 16, 2004 letter from Susan Martin to Michelle Kosilek (Appendix Ex. 13).

**I.  Rather Than Evaluating Security Concerns, The Defendant's Staff Begins To Look For Alternative Clinicians To Present A Different View of SRS To The Court.**

65.  The Defendant did not arrange for Kosilek to be evaluated for SRS following her one year of hormone treatment. Rather, she and DOC officials began considering litigation experts to support her position against providing SRS -- indeed, this occurred as far back as June 2004. *See* Appelbaum Dep. at 266-267 (Appendix Ex. 14).

> Q:  What indication did you have as of June 10, 2004 that DOC wanted to retain a psychoanalyst as an expert witness to argue in court that the treatment for selected inmates is not logical?
>
> A:  Well, I don't know that they in fact wanted to retain such a person. I think there had been some discussion and statements that someone with psychoanalytic expertise and point of view could potentially point out some of the alleged illogical aspects of this treatment but I don't know that there was any discussion of an actual intent on their part to retain such a person. It was more general discussion that ... *that type of point of view could be a useful point of view for ... the court to hear and to consider in making these determinations in their opinion.*
>
> Q:  Who had said that?
>
> A:  I can't precisely recall. It would have either been to the best of my recollection Mr. Hughes [the Commissioner's mental health services coordinator]or Miss Martin [the DOC Director of Health Services] or potentially both of them.

*Id.* (emphasis added).

**J.  Retention of Defendant's Expert Cynthia Osborne**

66.    During the summer of 2003, Defendant's counsel drafted a list of questions for potential evaluators of Kosilek. *See* Hughes Dep. at 87 (Appendix Ex. 15).

67.    By at least September 29, 2004, the DOC located Cynthia Osborne, the licensed clinical social worker who now serves as a principal GID expert for the Defendant. *See* Sept. 29, 2004, DOC/UMCH Executive Staff Meeting Minutes (Appendix Ex. 16).

68.    Ms. Osborne, who had been retained by the states of Virginia and Wisconsin to testify at trial, was affiliated with Johns Hopkins University School of Medicine, which is well known in the GID medical community as an outlier on the issue of treatment for GID. *See* Osborne Report at 1 ("Osborne II") (Def. Ex. 15); Paul McHugh (former Chairman, Johns Hopkins Psychiatry Department), *Surgical Sex*, God Spy: Faith at the Edge, Jan. 26, 2005, *at* http://www.godspy.com/issues/Surgical-Sex-Sex-Change-operations-by-Paul-McHugh.cfm (describing author's impact on Johns Hopkins's approach to GID) (last visited March 8, 2006) (Appendix Ex. 17).

69.    Greg Hughes, the regional administrator for mental health at the DOC, told the executive staff meeting of the DOC and UMMS on September 29, 2004 that Ms. Osborne is "more sympathetic to [the] DOC position," as recorded in notes taken by Dr. Appelbaum. *See* Sept. 29, 2004, DOC/UMCH Executive Staff Meeting Minutes.   At the October 6, 2004 executive staff meeting, DOC officials decided to contact Ms. Osborne, after noting that she had "worked with Virginia & Wisconsin (both in current litigation)" and that Mr. Hughes "heard [she] may do more *objective* evaluations." Oct. 6, 2004, DOC/UMCH Execute Staff Meeting Minutes (Appendix Ex. 18) (emphasis added).   Following this meeting, Mr. Hughes asked Dr.

Arthur Brewer, the medical director at UMMS, to contact Ms. Osborne. *See* Hughes Dep. at 107.

70.    Mr. Hughes also told UMMS officials that Ms. Osborne did not believe an inmate such as Kosilek could have a "real-life experience" in prison, as required under the Standards of Care. *See* April 6, 2005, DOC/UMCH Execute Staff Meeting Minutes (Appendix Ex. 19).

71.    Mr. Hughes also noted that Osborne did not believe SRS was appropriate in a prison. *See* Appelbaum Dep. at 277.

72.    As the DOC anticipated – indeed, this was the sole or principal reason its officials had selected her -- Ms. Osborne told Dr. Brewer of UMMS that she believed making an informed diagnosis of GID for an incarcerated person is difficult. *See* Brewer Dep. at 138.

73.    Dr. Appelbaum advised DOC officials that retaining Ms. Osborne presented problems because she was not licensed in Massachusetts and, therefore, not qualified to evaluate Ms. Kosilek for the purposes of treatment. *See* Nov. 3, 2004 DOC/UMH Executive Staff Meeting Minutes ("Dr. Appelbaum noted not having Massachusetts licensed [sic] presents credentialing problem. Also have other issues. Forensic evaluation considered practicing medicine in many states.") (Appendix Ex. 20).

74.    While the Defendant's staff was working with Ms. Osborne, UMMS officials were struggling to find an expert acceptable to the DOC. *See* Appelbaum Dep. at 273.

**K.    Kosilek's Evaluation at the Fenway Clinic**

75.    After searching for, but failing to locate, other Massachusetts clinicians credentialed to evaluate Kosilek, the DOC retained Drs. Kapila and Kaufman at the Fenway Clinic. Dr. Kaufman was familiar to the DOC by this time, because she had been retained to

provide information and supervisions sessions to UMMS clinicians treating inmates with GID.

*Id*. Drs. Kapila and Kaufman interviewed Kosilek on January 18, 2005 and prepared an

evaluation on February 24, 2005. *See* Fenway Report.

76.     In their report, Drs. Kaufman and Kapila recommend that Kosilek receive SRS.

*See* Fenway Report at 6; discussion *supra* ¶¶41-45.

77.     The officials who oversee the DOC's medical and mental health program, Arthur

Brewer, M.D., and Kenneth Appelbaum, M.D., respectively, both endorsed the recommendation,

which they consider medically necessary. *See* Sept. 1, 2005 letter from Appelbaum and Brewer

to Susan Martin at 3 (Appendix Ex. 21).

> From what we have been told by Dr. Kapila and Dr. Kaufman, it is
> our understanding that further delay in providing the recommended
> treatment likely will result in continued or increased levels of
> distress for each afflicted individual, with the possibility of self-
> inflicted injury. To that extent, we also view the treatment
> recommendations as medically necessary.

*Id*.

## L.     Criticism of UMMS by the Defendant's Legal Staff and Director of Health Services

78.     The Defendant acknowledges the Fenway Report to be the recommendation from

Kosilek's "treating clinician" that Kosilek "has a serious medical need for sexual reassignment

surgery because it involved a substantial risk of serious harm to her if not adequately treated."

*See* Dennehy Dep. at 157, 213.  Indeed, following the Fenway Report's release on February 24,

2005, UMMS officials informed DOC officials through discussion that the recommendations

were "clinically appropriate and that [they] had no clinical basis to question the

recommendations as far as their indications or contraindications." Appelbaum Dep. at 304.

79.     On April 15, 2005, UMMS filed a status report with the Court to the same effect. UMMS stated: "Dr. Brewer and Dr. Appelbaum have informed the DOC that they are presently unaware of any known medical or mental health contraindication to providing SRS to the plaintiff." April 15, 2005 Status Report of the Defendants, Correctional Medical Services, Inc., University of Massachusetts Medical School, Dr. Arthur Brewer, Dr. Harrison O'Connor, and Dr. Kenneth Appelbaum (Appendix Ex. 22).

80.     That candid report to this Court triggered a prompt rebuke from the Defendant's staff. On April 28, 2005, the DOC sent a letter by HSD Director Susan Martin, but drafted virtually in whole by the Defendant's legal counsel, to Drs. Brewer and Appelbaum at UMMS criticizing their review of the Fenway Report and its recommendations. *See* April 28, 2005 letter from Martin to Brewer and Appelbaum (Appendix Ex. 23).

81.     Ms. Martin asserted that the UMMS Status Report filed by UMMS counsel pursuant to this Court's order "fails to address the lack of detail, clarity and specific recommendations in the evaluation done by the Fenway Clinic." Notwithstanding the earlier discussions in which UMMS doctors had informed Ms. Martin regarding their assessment of the Fenway Report, Ms. Martin admonished Drs. Brewer and Appelbaum for their failure "to provide the Department with your recommendation, as the DOC's medical provider, to the appropriateness of the medical treatment recommended in the Fenway Clinic's consultation for inmate Kosilek, and whether UMMS supports that recommendation." April 28, 2005 letter from Martin to Brewer and Appelbaum (emphasis in original).

82.     In a May 10, 2005 reply, Drs. Appelbaum and Brewer informed Martin that they are "aware of no mental health factors that would clinically warrant rejection of the Fenway

recommendations and that, from a mental health standpoint, the treatment recommended in the

Fenway report for Michelle Kosilek appears to be reasonable and appropriate." May 10, 2005

letter from Appelbaum and Brewer to Martin at 1 (Appendix Ex. 24). They further state:

> We have consistently indicated to you at our meetings that we
> defer to the Fenway staff regarding the propriety of sexual
> reassignment surgery in the case of Michelle Kosilek. Our prior
> implementation of hormone therapy and laser hair removal for
> Michelle Kosilek similarly was based on the recommendations of
> Dr. Seil and required your approval before they could be
> implemented. We have also consistently advised you that we are
> aware of no mental health factors that would clinically warrant
> rejection of the Fenway recommendations and that, from a mental
> health standpoint, the treatment recommended in the Fenway
> report for Michelle Kosilek appears to be reasonable and
> appropriate, since the patient has met criteria for the diagnosis of
> gender identity disorder and has reached a point in clinical
> treatment where sexual reassignment surgery, if desired, would be
> the next step.

*Id.* at 2.

83.    In a May 25, 2005 reply, Martin continued to assert that Drs. Appelbaum and

Brewer had failed to state whether providing SRS for Kosilek was medically necessary. *See*

May 25, 2005 letter from Martin to Brewer and Appelbaum (Appendix Ex. 25).

> Your reluctance to provide a review as to the appropriateness or
> necessity of irreversible sex reassignment surgery recommended
> for inmate Kosilek is quite perplexing. This is especially so in
> light of the deficiencies apparent in the Fenway Clinic
> evaluation.... As you know, the Department is obligated under the
> Eighth Amendment to provide adequate medical treatment for an
> inmate's serious medical needs. However, the February 24, 2005
> evaluation by the Fenway Clinic does not indicate whether sex
> reassignment surgery is a medical necessity for Michelle Kosilek.
> Nor has UMMS provided any guidance with regard to the issue of
> whether the sex reassignment surgery recommended for inmate
> Kosilek is based on a medical necessity.

