UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
******************************
MICHELLE LYNNE KOSILEK,        *
                               *          Civil Action No. 00-12455-MLW
           Plaintiff,          *
                               *
v.                             *
                               *
KATHLEEN M. DENNEHY,           *
                               *
           Defendant.          *
******************************
```

## INFORMATIVE PLEADING RE MMPI

Plaintiff Michelle Lynne Kosilek files herewith material relating to the administration of

the Minnesota Multiphasic Personality Inventory by Randi Ettner, Ph.D, a psychologist trained

in the administration of the test.  The materials submitted include both:  1) the raw data from the

administration of the test, Bates-stamped Kosilek 000167 upon production to defendant, and 2)

the expert disclosure and an affidavit filed by Dr. Ettner.  The latter describe Dr. Ettner's

conclusions relating to the test, as well as the circumstances in which it was administered.

November 17, 2006

Michelle Lynne Kosilek,

By her attorneys,

/s/ Frances S. Cohen
Frances S. Cohen (BBO# 542811)
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA 02110-1726
(617) 951-8000

**MARKING DIRECTIONS**

Use a No. 2 pencil only, and fill in the circles with a heavy, dark mark.

If you want to change an answer, erase it carefully and then fill in the other circle.

Do not make any marks outside the circles.

KOS167

RANDI G. ETTNER PHD CLINICAL PSYCHOLOGIST

October 31, 2005


Frances Cohen, Esq.
Law Offices of Dechert LLP
200 Clarendon Street
Boston, MA 02116-5021


Re: Michelle Kosilek


Dear Ms. Cohen:

At your request, I met with Michelle Kosilek on October 7, 2005, for the purpose of conducting a psychological evaluation. On the basis of this evaluation, I will provide an opinion as to Ms. Kosilek's "readiness" for gender reassignment surgery, as per your instructions.


## BACKGROUND – DEVELOPMENT AND HISTORY

As you know, Michelle Kosilek is an inmate in MCI Prison in Norfolk, Massachusetts, a medium-security correctional facility, where she is serving a life sentence. The history of this individual has been well documented by others, so I will merely provide a brief summary.

Born in Chicago, Illinois [DOB 4/10/49], Michelle and an older sister lived with their mother until Michelle was four years of age. Michelle believes her father was incarcerated at the time. Then Michelle and her sister were placed in an orphanage by their mother, who returned to retrieve them on February 9, 1959, six years later.

Having remarried, the mother brought the children to live with her and her new husband. Michelle recalls this transition as being jarringly at odds with the life she had been accustomed to as a charge of the nuns at St. Hedwig orphanage: "I went from being awakened daily at 5 a.m., before breakfast, to say mass, to living with two alcoholics and being left to wander the streets."

Michelle lived in that one-bedroom home -- in which she slept on the floor -- until age 15. During this period, Michelle reports being subjected to episodic sexual and physical abuse.

Michelle ran away at 15, by which time she was abusing drugs and alcohol. Her sister had also left home. Michelle earned money by engaging in sex with men. The gay community provided both a haven and an abundant source of "johns" and drugs.

In 1967, at age 18, Michelle met a physician who exchanged drugs, including hormones, for sex. In 1968, Michelle was arrested for possession of marijuana and sentenced to prison.

In 1971, after being released from prison, Michelle was badly beaten and stabbed in an alley behind a gay bar she frequented. She spent a year in the army, went on furlough, and was dishonorably discharged. She resumed drinking heavily and using narcotics, and spent most of the seventies in prison for burglary related to her polysubstance abuse.

After release, Michelle spent a period of time working and living at a Salvation Army facility. During a drinking binge, she hitchhiked to Boston, where she would remain. In 1983, she entered a half-way house and became sober. Having completed her schooling in prison, Michelle pursued an advanced degree in social work. Her own experiences with mental health professionals led to a referral to a counselor, whom she married, in 1984.

Michelle lived with her wife and the wife's sons. She was working as a substance abuse counselor, but was fired, allegedly for reporting abuse. She also worked construction jobs, but was injured, and unable to continue in that capacity. Michelle reports that by 1986, she was depressed and relapsing into drug and alcohol use. During a heated fight with the wife, Michelle strangled her, and was sentenced to prison for life.

In 1990, while incarcerated in Bristol County jail, Michelle attempted suicide. She tried to obtain treatment for gender identity disorder, and in 1992, she filed a lawsuit toward that end.


GENDER HISTORY

