1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                         No. 1:00-cv-12455-MLW

4

5
    MICHELLE KOSILEK,
6          Plaintiff

7
    vs.
8

9
    THE MASSACHUSETTS DEPARTMENT OF CORRECTION, et al,
10         Defendants

11

12                    *********

13

14                  For Hearing Before:
                  Chief Judge Mark L. Wolf
15

16    Motion for a Preliminary Injunction (Continued.)
                   Judge's Ruling
17

18                 United States District Court
                   District of Massachusetts (Boston.)
19                 One Courthouse Way
                   Boston, Massachusetts 02210
20                 Wednesday, November 25, 2009

21
                       ********
22

23          REPORTER: RICHARD H. ROMANOW, RPR
                  Official Court Reporter
24             United States District Court
        One Courthouse Way, Room 5200, Boston, MA 02210
25                bulldog@richromanow.com

```
 1                   A P P E A R A N C E S

 2

 3    FRANCES S. COHEN, ESQ.
          Bingham McCutchen, LLP
 4        150 Federal Street
          Boston, Massachusetts 02110
 5        (617) 951-8872
          Email: Frances.cohen@bingham.com
 6   and
      JOSEPH L. SULMAN, ESQ.
 7        Dechert, LLP
          John Hancock Tower
 8        200 Clarendon Street
          Boston, Massachusetts 02116
 9        (617) 654-8621
          Email: Joseph.sulman@dechert.com
10        For Plaintiff

11
      RICHARD C. McFARLAND, ESQ.
12    JOAN T. KENNEDY, ESQ.
          Department of Correction
13        70 Franklin Street, Suite 600.
          Boston, Massachusetts 02110
14        (617) 727-7403
          Email: Rcmcfarland@doc.state.ma.us
15        For the Defendant Department of Correction

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2              (Open court, 10:30 a.m.)

3              THE CLERK:  This is Civil Action 00-12455,

4     Michelle Kosilek versus Harold Clarke, et al.  The Court

5     is in session.  You may be seated.

6              THE COURT:  Good morning.  Would counsel

7     please identify themselves for the record.

8              MS. COHEN:  Good morning, your Honor.  Frances

9     Cohen, for the plaintiff, and with me is Joseph Sulman.

10    And Miss Kosilek, the plaintiff, is also at counsel

11    table.

12             MR. McFARLAND:  Good morning, your Honor.

13    Richard McFarland and Joan Kennedy on behalf of the

14    Commissioner of Correction, the defendant.

15             THE COURT:  Since we recessed on Monday, I

16    have received letters from each of the parties which are

17    on the docket.

18         Is there anything else I should have received and

19    read?  One letter from each of you?

20             MR. McFARLAND:  That's it for us, your Honor.

21             MS. COHEN:  Nothing further from the

22    plaintiffs, your Honor.

23             THE COURT:  And I marked, as Exhibit A under

24    seal, a letter I received from a nonparty.  That was

25    marked on Monday.  It's been pointed out to me that that
```

1    included a telephone number, which pursuant to standard

2    privacy policies should not be part of the public

3    record.  So, with that telephone number removed after

4    the hearing, a redacted form of Exhibit A will be made

5    part of the public record.  However, I repeat, that that

6    letter is not evidence.  It's not something I've

7    considered or been influenced by.  However, since I saw

8    the letter, I felt I should bring it to your attention,

9    too.

10        With regard to the motion for a preliminary

11   injunction, I did a good deal of work on it for Monday.

12   The argument was certainly very helpful.  I will decide

13   the motion orally.  The transcript will be the record of

14   the decision.  I may review it to make any necessary

15   corrections if the stenographer has misunderstood me.

16   It's possible that it will also be converted into a more

17   formal memorandum and order.

18        However, for the reasons I'll describe in detail,

19   the plaintiff, Michelle Kosilek's, motion for interim

20   relief is hereby denied.

21        The motion asked the Court to issue a preliminary

22   injunction compelling the resumption of electrolysis

23   treatments that were started in 2008.  The parties agree

24   that the usual preliminary injunction standards apply.

25   They are familiar.  I believe they're still properly

1    stated in my *Cablevision of Boston* decision, 338 F.

2    Supp. 2nd 46.

3        The burden of proof is on the plaintiff.  The

4    Court is required to weigh four factors.  The first is

5    whether the plaintiff has shown a likelihood of success

6    on the merits.  The second is whether the plaintiff has

7    established an imminent threat of irreparable harm in

8    the absence of a preliminary injunction.  The Court is

9    also required to balance the hardship to the plaintiff

10    if no injunction is issued against the hardship to the

11    defendants if the requested injunction is ordered.  In

12    addition, the Court must consider the effect of the

13    proposed injunction on the public interest.

14        The Court of Appeals for the First Circuit has

15    said, on a number of occasions:  The likelihood of

16    success on the merits is of primary importance.  It is

17    the sine qua non for obtaining a preliminary

18    injunction.  If a great showing of likely success on the

19    merits is made by a plaintiff, a reduced showing of

20    irreparable harm may be appropriate.  In addition, a

21    preliminary injunction is an equitable remedy.  It does

22    not issue automatically even if the foregoing criteria

23    indicate that an injunction is warranted.

24        In addition, as the First Circuit wrote in *NBA*

25    *Properties, Inc. vs. Gold*, 895 F. 2nd 30 at 33, that

1    courts may be more reluctant to issue a mandatory

2    preliminary injunction than prohibitory ones.  That's

3    further explained in *LL Bean v. Bank of America*, 630 F.