*Id.* at 1.

84.     According to Ms. Martin, the failure of Drs. Appelbaum and Brewer to critically review the Fenway Report required the DOC to retain Ms. Osborne. "In the absence of a thorough review of the Fenway [Report] by UMMS, DOC contracted with an experienced GID professional, Cynthia Osborne, to conduct a peer review of the Kosilek evaluation and recommendations." *Id.* at 2.

85.     Contrary to Ms. Martin's assertion in the May 25, 2005 letter, however, the DOC had spoken to Osborne in September 2004 and retained Osborne by at least April 12, 2005, three days prior to the Status Report filed by UMMS and two weeks before Ms. Martin's first critical letter to Drs. Appelbaum and Brewer. *See* April 12, 2005 letter from Susan Martin to Cynthia Osborne (Appendix Ex. 26). Thus, the DOC decided to and did in fact retain Ms. Osborne to conduct a peer review of the Fenway Report prior to ever receiving a corresponding review by UMMS or Drs. Appelbaum and Brewer.

86.     In a June 14, 2005 reply, Drs. Appelbaum and Brewer described Ms. Martin's concerns as "disingenuous":

> we repeatedly have made it clear to you that we do not possess significant expertise upon which to base an independent assessment of whether a patient would be an appropriate candidate for SRS or other medical treatment for GID. Rather, we have consistently and reasonably relied upon the assistance of outside consultants for assessment and treatment recommendations for patients with GID and we have consistently tried our best to assist you in understanding those recommendations.

June 14, 2005 letter from Appelbaum and Brewer to Martin at 2 (Appendix Ex. 27).

87.     In a August 29, 2005 reply, Ms. Martin asked Drs. Appelbaum and Brewer to advise her whether the "peer review" report by Cynthia Osborne, *see infra* ¶ 110, had changed the opinions of Drs. Kapila and Kaufman, the clinicians who evaluated Kosilek at the Fenway

Clinic and drafted the Fenway Report recommending SRS. *See* August 29, 2005 letter from Martin to Appelbaum and Brewer (Appendix Ex. 28).

88.    In a September 1, 2005 letter, culminating this exchange, Drs. Appelbaum and Brewer informed Ms. Martin that they concluded that SRS was medically necessary for Kosilek. *See* Sept. 1, 2005 letter from Appelbaum and Brewer to Martin at 2;[7] Appelbaum Dep. at 338 (acknowledging the letter was written in regards to Kosilek).

89.    As Drs. Appelbaum and Brewer explained, the treatment recommendations for each inmate referred to in the September 1, 2005 letter "have not yet been implemented because we continue to wait for approval by DOC." Sept. 1, 2005 letter from Appelbaum and Brewer to Martin at 1.

90.    Drs. Appelbaum and Brewer also informed Ms. Martin that the DOC's repeated requests for further information regarding the treatment recommendations received by the Fenway Clinic appear contrary to the procedures implemented by the DOC for the treatment of inmates with GID in the contract Addendum. *See* supra ¶¶26-28:

> Even under the Addendum, once a request for certain treatment of GID has been forwarded to DOC to review any "safety or security concerns that may be posed" we are supposed to receive a response from DOC regarding the approval or rejection of the recommendations. Rather than provide us with a response approving or denying the treatment recommendations for these patients, you have sent us letters requesting further details, which we believe have already been explained to you, without approving or denying the specific treatment recommended.

Sept. 1, 2005 letter from Appelbaum and Brewer to Martin at 1.

---

[7] The September 1, 2005 letter concerns six or seven inmates in the custody of the DOC receiving treatment for GID who had received evaluations and treatment recommendations from Fenway Community Health. *See* Appelbaum Dep. at 337.

91.     Most critically, Drs. Appelbaum and Brewer stated their unequivocal endorsement of the recommendations received by the Fenway Clinic:

> From what we have been told by Dr. Kapila and Dr. Kaufman, it is our understanding that further delay in providing the recommended treatment likely will result in continued or increased levels of distress for each afflicted individual, with the possibility of self-inflicted injury.  To that extent, we also view the treatment recommendations as medically necessary.

*Id.* at 2.

**M.     The Defendant Invested Substantial Resources in Opposition to Plaintiff's Treatment.**

92.     Consistent with past practice, the DOC did not investigate security relative to providing SRS until after it was required to do so by an order of this Court.  *See* April 25, 2005 Order, *Kosilek v. Dept. of Corr.* (C.A. 00-12455-MLW) (Appendix Ex. 29).

93.     Indeed, the lion's share of the Defendant's attention to this issue was devoted not to security issues, but to building a media case.  The Defendant granted access to local television news reporter Joe Bergantino's "I-Team" to do a documentary ultimately broadcast as "Sex Changes Behind Bars."  *See* Joe Bergantino, *Sex Changes Behind Bars*, CBS4, May 25, 2005 *at* http://cbs4boston.com/iteam/local_story_145210838.html (video and transcript) (last visited March 8, 2006) (Appendix Ex. 30).  The documentary, which aired two weeks prior to the filing of the Defendant's report on safety and security relative to SRS, focused on the cost of sex reassignment surgery.  *Id.*  The Defendant not only met with the Bergantino team herself, including a videotaped interview, she provided access to her high ranking staff for information.  Ms. Martin informed employees from Mr. Bergantino's program that providing full treatment to Kosilek would cost in excess of $100,000.  *See* Martin Dep. at 101.  Neither the Defendant nor

any other DOC official informed Mr. Bergantino that the DOC had not asked UMMS to pay the costs of SRS in its capitation contract. *See* Dennehy Dep. at 130.

94.     The documentary also mentioned that the Defendant's neighbor, Massachusetts state Senator Scott Brown, *see* Dennehy Dep. at 77, planned to file legislation to prevent the state from providing SRS, *see Sex Changes Behind Bars*. Although the program aired before the Defendant's safety and security report was filed, it correctly predicted that the Defendant would tell this Court that providing SRS would result in a "security nightmare." *Id.*

95.     The DOC has willfully attempted to interfere with Kosilek's positive relationship with her regular therapist, at one point threatening to terminate his employment. *See* Burrows Dep. at 26; Kosilek Dep. at 77-78 (discussing her relationship with Mr. Burrows) (Appendix Ex. 31).[8]

**N.     The Defendant Officially Denies Kosilek's Recommended Treatment.**

96.     In its April 25, 2005 Order, this Court required the Defendant to inform the Court by June 10, 2005 whether it would provide SRS to Kosilek and, if not, to explain the reasons for not providing SRS. *See* April 25, 2005 Order.

---

[8] In a telling circumstance, following *Kosilek I* Mr. Burrows gave Kosilek a book written by a professor who suffered from GID about the professor's experience with GID. *See* Burrows Dep. at 24. As a result of the loan of the book, DOC officials held meetings without Mr. Burrows where they discussed terminating his employment. *Id.* at 45. The mental health director at the DOC, Suzanne Bergeron, was opposed to giving the book, and asked Mr. Burrows if he were a "rogue therapist." *Id.* Ms. Bergeron also told Mr. Burrows, in a related context, that he shouldn't "advocate" for Kosilek. *Id.* at 29. Kevin Casey, the regional director of mental health at the time, asked Mr. Burrows if he wanted to be a "team player." *Id.* at 26. DOC officials eventually acknowledged that giving the book to Kosilek was an appropriate clinical decision. *Id.* at 27

97.     On June 10, 2005, the Defendant informed this Court in a status report that it would not provide Kosilek with SRS. *See* June 10, 2005 Status Report of Defendants Massachusetts Department of Correction and Michael T. Maloney at 1 (Appendix Ex. 32).

98.     The Defendant purported to base her denial of Kosilek's recommended treatment on the Defendant's safety and security report, entitled *Defendant Department of Correction's Report on Anticipated Safety and Security Concerns Arising from the Allowance of Inmate Michele Kosilek's Request for SRS*[9] ("Security Report") (Def. Ex. 17), as well as Defendant's expert Cynthia Osborne's "peer review" of the Fenway Report, both of which were attached to the status report. *Id.*

**O.     The Security Report**

99.     The Defendant submitted the Security Report only upon a direct order from this Court and not, as required under its Guidelines, in response to the recommendations in the Fenway Report. *See* April 25, 2005 Order; Guidelines.[10]

100.    The Security Report identified the location of the surgery out of state as a principal security concern, partly due to the length of time required out of state and the number of officers required to guard Kosilek. *See* Security Report at 2.[11]

---

[9] The mere title of this report demonstrates the Defendant's misunderstanding of the subject matter of this dispute and, moreover, her cavalier attitude toward Kosilek's serious medical need. Kosilek is not "requesting" SRS; rather, her doctors have recommended this surgery as medically necessary treatment for her serious medical condition. *See* Fenway Report at 5.

[10] The Security Report was drafted by Defendant's counsel in consultation with Defendant, who first saw a draft of the Security Report one or two days prior to its filing. *See* Dennehy Dep. at 210

[11] The DOC transports far more dangerous and infamous inmates out-of-state when the purpose of the transportation benefits the department. *See* Shelley Murphy, Convicted Murderer alleges prison bias, *Boston Globe*, Feb. 9, 2006, at B5 (describing Massachusetts inmate serving a life sentence for brutal rape and murder as incarcerated in Arizona) (Appendix Ex. 33).