Michelle Kosilek has a well-established diagnosis of gender identity disorder [302.85 in Diagnostic and Statistical Manual of Psychiatric Disorders, fourth edition]. Previously known as transsexualism, this is a relatively rare disorder, with an incidence of 1 in 11,000 natal males.

While Michelle Kosilek is unlike most transsexuals, in that she is imprisoned for a felony, the elements of her transsexualism are remarkably typical of the people who have this condition.

Michelle relates a lifelong history of gender dysphoria. At age three or four she first had the thought of being a girl. She remembers playing with a certain toy and being told that little boys don't do that, a fact that seemed "incorrect" to her. As a small child, Michelle played mostly with girls and never engaged in competitive sports. When she tried on a dress in the orphanage, she reportedly was beaten and called "Satan's child."

As a preadolescent, reunited with her mother, Michelle experienced a period of breast growth –a common and temporary harbinger of adolescence, caused by a hormonal spike. She was elated. She proudly told her mother about this development, but her inebriated stepfather reacted by assaulting her and lacerating her abdomen with a broken beer bottle.

After leaving home, Michelle was confused about her cross-gender longings. She did not identify with the drag queens she met, who seemed so exaggerated in their comportment and so desirous of sexual activity. Yet, she knew she was not a gay man. Fortunately, the emergence of the Beatles ushered in a climate of "unisexuality", where boys could wear long hair without social derision, and Michelle could remain cloaked in androgyny until the turbulence of adolescence receded and identity galvanized.

By 18 years of age, Michelle was receiving injectable and orally administered estrogens. She was beginning to display the characteristic manifestations of female secondary sex characteristics, most notably breast development. While in prison, Michelle disclosed her gender condition to a psychologist. But outside of prison, after coming to terms with her gender variance and the ego syntonic effect of the hormones, a fierce beating for appearing effeminate frightened her into reviving her male persona.

This "flight into hypermasculinity"—an attempt to cure oneself by plunging into stereotypical male activities, joining the military, or marriage and parenting—is endemic to this population, and is repeatedly documented by clinicians who work with transsexual patients [Brown, 1988]. In the case of Michelle Kosilek, this strategy took the shape of growing a beard, joining the army, working construction jobs, marrying a woman, and attempting "normal" heterosexual relations.

Unfortunately, these defensive maneuvers are all doomed to fail and, in time, the transsexual capitulates to the "transsexual imperative." This is the term used to describe the inexorable pull that causes persons with this condition to leave everything they value and cherish in life in the quest for authenticity. And this destiny is pursued with the full knowledge that it will be undertaken against all odds of success, and will bring to bear the full weight of condemnation and social reproach.

In 1993, Michelle acquired a legal name change. She lived as a female, without benefit of hormones, for the ensuing decade.


SEXUAL HISTORY

Michelle Kosilek's sexual history seems largely devoid of pleasure. As a young person, she was sexually abused by her maternal grandfather. As a preteen and teenager, sex was a commodity to be traded for drugs or money. As a spouse, sex was an activity used to convince herself and others that she was a "normal" male. In this last arena, Michelle apparently had little success: she claims she was largely unable to perform sexually, but did obtain some satisfaction from fantasizing herself as a female in the sex act.

Michelle has relatively low libido, presently and historically. With the onset of puberty, she rarely masturbated, and had an aversion to touching her male genitals. With years of contrary hormone usage, her sex drive dwindled even further. In an attempt at auto-castration, one testicle was strangulated and devascularized. Since then, she has no intentional arousal, and no morning erections nor nocturnal emissions. Her last erection occurred spontaneously, while she was showering.

## MEDICAL HISTORY

Michelle appears to be in good health, both by self-report and by review of medical records. She exercises daily and follows a vegetarian diet. She takes a non-steroidal anti-inflammatory drug daily for chronic cervical arthritis, and antacids for indigestion. She takes no psychotropic medications. She notes some nerve sensation in her right elbow, which she attributes to referred radiculopathy of the cervical spine. She has tested positive for hepatitis A, B, and C. In 1976, she was hit with a brick and lost consciousness.