4    Supp. 2nd 83 at 89.  Moreover, heightened scrutiny is

5    also appropriate if issuing the injunction would provide

6    the plaintiff with "substantially all of the relief that

7    he or she seeks" and that relief could not be undone if

8    the defendant prevails at trial, as the Second Circuit

9    explained in *Phillips vs. Fairfield University*, 118 F.

10   3rd 131 at 133.

11        The parties confirmed and agreed, on November 23,

12   2009, that the law regarding the Eighth Amendment

13   jurisprudence, as stated in my decision in *Kosilek vs.*

14   *Maloney*, 221 F. Supp. 2nd 156, remains correct.  That

15   means that in this case Michelle Kosilek must now

16   establish a reasonable likelihood of ultimately proving

17   the existence of a serous medical need that is not being

18   adequately treated because of deliberate indifference of

19   the person who made the decision to deny Kosilek

20   continued electrolysis.  Kosilek asserts a serious

21   medical need for permanent facial and chest hair removal

22   by electrolysis, as explained in what the parties and

23   now I would call *Kosilek I* at 180, that a serious

24   medical need is one that involves a serious risk of harm

25   if it is not adequately treated.

1      The First Circuit has repeatedly defined a

2  "serious medical need" as "one that has been diagnosed

3  by a physician as mandating treatment, or one that is so

4  obvious that even a lay person would easily recognize

5  the necessity for a doctor's attention."  That statement

6  of the standard is found in *Mahan vs. Plymouth House of*

7  *Correction*, 64 F. 3rd 14 at 18, quoting *Gaudreault vs.*

8  *Salem*, 923 F. 2nd 203 at 208.  The plaintiff has not

9  proven, for present purposes, that the plaintiff now has

10  a serious medical need that requires electrolysis.

11      The plaintiff is entitled to adequate treatment

12  for severe Gender Identity Disorder.  Since 2002, the

13  Department of Correction has taken steps to treat the

14  plaintiff's Gender Identity Disorder.  It has provided

15  female hormones.  It has allowed the plaintiff to wear

16  female clothing.

17      Michelle Kosilek relies on Trial Exhibits 10 and

18  15 to argue that doctors have prescribed electrolysis as

19  a necessary component of the required treatment of

20  Gender Identity Disorder -- of the plaintiff's Gender

21  Identity Disorder.  Trial Exhibit 10 is the February 23,

22  2003 letter from Dr. Seil, S-E-I-L.  Trial Exhibit 25 is

23  the February 24, 2005 letter or report from the doctors

24  at the Fenway Clinic.  However, neither report states

25  that Michelle Kosilek must receive electrolysis until

1  all of her masculine facial and body hair is gone or

2  that it is unacceptable to augment several electrolysis

3  sessions with nonmedical hair removal.

4      The Seil report does discuss electrolysis.  It

5  says, on Page 5:  "Electrolysis.  Facial hair is a major

6  signifier of male gender.  The difficulty for the

7  individual with GID exists more in having to see oneself

8  in the mirror than in presenting to the public.  Laser

9  treatments are quick and more cost effective than

10  previous methods.  In combination with estrogen,

11  electrolysis is very effective."

12      However, the report does not state that

13  electrolysis and/or laser hair removal is the only

14  acceptable means of removing unwanted hair.  In

15  addition, the more recent 2005 Fenway report does not

16  mention electrolysis at all.  Written before

17  electrolysis treatments began in 2008, its only

18  reference to "hair removal" is in the diagnostic

19  impressions and recommendation section where it notes

20  that:  "Michelle Kosilek's joy around being feminized

21  with hormone therapy, facial and body hair removal and

22  her ability to have access to feminine attire and makeup

23  is palpable."

24      These reports are evidence that the removal of

25  Michelle Kosilek's hair is an essential component of

1    treatment for her severe Gender Identity Disorder.  They

2    do not, however, for present purposes, indicate that the

3    plaintiff is likely to prove that continued electrolysis

4    is medically necessary.

5         The plaintiff has, since the 2003 Seil report,

6    received some laser hair removal treatments and seven

7    electrolysis treatments.  The laser hair treatments

8    removed some of the plaintiff's black facial hairs.  New

9    black facial hairs have continued to grow.  The

10   electrolysis removed some of the plaintiff's white

11   facial hairs, but none on the chin, which the

12   electrolysist had not yet addressed.

13        Dr. Aminadav Zakai, the Chief Psychiatrist of the

14   Department of Correction's present contractor, MHM,

15   stated, in his affidavit, Paragraph 3, that:  "Prior" --

16   "The prior course of treatment, the electrolysis

17   treatment, there is a" -- and I guess laser treatment,

18   "resulted in a significant removal from Michelle

19   Kosilek's face and chest."  So the significant removal

20   of hair -- well, let me say this again.  The affidavit

21   states that "The prior course of treatment resulted in

22   the significant removal of hair from Michelle Kosilek's

23   face and chest."  It is not clear what this statement is

24   based on.

25        Dr. Zakai had testified in his deposition that the

plaintiff had received, quote, "maximal result from electrolysis."  That's at Page 58.  To the extent that this means that further electrolysis would not be helpful, there's no evidence to support this statement.