101.   The Defendant claims that Kosilek's recommended surgery cannot be performed in Massachusetts. *See* Security Report at 5. However, she never made any efforts to determine whether this statement was true. *See* Dennehy Dep. at 228. In fact, the Defendant acknowledged that her security concerns would be partially alleviated if a surgeon were able to come to Massachusetts to perform the surgery. *Id.*

102.   Dr. Brewer, the medical director at UMMS, attempted to determine whether the four SRS surgeons whom UMMS located would travel to Massachusetts to perform surgery by either looking on their websites or contacting their offices. *See* Brewer Dep. at 146; May 10, 2005 letter from Brewer and Appelbaum to Martin. Dr. Brewer did not seek to determine whether any of the surgeons were licensed in Massachusetts. *Id.* at 147. In fact, Plaintiff will call at trial an SRS surgeon in Illinois, Loren Schecter, M.D., who is willing to travel to Massachusetts to perform the surgery under the appropriate circumstances – that is, he receives temporary licensing or access to a federal institution where licensing may not be necessary, hospital privileges, an appropriate staff, and compensation. *See* Schecter Dep. at 25-26 (Appendix Ex. 34). Dr. Schecter also has some experience operating on inmates. *Id.* at 12-13.

103.   The Security Report states that Kosilek "has a history of flight" because she was apprehended out of state for the crime for which she is currently incarcerated, 16 years ago, while dressed as a woman. *See* Security Report at 2.

104.   Kosilek has no history of flight during her 14 years of incarceration. *See* Dennehy Dep. at 225-26. She blacked out following her alleged crime and has no memory of her flight out of state. *See* Kosilek Dep. at 120. Kosilek has received no disciplinary reports during her incarceration and no history of escape. *See* Dennehy Dep. at 227. The Defendant

admits that Kosilek "is a good inmate" and "she has no disciplinary reports." *Id.* In fact, the

Defendant acknowledges that Kosilek qualifies for low-security status under the current

classification system, though her life sentence prevents this. "With a zero score he actually

scores out for prerelease... Mass. General Law prohibits the placement of lifers in prerelease."

*Id* at 225.

105.    The Defendant's second principal security concern used to justify her denial of

Kosilek's recommended treatment is Kosilek's confinement post-surgery. *See* Security Report at

3.  The Defendant states that incarcerating Kosilek at either MCI-Framingham, a female state

prison, or her current male prison of MCI-Norfolk present serious safety and security concerns.

*Id.* "It is anticipated that housing inmate Kosilek at MCI-Framingham would create serious

climate issues within the prison. Inmate Kosilek's presence at MCI-Framingham would likely

exacerbate the mental health problems experienced by the inmates, many of whom have been

victims of domestic violence." *Id.* at 4.

106.    Kosilek has had an entirely uneventful history at MCI-Norfolk in which she has

never been attacked or faced physical threats or abuse. *See* Kosilek Dep. at 59.

107.    The Defendant testified that the DOC has possibly confined post-operative male

to female transsexuals at MCI-Framingham and has definitely confined pre-operative male to

female transsexuals at MCI-Framingham. *See* Dennehy Dep. at 239.  Other states have separate

transgendered prison units, and those that do not will transfer transgendered prisoners to states

that do. *See* Bob Hookway, *Transsexual Sentenced in Sister's Murder,* Valley News, Dec. 6,

2002, *available at* http://www.vnews.com/12062002/800356.htm (describing New Hampshire

post-operative male-to-female transsexual who was transferred to Connecticut for incarceration

because the state has a prison unit for transgendered inmates) (last visited March 3, 2006)

(Appendix Ex. 35); *Transsexual murderer housed in Washington state prison*, Portsmouth

Herald, Dec. 8, 2003, *available at*

http://www.seacoastonline.com/2003news/12082003/news/e.htm (last visited March 9, 2006)

(describing same inmate as being eventually transferred to women's prison in Washington state)

(Appendix Ex. 36).

    108.    The Defendant also acknowledged that if a *known* post-operative male to female

transsexual were arrested and imprisoned in Massachusetts, the DOC would find a way to house

the inmate.

> Q:    What if the inmate were known to be transsexual?  What arrangements would be made for that custody?
>
> A:    That would create – clearly create some protective custody needs which would tend to want to result in placement in the special management unit.
>
> Q:    And would you make those arrangements or would you tell the court that you could not provide custody within the Department of Corrections for that individual?
>
> A:    *We don't get to say no at the front door.*
>
> Q:    So you would make whatever arrangements were necessary?
>
> A:    Yes.
>
> Q:    If the court were to enter a decision which resulted in Michelle Kosilek having sexual reassignment surgery, you would make arrangements as well?
>
> A:    If Michelle Kosilek were to end up having surgery, we would make whatever arrangements we had to.

Dennehy Dep. at 246-247 (emphasis added).

109.   Furthermore, the Defendant admits that a post-operative male-to-female transsexual who was not known to be transsexual would possibly be confined in the general population at MCI-Framingham.

> If the inmate were not known, were able to come in through the front door and not have celebrity status accorded to that offender, not be perceived by other inmates as being treated differently or specially, did not in effect disclose medical information, there would be a possibility that we could try the inmate in general population.

*Id.* at 246.

## O.   Cynthia Osborne's "Peer Review"[12]

110.   On May 20, 2005, Ms. Osborne issued her "peer review" of the Fenway Report, which was based on a review of the Fenway Report and Dr. Seil's report, as well as the reports of Dr. Brown, Dr. Forstein, and Dr. Robert Dickey submitted in *Kosilek I. See* Cynthia Osborne, LICW, Peer Review Report, May 20, 2005 at 1 ("Osborne I") (Appendix Ex. 38). Ms. Osborne did not meet with Kosilek at any time prior to drafting her "peer review." *Id.* Astonishingly, the Defendant did not include Osborne's "peer review" in her Memorandum of Law, despite the enormous effort by her staff to use it to discredit the Fenway Report's recommendations.

111.   Osborne's 12-page "peer review" includes only <u>one</u> citation to a published article in a medical journal to support her contentions. *See* Osborne I at 3. In fact, Osborne's "peer review" is merely an extended assertion that the Fenway Report should not be relied upon to

---

[12] As a licensed clinical social worker, Ms. Osborne is not appropriately qualified to issue a peer review of medical care, as she does not have the same credentials as Drs. Kaufman and Kapila. *See* American Medical Association Policy H-375.997 (3) ("Voluntary Medical Peer Review") (stating that "physicians should be ultimately responsible for all peer review of medical care") (Appendix Ex. 37).

determine Kosilek's treatment, with virtually no citing references to support her bald

contentions.

112.    Although her assignment was limited to a "peer review" of the Fenway Report

and its recommendation for SRS, Ms. Osborne revisted the issue of hormone therapy, expressing

her personal view that it is unfair to treat incarcerated criminals for GID when "criminals in the

real world don't qualify for hormones or surgery." *Id.* at 5.

> With the standards as they are, how it can be justified that
> criminals in the real world don't qualify for hormones or surgery
> but incarcerated criminals do, or that non-incarcerated individuals
> must so often face and adjust to losses associated with their
> inability to access, for any number of reasons, desired feminizing
> options but incarcerated individuals must not, is, in my opinion,
> beyond reason.... In my view, providing surgery, or even
> hormones, to incarcerated individuals, is an undeniable lowering of
> the Standards [of Care], and an explicit violation of the criteria
> regarding sociopathy and suicidality.

*Id.*

**P.    Response of the Fenway Clinic to Cynthia Osborne**

113.    At the request of DOC staff, UMMS gave the Osborne report to the Fenway

clinicians for review.  Citing to ample, published authority,  Drs. Kapila and Kaufman of the

Fenway Clinic refuted virtually every assertion and critique included therein.

114.    On October 7, 2005, Drs. Kapila and Kaufman issued their report entitled

"Response to Cynthia Osborne" in which they responded to the concerns raised by Osborne's

"peer review." *See* Response to Cynthia Osborne ("Response to Osborne") (Appendix Ex. 39).

116.    Specifically, Drs. Kapila and Kaufman cite studies refuting several unsupported

claims made by Osborne:

**Question of Axis II Diagnosis**

Osborne: "In my opinion the apparent absence of any consideration of Axis II conditions reflects an incomplete evaluation that increases the risks of harm from surgical interventions.  Clarity regarding the presence, absence, nature and severity of Axis II pathology is critical because, when present, it complicates a GID diagnosis and renders it more difficult to say with certainty what motivates an individual's self-harming threats or behaviors."  Osborne I at 2.

Kapila/Kaufman: "An Axis II diagnosis is not a rule out for the diagnosis of GID, nor is it relevant to the diagnosis or clinical treatment of GID."  Response to Osborne at 3.

**Suicide, Self-Harm and GID**:

Osborne: While it is not my role to determine the inmate's diagnosis, I am compelled to clarify that in my opinion, which is in concert with my collegial community at the Johns Hopkins School of Medicine and with other colleagues and gender clinics around the nation, that *threats or gestures of suicide or self-harm signal serious mental illness, apart from GID, that demands to be taken seriously, requires treatment in and of itself, and contraindicates SRS.*[13] Osborne I at 3 (emphasis in original).

Osborne: "[T]here is a virtual absence of data documenting either elevated rates of suicide in patients with GID or casual link between GID and self-harm."  *Id.* (no citations follow this assertion).

Osborne: "There is substantial empirical evidence of an association between personality disorders and self-harming and suicidal behaviors. *Id.* at 4.  (No citations follow this assertion.).

Kapila/Kaufman: "The literature is replete with studies linking suicide with people who have GID."  Response to Osborne at 3-4 (thirteen studies cited in support).

.

---

[13] Osborne cites no authority for this proposition, other than the unsupported assertion that others at Johns Hopkins School of Medicine and "gender clinics around the nation" agree with her.

Kapila/Kaufman: "The particular type of self-harm can often be correlated with specific diagnoses. Self-harm in people with GID is qualitatively different from self-harm in people who have Borderline Personality Disorder. Types of self-mutilating behavior typically associated with people with Borderline Personality Disorder include cutting, burning, scratching, and skin picking or abrading, suicidal gestures, and parasuicidal behavior, such as overdosing. The most common areas that are cut or burned tend to be the arms, legs, and sometimes the torso... *In stark contrast, self-harm in the transgender population frequently takes the form of mutilating one's genitalia.*" Response to Osborne at 4 (multiple internal citations omitted) (emphasis added).

### Lack of corroborating reports

Osborne: "While the inmate meets criteria for GID as an adult, there appears to be no external validation of his self-reports of earlier symptoms, other than police reports that confirm that he was cross-dressed when arrested following his wife's death." Osborne I at 7.