At present, Michelle receives daily injections of hypogonadal releasing hormone blocker, and transdermal estradiol. She has been on this hormonal regimen since August, 2003. She is monitored by an endocrinologist every ninety days, and all parameters are within normal limits, including cholesterol, blood pressure, and liver function.

## PSYCHIATRIC HISTORY

In 1990s, Michelle Kosilek is reported to have had a depressive disorder, and she received paroxetine for twelve months. In 1991-1992, she made two suicide attempts and one attempt at auto-castration. Michelle has a history of polysubstance abuse, in remission for over a decade.

## CURRENT PSYCHIATRIC STATUS

Michelle Kosilek attends regular sessions with a therapist in regards to her gender identity disorder.

At present, she has no Axis I disorders, save gender identity disorder [302.85]. She has no axis II disorders.

## CLINICAL FINDINGS

Michelle is a 5'7" 128-pound hormonally reassigned Caucasian. She has a small frame and well-toned musculature, and is thin, but well-nourished. She has long hair. She wore a modest amount of make-up and was casually attired and well-groomed. Michelle makes an authentic female presentation. Her gait is normal. She is socially appropriate, pleasant and cooperative. Her thought process was goal-directed and relevant. She completed an MMPI-2 [Minnesota Multiphasic Personality Inventory] test in a focused and systematic manner.

My estimate of Michelle's cognitive ability placed her within or beyond the superior range, far surpassing her educational level. Her mood was euthymic, and congruent: she displayed the full range of affect during the interview, from tearfulness to jocularity. There was no indication of any depressive symptomatology: no anhedonia, rumination, nor anergia. There is no paranoia, grandiosity, loose associations, nor ideas

of reference. There is no evidence of any disorder of thought or affect. Michelle denied any suicidal ideation.

Attention was normal for her age. Processing speed was superior. Speech was fluent, with no evidence of word-finding difficulty. She had no difficulty following instructions, nor inhibiting automatic response tendencies. Eye contact was good. Michelle is oriented in all spheres, and all sensorium are intact. Auditory and working memory are superior. Basic reasoning skills not only are intact, but expand as complexity increases.

Michelle is talkative and erudite. Her style of communication is often histrionic or dramatic. She was observed interacting with several staff members. Her behavior was appropriate. She appears to have good social skills, and was able to educate one lieutenant on the necessity of referring to her as a female, in a manner that was conciliatory with no evidence of stridency.

## PSYCHODIAGNOSTIC FINDINGS

The MMPI-2, the most widely used test in clinical practice, was administered. It employs a number of measures [validity scales] that address the credibility of an individual's responses and provide an objective portrayal of mental health symptoms. I do not administer the MMPI to determine surgical readiness, but am doing so in response to Cynthia Osborne's report.

### Validity Scales

There are nine validity scales. Michelle Kosilek produced a valid test profile. Her K scale is mildly elevated [69], indicating defensiveness. Elevations of K are common in forensic and personnel settings, and high K is correlated with higher education levels in the test-taker. Moderate elevations can reflect greater ego strength and psychological resources (McGrath, Sweeney, O'Malley, & Carlton, 1998).

### Clinical Scales

There are ten clinical scales on the MMPI-2. They are Scale 1: Hypochondriasis [HS], Scale 2: Depression [D], Scale 3: Hysteria [Hy], Scale 4: Psychopathic Deviate [Pd], Scale 5: Masculinity-Femininity [Mf], Scale 6: Paranoia [Pa], Scale 7: Psychasthenia [Pt], Scale 8: Schizophrenia [Sc], Scale 9: Hypomania [Ma], and Scale 0: Social Introversion [Si].

On the clinical scales, her scale 4 is elevated, and scale 3 is slightly elevated. This profile is extremely frequent in correctional facilities. It occurs in 36.8% of inmates in state prison, and 21.5% of inmates in federal prison (Magargee, 1993). No other clinical scales are elevated. Butcher (1992) notes that since scale 4 is very heterogeneous in item content, "interpretation of this scale is somewhat complex."

In order to interpret an elevated clinical scale, one would look to content scales.

### Content Scales

The content scales help in the process of refining interpretations of elevated clinical scales. There are 15 content scales. They convey information about feelings,

personality style and past or current problems. These are: the anxiety scale [ANX], the fears scale [FRS], the obsessiveness scale [OBS], the depression scale [DEP], the health concerns scale [HEA], the bizarre mentation scale [BIZ], the anger scale [ANG], the cynicism scale [CYN], the antisocial practices scale [ASP], the type A scale [TPA], the low self-esteem scale [LSE], the social discomfort scale [SOD], the family problems scale [FAM], the work interference scale [WRK], and the negative treatment indicators [TRT]. Michelle Kosilek scored in the normal range for all, except for familial alienation, a sub-scale of FAM, [T=77]. As items about family alienation and/or family discord are high contributors to scale 4, this accounts for her elevation on scale 4.