The Department of Corrections now takes the position that the remaining hair removal should be accomplished by shaving and/or the use of depilatories such as "Nair."  No doctor has opined that electrolysis is now essential to the feminizing necessary to treat adequately the plaintiff's severe Gender Identity Disorder.

The plaintiff has sincerely stated that the lack of continuing electrolysis is depressing.  I accept that the enduring facial hair is painful for the plaintiff to see daily.  However, the plaintiff is functioning apparently well in prison.  There is no report that Michelle Kosilek is now suicidal, although I emphasize that something significantly less than suicidal ideation could manifest a serious medical need.

In the existing circumstances, it would not be obvious to a lay person that electrolysis is required. Therefore, on the present record, the plaintiff has not borne the burden of showing that the plaintiff is reasonably likely to prove the existence of a present serious medical need for which electrolysis is the

1    essential treatment.  That, of course, addresses the

2    standard as stated by the First Circuit in **Mahan** and

3    **Gaudreault.**  No doctor has opined that there's a present

4    need for electrolysis, nor would it be obvious to a lay

5    person that electrolysis was required.

6         The plaintiff has also not made the required

7    showing that her hair condition is not being adequately

8    treated to justify a preliminary injunction, even if the

9    plaintiff's current condition is a serious medical

10   need.  The plaintiff has received laser treatments and

11   some electrolysis.  The Harry Benjamin Standards of

12   Care, Trial Exhibit 9, at Page 18, do discuss

13   electrolysis as an effective way to remove facial hair

14   as is required for a real-life experience.  However, the

15   Standards of Care also note, at Page 12, that hair

16   removal through body waxing, as well as electrolysis,

17   has assisted people with GID to find more personal

18   comfort.  This indicates that medical professionals do

19   not always view electrolysis as the only adequate way to

20   deal with the need to remove body hair from individuals

21   with severe Gender Identity Disorder.

22        The First Circuit explained in **DeCologero**, 821 F.

23   2nd 39 at 43, and it was reiterated at **Kosilek I** at 180,

24   that adequate services are "services at a level

25   reasonably commensurate with modern medical science and

1    of a quality acceptable within prudent professional

2    standards."  On the present record, the plaintiff has

3    not proven that the plaintiff has not received -- is not

4    receiving adequate services for hair removal or that

5    depilatories such as "Nair," particularly, are not now

6    adequate.

7         The First Circuit has emphasized in *DeCologero*, in

8    *DesRosiers vs. Moran*, 949 F. 2nd 15 at 19 to 20, that an

9    inmate is entitled to adequate medical care, but not

10   ideal care or the care of her choice.  On the present

11   record, electrolysis appears to be the ideal care that

12   the plaintiff prefers, but not a medically-necessary

13   treatment.

14        Because the plaintiff has not proven a likelihood

15   of success on the merits, that is, because the plaintiff

16   is not likely, on the present record, I conclude, to

17   prove that the absence of electrolysis means there's a

18   serious medical need that's not being adequately

19   treated, the Court's finding on deliberate indifference

20   is not material to the outcome, the decision on the

21   motion for a preliminary injunction.  However, it is

22   necessary and appropriate to address all of the prongs

23   of the test.  I find, on the present record, that the

24   Department of Correction's conduct regarding continuing

25   electrolysis runs the risk of constituting a deliberate

1    indifference if a serious medical need for the treatment

2    is ultimately established.

3         The Eighth Amendment is violated if an inmate is

4    denied adequate treatment for a serious medical need and

5    the denial is intended to cause harm to the prisoner or

6    is the result of deliberate indifference.  That, as the

7    parties recognize, is derived from the Supreme Court's

8    decisions in *Estelle vs. Gamble*, 429 U.S. 97 at 106, and

9    *Farmer vs. Brennan*, 511 U.S. 825 at 831.

10        Deliberate indifference has both a subjective and

11   an objective component, as described in *Farmer* at 846,

12   Note 9, and *Kosilek I* at 180.  To satisfy the objective

13   component of the standard, an inmate must show that he

14   or she has a serious medical need and the need is not

15   being adequately treated.  That's *Kosilek* at 180,

16   summarizing the cases.  As explained, for present

17   purposes, this standard has not been met.

18        The prisoner must also satisfy the subjective test

19   by showing that the official responsible for making the

20   relevant decisions regarding an inmate's medical care

21   both be aware of facts from which an inference could be

22   drawn where the substantial risk of serious harm exists,

23   and he must also draw that inference.  That's *Farmer* at

24   837.

25        As explained in *Kosilek I*, which, as I noted, the

1    parties agree properly describes the Eighth Amendment

2    jurisprudence:  "The Department of Corrections has a

3    constitutional duty to make decisions concerning a

4    prisoner's medical care based on an evaluation of the

5    prisoner's unique circumstances rather than pursuant to

6    a general policy applicable to all prisoners."  That's

7    described in part in *Kosilek I* at 183.  That it is

8    permissible to have a presumptive policy regarding

9    medical care or forms of medical care.  However,

10   decisions concerning whether certain treatments are

11   necessary to treat a particular prisoner adequately must

12   be made based on an individualized medical evaluation

13   rather than as a result of the inflexible application of

14   a blanket rule, again as discussed in *Kosilek I* at 193.