Kapila/Kaufman: "External validation is not called for by the [Diagnostic and Statistics Manual, Fourth Edition], is not commonly accepted to be the standard of care, and *would be subjecting Kosilek to a different standard than anyone else assessed for GID.*" Response to Osborne at 7 (emphasis added).

### Treatment for incarcerated patients

Osborne: "[T]he standards include a criterion of being crime free ("satisfactory control of problems such as sociopathy, substance abuse, psychosis and suicidality").[14] This is without exception accepted as the community standard in competent gender clinics throughout the world. Imprisonment presents, in my opinion, an inherent and irresolvable contradiction to this standard, and an implicit contradiction to the notion of personal mastery over one's sociopathic leanings." Osborne I at 5.

---

[14] Osborne revises the *Standards* here to require being "crime free," which is nowhere to be found in the *Standards*. As she indicates in the ensuing parenthetical, she creates this requirement out of the legitimate condition in the *Standards* that a patient must have satisfactory control of his/her sociopathy, etc., which is not synonymous with being crime free.

Kapila/Kaufman: "Kosilek has shown clear evidence of increased mental health during the time she has been in prison. She shows demonstrable progress in controlling sociopathic behavior, with an excellent record of conduct for the past fifteen years. She gets along well with both inmates and prison staff, so much so that she earned a single cell ten years ago. She continues to have this privilege today. Kosilek has also shown satisfactory control of substance abuse, with which she had a serious problem prior to incarceration." Response to Osborne at 8.

**Real-Life Experience in Prison**

Osborne: "Incarcerated individuals are usually individuals who cannot make adequate psychosocial adjustment in the real world, and who would rarely if ever succeed in a real life experience in the real world. Prison life is a context that renders existing standard treatment guidelines unrealistic and impossible." Osborne I at 5.

Kapila/Kaufman: "Osborne subtly distorts the intended meaning of the Real-Life experience… The point of having such an experience is to provide the person with an awareness of what to expect in a different gender role. 'The real-life experience tests the person's resolve, the capacity to function in the preferred gender' … and 'assists both the patient and the mental health professional in their judgments about how to proceed.' (Standards of Care, 2001)… *Ironically, living as a female in an all-male prison is actually a more stringent Real-Life Test. An outpatient client cannot be monitored 24 hours a day, and therefore the therapist or gender team must rely on their report regarding [the client's] status as living full-time. In a prison, however, the inmate is monitored around the clock. If she does not present herself as female full-time, it will be immediately obvious. Furthermore, living as a female in an all-male prison further tests the inmate's ability to be female in a system that is humiliating and unresponsive to her.*" Response to Osborne at 9 (second internal citation omitted) (emphasis added).

117.    Drs. Kapila and Kaufman also found Osborne's clinical judgments and

recommendations to be inappropriate considering that she had never evaluated nor even met

Kosilek:

> It should again be noted that Osborne never met with the inmate.
> Rather, she based her challenges to our treatment
> recommendations on a review of Kosilek's chart, without meeting
> or evaluating Kosilek. Given this, Osborne admitted to the
> inappropriateness for her to diagnose Kosilek, so it is unclear why
> she does not appear to see the inappropriateness for her to form
> clinical treatments judgments and treatment recommendations.

Response to Osborne at 13-14.

118.   Drs. Kapila and Kaufman concluded by reiterating their recommendation for SRS

for Kosilek:

> Kosilek has been unwavering in her wish for surgery. There is no
> evidence that she might change her mind. Given her continued
> psychological distress, despite the treatment she has already had
> for GID in making a social and hormonal transition, SRS is the
> only treatment at this point that would ameliorate Kosilek's
> continued gender dysphoria.

Response to Cynthia Osborne at 14.

119.   The Response to Osborne was sent by Dr. Appelbaum of UMMS to Peter

Heffernan, the acting director of the health services division at the DOC, on October 17, 2005.

*See* Oct. 17, 2005 letter from Dr. Appelbaum to Peter Heffernan, included in Response to

Cynthia Osborne.

120.   When the Defendant was deposed by Kosilek's counsel on January 5, 2006, she

had not yet received the Response to Osborne or learned that it had been issued. Dennehy Dep.

at 267.

## ARGUMENT

This case differs significantly from the overwhelming majority of deliberate indifference

claims brought by prisoners. In this case, Kosilek seeks only her *prescribed treatment* -- she is

not requesting treatment that the DOC's medical staff has refused to provide. She merely asks

this Court to ensure that the Defendant does not obstruct the medical staff's recommended

treatment. What this case is about is a willful and deliberate refusal to follow the clinicians

explicit recommendations.

Astonishingly, the Defendant continues to insist that the Eighth Amendment only

requires that "some type of medical treatment be made available to the transsexual prisoner."

Def. Memo. at 11. This assertion was considered and rejected by this Court in *Kosilek I*. 221 F.

Supp. 2d at 185-86. Indeed, the Defendant consistently cites the same cases in support of her

position which this Court found unpersuasive in *Kosilek I*. *See* Def. Memo. at 11-12; *Kosilek I*,

221 F. Supp. 2d 221 at 191-92.

## I.   DEFENDANT AS THE MOVING PARTY HAS THE BURDEN TO DEMONSTRATE A COMPLETE ABSENCE OF FACTS TO SUPPORT KOSILEK'S CASE.

Summary judgment may only be granted if the nonmoving party has failed to make a

showing sufficient to establish the existence of an element essential to that party's case. *See*

*Torraco v. Maloney*, 923 F.2d 231, 232 (1st Cir. 1991). The moving party bears the burden of

demonstrating the absence of evidence to support the nonmoving party's case. *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The record must be examined in the light

most favorable to the nonmoving party, with all inferences drawn in the nonmoving party's

favor. *See Torraco*, 923 F.3d at 233.

To establish an Eighth Amendment violation on the basis of inadequate medical care, a

prisoner must show that prison officials have demonstrated deliberate indifference to a serious

medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Kosilek I*, 221 F. Supp. 2d at 160.

Prison officials act with deliberate indifference when they know of and disregard an excessive risk to an inmate's health. *Kosilek I*, 221 F. Supp. 2d at 189, *citing Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994). In order to obtain an injunction on the basis of a finding of deliberate indifference, an inmate must show: 1) a serious medical need; 2) inadequate treatment of the serious medical need; 3) deliberate indifference as the cause of the inadequate treatment; and 4) the deliberate indifference is likely to continue into the future. *Kosilek I*, 221 F. Supp. 2d at 161. Deliberate indifference may be found where a prison official fails to provide an inmate with her prescribed treatment, *id.* at 181, or where an official chooses an easier and less effective course of treatment, *id.* at 183.

## II.   THERE IS A MATERIAL ISSUE OF FACT AS TO WHETHER KOSILEK CONTINUES TO HAVE A SERIOUS MEDICAL NEED.

This Court found in *Kosilek I* that Kosilek's condition created a "substantial risk of serious harm until [s]he receives adequate treatment." *Id.* at 184. That conclusion was well-buttressed by the medical testimony; Kosilek had been diagnosed with GID by Dr. Forstein, the clinician retained by the DOC to diagnose Kosilek, and by many qualified experts before and since. GID is defined as a major mental illness by the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition – Text Revision ("DMS-IV-TR). *Kosilek I*, 221 F. Supp. 2d at 163.

Defendant now claims that Kosilek has been adequately treated because she "has shown improvement in response to the GID treatment provided." *See* Defendant's Memo at 13. Far from being adequately treated, the record overwhelmingly compels the conclusion that the treatment provided, while beneficial, has not significantly reduced Kosilek's "intense emotional

distress, and the related risks of suicide and self-mutilation, to the point at which [s]he would no longer be at a substantial risk of serious harm." *Kosilek I*, 221 F. Supp. 2d at 185.

Since the decision in *Kosilek I*, Kosilek has been diagnosed as requiring additional treatment in several subsequent evaluations. Fenway Report; Brown at 3; Ettner;[15] Forstein at 3.[16] The UMMS medical officials overseeing the provision of medical and mental health services at the DOC "also view the treatment recommendations as medically necessary." *See* Sept. 1, 2005 letter from Appelbaum and Brewer to Martin. These clinicians show remarkably uniformity concerning the risks of not providing SRS to Kosilek. "A return of depression, hopelessness, and despair that will likely be followed by attempts at autocastration and/or suicide can be predicted with a high degree of medical certainty." Brown at 7-8. "[T]o deny [SRS] in the context of lifetime incarceration would precipitate a concerted effort on her part to self-destruct." Forstein at 4. "[The risk of suicide] is not a symptom of any depressive disorder. It is a reaction to the dysphoria [Kosilek] is experiencing." Ettner at 11.

The clinicians retained by the DOC, Drs. Kapila and Kaufman, have concluded that "it is quite likely that [Kosilek] will attempt suicide again if she not able to change her anatomy." Fenway Report at 5. Kosilek "continues to have a strong-persistent cross-sex identification" and "continues to feel quite distressed, both with having male genitalia, as well as not having female

---

[15]  Plaintiff's expert Dr. Randi Ettner did not explicitly diagnose Kosilek with GID in her report submitted on October 31, 2005, but only because she was instructed to assess and evaluate Kosilek for eligibility and readiness for SRS. She concluded that Kosilek was ready. *See* Ettner.

[16]  Dr. Seil explicitly included SRS as step 5 in his recommendations, though he stated that Kosilek required a subsequent evaluation before proceeding with the surgery. *See* Seil at 5.

genitalia." *Id.* Indeed, Kosilek's GID remains a serious medical need for the very fact that it has not been adequately treated.

The Defendant, nonetheless, seeks credit with this Court for a "check-the-box approach" to Kosilek's treatment. "[P]laintiff has been provided with GID treatment in the form of female hormones, laser hair removal, access to female undergarments and canteen items, and regular therapy with a mental health clinician. Such treatment clearly meets the standard of adequate medical treatment for GID." Defendant's Memo at 12. Contrary to the Defendant's assertions, however, an inquiry into the adequacy of the treatment received must focus on the *effect* on Kosilek, not on a list of what has been provided. "Adequate care is tailored to an *inmate's particular medical needs* and is based on *medical considerations.*" *Kosilek I*, 221 F. Supp. 2d at 160 (emphasis added); *see Jesionowski v. Beck*, 937 F. Supp. 95, 102 (D. Mass. 1994) ("The seriousness of a need may also be determined by reference to the effect of the delay of treatment.") (internal quotations omitted).