Restructured Clinical Scales
    To obtain greater clarity as to the meaning of the clinical scales, restructured clinical scores factor out the "demoralization" component, RCd, which saturates the clinical scales. In Michelle Kosilek's profile, RC4 is not elevated, [nor is RC3]. Graham describes this precise situation:

    The content scales can also be used to clarify the interpretation of high scores on clinical scales. Let's consider the example of a high score on scale 4, suggesting possible antisocial behaviors, family problems, and negative affect. If you find that the Antisocial Practices [ASP] content scale is also high, you should focus on the antisocial inferences for scale 4. However, if the ASP scale is not very high, but the Family Problems [FAM] content scale is high, you should focus on the inferences having to do with family problems and not on those having to do with antisocial behaviors...if a clinical scale score is high but the corresponding RC scale score is not high, it is likely that the clinical scale is high because the test taker endorsed many items having to do with demoralization and not because of the characteristics associated with the core construct (2006).

Supplementary Scales
    On the supplementary scales, a T score of 65 or higher indicates a significant problem: the higher the score, the more pathology present. There are five such scales:
    The Mac Andrew Alcoholism R scale [MAC], differentiates alcoholic from nonalcoholic responders. Michelle Kosilek scored very low on this scale. It has been suggested that the MAC scales measure general antisocial tendencies (Wolf, Schubert, Patterson, Grande, & Pendelton, 1990), with high scorers tending to have diagnoses of antisocial personality disorder.
    The second supplementary scale is the Addiction Potential Scale [APS]. This scale is designed to discriminate between substance abusers and non-abusers. High APS scores serve to alert clinicians. Michelle Kosilek scored low on this scale.
    The third supplementary scale is the Addiction Acknowledgement Scale [AAS]. This scale detects the extent to which an individual acknowledges alcohol or drug use and abuse. Michelle's T score of 65 is elevated, and reflects her admission of alcohol and drug-related problems and prior dependency.

The fourth of the supplemental scales is Post-Traumatic Stress Disorder Scale [PK]. The fifth scale is the Hostility Scale [Ho]. Michelle's scores are normal on these parameters.

Psychopathology Five

There are five scales that select for psychopathology, the Personality Psychopathology Five [PSY-5]. They are aggressiveness [AGGR], psychoticism [PSYC], disconstraint [DISC], neuroticism/negative emotionality [NEGR], and Introversion/low positive emotionality [INTR]. Michelle Kosilek was low on all of these scales except INTR, where she scored T of 66, indicating a tendency towards pessimism. "High scores on INTR scale were positively related to depression and previous suicide attempts" (Graham, 2006).

Harris-Lingoes Subscales

There are 6 Harris-Lingoes Subscales. They are: 1. Depression Subscales, 2. Hysteria Subscales, 3. Psychopathic Deviate Subscales, 4. Paranoid Subscales, 5. Schizophrenia subscales, 6. Hypomania Subscales. All of these were within normal range, except need for affection [T=71].

Measures of Adjustment

A simple but meaningful measure of overall adjustment can be obtained by calculating the average linear T score for the eight clinical scales [excluding scales 5 and 0]. Average T scores greater than 75 are indicative of serious disorders or personality decompensation. Michelle Kosilek has a profile elevation of 53.3. Another method is to use the F validity score as a measure of overall adjustment; the higher the F score, the more maladjustment. Michelle Kosilek has an F score of 51. The Demoralization Restructured Clinical Scale [RCd] is likewise a good measure of overall emotional adjustment. Michelle's T score =50-normal. Finally, Welsh's Anxiety [A] and Barron's Ego Strength [Es] scales are measures of general maladjustment. High scorers on A and low scorers on Es are likely to be quite disturbed. Michelle Kosilek scored low on A [T=41] and high on Es [T=60]. This indicates an ability to cope with the stressors of everyday life (Graham, 2006).

In summary, objective psychodiagnostic test results are not consistent with any Axis I or Axis II disorders, and support the clinical findings.

STANDARDS OF CARE

Every medical condition that requires pharmacological, surgical, or mechanical intervention [physiotherapy] has attendant medical nosology and standards of care, which confer uniformity of treatment for the protection of caregivers and patients. Few medical disorders, however affect the physical appearance of a patient, with the notable exceptions of progeria, neurofibromatosis, porphyria, disfiguring birth defects, and the like. In these cases, social stigmatization occurs. Gender identity disorder, when severe,