15        As I wrote in *Kosilek I* at Page 186:  "The First

16   Circuit has indicated that an Eighth Amendment violation

17   may be established by proof of failure to adjust an

18   established policy to accommodate a serious medical

19   need."  That's *Mahan* at 18.  In explaining this, the

20   First Circuit stated that the seemingly inflexible

21   prison "policy relating to prescription medicines,

22   coupled with limited medical office hours, could well

23   have resulted in serious harm to Mahan."  That's at Note

24   6.  I also went on to write, in 2002:  "Similarly, the

25   Ninth Circuit held in *Allard* that the denial of a

1   treatment such as hormone therapy based upon a blanket

2   rule rather than an individualized medical evaluation

3   can constitute deliberate indifference to a serious

4   medical need."

5        Decisions concerning medical care for an inmate

6   must be based upon sound medical judgment.  Therefore,

7   decisions regarding necessary medical care must be made

8   by qualified medical professionals.  They cannot

9   properly be made based on issues such as cost or

10  political controversy.  These principles were discussed

11  in detail in *Kosilek I* at Pages 182, 183 and 193.

12       On the present record, it appears that the

13  decision to end Kosilek's electrolysis treatments and to

14  refuse Kosilek's request to resume them were not

15  properly made.  Drs. Arthur Brewer and Kenneth Appelbaum

16  approved the electrolysis treatments on behalf of the

17  Department of Corrections in 2005 based on the

18  recommendation of Dr. David Seil, their Gender Identity

19  Disorder specialist, that they, on behalf of the

20  Department of Corrections, consulted.  Dr. Appelbaum

21  testified to this on June 1, 2006 as reflected on Page

22  47 of the transcript.

23       The decision to actually -- to implement -- this

24  decision to provide electrolysis treatment was not

25  actually implemented by the Department of Corrections

1   until the new commissioner, Harold Clarke, was called to

2   testify on this, among other issues, in 2008.  At that

3   time the Department of Corrections agreed to provide

4   electrolysis which ended the necessity to hear testimony

5   from Commissioner Clarke on that issue in 2008.  The

6   Department of Corrections subsequently purchased seven

7   electrolysis sessions for Michelle Kosilek.

8        There is a March 13th, perhaps 19th, 2009 progress

9   note in Kosilek's medical records which states that her

10  response to electrolysis was not as good as hoped.  That

11  note is attached to the defendants' opposition to the

12  present motion as Exhibit 6.  However, it is not clear

13  who expressed this opinion or what the basis of it was,

14  nor is it clear that this assessment affected the

15  decision not to continue the electrolysis.

16       The person administering the electrolysis

17  described for Dr. Lubelczyk, who was monitoring it on

18  behalf of the Department of Corrections, that progress

19  had been made.  The electrolysist also described what

20  remained to be done.  For example, electrolysis of the

21  hairs on Michelle Kosilek's chin.  However, on behalf of

22  the Department of Corrections, Dr. Zakai of MHM, a new

23  provider engaged for mental health services by the

24  Department of Corrections, developed the policy that

25  while hair removal was important to treating Gender

1    Identity Disorder, electrolysis was not necessary, that

2    alternate means like shaving and depilatories would be

3    relied upon instead.

4        On May 1, 2009, several Department of Corrections

5    doctors and several Department of Corrections officials

6    who were not doctors, including Terry Marshall, met to

7    discuss Kosilek's motion for interim relief.  Kosilek

8    requested the Court order electrolysis or at least they

9    met to discuss the issue of whether the electrolysis

10   treatment should be resumed.

11       The record does not reflect any particularized

12   consideration of Michelle Kosilek's unique circumstances

13   in reaching the decision to deny the request to resume

14   electrolysis.  As indicated earlier, while Dr. Zakai

15   testified at his deposition that he understood from the

16   meeting that Kosilek had received "maximal benefits from

17   the treatments she had received" -- and that's Page 58

18   of the transcript, there is no evidence that anyone at

19   the meeting said this or that anyone at any time said

20   this.  The conclusion is inconsistent with what the

21   electrolysist told Dr. Lubelczyk.  I also note that,

22   contrary to the Department of Correction's regular

23   practice, there appears to be no progress note or any

24   other contemporaneous document concerning the May 1,

25   2009 meeting.

1          The decision not to resume electrolysis may have

2     been the result of an inflexible application of the

3     general policy.  It is not clear if the decision was

4     made by a medical professional or by another Department

5     of Correction's official, Terry Marshall.

6          In these circumstances, the plaintiff may have a

7     reasonable likelihood of proving deliberate

8     indifference.  However, it is not, on the present

9     record, deliberate indifference to a serious medical

10    need.  As described earlier, this is not now a case in

11    which -- as described earlier, this is not now a case in

12    which the attention Michelle Kosilek has received is so

13    clearly inadequate as to amount to a refusal to provide

14    essential care, which is one iteration of the standard

15    used by the First Circuit in *Torraco*, T-O-R-R-A-C-O, 923

16    F. 2nd at 234.

17         Nevertheless, as in 2002, the Department of

18    Corrections will run a great risk of violating the

19    Eighth Amendment if it makes medical decisions based on

20    inflexible general policies or allows nonmedical

21    considerations that are not rooted in legitimate

22    penological objectives to motivate such medical

23    decisions.