The undisputed evidence indicates several material issues of fact concerning the effect of Kosilek's treatment to date. The clinicians at the Fenway Clinic, the mental health provider for the DOC, and Kosilek's three GID experts, uniformly agree that SRS is Kosilek's medically necessary treatment. As this Court said, "Typically, [a serious medical need] is a need that has been diagnosed by a physician as mandating treatment." *Kosilek I*, 221 F. Supp. at 160 . Based on Kosilek's "particular medical needs," *id.*, SRS is the only adequate treatment available.

In the same way that a cancer patient does not receive *per se* adequate treatment by being provided with chemotherapy if his tumor remains after such treatment, Kosilek's hormone treatment does not constitute *per se* adequate treatment, as the Defendant would have it.

Treatment for GID is a process in which different therapeutic regimes are administered, in a sequence and to an extent tailored by the clinician, including hormone therapy and a real-life experience of living cross-gendered for one year. *See* Standards of Care at 12-18. Because "every case is unique," *Kosilek I*, 221 F. Supp. 2d at 192, the Defendant did not automatically provide adequate care by administering some of the regimes. Kosilek "is not entitled to the care of her choice," *Kosilek I*, 221 F. Supp. 2d at 180, but the DOC's own doctors – not Kosilek – have chosen SRS as her recommended treatment.

SRS for Kosilek is a medically necessary treatment. According to the Standards of Care, SRS "when prescribed or recommended by qualified practitioners, is medically indicated and medically necessary." Kosilek's treating clinicians believe that the surgery is "medically necessary," *see* Fenway Report at 5; the mental health care provider for the DOC believes that the surgery is "medically necessary," *see* Sept. 1, 2005 letter from Appelbaum and Brewer to Martin: and Kosilek's three experts agree, *see* discussion *supra* ¶¶ 47-57. In these circumstances, it is astonishing that Defendants contends that there is no genuine issue of material fact regarding the adequacy of Kosilek's treatment.

Defendant's experts Dr. Schmidt and Ms. Osborne opine that the surgery is not medically necessary. *See* Schmidt at 9 (Def. Ex. 14); Osborne II at 9. Ms. Osborne applies her own unique definition of medical necessity: "Medical necessity is a term used in the insurance industry, with the intent to define those medical interventions without which the likelihood of a patient's illness or condition worsening is high." Osborne II at 9. Although Ms. Osborne denies it, this definition supports rather than refutes the conclusion that SRS is medically necessary – as the Fenway clinicians conclude that "this surgery would allow Michelle to have full relief from the

symptoms of gender dysphoria she has experienced over the course of her life, and may well increase her chance of survival." Fenway Report at 6. Furthermore, Ms. Osborne and Dr. Schmidt reflexively rule out surgery for prisoners as a valid treatment option[17] as Dr. Dickey ruled out hormone treatment in *Kosilek I*. *See Kosilek I*, 221 F. Supp. 2d at 173. This disagreement is to be decided by the trier of fact and not on summary judgment.

Courts across the country have shown deference to the professional judgments of the clinicians who treat prisoners. In *Kiman v. New Hampshire Dept. of Corr.*, the inmate was diagnosed in prison with amyotrophic lateral sclerosis, the degenerative neural disease commonly known as Lou Gherig's disease. 301 F.3d 13, 25 (1st Cir. 2002). Prison officials denied plaintiff a number of his requests for accommodations, including a cane for walking, a chair for showers, quick access to food because he could not stand in line for an extended period, a cell on a low-number floor to avoid stairs, and an accessible toilet.

> Permitting him the means for his daily walks, cuffing his hands in front rather than in back, providing him with a chair for his shower, exempting him from food lines, and giving him a cell that did not require him to climb stairs are matters of apparently small import to the prison yet of enormous significance to Kiman.

*Id.* at 24-25. The Court found that the "prison's failure to do these things, in the context of his illness and its consequent disabilities, can easily be called deliberate indifference to [the inmate's] welfare. *Id.* at 25.

Even relatively minor conditions can constitute serious medical needs. In *Dullen v. Chesire County*, the inmate claimed a pre-existing elbow injury that needed prescribed

---

[17] Dr. Schmidt's and Ms. Osborne's approach to the treatment of GID differs so far from the generally-accepted medical standards that Kosilek intends to file a *Daubert* motion to exclude their expert reports.

medication, which prison officials denied. No. 05-CV-139-PB, 2005 U.S. Dist. LEXIS 16637, at *8 (D. Mass. June 23, 2005). The inmate also was denied replacement dentures. *Id.* at *10. The court found that both the elbow injury and the need for dentures constituted serious medical needs under the Eighth Amendment. *Id.* at *8-10. *See also Tvelia v. New Hampshire Dept. of Corr.*, No. 03-537-M, 2004 U.S. Dist. LEXIS 937, at * 9 (D.N.H Jan. 27, 2004) ("Inadequate dental care can support a valid § 1983 action challenging conditions of confinement protected by the *Eighth Amendment*.") (emphasis in original). In *Reise v. Wall*, an inmate was diagnosed with "severe" sleep apnea, ie., snoring, and offered several treatment options, all of which were denied by the prison. No. 04-158-ML, 2005 U.S. Dist. LEXIS 13799, at * 10-11 (D.R.I. June 2, 2005). The court found that the inmate presented a "serious medical need for *Eighth Amendment* purposes." *Id.* at 11 (emphasis in original).

Indeed, "[m]erely because a condition might be characterized as 'cosmetic' does not mean that its seriousness should not be analyzed" under the normal deliberate indifference jurisprudence. *See Brock v. Wright*, 313 F.3d 158, 164 (2d Cir. 2003) (Calabresi, J.). In *Brock*, the inmate developed a keloid, an abnormal growth of tissue, on his cheek following a knife injury. *Id.* at 161. The keloid caused daily throbbing pain, some tooth decay, and inhibited his facial movements, resulting in lost sleep, and eventually formed a large scar. *Id.* The prison's regional medical director denied a request for a referral to a specialist based on the prison's policy that keloid treatment was cosmetic. *Id.* at 161. In rejecting the district court's holding that the keloid and its accompanying scar were not a serious medical condition, the Court of Appeals for the Second Circuit stated that an inmate does not need "to demonstrate that he or she experiences pain that is at the limit of human ability to bear" or "that his or her condition will

degenerate into a life threatening one." *Id.* at 163.  The *Brock c*ourt did not consider whether the

severity of the inmate's disfigurement due to the keloid constituted a serious medical condition,

but noted that labeling a treatment "cosmetic" did not automatically remove it from deliberate

indifference scrutiny.  Thus, although Kosilek's surgical treatment has been deemed medically

necessary by her treating clinicians and three highly-qualified experts, any disparagement of the

recommended surgery are merely "cosmetic" should not affect the Court's consideration.

   Moreover, Kosilek's recommended treatment of SRS is the only adequate treatment

available.  Drs. Kapila and Kaufman informed the DOC that "SRS is the only treatment at this

point that would ameliorate Kosilek's continued gender dysphoria."  Response to Osborne at 14.

This recommendation was supported by three subsequent evaluations.  *See* Brown; Ettner;

Forstein.  Indeed, Dr. Brown concluded that the "risks of withholding the treatment [of SRS] far

outweigh the clinical risks of providing it."  Brown at 7.  "[C]hoosing the easier and less

efficacious treatment ... may be attributable to deliberate indifference."  *Kosilek I,* 221 F. Supp.

2d at 183, *citing Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

   No legitimate medical disagreement exists concerning the proper course of Kosilek's

treatment.  *See Kosilek I*, 221 F. Supp. 2d at 189.  In *Kosilek I,* Defendant Michael T. Maloney

claimed a disagreement between medical professionals existed regarding Kosilek's treatment

based on a report by Dr. Robert Dickey that concluded Kosilek was not an appropriate candidate

for hormone treatment.  *Id.* at 174.  The Court concluded that Commissioner Maloney had

adopted his policy prohibiting hormones prior to retaining Dr. Dickey.  *Id.*  The Court also noted

that Dr. Dickey imposed "more rigorous requirements before prescribing hormones or

authorizing SRS than prudent professionals in the United States and elsewhere, who adhere to

the Standards of Care." *Id.* In the present action, the Defendant pursues the same deceptive tactic of claiming a disagreement based on evaluations she sought to support her previously-established position against providing Kosilek with further treatment. The Defendant, like her predecessor in *Kosilek I*, did not receive a recommendation contrary to the Fenway Report until the DOC sought out Ms. Osborne, *prior to receiving the Fenway Report*, to rebut any possible recommendation. *See* Hughes Dep. at 100-102 (acknowledging that he contacted Cynthia Osborne in the fall of 2004 because he had heard Ms. Osborne may do "more objective evaluations" than Drs. Kapila and Kaufman). Ms. Osborne was retained by the DOC, not UMMS, in direct contradiction to the usual practice of UMMS retaining outside peer reviewers to assess its provision of medical and mental health care. *See* Dennehy Dep. at 135

Finally, neither this Court nor any mental health clinician has ever considered Kosilek's risk of suicide to be anything other than genuine. The Defendant argues that Kosilek's risk of suicide is an attempt "to manipulate prison officials to obtain ... specific medical treatment." Defendant's Memo. at 20. However, this Court did not find that Kosilek's risk of suicide was manipulative when it ruled in *Kosilek I* that the risk required treatment.

> Kosilek's gender identity disorder, and not any sense of guilt or
> despair about his life sentence, causes him intense and enduring
> mental anguish. It has prompted him to attempt suicide twice
> while incarcerated, and to try to castrate himself as well. There is
> a significant risk that he will attempt to kill mutilate, or otherwise
> harm himself again if he is not afforded adequate treatment for his
> disorder.... *Kosilek's stated intention to commit suicide is not
> merely a threat to manipulate the DOC or the court, but rather a
> sincere manifestation of his mental anguish.* Kosilek will attempt,
> and perhaps succeed, in killing himself if he does not receive
> adequate treatment."