requires body modifications which defy social norms, cause havoc in Western society, and confound gender-bifurcated legal systems.

The Standards of Care for gender identity disorders are set forth by the Harry Benjamin International Gender Dysphoria Association. They specifically address the role of the mental health professional, the endocrinologist, and the surgeon in regards to the gender patient, as this complex disorder requires a multidisciplinary approach.

The Standards of Care are explicit in delineating the mental health professional's role. In regards to assessing appropriateness for surgical therapy, they state:

> "The Differences between Eligibility and Readiness Criteria for Hormones or Surgery.
>     A.  Eligibility—the specified criteria that must be documented before moving to a next step in a triadic therapeutic sequence (real life experience, hormones, and surgery)
>     B.  Readiness—the specified criteria that rest upon the *clinician's judgment* prior to taking the next step in a triad sequence. [Emphasis added]

> Two readiness criteria exist:
>     1.  demonstrable progress in consolidating one's new gender identity
>     2.  demonstrable progress in dealing with work, family, and interpersonal issues, resulting in a significantly better state of mental health; this implies satisfactory control of problems such as sociopathy, substance abuse, psychosis, suicidality, for instance.

The Standards of Care do not state that a patient must be law-abiding, or of good moral character, in order to meet the readiness criteria. They do not state that a patient must be free of any and all comorbid psychiatric disorders to meet the readiness criteria. They do not state that persons who have atypical or fluctuating sexual orientations do not meet the readiness criteria. Of course, neither do the standards of care for any medical disorder of adult patients.


THE SURGICAL EVALUATION

To assess the readiness criteria, the mental health professional must interview the patient, and determine whether the patient has, indeed, met the above criteria. I have personally conducted 223 surgical evaluations, to date.

In preparation for this assessment, I have reviewed the medical records of Michelle Kosilek (dating from her incarceration at MCI-Norfolk through April 2005), which you have provided, and administered the MMPI-2. While it is not customary to do psychological testing for surgical evaluations, I have done it in this case, at your request, because of my experience with the MMPI instrument.

The evaluation typically consists of a semi-structured interview which covers the domains of gender, sexual, and medical history, as well as educational background, social relationships, employment history and present work situation. A detailed psychiatric

history, including prior symptoms, treatments, psychopharmacological and therapeutic interventions is also elicited. The clinician must consider the patient's defenses, coping strategies, self-concept, expectations of surgery, preparedness for social, financial, and/or familial loss, stability of thought and affect, and ability to adapt to a major life change. The subjective reports of the patient's "real life experience", how they feel when taking hormones, and how they recall their internal feelings of femininity during childhood, are significant sources of relevant data.

The clinician must rule out any cognitive disorder that may render the patient incapable of understanding the irrevocable nature of surgery, such as dementia, or mental retardation, or any diagnosis that one might confound with gender identity disorder, such as body dysmorphic disorder; or delusional disorder, somatic type, both of which are exceedingly rare.

In a 2003 study of 232 male-to-female transsexuals who underwent surgery, Lawrence found that "readiness"—indicated by clinician judgment--was a better predictor of surgical outcome than "eligibility."


## RECOMMENDATIONS AND CONCLUSIONS

My opinion is that Michelle Kosilek meets and exceeds the readiness criteria for surgical treatment of gender identity disorder. She has consolidated a female identity in a harsh environment, and has overcome seemingly insurmountable obstacles.

Michelle is psychologically stable and intellectually competent. She has an indisputable diagnosis of severe gender identity disorder. She has no other comorbid psychiatric conditions.

The rationale for surgery for this patient is twofold: First and foremost, it would provide appropriate congruent genitalia, which would cure her of gender dysphoria. Second, removal of the target organ [testes] eliminates 80% of testosterone production and involves an entirely different pathophysiology than a medically suppressive regimen. This means that the patient would no longer require costly, daily injections of agonistic agents. The entire hormonal regimen would thus be minimized [low-dose estrogen is still required to maintain bone density], providing considerable health benefits to the patient.