24         Also, in the interest of addressing all of the

25    prongs of the preliminary injunction analysis, I find

that if the plaintiff had proven a reasonable likelihood
of success on the merits, the evidence might satisfy the
requirement of proving an imminent threat of irreparable
harm.  The plaintiff is, to some degree, suffering
distress from the remaining facial hair.  The plaintiff
in Federal court cannot recover money damages from the
state, which has Eleventh Amendment immunity from awards
for money damages in Federal court.  No defendants have
been sued individually and they would, in any event,
probably have qualified immunity subject to the
standards I've described in finding qualified immunity
in 2000 in this case.  That's at 2000 Westlaw 1346898.
It is not clear whether there's an adequate damage
remedy in state court, but that issue is not material to
the disposition of the present motion.

I also find that the balance of hardships would
favor the plaintiff, if the plaintiff had provided
sufficient evidence of a serious medical need that could
only be adequately treated by electrolysis.  The
plaintiff is suffering from unwanted hair, to some
extent.  The Department of Corrections can provide
electrolysis.  It has done so.  Electrolysis is costly.
The Department of Correction was paying $500 a session.

However, as I noted in *Kosilek I,* at Page 182, the
Seventh Circuit has written that it would not be

reasonable to deny an inmate adequate medical care
because it would be expensive to do so.  That's the
Seventh Circuit in **Ancata**, 769 F. 2nd at 705, and also
in **Harris**, 941 F. 2nd at 1509.  Lack of funds cannot
justify an unconstitutional lack of competent medical
care and treatment for inmates.  The Seventh Circuit
said:  "We do not agree that financial considerations
must be considered in determining the reasonableness of
an inmate's medical care to the extent that such a
rationale could ever be used by so-called 'poor states'
to deny a prisoner of the minimally-adequate care to
which he or she is entitled.  Minimally-adequate care
usually requires minimally-competent physicians.  It may
also sometimes require access to expensive equipment,
e.g. CAT scans or dialysis machines or the
administration of expensive medicines."

        In 1991, the Supreme Court noted that there has
not been "any indication that any officials have ever
sought to use a cost offense to avoid the holding of
**Estelle**."  And that's in **Wilson**, 501 U.S. at 301.  I am
not aware of the Supreme Court or any other court
expressing a different view since 1991 through 2002.

        If the plaintiff were likely to prove that the
denial of electrolysis violates the plaintiff's Eighth
Amendment rights, the public interest would be served by

1    giving immediate integrity to the guarantee of the

2    Constitution.  However, in the circumstances of this

3    case, the public interest is served by allowing prison

4    officials to exercise their usual discretion to make

5    decisions regarding what is the most -- what is most

6    appropriate for prisoners, as long as those decisions do

7    not violate the prisoner's constitutional or statutory

8    rights.

9         So, to sum this up in conclusion, I again note

10   that the plaintiff is seeking a mandatory injunction

11   that would alter the status quo.  Granting the requested

12   preliminary injunctive relief would probably really

13   provide permanent relief.  If additional electrolysis

14   treatments remove all of the Michelle Kosilek's facial

15   hair permanently, there would be no need for a final

16   decision on the merits concerning this issue.

17   Therefore, it has been particularly important that the

18   standards for obtaining a preliminary injunction be

19   fully met, as the First and Second Circuits have

20   indicated in **NBA Properties** and **Phillips.**

21        With regard to electrolysis, this case does not

22   involve the absence of any treatment.  As I noted, the

23   plaintiff did receive some laser hair removal and

24   electrolysis treatments.  The plaintiff has not made the

25   required showing that the plaintiff now has a serious

medical need that requires electrolysis. Therefore, the motion for a preliminary injunction that would compel the resumption of electrolysis has been denied.

When we were suspending on Monday, I think the parties agreed that to facilitate my decision on the still -- on the heart of the case, the plaintiff's request that the Department of Corrections -- the Commissioner of the Department of Corrections be ordered to follow the advice of the Department of Correction's doctors and provide Sex Reassignment Surgery, that that would benefit from some further argument. I have never forgotten and I'm certainly reminded that I need to decide that issue.

Dennis, may I see your book.

(Pause.)

THE COURT: I wonder how much time the parties would like to refresh themselves, prepare themselves to present that argument. It would be useful for me to address again at least two issues. One is the issue of whether the care recommended by Dr. Schmidt is within the range of what prudent professionals would regard as adequate care for Michelle Kosilek. And if the answer to that is "No," the -- as far as I know, the still novel issue of whether the penological concerns, if they're sincerely held, can trump the constitutional

1    right that an inmate would otherwise have to adequate

2    medical care.

3         So the question is how much time, essentially in

4    weeks or more, would you like to prepare for that

5    argument?

6         MS. COHEN:  I think, your Honor, the plaintiff

7    can be ready at the Court's convenience.

8         MR. McFARLAND:  Yes, your Honor, we've already

9    submitted lengthy proposed findings of fact and opinions

10   of law which we can rely on, and maybe perhaps an hour

11   or half an hour for each party to present this issue

12   would be sufficient, your Honor.

13        THE COURT:  I doubt that.  But, I mean, I

14   intend to -- you know, I have the transcripts of the

15   arguments and I want to read those findings of fact, but

16   I assume you need to, too.  I've had a very good command

17   of the record with regard to this electrolysis issue,

18   but it's much later now.  Well, let me see.

19             (Pause.)