*Kosilek I*, 221 F. Supp. 2d at 184.  Neither Kosilek's treating clinicians at the

Fenway Clinic nor the DOC's medical officials ever viewed Kosilek's suicidality

as manipulative, and Kosilek's three experts flatly rejected the proposition.  *See*

Fenway Report; Response to Osborne at 12; Brown Report at 3; Forstein Report

at 6-7; Ettner Report at 11.

### III.   A Material Issue of Fact Exists As To Whether The Defendant Knows of Kosilek's Substantial Risk of Serious Harm and Has Consciously Chosen to Disregard That Risk

A material issue of fact exists as to whether the Defendant has satisfied the subjective

prong of the deliberate indifference standard by knowing of Kosilek's substantial risk of serious

harm and consciously choosing to disregard that risk.  As the Court of Appeals for the First

Circuit has stated, "[a] state-of-mind issue such as the existence of deliberate indifference usually

presents" a question for a trier of fact.  *Torraco v. Maloney*, 923. F.2d 231, 234 (1st Cir. 1991);

*see Dumer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (describing importance of the

defendant's trial testimony and plaintiff's opportunity to cross-examine for purpose of

determining whether defendant's decision to deny treatment was based on non-medical reasons).

*Torraco* was a jury trial, but the same principle applies here.  The Defendant understands that

Kosilek's GID poses a substantial risk of serious harm and has deliberately chosen to deny

treatment for that risk.  *Farmer*, 511 U.S. at 837-38; *Kosilek I*, 221 F. Supp. 2d at 189-90.  A

material issue of fact, that this Court should judge on the basis of witnesses, also exists as to

whether the security concerns are the Defendant's genuine rationale to deny Kosilek's medically-

necessary treatment.

The Defendant made the decision to deny Kosilek's medically necessary treatment. *See* Defendant's Memo. ¶ 15. In her deposition, the Defendant acknowledged her awareness of the recommendations in the Fenway Report and that Kosilek's treating clinicians believed she had a serious medical need for SRS and would pose a substantial risk of serious harm to her if denied.

> Q:    And the [Fenway] [R]eport concludes that at this time Michelle appears to be ready for sexual reassignment surgery. Did you become aware of that in the report?
>
> A:    Yes
>
> Q:    And also the conclusion that it appears likely that this surgery would allow Michelle to have full relief from the symptoms of gender dysphoria she has experienced over the course of her life and may very well increase her chance of survival. Did you see that in the report?
>
> A:    Yes.
>
> Q:    And did you have any reason to disagree with it at the time you read the report?
>
> A:    I had no reason to take issue.
>
> Q:    Did you understand at the time that you received this report that this was a recommendation by the treating clinician that Michelle Kosilek have sexual reassignment surgery.
>
> A:    Yes.

Dennehy Dep. at 156-67.

> Q:    And do you understand that as of May 27, 2005 the consultant retained by the University of Massachusetts Medical School had made a decision that Michelle Kosilek had a serious medical need for sexual reassignment surgery because it involved a substantial risk of serious harm to her if not adequately treated.
>
> A.    Yes

*Id.* at 213.

> Q:    And [the decision to permit or deny SRS] may even be a
>       matter of life or death.  You understand that?
>
> A:    Yes.

*Id.* at 269.

Thus, the record shows that the Defendant "knows of and disregards an excessive risk to [Kosilek's] health." *Kosilek I*, 221 F. Supp. 2d at 189; *Farmer*, 511 U.S. at 837-38.  The Defendant does not dispute this consciousness of the risk to Kosilek.

## IV.   COURTS DO NOT APPLY A DEFERENTIAL STANDARD WHEN EVALUATING THE SIGNIFICANCE OF SECURITY CONCERNS RELATIVE TO THE DENIAL OF MEDICALLY-NECESSARY TREATMENT.

The Defendant appears to believe that any conceivable security concern grants her *carte blanche* to deny treatment.  "Commissioner Dennehy's decision to deny SRS is not the result of deliberate indifference…but is in response to her constitutional and statutory obligations to provide for plaintiff's safety, the safety of other inmates, and the security of prisons." *See* Defendant's Memo. at 16.  Raising security issues, however, does not automatically insulate a non-medical decision regarding treatment from judicial scrutiny.

First of all, the Supreme Court has never held that security concerns automatically trump a claim of inadequate medical care.  Quite to the contrary, the Supreme Court has *repeatedly* stated that the calculus is different when considering a claim of deliberate indifference to a serious medical need.  In *Whitley v.* Albers, 475 U.S. 312, 320 (1986), the Supreme Court emphasized that cruel and unusual punishment claims must be evaluated with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged." The *Whitley* Court distinguished between Eighth Amendment claims based on a response to a

prison disturbance and those based on the provision of medical services. "The State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities. Consequently, [deliberate indifference] can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates." *Id. Johnson v. California*, 543 U.S. 499, 510-11 (2005). As then-Judge, now Supreme Court Justice, Anthony M. Kennedy stated in 1979 while on the Ninth Circuit:

> "[T]he full protections of the eighth amendment most certainly remain in force [in prison]. The whole point of the amendment is to protect persons convicted of crimes. . . . *Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary.*"

*Spain v. Procunier*, 600 F.2d 189, 193-94 (9th Cir. 1979) (internal quotation marks omitted) (emphasis added).

The First Circuit decision in *DesRosiers v. Moran*, 949 F.2d 15 (1st Cir. 1991), is not to the contrary. In *DesRosiers*, the Court found either that 1) the medical need was adequately treated, or 2) at most, the fault attributable to prison staff amounted to carelessness. *Id*. at 21. In *dicta*, the court stated: "[i]n evaluating the quality of medical care in an institutional setting, courts must fairly weigh the practical constraints facing prison officials." *Id*. at 19. For this proposition, the Court cited *Wilson v. Seiter*, a Supreme Court case decided that same year but in which the Supreme Court did not hold or even state that courts should weigh the practical constraints facing prison officials in considering a claim of deliberate indifference. *See* 501 U.S. 294, 302 (1991). Rather, the *Wilson* Court distinguished between those decisions taken in haste, such as responses to prison disturbances, and decisions in response to a medical need, stating:

"Where ... officials act in response to a prison disturbance, their actions are necessarily taken in haste, under pressure, and balanced against competing institutional concerns for the safety of prison staff or other inmates." *Id.* (internal citations omitted)). Here, the Defendant is not acting in haste but rather has reached an informed - albeit wrong - decision to deny Kosilek's medically necessary treatment.

A recent decision involving equal protection rights rather than inadequate medical care is nonetheless instructive. *Johnson v. California*, 543 U.S. 499 (2005). *Johnson* involved racial classification system in the California prison system, which was implemented for security reasons to prevent violence caused by racial gangs. *Id.* at 502. Prison officials testified that without the racial classification, racial conflict and violence would occur in the prison. *Id.* at 502-03. In its holding, the Court distinguished the issue of racial classification in prisons from its prior authority from *Turney v. Safley*, 428 U.S. 73, 91 (1987), which held that prison restrictions that infringe on certain constitutional rights are valid if "reasonably related" to a legitimate penological interest. Despite the compelling security concerns, the Court held that the racial classification should be examined under strict scrutiny, rather than the more deferential "reasonably related" test of *Turner. Id.* at 515.

The Supreme Court, the *Johnson* decision explained, only applies a reasonableness standard to "rights that are inconsistent with proper incarceration." *Johnson*, 543 U.S. at 510 (internal citations and quotations omitted). A reasonableness standard is appropriate for certain rights, which it classified as rights that are necessarily qualified upon incarceration, such as First Amendment challenges, certain due process claims, and restrictions on the right to marry. *Id.* However, "[t]he right not to be discriminated against based on one's race is not susceptible to the

logic of *Turner*. *It is not a right that need necessarily be compromised for the sake of proper prison administration.*" *Id.* at 510 (emphasis added).  The Court likened this refusal to subject racial classifications in prison to a deferential review to the deliberate indifference standard in Eighth Amendment claims.  "For similar reasons, … [w]e judge violations of that Amendment under the "deliberate indifference standard, rather that *Turner's* "reasonably related" standard.  This is because the integrity of the criminal justice system depends on full compliance with the Eighth Amendment."  *Id.* at 511.

Indeed, as the Court of Appeals for the Seventh Circuit explained, "the policy of deferring to the judgment of prison officials in matters of prison discipline and security does not usually apply in the context of medical care to the same degree as in other contexts."  *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983).  Kosilek's right to medical treatment is "not a right that need necessarily be compromised for the sake of proper prison administration."  *Id.* at 510; *see* Marc J. Posner, *The Estelle Medical Professional Judgment Standard: The Right of Those in State Custody to Receive High-Cost Medical Treatments*, 18 Am. J. L. and Med. 347, 354 n. 45 ("[J]udicial deference to prison authorities' security expertise, known as the "hands-off" doctrine, is generally unwarranted in the medical care context.");  *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974) ("[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution.  When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.").

Numerous federal courts considering claims of deliberate indifference which were defended by security concerns have looked past the prison official's purported basis and found

for the inmate. *See Prewitt v. Roos*, No. 03-35874, 2005 U.S. App. LEXIS 28557, at *6-7 (9th Cir. Dec. 22, 2005); *Simmons v. Cook*, 154 F.2d 805 (8th Cir. 2005); *Madewell v. Roberts*, 909 F.2d 1203, 1207 (8th Cir. 1990); *Rosado v. Alameida*, 349 F.Supp.2d 1340 (S.D. Cal. 2004). In *Prewitt*, for example, prison officials denied an inmate the right to use physical therapy equipment after he had undergone surgery. *Id.* The Court of Appeals for the Ninth Circuit vacated summary judgment for the prison officials, although the officials had denied the use of the equipment for security reasons. As the Court noted, the defendants provided no explanation as to whether the security concerns could be accommodated through limited use of the equipment, supervised use, nor explained why the inmate was allowed to use the equipment in the therapist's office but not in his cell. *Id.* "Issues of material fact therefore remain concerning whether the defendants' complete exclusion of the prescribed equipment was in fact warranted by security concerns, in light of the actual impact on Prewitt's health." *Id.*

In *Madewell*, prison officials required arthritic inmates to sit on the floor rather than use chairs when they performed work due to security concerns with providing them non-anchored chairs. *Madewell*, 909 F.2d at 1205. The Court of Appeals for the Eighth Circuit acknowledged the security concerns but vacated the district court's grant of summary judgment due to the aggravation of the inmate's arthritis caused by sitting on the floor. *Id.* at 1205. As these decisions indicate – and as the Supreme Court instructs -- federal courts do not hesitate to scrutinize prison officials' recitation of security concerns when the constitutional guarantee of adequate medical treatment is implicated.