Countless studies have demonstrated that surgery is supremely therapeutic for patients with gender identity disorder. [See Lawrence for a review of over 70 studies in 13 countries, 2003]. Patients are "overwhelmingly happy...and (state) that SRS [sex reassignment surgery] had greatly improved the quality of their life [Lawrence, 2003]." Lawrence goes on to state, "It is hard to imagine any other major life decision—whether to have married a specific person,...or whether to have pursued a specific occupation—that would yield such an overwhelmingly positive set of subjective outcomes...the results of male-to female SRS appear to be so uniformly good that looking for factors predictive of satisfaction or regret might seem a pointless exercises."

Nevertheless, many patients in the Unites States find the social losses too daunting to avail themselves of this remedy. They fear that their children will be taunted, their coworkers will shun them, they will be ousted from their place of worship, and/or

they will suffer undue financial hardship. Unfortunately, these catastrophic scenarios too often unfold in reality.

Michelle Kosilek does not face any of the aforementioned social losses. With no family, no status, and no worldly goods, her genital reconstruction will affect no one but herself. Her treatment will render her able to proceed with her life, using her superior intellect for other pursuits, without diverting all her attention and energy to her medical condition.

While sexual desire diminishes with age, gender dysphoria intensifies over a lifetime. Although there is no ready explanation for this, one theory is that as testosterone decreases with age, the precursor DHEA also declines. This will affect the ratio of DHEA to cortisol, which acts to upset brain chemistry and intensify gender dysphoria [Ettner, 2005]. Therefore, Michelle will be at risk, with the passage of time, of even greater distress and no means of relief.

Michelle states that if she is denied surgery she will take her own life. She feels that she will not have a sustainable quality of life without surgery, and would rationally choose to terminate living. She has devised four strategies for killing herself that she can implement, if need be. This is not a symptom of any depressive disorder. It is a reaction to the dysphoria she is experiencing.

Michelle Kosilek is an excellent candidate for surgery. It is my opinion that she is ready for gender reassignment surgery, and that this is the necessary medical treatment to relieve the profound distress of this disorder.

Sincerely,

Randi Ettner, PhD

RCE/ fe

## REFERENCES

Brown, G. R. (1988). Transsexuals in the military: Flight into hypermasculinity. Archives of Sexual Behavior, 17(6), 527-537.

Ettner, R. (2005). Social and psychological adjustment issues in aging transsexuals. Paper presented at the nineteenth international gender dysphoria symposium, Harry Benjamin International Gender Dysphoria Association, Bologna.

Graham, J. R. (1990). Assessing personality and psychopathology., second edition. New . New York: Oxford.

Graham, J. R. (2006). Assessing personality and psychopathology, fourth edition. New York: Oxford.

Graham, J. R., Barthlow, D. L., Stein, L. A. R., Ben-Porath, Y. S., & McNulty, J.L. (2002). Assessing general maladjustment with the MMPI-2. Journal of Personality Assessment, 78, 334-347.

Greene, R. L. (1991). The MMPI-2/MMPI: An interpretive manual. Boston: Allyn and Bacon.

Keller, L. S., & Butcher, J. N. (1991) Assessment of chronic pain with the MMPI-2. Minneapolis: University of Minnesota Press.

Lawrence, A. (2003). Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. Archives of Sexual Behavior, 32 (4), 299-315.

Lawrence, A. (2005). Sexuality before and after male-to-female sex-reassignment surgery. Archives of Sexual Behavior, 34 (2), 147-166.

**EXPERT TESTIMONY [past four years]**

USA v. Edward Snarski 3: CR-02-301
District Court, Middle District of Pennsylvania 2005

Donna Dawn Konitzer a/k/a Scott Konitzer v. Bartow, et al. 03-C-717
District Court for Eastern District of Wisconsin 2005

Stein v. Rosenberg 00L 10718
Circuit Court of Cook County, Illinois 2004

Sanks v. Cook County 00L 012414
Circuit Court of Cook County, Illinois 2004


**FEE SCHEDULE**

$225.00 per hour for clinical services; $325.00 per hour for court testimony.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
*******************************
                              *
MICHELLE LYNNE KOSILEK,       *      Civil Action No. 00-12455-MLW
                              *
        Plaintiff,            *
                              *
v.                            *
                              *
KATHLEEN M. DENNEHY           *
                              *
        Defendant.            *
                              *
*******************************
```