20        MR. McFARLAND:  Whatever the Court prefers.

21        THE COURT:  All right.  Well, we'll see about

22   that.  I'm concerned that I may have already complicated

23   your Thanksgiving, since you were planning to be

24   elsewhere this morning, I think, as you told me on

25   Monday.

```
 1                (Pause.)

 2                THE COURT:  What about December 21st, it's a

 3      Monday?  And don't hesitate to tell me if you're

 4      expected to be traveling for the holidays.

 5                MR. McFARLAND:  That's fine with me, your

 6      Honor.

 7                MS. COHEN:  Yes, I think that day will work

 8      for plaintiffs, your Honor.

 9                THE COURT:  Well, I'm going to leave all of

10      that day.  I don't know that you're going to need it.

11      But I will get back into this myself before then.

12                MR. McFARLAND:  Your Honor, may I raise

13      something on this point, please?

14                THE COURT:  Yes.

15                MR. McFARLAND:  On our hearing on Monday --

16                THE COURT:  In fact, just before you do that,

17      let's say, pending further any refinement of this, that

18      hearing will start at 10:00 on December 21 and I'll

19      leave the day for it.

20           Okay.  Go ahead.

21                MR. McFARLAND:  On Monday, plaintiff's counsel

22      referred to double hearsay testimony about the DOC was

23      preparing a policy for a unified GID unit.  That is not

24      the case, your Honor.  The DOC is not now planning a

25      unified unit for GID inmates at this point.
```

1            THE COURT:  Well, that's the -- that relates

2      to -- well, I guess I'll say a couple of things.

3            Um, I'm not encouraging any of you to reopen the

4      evidence, but I do have to decide this case based on --

5      but one issue I have to decide, and it would be like in

6      2002, that if I got to the point of finding that

7      injunctive relief might be justified, I'd have to decide

8      whether it were necessary, and any steps the Department

9      of Correction could have taken itself might influence

10     the necessity of ordering relief.

11           So, one, I make that observation.  I suppose, if I

12     got to that point before issuing an injunction, I might

13     ask what, if anything, has been done since the trial and

14     what does the Department intend do in the

15     circumstances?

16           And there's -- well, I haven't ordered

17     electrolysis, obviously.  On the other hand, I haven't

18     prohibited it either.  And, you know, let's say it

19     publicly, and it wouldn't be inappropriate for me to say

20     it privately.  I read the pertinent parts of Dr. Zakai's

21     deposition, the most pertinent parts, and I get the

22     impression, although he's no longer employed, I guess,

23     by the organization that the Department of Corrections

24     is employing, but I got the impression that, you know,

25     he was a qualified and responsible psychiatrist, that he

1    had experience with Gender Identity Disorders when he

2    worked at the Veteran's Administration.  And I was

3    reminded of what I found in 2002, that the -- that there

4    seemed to be a misunderstanding not -- of what's legally

5    required, which is, you know, the making of an

6    individualized determination.

7        I put my able law clerk on it in preparation for

8    Monday's hearing.  I somewhat anticipated Miss Cohen's

9    focus.  I mean, the most careful analysis of all of

10   those depositions, the Zakai, the Lubelczyk, I can't

11   find a medical human being who says, you know, "I've

12   looked carefully at the record, I've got the relevant

13   information, not necessarily directly, but from whoever

14   had the information, and I decided that electrolysis was

15   not medically necessary for Michelle Kosilek."

16       So -- and that's why I was asking on Monday, "Who

17   do I focus on for the deliberate indifference prong?"

18   Because the Supreme Court says there has to be an

19   objectively serious medical need and somebody

20   subjectively has to understand that.  But the corollary

21   of that is that somebody has got to take -- some

22   qualified medical person has a legal obligation to get

23   the necessary information and form a judgment.  And I

24   know a lot of people talked about this, but -- and I

25   understand that the Department of Corrections doesn't

1   dispute it, the general principle that medical decisions

2   regarding any inmate, not just this inmate, can't be

3   made solely based on inflexible policies.  There can be

4   presumptive policies, but, in certain circumstances,

5   consideration needs to be given.  The law requires that

6   consideration be given to whether exceptions to the

7   general policies should be made.

8        And, you know, the Department of Corrections has

9   -- they have done some things that it previously didn't

10  feel it could or would do.  I didn't order it, but the

11  hormones have been administered.  I didn't order it, but

12  Michelle Kosilek's living in a male prison essentially

13  as a female.  So the Department of Corrections has, you

14  know, I think been educated by this litigation and has

15  taken some actions even when it wasn't ordered to.  You

16  know, I think it's -- I assume the Department of

17  Corrections will -- the Commissioner of Corrections

18  perhaps will look at this transcript or at least be

19  advised of the essence of it and will understand that

20  while the motion hasn't been granted, it didn't win on

21  every point, particularly -- well, particularly on every

22  point in the analysis, particularly with regard to the

23  decision-making process.

24       But it does remind me that I wanted to ask you

25  whether, you know, now that I've denied the preliminary

1    injunction concerning the electrolysis and having tried

2    that case, as I said, on Monday, the complaint should be

3    looked at to see whether it should be amended, and it

4    could be amended any time that justice so required, and

5    whether anything else should be done to develop even

6    further this electrolysis issue.

7         Miss Cohen, do you have any thoughts on that?

8         MS. COHEN:  I have thoughts on that and if I

9    may not be so restricted, I have thoughts on a couple of

10   other issues.

11        THE COURT:  Sure.  And I may have you all go

12   out and talk to each other.