Thus, this Court should not pay "mechanical deference" to the Defendant's recitation of security concerns. *Procunier*, 600 F.2d at 193-94. What is clear, however, is that this Court in

*Kosilek I* instructed the Defendant, when considering the security ramifications of providing treatment to Kosilek, to appreciate that Kosilek is "living largely as a woman in a medium security male prison. This has not presented a security problem." *Kosilek I*, 221 F. Supp. 2d at 162. The Defendant's history of denials, delays, and sabotage of Kosilek's treatment regimen should impose a skeptical gloss on the Defendant's concerns. This Court explicitly required a showing of good faith and reasonableness on the part of the Defendant when raising security concerns. *Id.* ("If Maloney, *in good faith, reasonably* decides that there is truly no way that he can discharge both his duty to protect safety and his duty to provide Kosilek with adequate medical care..." this Court would need to determine if the Eighth Amendment were violated.). Indeed, although Kosilek contends that a reasonableness standard is overly deferential and not consistent with Supreme Court and other leading federal decisions, even under a reasonableness standard the Defendant's objections are unreasonable and lack good faith.

**V.    A Material Fact Exists As To Whether the Defendant's Security Concerns Are Valid And Not Simply A Pretext to Deny Medically Necessary Treatment**

Several issues of material fact exist regarding the Plaintiff's claim that the Defendant's security concerns are pretextual and offered to justify a predisposed objection to providing SRS. The DOC, under the Defendant's direction, purposefully and deliberately implemented special requirements in order for inmates diagnosed with gender dysphoria to receive treatment. These "never-before" obstacles to receiving treatment for a serious medical need, coupled with the general delay, denial, and sabotage of Kosilek's treatment regiment, should inform the Court's evaluation of the Defendant's security concerns. The facts bear out that no other medical condition has special approval procedures involving the Defendant before treatment may be provided; the Defendant's staff searched far and wide for a GID consultant favorable to its

predisposed position against SRS; and the Defendant's stubborn refusal to provide Kosilek with

any kind of treatment relented only upon direct orders from this Court. "Deliberate indifference

is also evident where prison officials erect arbitrary and burdensome procedures that "result[] in

interminable delays and outright denials of medical care to suffering inmates." *Monmouth*

*County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d. Cir. 1987).

    Prior to the decision in *Kosilek I*, the DOC offered "no real treatment" for prisoners with

GID. *Kosilek I*, 221 F. Supp. 2d at 161. The freeze-frame policy in place then, denying

prisoners with GID progressive treatment while incarcerated, was amended only due to the

Court's ruling that "decisions as to whether psychotherapy, hormones, and/or SRS are necessary

to treat Kosilek adequately must be based on an individualized medical evaluation of Kosilek

rather than as a result of a blanket rule." *Kosilek I*, 221 F. Supp. 2d at 193 (internal citations

omitted). Although adopting a policy that mandates objective, individualized consideration, the

Defendant and the DOC follow a *de facto* practice that will always result in a blanket denial of

SRS.

    Countless acts of deception and delay demonstrate the DOC's and its officials' callous

disregard toward inmates diagnosed with GID. Kosilek waited a full year after this Court

ordered the DOC to provide her with individualized treatment before she received hormones.

*See* discussion *supra* at ¶ 61; *see Hoptowit v. Ray,* 682 F.2d 1237, 1254 (9th Cir. 1982) (stating

that prisons can constitutionally refer inmates to outside medical consultants "if there is

reasonably speedy access to these other physicians or facilities."). Although Dr. Seil

recommended that Kosilek receive electrolysis "in combination with estrogen," *see* Seil Report

at 4, the DOC required Kosilek to wait 14 months after she began hormone therapy before she

received electrolysis. When Kosilek was finally evaluated for SRS, the DOC refused to provide her with the results of the evaluation until Kosilek's counsel sought and received a court order.

Moreover, the DOC and Defendant continue to approach Kosilek's GID treatment – and treatment for all inmates suffering from GID – as a legal and political rather than a medical issue. *See Kosilek I*, 221 F. Supp. 2d at 191. The Defendant and other officials at the DOC have repeatedly ignored explicit recommendations by their medical provider and, with the assistance of legal counsel, sought to limit their obligations to provide adequate medical treatment. The DOC's legal counsel had drafted a list of questions for potential evaluators for Kosilek and other inmates suffering from GID by at least July 2003, more than two years before the stay in this action was lifted. *See* July 18, 2003 email from Susan Martin to Kathleen Dennehy (Appendix Ex. 40); Hughes Dep. at 87. After receiving the Fenway Report recommending SRS, the Defendant had her legal counsel draft the Security Report which she submitted to this Court in response to the Court's order requiring a final decision on whether she would approve SRS. *See* Dennehy Dep. at 210. Around the same time, the DOC's legal counsel drafted letters to Drs. Appelbaum and Brewer at UMMS over the signature of HSD Director Susan Martin. *See* Martin Dep. at 143-44.

DOC officials sought out Cynthia Osborne as a potential evaluator for Kosilek as early as September 2004, *see* September 29, 2004 DOC/UMCH Executive Staff Meeting Minutes, even though she lived in Baltimore, Maryland, ignoring at least two local evaluators – the Fenway Clinic, which sees more GID patients than any other facility in the region, and Dr. Marshall P. Forstein, the chairman of the Harvard residency program at the Cambridge Hospital and an

experienced GID treatment provider.[18]  Moreover, Osborne interested DOC officials not because she had experience with GID, but because she was more sympathetic to the DOC's position, that is, Osborne did not believe that Kosilek could have a real-life experience in prison, *see* April 6, 2005 DOC/UMCH Executive Staff Meeting Minutes, and Osborne had experience in similar litigation, *see* Sept. 29, 2004 DOC/UMCH Executive Staff Meeting.  The history of Kosilek's treatment since *Kosilek I* is exactly what this Court instructed the DOC to avoid.  This Court hoped that officials would act in good faith and sincerely consider the recommendations of the clinicians.  Instead, the Defendant and the DOC approached Kosilek's treatment as a legal battle in which they would only provide treatment upon a direct order from this Court.

**VI.   Regardless of Pretext, A Material Fact Exists As To Whether The Defendant's Purported Security Concerns Are Reasonable and Offered in Good Faith.**

Defendant offers two purported "security concerns" to support its denial of SRS. Material issues of fact exist as to whether both are pretextual.  First, Defendant asserts that fears over the location of the surgery prevent SRS.  Second, Defendant relies on concerns about Kosilek's placement post-surgery.  Such concerns are wholly speculative.  In particular, the claimed security threat arises from the presence of a former man in a woman's prison – MCI-Framingham - and Kosilek's crime of killing her wife.  However, the Defendant's concerns would be mooted by simply housing Kosilek in a separate unit for transgendered inmates, as some states now do, or sending her to a state which has a transgendered housing unit.  *See* Bob Hookway, *Transsexual Sentenced in Sister's Murder,*  Valley News, Dec. 6, 2002, *available at* http://www.vnews.com/12062002/800356.htm (describing New Hampshire post-operative male-

---

[18] The DOC's willingness to look far and wide for agreeable evaluators of Kosilek is well-known to this Court.  In *Kosilek I*, the DOC looked to Canada to find Dr. Dickey.

to-female transsexual who was transferred to Connecticut for incarceration because the state has a prison unit for transgendered inmates) (last visited March 3, 2006).  The Defendant, moreover, ignores Kosilek's history as a model prisoner during her incarceration, her already small, feminine body type, and common sense that tells that many larger, stronger female prisoners who have committed violence against women are already incarcerated in the general population at MCI-Framingham.  When examined, the security issues reveal themselves as nothing more than a smoke-screen without any reasonable basis which should not receive "mechanical deference" at the expense of Kosilek's well-being.  *Procunier*, 600 F.2d at 193-194 (Kennedy, J.).

A.   **It Is Undisputed That Defendant's Pre-Surgery Security Concerns Are Mooted When A Surgeon Is Available to Travel to Massachusetts**

When a qualified surgeon has testified that he is willing to travel to Massachusetts to perform SRS, the Defendant's concerns relating to transportation for treatment must be disregarded.  In her Security Report, the Defendant explained that transporting Kosilek out-of-state to receive the recommended treatment would present an escape risk and require three officers, two transportation vehicles, a nurse, and 24-hour security coverage.  *See* Security Report at 2-3.  These logistical issues relate to the cost of providing treatment, as the Defendant could overcome them easily through providing additional resources, and therefore lack relevancy.  *See Kosilek I*, 221 F. Supp. 2d at 162.  Moreover, Dr. Loren Schecter, a plastic surgeon from Illinois with experience performing SRS, is willing to travel to Massachusetts to perform the surgery.  *See* Schecter Dep. at 26.  At no time, however, has the Defendant or anyone at the DOC investigated the availability and willingness of a surgeon to travel to Massachusetts or the ability to place Kosilek in temporary federal custody to receive treatment, even though the Defendant acknowledges that an in-state surgeon would eliminate her concerns

64

relating to the location of the surgery. *See* Dennehy Dep. at 220, 228. Plaintiff, on the other hand, located Dr. Schecter on her own despite her limited access to such information. By dismissing the possibility of in-state surgery without even a phone-call or an Internet search, the Defendant again demonstrates the lack of good faith underlying her Security Report.[19]

Indeed, the Defendant herself has traveled as far as Dallas to inspect facilities for the purpose of transporting inmates from Massachusetts due to overcrowding. *See* Dennehy Dep. at 230-31. The DOC transfers dangerous inmates out of state when possible if they can locate a suitable alternative placement. *See* Murphy, *supra* at 34, n. 13.