## AFFIDAVIT OF RANDI ETTNER, PHD.

I, Randi Ettner, depose and state as follows:

1.      I am a clinical psychologist in private practice.  I am also the Director of Clinical

Psychology at the Chicago Gender Center, which is a consulting position.  I have been a member

of the University of Chicago Gender Board, which evaluates patients prior to SRS surgery.  I

have a doctoral degree in psychology from Northwestern University and am a licensed clinical

psychologist in the state of Illinois.

2.      Plaintiff's counsel has asked me to provide this affidavit in response to

defendant's request to administer various psychological tests, including the Hare Psychopathy

Checklist ("Hare PCL") and the Minnesota Multiphasic Personality Inventory ("MMPI").

3.      I have completed graduate course work in psychological tests and measurements

and taught courses in psychological tests and measurements.  I have also completed courses for

post-doctorate psychologists at the University of Minnesota on advanced MMPI issues for

clinicians.  I am familiar with various personality instruments, including the MMPI.  I am

somewhat less familiar with the Hare PCL, but I have reviewed background information regarding that test.

4.    The Hare and the MMPI are so-called "A level" tests, which require certain credentials to be administered. "A level" means that one who administers the test must either: a) have a license to practice psychology independently, or b) have a graduate degree in psychology or a closely related field and have taken graduate level courses in tests and measurements, and c) have been granted the right to administer tests at this level in their jurisdiction.

5.    I am also very familiar with generally accepted practices concerning readiness for sexual reassignment surgery ("SRS").

6.    I have seen over 1,000 transsexual patients and have personally evaluated 236 for surgical readiness for Sex Reassignment Surgery ("SRS").

7.    I have worked with Dr. Eugene Schrang, an SRS surgeon, for over 10 years in the evaluation of patients.

8.    I am a member of the Harry Benjamin International Gender Dysphoria Association ("HBIGDA"). I am also a Board Member of the organization, and I serve on the Standards of Care Committee, the Scientific Committee, and I chair the Symposium Committee. The HBIGDA Standards of Care for Gender Identity Disorder ("Standards of Care") are the recognized, generally accepted standards for determining the readiness and eligibility of patients to undergo SRS. The Standards of Care include both readiness criteria and eligibility criteria for SRS.

9.    The six eligibility criteria are: 1) having attained 18 years of age; 2) completion of 12 months of hormone therapy, if medically tolerated; 3) living as cross-gendered for at least 12 months without reverting to one's natal gender role (the so-called "real-life experience"); 4)

cooperation with psychotherapy; 5) demonstrable knowledge of SRS, its attendant risks, and its costs; and 6) knowledge of at least two different surgeons who can provide the treatment.

10.    The three readiness criteria are: 1) demonstrable progress in consolidation of gender identity during the real-life experience; 2) demonstrable progress in dealing with work, family, and interpersonal issues resulting in a significantly better state of mental health; and 3) an unofficial but *de facto* criterion to obtain letters of support from two qualified mental health care practitioners.

11.    Neither the eligibility nor the readiness criteria of the Standards of Care include the administration of a personality test or require a finding that the patient does not suffer from any comorbid psychological disorder.

12.    I have never administered the Hare PCL to any patient whom I evaluated for SRS surgical readiness. Based on my professional judgment and experience, I do not believe the Hare PCL is relevant, appropriate, or helpful in any way in determining whether the plaintiff is an appropriate patient for and can be recommended to undergo SRS. I have administered the MMPI to patients only at the request of counsel in litigation and not for purposes of determining surgical readiness. However, I do not believe the MMPI is relevant, helpful, or appropriate in any way for the plaintiff's evaluation.

13.    Nonetheless, I am familiar with the MMPI, how it is used, and how it must be administered. I administer the MMPI frequently in my clinical practice.

14.    I visited the plaintiff on October 7, 2005 to evaluate her for surgical readiness for SRS.

15.    At the request of plaintiff's counsel, I administered the MMPI to the plaintiff. That administration generated raw data which could be used by a qualified psychologist to produce certain information concerning behavior, symptoms, and temperament of the plaintiff.

Executed under the penalties of perjury this 14th day of November, 2005.

_Randi Ettner_

Randi Ettner

L7XP01_.DOC (695769 v. 1)