13        MS. COHEN:  Well, first of all, let me just

14   thank opposing counsel for their courtesy in

15   accommodating my schedule, and I wanted to also thank

16   the court and, in particular, the court staff and the

17   corrections officers who brought Michelle Kosilek in

18   today and I appreciate that.  It's obviously an issue

19   that is very important to the plaintiff and one that she

20   feels deeply about.

21        With respect to the Court's decision, um, as an

22   advocate I must say that it's disappointing to say that

23   there's not -- to hear that we haven't established that

24   there is a serious medical need.  This obviously has

25   been going on for quite some time.  And in that way I

1   think the plaintiff is at something of a disadvantage

2   because there was a trial record established quite

3   extensively with experts called at that time she was

4   undergoing laser treatment.  So the issue of

5   electrolysis, although I believe the record is, in

6   particular, as we described it in the letter yesterday,

7   was adequate, there wasn't the same focus on

8   electrolysis.

9           THE COURT:  And I asked you at the outset on

10  Monday whether there was anything else you wanted to

11  present and you said "No."

12          MS. COHEN:  And we did follow up with the

13  testimony of Dr. Appelbaum with respect to Dr. Seil's

14  report.

15      In addition, your Honor's ruling has not addressed

16  the particular circumstances here, where an agreement

17  was made by the Department of Corrections and not

18  carried out to provide electrolysis.  And that

19  agreement, I think, is relevant both to the -- and I'm

20  not trying to reargue this ruling at all, I'm merely

21  getting to the issue your Honor asked me to address,

22  which is what else needs to be on the record.

23          THE COURT:  Well, I just decided this orally

24  because I'm emersed in it, it's very important to

25  everybody.  Maybe it would be less shocking if I took it

1    under advisement and in a couple weeks or months issued

2    a decision, but I just don't think that's in the best

3    interest of the case.

4         But let me clarify, because it's not that I

5    overlooked that agreement.  Um, that agreement was

6    reached.  It said that electrolysis would be provided.

7    It didn't say seven sessions of electrolysis would be

8    provided, but that's what was decided.  There was some

9    electrolysis provided.  And, you know, had I been asked

10   before Monday or on Monday to take further testimony on

11   any of this, if the testimony would have addressed a

12   material disputed fact, I would have permitted it.

13   That's part of what I had in mind when I asked the

14   question I asked at the outset on Monday.

15        But essentially I'm not -- I considered the fact

16   that this issue wasn't included in testimony that was

17   taken last year, I believe, because the Department

18   represented it would provide electrolysis.  I guess I

19   found that -- well, implicit in what I found, and I'll

20   make it more explicit, is that you haven't proven that

21   the Department violated that agreement although --

22   because some electrolysis was provided, although you did

23   persuade me that there's good reason to be concerned

24   about the decision-making process not to continue it.

25        It really appears to me that -- well, as I said,

1    it seems to be three things:  Either, once again, an

2    inflexible application of a valid presumptive policy, or

3    a decision made perhaps by Dr. Zakai based on

4    misinformation, or a decision that wasn't made by a

5    medical professional, as you argued, by Terry Marshall.

6    If I had found a serious medical need not being

7    adequately established, that decision-making process

8    might have proved decisive.  But it's not the way I see

9    the evidence.

10         MS. COHEN:  Well, yes, your Honor.  Let me say

11    three things about that, prefatory to outlining what I

12    think we need to do before the December 21st argument.

13         First of all, I think that the -- had the

14    Department of Corrections clarified at the time that

15    they were only going to provide seven sessions,

16    obviously there would been no agreement at that time.

17         Second of all, the decision to provide

18    electrolysis, I think, was itself an acknowledgement of

19    the medical need that the Department was aware of, based

20    on Dr. Seil's report, based on Drs. Appelbaum and

21    Brewer's recommendation, and based on what was just

22    produced to me yesterday, a note from Dr. Maria Warth

23    saying, you know, the laser hair removal has just come

24    to an end, it's time for electrolysis.  So I think it's

25    relevant as an acknowledgement of serious medical need.

```
1           It's also relevant on the deliberate indifference
2      issue because I think it shows the obstinacy of the
3      Department even when they have agreed to something.
4                THE COURT:  So what's the point?  I gave you
5      time on Monday to argue it, now I've decided it, and
6      I've asked you a question.  Since the request was for a
7      preliminary injunction, and you agreed that the usual
8      preliminary injunction standard should apply, what if
9      anything needs further to be done to, in effect, finally
10     try the electrolysis issue?  And if you're not -- and
11     maybe you should consult the Department of Correction's
12     counsel and get back to me in a week or something.
13               MS. COHEN:  We will do that, your Honor.  The
14     other issue is that we would like a copy of the policy,
15     and I'll request it now, in all of its drafts and weekly
16     iterations and changes, from the date of its inception
17     to the present.  It is directly relevant to the
18     Department's intent, the intent of Commissioner Clarke,
19     of Terry Marshall, and of Dr. Zakai, all of whom have
20     participated.
21               THE COURT:  I'm sorry.  Which policy?
22               MS. COHEN:  The draft policy that's an
23     iteration.
24               THE COURT:  The draft policy about
25     electrolysis or about everything?
```

```
 1              MS. COHEN:  About everything.
 2              THE COURT:  Well, Mr. McFarland said on Monday
 3    that the Department would assert a deliberative process
 4    privilege and not produce the policy.  I think you need
 5    to discuss it and, if you don't have an agreement, you
 6    need to file a motion and a memo, and I need to get a
 7    response.
 8              MS. COHEN:  Well, maybe we would compress the
 9    time for that because I don't think we should delay the
10    December 21st closing arguments and I think we're all
11    involved in a litigation where parties move
12    expeditiously.  I don't think it will take a lot of time
13    to collect this or to brief the issue.  And I think that
14    is something that is outstanding.
15         The other thing --
16              THE COURT:  Well --
17              MS. COHEN:  And that this court should have
18    it, it's bearing on the intent here and the discussions
19    of the parties regarding --
20              THE COURT:  Well, it seems to me, and I
21    haven't thought about this very much, but that any
22    evolving policy would go to whether if I found an Eighth
23    Amendment violation, an injunction should issue, or
24    whether it's unnecessary.  It's the last variable I
25    discussed in *Kosilek I.*  So I don't know --
```