### B.  A Material Issue of Fact Exists As To Whether Post-Surgery Security Concerns Are Reasonable When The Defendant Refuses to Consider Housing Kosilek in a Separate Unit for Transgendered Inmates

The Defendant shows her lack of good faith by refusing to seriously consider the feasibility of either establishing a separate prison unit for transgendered inmates or simply transferring Kosilek to a nearby state that already has such a unit. In her Security Report, the Defendant explains – in one brief paragraph – that creating separate housing unit for GID inmates is not feasible because of the various security levels, stages of treatment, and program and operational needs for each inmate. *See* Security Report at 4. The Defendant fails to explain why these factors have not prevented other states from establishing separate units for transgendered inmates. *See* Hookway, *supra* at 48. The DOC may also transfer Kosilek through the Interstate Corrections Compact to a state with an appropriate prison unit, as New Hampshire

---

[19] The Defendant's failure to consider bringing an out-of-state surgeon to Massachusetts is surprising considering their willingness to retain evaluators from Maryland and Canada to support their denial of treatment.

did when it transferred a post-operative male-to-female inmate to Connecticut because it lacked an appropriate prison setting. *Id.*

C.    **A Material Issue of Fact Exists As To Whether Post-Surgery Security Concerns Are Reasonable When They Are Based on Generalized and Speculative Issues Without Any Consideration of Kosilek's Specific Situation**

Numerous issues of material fact concerning the Defendant's security concerns relating to Kosilek's post-surgery incarceration at MCI-Framingham preclude the granting of summary judgment. A close examination of the concerns shows that they will exist for any high-profile inmate. First, the Defendant acknowledges that the DOC would normally place a post-operative male-to-female transsexual at MCI-Framingham – which would correspond with the practice of other states. Second, the Defendant again ignores the advice of Dr. Appelbaum, the UMMS official overseeing the DOC's mental health services, when she argues that Kosilek's presence at MCI-Framingham will create serious climate issues. Third, fears over Kosilek's celebrity status and its psychological effect on other inmates appear unfounded considering that the DOC, like any state prison, receives high-profile inmates each year and addresses their needs accordingly, and furthermore, that Kosilek has been a high-profile inmate at an all-male prison during her entire incarceration and never been the victim of abuse. Fourth, the claim that Kosilek may pose a threat to other inmates disregards her nonviolent history at MCI-Norfolk – indeed, her record as a model inmate – and her small size. Fifth, any perceived risk to Kosilek's safety could be addressed through the same means that the DOC now addresses those risks – by asking her to sign a waiver of responsibility. The DOC routinely requires inmates to sign such waivers to avoid being placed in segregated units. Finally, the Defendant's allegation that Kosilek's risk of suicide is manipulative and will result in other inmates trying to manipulate the DOC to receive

specialized treatment *ignores once again* the written opinion of her medical staff, this Court, and Kosilek's treating clinicians.

By acknowledging that the DOC would normally place a post-operative male-to-female transsexual at MCI-Framingham, the Defendant demonstrates the special restrictions she has imposed on Kosilek. In her deposition testimony, the Defendant stated that if a post-operative male-to-female transsexual was not perceived by other inmates as receiving special treatment, she would be placed at MCI-Framingham. *See* Dennehy Dep. at 246. This practice would follow that of other states, such as California, and the federal government, which place post-operative transsexuals in prison settings according to their genitalia. *See* Oliver Libaw, *Prisons Face Dilemma With Transgender Inmates*, ABC News, Jan. 22, 2006, *at* http://abcnews.go.com/US/story?id=90919&page=1 (last visited March 8, 2006) (Appendix Ex. 41). As the Defendant readily admits, Kosilek's celebrity status is the distinguishing factor that will allegedly create the unresolvable security problems by her placement in a women's prison. *See* Dennehy Dep. at 246.[20]

The Defendant disregards the opinion of the Dr. Appelbaum by claiming that Kosilek's presence at MCI-Framingham will "create serious climate issues within the prison." *See* Security Report at 4; Bissonnette Aff. ¶ 8 (Def. Ex. 20). According to the Defendant, her presence would allegedly heighten the mental health problems experienced by existing inmates, many of whom have been victims of male abuse. *Id.* Once again, the Defendant has ignored the advice of the DOC's medical staff, which advised that any negative effect on MCI-Framingham

---

[20] Kosilek is cognizant of the DOC's recent failure with high-profile inmate John Geoghan. Any problems relative to the DOC's policies and procedures with such inmates should not be used to further punish Kosilek, however.

inmates' mental health as a result of Kosilek's presence is purely speculative. *See* April 20, 2005 Executive Staff Meeting Minutes (Appendix Ex. 42); Appelbaum Dep. at 295. As Dr. Appelbaum explained to DOC officials prior to the Defendant's Security Report, "a multitude of factors – most much more potentially significant than the presence of a GID inmate, can retraumatize some [inmates]" and the DOC mental health staff "would simply address any potential issues when [and] if they occur as we do." April 20, 2005 Executive Staff Meeting Minutes (handwritten additions to minutes by Dr. Appelbaum). Dr. Appelbaum also testified that he contacted the mental health director at MCI-Framingham regarding this concern and that she concurred in his assessment. *See* Appelbaum Dep. at 297-98. Predicting climate issues such as heightened mental health problems for inmates involves a psychological analysis that exceeds the training and, indeed, the responsibilities of the Defendant.

Furthermore, neither the Defendant nor anyone at the DOC have studied climate issues relating to housing a post-operative male-to-female transsexual at MCI-Framingham. *See* Dennehy Dep. at 240. When pressed on this issue, she merely testified: "I think the shifts in climate become apparent with any high profile offender." Dennehy Dep. at 240-41. As the Defendant's testimony indicates, being a high-profile inmate and receiving SRS have no inherent relationship – well-known inmates exist who are not transsexuals and obscure inmates have been incarcerated who presented themselves as pre- and post-operative transsexuals. *See* Dennehy Dep. at 239. The Defendant can address any problems due to Kosilek's celebrity status when they arise, just as the DOC does with any inmate. The Defendant should not be allowed to use Kosilek's fame in the prison community – which the DOC has created through specialized procedures for GID inmates – to further deny her adequate treatment.

Additionally, being a high-profile inmate at a *female* prison cannot pose a significant security concern when Kosilek has been well-known inmate in a *male* prison throughout her incarceration.  In fact, DOC officials at MCI-Norfolk believe that Kosilek's unique situation has benefited her safety.  As MCI-Norfolk Superintendent Luis Spencer attested in his affidavit, "I believe that Kosilek is perceived by the inmate population as an oddity and is basically left alone by the other inmates."  Spencer Aff. ¶ 4 (Def. Ex. 8).[21]  While Kosilek is undeniably a high-profile inmate, the Defendant fails to explain why her celebrity status at MCI-Norfolk does not pose a problem while it will pose unresolvable problems at MCI-Framingham.  Moreover, the Defendant does not explain how Kosilek's celebrity status poses concerns that are not found with other high-profile prisoners.

Kosilek's small size and record as a model inmate were never considered by the Defendant in assessing the security concerns relating to her incarceration at MCI-Framingham.  Rather, the Defendant merely asserts that Kosilek's crime makes her a potential threat to other inmates.  *See* Security Report at 4; Bissonnette Aff. ¶ 9.  This ignores plain, indisputable facts: at five-foot seven-inches in height and approximately 137 pounds, Kosilek will be smaller than many inmates at MCI-Framingham; many women at MCI-Framingham are incarcerated for violent acts against other women; Kosilek has received no disciplinary reports while incarcerated.  *See* Dennehy Dep. at 227.  Concerns over the perimeter fence at MCI-Framingham, *see* Bissonnette Aff. ¶ 10, lack any relevance to Kosilek's situation, as they are

---

[21]  Spencer does attest that Kosilek's safety will be endangered if she receives SRS and is placed at MCI-Norfolk, although his concerns do not seem credible.  Kosilek is already one of the most, if not the most, well-known inmates at MCI-Norfolk, and she does not face any threats of rape or assault currently.

institutional concerns that need to be addressed separately. Moreover, Kosilek has never attempted to escape while incarcerated. *See* Dennehy Dep. at 223.

Any risk to Kosilek's safety posed by her post-surgery incarceration may be addressed through the DOC's normal practice of asking her to sign a waiver releasing the DOC of responsibility for the perceived threat. Such waivers are common. *See* March 11, 2005 Report from Sgt. John Camelo to Luis Spencer (explaining that Kosilek and another inmate had signed waivers "noting no concern with remaining in population") (Appendix Ex. 43). That the Defendant fails to consider, or even mention, the use of waivers to address situations where the DOC anticipates a potential risk to inmate safety indicates the bad faith pervading the Defendant's security concerns.

Finally, the potential for future manipulative behavior by inmates should not affect Kosilek when no medical professional except those retained by the Defendant has ever considered her actions to be manipulative. In *Kosilek I*, this Court explicitly discounted this allegation by the DOC: "Kosilek's stated intention to commit suicide is not merely a threat to manipulate the DOC or the court, but rather a sincere manifestation of his mental anguish." *Kosilek I*, 221 F. Supp. 2d at 184. The Defendant attempts to circumvent her inability to show that Kosilek's risk of suicide is not sincere by raising the spectra of other inmates using Kosilek's treatment as provocation to engage in manipulative behavior. Dennehy Aff. ¶ 8 (Def. Ex. 1). However, as the Defendant should know, testing the sincerity of an inmate's beliefs is common in prison settings, where officials must routinely consider how sincere an inmate's religious convictions are before approving or denying a specific request for a religious item. The Defendant cannot deny every Muslim a prayer rug, for instance, merely because some inmates

may request one for comfort rather than to pray.  On the other hand, determining the sincerity of a medical condition should not be a great challenge, as medical professionals are trained to do just that.  The Defendant's concern over the potential for manipulative behavior also can be addressed through reasonable procedures and safeguards rather than a blanket denial of SRS treatment.

## Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment should be denied.

March 10, 2006

/s/ Frances Cohen
Frances S. Cohen (BBO# 542811)
Joseph L. Sulman (BBO #663665)
DECHERT LLP
200 Clarendon Street, 27th Floor
Boston, Massachusetts 02116
Phone: (617) 728-7100
Fax: (617) 426-6567
frances.cohen@dechert.com
joseph.sulman@dechert.com
*Counsel for Plaintiff Michelle Kosilek*