1              MS. COHEN:  Your Honor, what we have here is a

2     course of conduct by officials who have, um, I think,

3     prevented the clinicians from reaching decisions, and

4     now there is a policy and draft which the clinicians are

5     familiar with, the corrections officials are familiar

6     with, and everyone is familiar with except the Court and

7     the plaintiff.

8              THE COURT:  Well, it -- I'm sorry.

9     Mr. McFarland.

10             MR. McFARLAND:  Yes, your Honor.  I think

11    she's going way afar of the issue at hand.  I mean, we

12    could do discovery until, you know, the crow flies, at

13    this point.  We're working on a policy that hopefully

14    will provide some clarity, and it's going through many,

15    many changes and it's not written in stone at any point

16    yet.  And I think to enter into discovery for her trying

17    to figure out deliberations made years ago, or two years

18    ago, and how they changed, that would onerously affect

19    the deliberative process of the Department of

20    Correction, and I'm not sure to what end at this point.

21             THE COURT:  Look, I don't have anything in

22    front of me right at the moment.  I do encourage you to

23    talk about it and think about it.  And if I get a

24    motion, a request to require an expeditious response,

25    I'll decide whether that's necessary or appropriate.

1    I'm not going to -- it looks to me like Mr. McFarland is

2    already delayed leaving for Thanksgiving.  I'm not going

3    to order that they start --

4            MS. COHEN:  No, and I certainly wasn't

5    requesting it that expeditiously, your Honor.

6            THE COURT:  The other thing I would encourage

7    you all to think about is whether you really want to

8    intentionally, or as a practical matter, discourage the

9    Department of Corrections from developing a policy for

10   paying close attention to these things.  I don't know

11   whether or not the Department's given consideration to

12   having special units or pods for transsexual prisoners,

13   but it could be a constructive thing.

14           MR. McFARLAND:  Your Honor, I agree it would

15   be a very -- a system that would discourage us from

16   creating policies that we have to go back three or four

17   years and find e-mails in people's discussions and

18   honest analysis of issues and then put it all out to the

19   public.  It would certainly discourage the Department in

20   engaging in trying to develop a policy to address a very

21   complicated issue.  And certainly if the Department, as

22   I said earlier, is not looking at creating a pod or a

23   GID unit, if any discussions that may have been in the

24   past on that is to be open to the public, it would

25   discourage people from voicing those opinions on those

1   ideas.

2        If it was going to be made public every time an

3   inmate raised a claim, then --

4             THE COURT:  Well, this is good.  All right.

5   Well, as I said, I think all I can do now is direct you

6   to confer on what, if anything, further should be done

7   beyond the argument to refresh and refocus me on

8   December 21st.

9        And I'm going to order that by 12:00 noon on

10  December 4, a week from tomorrow, you file a joint

11  report addressing whether there's anything further you

12  jointly propose and, if not, what your respective

13  positions are.

14            MR. McFARLAND:  As to the policy, your Honor?

15            THE COURT:  No, about anything.  You know,

16  should the complaint be amended?  I've denied a motion

17  for a preliminary injunction on electrolysis.  The

18  electrolysis issue is not necessarily dead.  You know,

19  it may be that I'll be asked for a trial on this issue

20  and what needs to be -- I mean, I'm trying to -- it

21  shouldn't -- I'm -- I just want you to tell me what your

22  respective views are on whether I have a record that's

23  complete.

24        I'll try to be clear.  I don't intend to do

25  anything else in the foreseeable future with regard to

```
 1    the electrolysis issue.  This is part of a bigger issue
 2    that I -- that I have to decide.  So I don't want to
 3    give the misimpression that I think we should be doing
 4    this again soon.  On the other hand, I need to hear from
 5    the parties on what you think.
 6         All right.  Is there anything else that needs to
 7    be discussed, either in court or sort of with regard to
 8    scheduling in the back?  Because that's all that we
 9    might have further discussion on, is scheduling.
10         And, in fact, here.  I'm sorry.  Here.  I will see
11    counsel briefly in the back.  I think it's -- just to
12    talk about scheduling and related matters.
13         Okay?  The Court is in recess.
14                   (Ends, 11:20 a.m.)
15
16              C E R T I F I C A T E
17
18         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,
19    do hereby certify that the foregoing record is a true
20    and accurate transcription of my stenographic notes,
21    before Chief Judge Mark L. Wolf, on Wednesday, November
22    25, 2009, to the best of my skill and ability.
23
24    /s/ Richard H. Romanow 12-14-09
      _____
25    RICHARD H. ROMANOW  Date
```