1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3                              No. 1:00-cv-12455-MLW

4

5
    MICHELLE KOSILEK,
6          Plaintiff

7
    vs.
8

9
    THE MASSACHUSETTS DEPARTMENT OF CORRECTION, et al,
10          Defendants

11

12                         * * * * * * * * *

13

14                        For Hearing Before:
                         Chief Judge Mark L. Wolf
15

16                       Motion Session with
                    Closing Arguments (Revisited.)
17

18                    United States District Court
                     District of Massachusetts (Boston.)
19                    One Courthouse Way
                     Boston, Massachusetts 02210
20                    Monday, December 21, 2009

21                         * * * * * * * *

22

23            REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
24               United States District Court
        One Courthouse Way, Room 5200, Boston, MA 02210
25                 bulldog@richromanow.com

```
 1                    A P P E A R A N C E S

 2

 3    FRANCES S. COHEN, ESQ.
          Bingham McCutchen, LLP
 4        150 Federal Street
          Boston, Massachusetts 02110
 5        (617) 951-8872
          Email: Frances.cohen@bingham.com
 6    and
       JOSEPH L. SULMAN, ESQ.
 7        Dechert, LLP
          John Hancock Tower
 8        200 Clarendon Street
          Boston, Massachusetts 02116
 9        (617) 654-8621
          Email: Joseph.sulman@dechert.com
10        For Plaintiff

11
       RICHARD C. McFARLAND, ESQ.
12     JOAN T. KENNEDY, ESQ.
          Department of Correction
13        70 Franklin Street, Suite 600.
          Boston, Massachusetts 02110
14        (617) 727-7403
          Email: Rcmcfarland@doc.state.ma.us
15        For the Defendants

16

17

18

19

20

21

22

23

24

25
```

```
1                P R O C E E D I N G S
2              (Open court, 11:05 a.m.)
3              THE CLERK:  Civil Action 00-12455, Michelle
4    Kosilek versus Harold Clarke, et al.  The Court is in
5    session.  You may be seated.
6              THE COURT:  Would counsel please identify
7    themselves for the record.
8              MS. COHEN:  Good morning, your Honor.  Fran
9    Cohen and Joseph Sulman for the plaintiff, Michelle Lynn
10   Kosilek, and Miss Kosilek is seated with me at counsel
11   table.
12             MR. McFARLAND:  Good morning, your Honor.
13   Richard McFarland and Joan Kennedy on behalf of the
14   Commissioner of Correction, Harold Clarke.
15             THE COURT:  The plaintiff is present.
16        I have on my agenda today the plaintiff's motion
17   to amend the complaint to seek an order compelling the
18   Department of Corrections to have a Gender Identity
19   Disorder specialist determine whether the plaintiff has
20   a serious medical need for electrolysis and also a
21   motion to substitute Mr. Clarke, which I thought had
22   been done previously.  I have the plaintiff's December
23   18th, 2009 filing of Judge Tauro's recent decision
24   ordering hormone therapy for Inmate Brugliera.  And then
25   I'd like to have some renewed final argument concerning
```

1    the trial testimony, which I've spent some time

2    reviewing.

3          Is there something else that should be on the

4    agenda, however?

5              MS. COHEN:  Nothing from the plaintiff, your

6    Honor.

7              MR. McFARLAND:  Nothing else, your Honor.

8              THE COURT:  Okay.

9          With regard to the motion to amend, I'm, of

10   course, interested in hearing from you, but I'm inclined

11   to allow it in part because if it's not allowed a

12   separate case could be filed seeking electrolysis and it

13   would be assigned to me as a related case.  If I

14   understand it correctly, from the reply brief, it's not

15   the plaintiff's review that any additional discovery is

16   necessary.  So my present state of mind is that it would

17   be sensible to allow the motion and have all the issues

18   in a single case.

19         But since I'm leaning toward allowing it, would

20   you like to be heard first, Mr. McFarland?

21             MR. McFARLAND:  We did oppose the motion and

22   we did argue that the Court has twice denied the

23   preliminary injunction request by the plaintiff and that

24   it would possibly delay this action.  We would like the

25   opportunity, if this goes forward, to present an expert,

1    your Honor, expert testimony in response to the claims

2    of -- for the electrolysis.

3              THE COURT:  Okay.  So if this is added to the

4    complaint, you would like to present further evidence on

5    this issue?

6              MR. McFARLAND:  Yes, your Honor, we would like

7    to have -- you know, have someone examine the plaintiff

8    and look at the issue of electrolysis as a necessity in

9    this case.

10              THE COURT:  Well, that's exactly what I --

11    well, assuming it's somebody who's qualified, I think

12    that's exactly the relief that's being sought.

13        And I understand, um -- well, it seemed to me

14    there's some ambiguity in the amended complaint and the

15    issue was more narrowly defined in the reply brief, I

16    think, but -- you know, so if I allow the amendment, you

17    would like to have the Department of Corrections, um,

18    get somebody to opine whether electrolysis is medically

19    necessary, right?

20              MR. McFARLAND:  Whether it would be

21    sufficient, on the hair removal at this point in time,

22    to not warrant further electrolysis.

23              THE COURT:  Okay, I understand that and I

24    would afford that opportunity.  I have all my back

25    boxes, which sat by my desk for two years, um, back by

1    my desk and I don't intend to put them away.  But I can

2    build in time for you to do this.

3         Does the plaintiff want to be heard?

4              MS. COHEN:  I don't think there's any reason

5    to delay the decision of this matter.  The reason for

6    the amendment was -- and frankly it was the plaintiff's

7    hope that any decision by the Court would provide a

8    framework that was sufficiently clear that it would give

9    guidance to the Department with regard to treatment,

10   because one of the plaintiff's primary contentions in

11   this case is that the Department has not left it up to

12   the medical experts, but rather each time has put not

13   just the thumb, but a whole hand on the scale with

14   respect to expert selection and expert outcome, et

15   cetera, and the only reason for the amendment was to

16   make it clear that electrolysis is a piece of the

17   treatment, that it falls within the standards.

18              THE COURT:  That's the way I interpreted it.

19              MS. COHEN:  And I don't think any additional

20   evidence is necessary.  If the Department, once again,

21   will not accept the opinion of an outside expert on this

22   issue, then they can challenge it.

23              THE COURT:  I'm not sure you're hearing

24   Mr. McFarland.  I think he says that if I allow the

25   amendment, the Department wants to go out and get an

1      outside expert.  They don't want me to make a finding as

2      to whether they've been deliberately indifferent to a

3      serious medical need until they have somebody analyze

4      that issue and they present some evidence.  But it's

5      possible -- but I think that's the relief you're

6      requesting in the amended complaint.

7              MS. COHEN:  And that is just the relief we're

8      requesting.

9              THE COURT:  I know it's unaccustomed, but I

10     think you're in substantial agreement.

11             (Laughter.)

12             THE COURT:  So here -- here's what I'm going

13     to do.  The motion to amend the complaint is allowed.

14     The cases for injunctive relief, primarily Sex

15     Reassignment Surgery, electrolysis as a lesser form of

16     treatment for Gender Identity Disorder, in certain

17     circumstances, are possibly part of a package of

18     medically-necessary treatment.  Motions to amend are to

19     be freely given unless there's some good reason to deny

20     them.  As I said, the plaintiff could bring a separate

21     case seeking an evaluation for electrolysis, that would

22     be assigned to me as related to this pending case.  The

23     plaintiffs represented that no more discovery would be

24     needed, although post-trial discovery can be ordered, as

25     I said, last August, according to cases like ***Rodriguez***,

1    243 F. 3rd 1221 at 1229, and **England**, 194 F. 3rd 265 at

2    270.

3          It's particularly appropriate in a case involving

4    a request for injunctive relief, when so much time has

5    passed, which is my responsibility, to make sure that

6    the factual record is up to date.  There has been no

7    undue delay, in seeking to amend, to request the

8    electrolysis.  The electrolysis has been an issue since

9    the Seil report in 2003.  It's an issue that I would

10   have heard testimony on in the spring of 2008, except

11   the Department of Corrections agreed to provide

12   electrolysis, and it did that up to a point.

13         The plaintiff was told, in May of 2009, that the

14   Department of Corrections would not continue the

15   electrolysis.  The plaintiff promptly sought a

16   preliminary injunction.  The issue should be in the

17   complaint, so I can decide it, and I would say,

18   commendably, that the Department of Corrections wants to

19   supplement the record, if I hear it right, by having the

20   kind of evaluation the plaintiff's seeking in the

21   amended complaint done.  So I'll allow the motion.

22         Mr. McFarland, how long would the Department of

23   Corrections like to engage an expert and have the

24   evaluation done and submit it to the plaintiff and the

25   Court?

1           MR. McFARLAND:  Your Honor, I haven't started

2    actually looking for someone.  It would probably be a

3    couple of months would be required.  Six weeks, perhaps.

4           (Pause.)

5           THE COURT:  All right.  Well, Miss Cohen, I'm

6    inclined to say that by March 1st, the Department of

7    Corrections select somebody qualified to evaluate Miss

8    Kosilek and provide a report on whether electrolysis is

9    medically necessary.  I'm talking shorthand.  Do you

10   want to be heard on that?

11          MS. COHEN:  No, your Honor, that sounds

12   appropriate to the plaintiff.

13          THE COURT:  Okay.  Then I'll give you until

14   March 1st to do that.

15          MR. McFARLAND:  Thank you, your Honor.

16          THE COURT:  And in addition to the report, if

17   the report advises that electrolysis is medically

18   necessary in the circumstances, I'll need to know

19   whether the Department of Corrections is going to

20   implement that recommendation.  Okay?

21          MR. McFARLAND:  That's fine, your Honor.

22          THE COURT:  Thank you.

23      All right.  The second thing I had on the agenda,

24   unless you would like to weave it into the more general

25   argument, is some discussion of the implication of Judge

```
1    Tauro's December 18th, I think it is, decision in the
2    Brugliera case, B-R-U-G-L-I-E-R-A, Civil Action Number
3    07-40323, which ordered the Department of Correction to
4    implement the advice received from its doctors and
5    provide the plaintiff, in that case, another inmate with
6    Gender Identity Disorder, hormone therapy.  Do you want
7    to be heard on that, Ms. Cohen?
8              MS. COHEN:  I'd be glad to comment on it
9    briefly, and I really don't want to make too much of it
10   because I think it's -- obviously your Honor is not in a
11   position to try the Brugliera case or to understand the
12   facts that transpired there.  It is one of two other
13   litigations in this building that I'm aware of.
14   Brugliera and Battista.  I think --
15             THE COURT:  Battista is Judge Woodlock's
16   case?
17             MS. COHEN:  Judge Woodlock's case, which I
18   think is progressing towards a decision.  I think what
19   is striking about Brugliera and, once again, it's simply
20   findings on a preliminary injunction and it's not res
21   judicata against the Department, but I think, you know,
22   what jumps out there is the chronology.
23             THE COURT:  I don't think, um -- well, anyway,
24   go ahead.  I don't know that res judicata would operate
25   in these cases even though there's a common defendant.
```

1    But we're not there.

2              MS. COHEN:  Yes.  Anyway, you know, what is

3    striking is simply the chronology, the 2005 approval for

4    hormones reviewed by the endocrinologist in 2006, and

5    having it rereviewed again in 2008.  I think that

6    rereview was completed in January or February of early

7    2008 and hormones were not provided then.  The

8    Department had a hold on hormones.  It's the evidence in

9    that case that they had put a hold on hormones for all

10   inmates other than Michelle Kosilek, who is the subject

11   of this proceeding, and then a further hold was placed

12   on them following a security review.  And just last

13   week, December 16th, 2008, some three years later, um --

14   actually 2009, excuse me, some four years later or

15   three-and-a-half years later, Judge Tauro, finally

16   issued a preliminary injunction ordering the

17   commencement of hormones and the selection of a

18   psychotherapist.

19        So, you know, I think if these were findings,

20   final findings, we would be arguing that it is relevant

21   to the deliberate indifference standard.  Once again it

22   shows that the Department has been unwilling to order

23   hormones unless -- to implement the decisions, the

24   documented decisions, even the decision of Dr. Steven

25   Levine, in 2008, that hormones will be administered

1    without a court order.

2         I don't think the facts are in dispute and that is

3    what the record shows in that case.

4              THE COURT:  So basically -- I thought there

5    were a couple of things.  One, Judge Tauro found the

6    security concerns that were expressed by the Department

7    of Corrections to be pretextual, not sincere.  Correct?

8              MS. COHEN:  Yes, your Honor.

9              THE COURT:  Which is one of the things you

10   urge me to do in this case?

11             MS. COHEN:  Yes.

12             THE COURT:  And that was another case where

13   the Department of Corrections, the Commissioner of the

14   Department of Corrections, was not following the

15   recommendations of the medical experts that the

16   Department of Corrections had engaged.

17             MS. COHEN:  Over four and a half years.  And

18   had it reevaluated.  And also there's the suggestion

19   that there was a hold placed on hormones simply because

20   they were hormones, without individualized

21   consideration.

22             THE COURT:  And that's -- I addressed this in

23   200 -- in my decision in 2002, and again in the

24   electrolysis context last month.  My understanding of

25   the law is that it's permissible for the Department to

```
 1   have certain presumptive policies, but ultimately in
 2   this Eighth Amendment right to medical care, there have
 3   to be individualized determinations made to see whether
 4   there's a situation that justifies an exception to the
 5   presumptive policy.
 6        MS. COHEN:  And Judge Tauro relied heavily on
 7   that decision throughout.
 8        THE COURT:  On what you call *Kosilek I*?
 9        MS. COHEN:  *Kosilek I*, yes.
10        THE COURT:  And I saw that Judge Woodlock
11   discussed the implications of that decision in his case
12   where he denied relief, but did focus in on the need for
13   individualized determinations and the conflicting
14   medical evidence with regard to *Battista.*  He didn't
15   know that *Battista* was psychologically fit to
16   essentially have the next steps that *Battista* was
17   seeking.  Did I read that right?
18        MS. COHEN:  Yes.  And I think the analysis the
19   Court has laid out in *Kosilek I* is really the analysis
20   that drives the decision here, with the one exception
21   that we've culled out to you previously, which is that
22   we think there would be a strict scrutiny test as to
23   whether any security concerns can trump the Eighth
24   Amendment.
25        THE COURT:  Well, this is sort of morphing
```

1    into the more fundamental argument.  But Judge Tauro

2    expressed the view that security concerns could trump a

3    need for medical care, what would otherwise have to be

4    addressed, but he found that the security concerns

5    expressed, in his case, were pretextual, not real.

6         MS. COHEN:  And you will shortly hear the

7    plaintiff take that position here as well, your Honor.

8    That even evaluating them under the reasonableness

9    standard that your Honor has suggested, they are simply

10   not reasonable.

11        THE COURT:  Okay.  Mr. McFarland.

12        MR. McFARLAND:  Yes, your Honor.  First of

13   all, the DOC does have policy which provides inmates who

14   are GID with hormones.  In fact, we have five inmates

15   who are on hormones.  But following a case-by-case

16   analysis, there was a decision made, with regard to

17   *Brugliera*, that there were factors that rendered -- that

18   this is a difficult case and that there are some

19   concerns about the inmate's safety and security.  But

20   there is a case-by-case method, which is what the Court

21   -- which we're reading into the *Kosilek I* decision.

22        In this case, the two situations are extremely

23   different.  The *Brugliera* case was injunctive relief

24   based on a five-page security review prepared by a

25   superintendent.  In this case, the case at bar, we have

1   testimony from Commissioner Dennehy, two days of

2   testimony from Commissioner Clarke, testimony from two

3   superintendents, testimony from a warden from the

4   Federal Bureau of Prisons, and testimony from an expert

5   on sexual violence and assaults, Robert Dumond.

6        So we go from 24 days of trial and what is ample

7   testimony and you can't really compare that to a -- to

8   injunctive relief based on a five-page report, looking

9   at whether or not the concerns about this inmate's

10  safety with hormones and developing breasts in a male

11  prison, we'd be able to keep him safe.  That was a major

12  concern in that case.  It's a far cry from the issue we

13  have right now in the sense that we have a lot more

14  testimony and exhibits for the Court to review.

15              THE COURT:  Okay.  Okay.  Well, go ahead.

16              MS. COHEN:  Just one comment, your Honor.

17  There hasn't been allowed to be any discovery about

18  other inmates, so Mr. McFarland's comment about five

19  inmates on hormones would not be part of this case.

20              MR. McFARLAND:  I was just addressing the

21  other case, *Brugliera*.

22              MS. COHEN:  I think it's beyond the scope of

23  *Brugliera*.

24              THE COURT:  Um -- all right.  I've started to

25  get back into the issues and evidence of this case.  I

```
 1    suppose there's a threshold question that you've
 2    implicitly answered, but I'd like you to explicitly
 3    answer.
 4         We're now several years after the trial.  Is there
 5    anybody who asserts that the facts have changed in some
 6    material way since I took the evidence in 2006 and
 7    2007?  To put the question differently, do I need --
 8    except perhaps for electrolysis, any updated evidence?
 9    If the answer to that is "Yes," then I have to take the
10    evidence, but if the answer is "No," then I'll decide
11    the case on the existing record.
12              MR. McFARLAND:  The answer is "No" from our
13    perspective, your Honor.
14              MS. COHEN:  And the answer is also "No" from
15    the plaintiff's perspective.
16              THE COURT:  So I'm going to plan to decide the
17    case on the existing record.
18              (Pause.)
19              THE COURT:  And then -- and you can argue this
20    more expansively, and we've discussed this before, too,
21    but at the beginning of the case the parties stipulated
22    that the Commissioner is the decision-maker on whom I
23    should focus for the subjective prong, but then
24    Commissioner Dennehy testified that she wasn't a doctor,
25    she relied on the doctors at UMass and the people they
```

1    hired for the medical judgments, but my memory is that

2    she testified, you know, that she accepted their

3    judgment that there's a serious medical need and that,

4    in their view, that Sex Reassignment Surgery is

5    required.  But she took the position that the security

6    concerns, however, precluded providing that treatment.

7    And as far as I recall, and I don't have as vivid a

8    recollection on this, and I can go back and check the

9    testimony this weekend, but Commissioner Clarke agreed.

10         So it seems to me that either I should focus on

11   the doctors who are hired for treatment and not

12   litigation purposes for the subjective prong and/or say

13   the Commissioners have relied on those doctors.  So

14   essentially the subjective prong seems to be -- well,

15   the Commissioners have relied on those people and sort

16   of shared the doctors' state of mind.  So what are your

17   thoughts on that?

18         MR. McFARLAND:  Well, your Honor, clearly the

19   subjective prong, I think, would go towards the

20   Commissioner since he made a decision that there were

21   insurmountable obstacles to providing the actual

22   surgery.

23         THE COURT:  I don't think that's the

24   subjective prong.  The subjective prong goes to whether

25   there's a substantial risk of serious harm if there's

1   not -- you know, whether somebody -- whether the

2   decision-maker has formed the opinion that there's a

3   substantial risk of serious harm, if there's not

4   surgery, as opposed to whether the security concerns

5   trump the need for surgery.

6           MR. McFARLAND:  Well, I mean, the doctors are

7   familiar -- I think Commissioner Clarke read -- somebody

8   read the testimony, read the recommendations from

9   Dr. Seil, so they're both aware of the -- some of the

10  medical testimony as well as the medical

11  recommendations, um, and those went into their

12  consideration with regard to whether there was an

13  excessive risk of harm that the DOC could not manage.

14          THE COURT:  So you say I should still focus on

15  the Commissioner for the subjective prong?

16          MR. McFARLAND:  Well, as to that the decisions

17  were made by the Commissioner.  But that they would not

18  be able to completely fulfill, as the Court ordered,

19  that they would have difficulty and certain

20  insurmountable concerns and obstacles to providing

21  surgery for the plaintiff.  But they are not doctors.

22  They're not medical people.

23          THE COURT:  Miss Cohen.

24          MS. COHEN:  Your Honor, I think the way the

25  issue was left is the following.  That the subjective

1    belief of UMass regarding Michelle Kosilek's medical

2    treatment is the relevant standard and that they were

3    the official delegated with responsibility to determine

4    the medical treatment for the prisoners.  And that was

5    dealt with, I think, by both -- well, your Honor spoke

6    to it and we spoke to it at the September 19th, 2007

7    closing, at 18 to 19.

8         And I think there was a letter written by

9    Commissioner Dennehy to the Court.  And I think that's

10   Exhibit 106.  And I'm not sure I have it with me this

11   morning.  And thereafter the Court had raised the

12   question about whether that letter was written by

13   counsel or reflected Commissioner Dennehy's views?  She

14   came in and testified on, I believe it was October 18th,

15   2006, acknowledging that the medical and mental health

16   provider believes there's a serious medical need for

17   SRS.  And although Commissioner Clarke was less precise

18   about this, he didn't back away from that position in

19   his testimony.

20        That would leave the two issues to focus on,

21   first, objectively, is there a need for Sexual

22   Reassignment surgery, and in that regard I think your

23   Honor has consistently asked us to focus on

24   Dr. Schmidt's testimony and whether that presents an

25   alternative within the standards of generally-accepted

1   treatment?  And then the other question would be, um,

2   the question of are there legitimate security concerns

3   and what would be the standard that would apply to such

4   concerns, is it reasonableness or strict scrutiny?

5          THE COURT:  Well, that's my memory of the way

6   things evolved.  I'll check the transcript of the last

7   closing argument.  But I think, as a practical matter,

8   it may not make a difference, since the Commissioner is

9   essentially -- can know what the doctors know and don't

10  dispute the doctors, they just put great weight on the

11  stated security concerns.  But I'll check on that.

12         MS. COHEN:  I think it was probably most

13  clearly articulated in the -- there were two closings,

14  one in late June, June 23rd, I think, and the 24th of

15  2006, and then the closing, September 12th, 2007, where

16  there was colloquy about this around Page 18.  And then

17  Commissioner Clarke's testimony that I believe would be

18  most relevant was May 13th, 2008 at Pages 34 to 38.

19         THE COURT:  And then I have -- a big part of

20  what I've struggled with, until I put this down, is the

21  issue of whether what Dr. Schmidt recommended is within

22  the range of -- is adequate and within the range of what

23  prudent professionals in the community would consider

24  reasonable.  I appointed Dr. Levine because I thought

25  that this is a medical decision before it's a judicial

1    decision.  Dr. Levine's report, deposition, and then

2    lengthy trial testimony is not perhaps unequivocally

3    clear, although it did educate me to the complexities.

4         But there's a -- part of his testimony that

5    engaged my interest, particularly over the weekend, I

6    want to mention it to you so you can -- as you address

7    this more generally, have it in mind.  Looking at the

8    December 19, 2006 transcript, particularly Pages 180 to

9    190.  I'm sorry, 190 to -- 191.  If you have it, you

10   might want to get it.

11             (Pause.)

12             THE COURT:  Do you have it?  As I recall, in

13   his report, Dr. Levine said Dr. Schmidt was within the

14   range of prudent professionals in his recommendations

15   for Michelle Kosilek.  But at 190 to 191, starting on

16   Page 12, in response to a question from me that was

17   aimed at getting an answer as to whether Sex

18   Reassignment Surgery was reasonable or the only

19   reasonable response.  And I said:  "Put aside cost, put

20   aside security concerns, from a purely medical

21   perspective is it also within the range of what is

22   reasonable, that is, which prudent professionals in your

23   profession would prescribe, to deny Sex Reassignment

24   Surgery and to use psychotherapy and, if necessary,

25   hospitalization or antidepressants?"  Dr. Levine

1    responded:  "I don't think we would prudently deny Sex

2    Reassignment Surgery, life, reality would deny Sex

3    Reassignment Surgery."

4           And, as I was getting back into this, it occurred

5    to me that perhaps Gender Identity Disorder is different

6    than, say, treating cancer, and in this respect.  If a

7    patient has cancer, she might go to one or more than one

8    professional.  The professionals might say this is --

9    this isn't the only way to treat it or they might

10   provide some options.  And then if the person -- well,

11   pretty much the professionals are in control -- well, or

12   they might provide some options.

13          And I thought perhaps that what Dr. Levine was

14   saying here is that with regard to Gender Identity

15   Disorder, doctors don't prescribe Sex Reassignment

16   Surgery, they make a determination as to whether

17   somebody is eligible for it.  Do they have severe Gender

18   Identity Disorder?  Have they gone through the real-life

19   experience, including hormones?  Are they eligible?  And

20   then some doctors write letters.  And if I remember

21   right, Dr. Schmidt doesn't.  But he wouldn't stand in

22   the way of somebody else advising a surgery and that

23   this person is eligible.

24          But I thought what Dr. Levine perhaps was saying

25   here, on Pages 190 and 191, is that, you know, all

1  prudent professionals would say that if Michelle Kosilek

2  were not in prison, that Michelle Kosilek is eligible

3  for Sex Reassignment Surgery, but possibly life or

4  reality would prevent it, if there's no insurance to pay

5  for it, if there's no money to pay for it.  That it

6  would be a problem, for example.  And then he's saying

7  here, you know, that if life, reality prevents it, then

8  Dr. Schmidt's response would be prudent, you know, to

9  use psychotherapy, to use antidepressants, you know, to

10  monitor the person closely.  And unless the law has

11  changed since I wrote it in 2002, and you agreed it was

12  still the law, I think, in 2007, in the prison context,

13  that cost is not a cognizable concern.  So I am

14  interested in your views on what I should interpret

15  Dr. Levine to be saying here.

16       Because, for example, on 191, I asked him:  "Do

17  other prudent professionals deny Sex Reassignment

18  Surgery if somebody is ready and eligible?"  And he

19  said:  "I don't think so.  If they do, it's on the basis

20  of something of what we call 'countertransference of

21  their own ethical beliefs'".

22       So he -- so now you know my -- you know my main

23  questions or my present state of mind if -- if it seems

24  to me that if I concluded -- and I haven't reached any

25  conclusions, but that if Michelle Kosilek is not in

1    prison, all prudent professionals would say, "You may,"

2    you know, "You're eligible for Sex Reassignment Surgery,

3    we'll facilitate it, but we won't stand in the way of

4    it," then I think I'd have to focus in on whether there

5    was a valid reason for the prison not to provide it.  As

6    I said, as far as I know, cost is not a cognizable

7    consideration, although -- and I described that in

8    **Kosilek I**.  But if there's more law on that, I'd like to

9    read it.

10        And political controversy would not be a valid

11   reason not to provide it.  With regard to security, that

12   is, whether security concerns could trump a need for

13   adequate medical care for a serious medical need, I left

14   that issue open in **Kosilek I**.  I think Judge Tauro,

15   perhaps in dicta, found that security could trump what

16   would otherwise be a right to medical care, but he found

17   the security concerns in his case pretextual and that's

18   something I know I'm going to have to decide in this

19   case.

20        So those are some of my -- well, it kind of

21   captures my present state of mind.  Which of you would

22   like to go first?  We can go now until about 1:00 and

23   then, if necessary, which it may be, we can resume at

24   2:00.  Okay.  Mr. McFarland.

25             MR. McFARLAND:  Yes, your Honor.

CLOSING STATEMENT BY MR. McFARLAND:   (Revisited.)

        Good morning, your Honor.  The evidence in this jury-waived trial was closed -- can you hear me? -- was closed with the testimony of the current Commissioner of Correction, Harold Clarke, in May 12th and 13th of 2008.  This court has heard over 20 witnesses over 24 days, including 7 experts, and with regard to the diagnosis and treatment of Gender Identity Disorders. The Court has heard testimony with regard to the safety and security concerns raised by the defendants.  Um, testimony from the former Commissioner, Kathleen Dennehy, the current Commissioner, Harold Clarke, Superintendent Luis Spencer, Superintendent Lynn Bissonette, and the Federal Bureau of Prisons' Warden, Dr. Beeler, and Robert Dumond, the DOC Director of Treatment and -- of Planning and Research.

        Commissioner Clarke has maintained, through his testimony and his reports, that there are insubstantial -- insupportable -- insurmountable, sorry, burdens with regard to the transfer of the plaintiff out of state for the surgery and for a return to this state and the placement of him in safe custody.

        The evidence in this trial demonstrates that the plaintiff is presently receiving adequate treatment for

1    Gender Identity Disorder.  The evidence at trial shows

2    that Commissioner Clarke's decision to prohibit the

3    surgery, like the decision of former Correction --

4    Commissioner of Correction, Dennehy, is based on

5    legitimate security and safety concerns, not with the

6    intention to cause pain to the plaintiff.

7         With regard to the objective component of the

8    standard, we believe that the plaintiff has not met that

9    burden.  We believe that the plaintiff has done well

10   while at MCI Norfolk.  He continues to receive

11   psychotherapy and receive treatment with hormones since

12   2003.  He has access to female clothing and cosmetics.

13   He has had laser hair removal and some electrolysis.  He

14   presently --

15        THE COURT:  Excuse me just one second,

16   please.

17        Dennis, could you turn that microphone up.

18        (Pause.)

19        THE COURT:  Okay.

20        MR. McFARLAND:  Can you hear me better?

21        THE COURT:  I can hear you now.

22        MR. McFARLAND:  The plaintiff has received

23   long-term psychotherapy at prison.  The plaintiff

24   resides in a single cell.  He continues to be employed

25   within the prison.  He gets along well with other

1    inmates and staff and he engages in programs and
2    activities within the prison.
3        The evidence at trial showed that the plaintiff
4    appears to do well on the current treatment regimen.
5    That there is a lack of depression, a significant
6    reduction of dysphoria, a reduced anxiety, and a lack of
7    suicidal ideation on the current treatment plan.
8        Dr. Brown testified that he found significant
9    changes in Kosilek's behavior between his 2001
10   evaluation and his 2005 evaluation, all due to the GID
11   treatment.  He found an absence of depression, a lack of
12   the anxiety, and a lack of suicidal ideation from the
13   plaintiff.
14       Dr. Appelbaum testified that the reports to the
15   mental health community that you oversaw reported
16   similar benefits and improvements in Kosilek's
17   dysphoria.
18       Dr. Kaufman also testified that hormone treatment
19   had improved the plaintiff's mood, his self-esteem, and
20   reduced the dysphoria.
21       One of the issues raised at this trial is the
22   threats of suicide should the plaintiff not be provided
23   the Sex Reassignment Surgery.  Dr. Forstein testified,
24   though, that it is difficult to predict future
25   suicidality and he refused to do that.  Dr. Levine also

1   testified that absent Sex Reassignment Surgery, the

2   plaintiff would have an existential crisis, but suicidal

3   behavior is not a certainty in his case.

4           THE COURT:  Well, let me ask you this, and

5   this is a matter that's concerned me.  But is it

6   possible that the plaintiff would have a serious medical

7   need or be able to prove a serious medical need without

8   persuading me that she's likely to commit suicide if the

9   Sex Reassignment Surgery is denied, that is, that

10  they'll be, you know, intense psychological pain, even

11  though it's uncertain whether that will lead to an

12  attempt to kill herself?

13          MR. McFARLAND:  Well, your Honor, all the

14  reports from all the experts is that Kosilek has done

15  very well in the current treatment plan and that it's

16  only upon the ultimate denial of surgery with this court

17  or a higher court that he would undertake a rational or

18  an existential decision to harm himself.

19          THE COURT:  Well, that addresses a somewhat

20  different point.  I was asking -- it does add something,

21  it reminds me of something, or confirms my memory.  To

22  the extent, say, Dr. Brown noted an improvement and a

23  lack of suicidality now, he pinned that on the fact that

24  there's still a hope of getting the Sex Reassignment

25  Surgery.  I think Dr. Brown's view was that if that hope

1    were ended, um, there's a good chance that Kosilek would

2    try to kill herself.

3         Is that a correct memory of his testimony?

4              MR. McFARLAND:   That's correct.   And the

5    experts disagreed.   Where Dr. Brown said it would be a

6    -- a kind of a rational basis or a rational decision,

7    other doctors felt it might be due to depression based

8    on not getting what one has been seeking for many, many

9    years, an "existential crisis," as Dr. Levine called

10   it.

11             THE COURT:   The issue that I was trying to

12   raise with you, though, is does the plaintiff have to

13   prove a likelihood that she'll attempt suicide in order

14   to establish a serious medical need or does she just

15   have to prove that she'll be in intense painful

16   distress?

17             MR. McFARLAND:   You mean at the conclusion of

18   everything when it's a final denial?   That really wasn't

19   addressed by the -- among the experts in the testimony,

20   it was more that if she -- "If Kosilek does not get it,

21   this is what's going to happen."   I presume there could

22   be some -- you know, it could be deemed to be a

23   depression, so feeling morose, feeling sad.   It could be

24   feeling anxious.   It could all be parts of that feeling,

25   experienced by the plaintiff, should the final decision

```
 1    be made that there is no surgery coming along.  But,
 2    again, Dr. Levine and Dr. Schmidt said that that's not
 3    uncommon to have that happen to somebody to become very
 4    depressed if what they've wanted for all their life is
 5    no longer available.  Dr. Forstein and Dr. Brown, I
 6    believe, testified that it was a -- it wouldn't be the
 7    result of a depression, it would be the result of a
 8    decision on Kosilek's part that "I can't live as a
 9    female anymore."  "I can't live as a female with male
10    genitalia anymore in prison."
11               THE COURT:  That's what the suicidality would
12    be?
13               MR. McFARLAND:  Yes, and not due to a
14    depression, due to a choice on the part of Kosilek to
15    not want to live with male genitalia for his life in
16    prison.
17               THE COURT:  Okay.  Go ahead.
18               MR. McFARLAND:  Dr. Levine testifies that if
19    the plaintiff were denied the surgery, that he would
20    recommend frequent, even daily meetings with
21    psychotherapists and close monitoring for suicidality
22    and perhaps use medications, similar to what Dr. Schmidt
23    had predicted.  Dr. Forstein even agreed that if the
24    plaintiff became depressed, after a denial of surgery,
25    that it would be prudent to try to get her a formula
```

1    such as intensive psychotherapy and antidepressive

2    medications and monitoring for suicidal behavior.

3         Dr. Schmidt testified at length that he is an

4    expert psychiatrist with extensive experience in the

5    diagnosis and treatment of GID.  He founded the Sexual

6    Behavior and Consultation Clinic at Johns Hopkins in

7    1971 and has been involved with the evaluation of over

8    300 individuals.  Dr. Schmidt evaluated the plaintiff at

9    MCI Norfolk and he also agreed with the other experts

10   that Kosilek had -- was able to function at a high level

11   in prison.  Dr. Schmidt felt that there was no real

12   necessity for providing the plaintiff with the surgery

13   based on the greater -- the great functionality of the

14   plaintiff, he also had serious concerns about the

15   ability to conduct a real-life experience in a prison

16   environment when in the Standards of Care they're

17   focusing primarily on the community.

18            THE COURT:  Am I correct in recalling that

19   both Dr. Schmidt and Cynthia Osborne, the social worker

20   from Johns Hopkins, are of the view that a prisoner

21   cannot have a real-life experience in prison as

22   contemplated by the Standards of Care and that's one

23   reason why Michelle Kosilek, in their opinion,

24   particularly Dr. Schmidt's opinion, is not eligible for

25   Sex Reassignment Surgery?

1          MR. McFARLAND:  That is part of it.  They were

2     also worried about the effects of isolation on the

3     plaintiff and how that might enhance or increase the

4     desire for the surgery.  And I might add to that that

5     Dr. Levine --

6          THE COURT:  What does he mean by "isolation"

7     in that context?

8          MR. McFARLAND:  Well, you're certainly not in

9     the community, you're an inmate in prison, you're

10    different from other inmates, there's a bit of isolation

11    in there.  There's no one to really bounce off, no one

12    similar to you, to bounce off ideas and talk about what

13    is going on in your mind.  Cynthia Osborne was also one

14    who promoted the initiation of group therapy for GID

15    inmates to help them discuss issues and work through

16    some of their concerns and desires.

17         But Dr. Levine also shared the concerns of Cynthia

18    Osborne and Dr. Schmidt about the, um, the fact that the

19    Standards of Care did not really address the real-life

20    experience to fit in a prison.  And he said that it

21    would be, um, a very difficult, but not impossible

22    situation.  And he really felt that it was the first

23    time that he heard it being done in a prison

24    environment.  And he was on the committee that drafted

25    this regulation, this Standard of Care.

1          THE COURT:  My memory or my understanding of

2    the real-life experience is that it's intended to test

3    whether somebody is, um, unequivocally committed to

4    living as a female.  With a real-life experience not in

5    prison, a person could take hormones, a person could

6    wear female clothing, a person could go to work that way

7    or interact with his family that way, and after a period

8    of time, 6 months or a year, and I don't remember what

9    the minimum period is, you know, that a doctor would be

10   able to test, you know, is this person comfortable

11   living like this or is this person equivocal?  Because

12   the Sex Reassignment Surgery would be essentially

13   irreversible.  So you want to make sure somebody is

14   comfortable.

15        Is that an appropriate understanding of the real-

16   life experience?

17          MR. McFARLAND:  That is correct, your Honor.

18   I do think that, um -- you know, that there are some

19   concerns about, in the community, the individual

20   confronts a lot of things that you wouldn't do in

21   prison, you'd go to the library and you'd have people

22   laughing at you or you'd have people on the bus.  There

23   are a lot of things that are more complex, more

24   confrontational in the community than they would be in

25   the prison.  But, um -- so then they definitely felt

```
1    that as these Standards of Care were written, this
2    prison environment was not the place to meet that.  In
3    fact, Dr. Levine testified that there were no studies
4    that he was aware of which show that a prisoner in
5    custody could undergo this.  There's been no scientific
6    studies at all about this area of law.
7              THE COURT:  This area of medicine.
8              MR. McFARLAND:  Yes, this area of medicine.
9    I'm sorry.
10             THE COURT:  Well, sometimes judges and juries
11   are asked to answer questions that scientists haven't
12   yet answered because you have a particular case and
13   controversy.  But what I believe I concluded in 2002 is
14   that one can have a real-life experience in prison.
15   That's Michelle Kosilek's real life.  It's where she's
16   going to be for the rest of her life.  There's no
17   possibility of parole.  And so if she's had the
18   opportunity to take hormones, to wear female clothing,
19   and hasn't shown any ambivalence about having Sex
20   Reassignment Surgery, the goals of a real-life
21   experience have been met.  Why shouldn't I reason that
22   way?
23             MR. McFARLAND:  Well, I think there is some --
24   a number of issues raised.  One was that -- the fact
25   that, again, Dr. Levine's whole premise that there is a
```

1   lack of scientific evidence supporting Sex Reassignment

2   Surgery as a pure early treatment for GID and this falls

3   within that.  There are no studies that have been done

4   whatsoever regarding, um, can a prison provide a real-

5   life experience such as Miss Kosilek has been

6   undergoing.  You're also looking at the fact that the

7   Standards of Care have not been changed in many, many

8   years and this issue has been out there for 5 or 10

9   years.  Maybe the Standards of Care should have changed

10  to reflect this?  But it's still 10 years later and

11  nothing has happened.

12      There's been no -- there are no studies.  There's

13  no effort to really focus Standards of Care on prisoners

14  beyond making sure that they can get hormones if they

15  enter prison with hormones.  So that shows you a lot

16  that there is, again, nothing out there that addresses

17  scientifically the premise, can -- I mean, based on

18  compassion, perhaps.  You know, "Kosilek has done all of

19  these other things, so why not just go ahead and give

20  her surgery because she's worked very hard for this."

21  But that's not based on scientific evidence the way

22  Dr. Levine stated in his testimony and in his reports.

23      Dr. Levine described GID as an "orphan disorder"

24  and he said that because it was not popular, there is no

25  money available to conduct any long-term studies on the

effects of hormones on GID individuals, that there are

no long-term studies to look at the benefits of Sex

Reassignment Surgery on individuals.  He called them

"loss to follow," that there are a lot of patients who

have the surgery and are never seen again.

So you don't know whether these individuals who

have gone through the surgery have been successful or

they just decided that "It didn't work, you know, so

what can I do about it now" or have just gone somewhere

else.  He said that without a high level of scientific

evidence, it's just a matter of saying, "Well, this is

what the patient wants, so we'll just go ahead and do

it."

THE COURT:  But if that's what prudent

professionals do, why shouldn't the Department of

Corrections -- wait, for a moment, putting aside

security, be required to permit it?

MR. McFARLAND:  Well, I mean, if you simply

ignore the fact that there is no evidence and go on

advocacy or compassion, um, that may not be the best way

to justify an irreversible treatment.

THE COURT:  But the standards -- I mean, I

previously found that the Standards of Care, um, are

guidelines, but they're followed by prudent

professionals.  Don't the Standards of Care say that, in

1    some instances, Sex Reassignment Surgery is medically

2    necessary and not cosmetic?  Don't they say that?

3              MR. McFARLAND:  Yes, they do.  And, again, if

4    you heard Dr. Levine's testimony, the Harry Benjamin

5    Society is an advocacy group and a scientific group and

6    that they don't like to hear from people who have any

7    kind of disagreement with them.  And if you say that

8    "the emperor has no clothes," then they don't want to

9    talk to you.  And that's what he was saying in his

10   report and in his testimony.

11        That in the absence of double-blinded studies with

12   large samples, you're going on this kind of compassion

13   that this individual deserves to have the surgery based

14   on compassion, and that is unique to this situation.

15   And he said that, you know, that improvements in

16   treatment for GID have come through the testimony of

17   experts and he said that is the most vulnerable

18   scientific evidence is to have an expert, someone like

19   Dr. Brown, testify that this is what he thinks is the

20   appropriate way of doing it, but not providing a follow-

21   up of people he has recommended for surgery over the

22   next 5, 10 or 15 years.

23              THE COURT:  But -- well, I have to look at

24   what prudent professionals do, whether they're motivated

25   by scientific studies or compassion.  I -- for the

1    objective part, I have to look at what the prudent

2    professionals do.  And the fact that this area hasn't

3    been studied, because people with Gender Identity

4    Disorder, sometimes known as "transsexuals," are

5    unpopular, doesn't necessarily mean that particular

6    individuals don't have a medical need for a particular

7    treatment.  There were times when, you know, leprosy or

8    even cancer were stigmatized.

9         But part of the -- part of what I recall from

10   Dr. Levine's testimony that is consistent with what

11   you're saying is this -- in contrast to, say, treatment

12   of cancer, where doctors might disagree, basically their

13   positions are based on scientific evidence and what

14   weight they give to different science.  Here there's a

15   somewhat -- I think Dr. Levine said, perhaps not in

16   these words, but there's a political or a philosophical

17   or sometimes theological dimension to what doctors

18   involved in the area think is ever appropriate or

19   appropriate for a particular person.

20        Am I remembering that right?

21            MR. McFARLAND:  Yes, correct.  And Dr. Levine

22   came down both ways, if you recall, and said that there

23   is no scientific evidence supporting the premise that

24   surgery is a cure or an effective treatment for GID.  On

25   the other hand, in other testimony he said, but, you

1    know, wouldn't it be really okay to give Kosilek the

2    surgery, not because science has changed in the past

3    half hour or an hour, but because he felt that Kosilek

4    maybe deserved it.  He believed he had worked hard.  But

5    he agreed not to.  That -- his change, with regard to

6    the prudency of the surgery, was based on compassion,

7    not on scientific evidence saying, "This is a proven

8    effective treatment and we have all these studies to

9    show you that for the past 10 years."

10        And he looked at the study relied on by Dr. Brown,

11    the Pfafflin & Jung study, and he was very critical of

12    that study.  And he said that one third of the people

13    studied said that there was no difference, no

14    improvement after the Sex Reassignment Surgery.  And he

15    questioned some of the studies that they looked at as

16    being not -- as being lacking in adequate science

17    techniques, a lot of the individual case studies.  So he

18    came down very hard on that review by Pfafflin & Jung,

19    which has been supported by or cited by many, many

20    advocates and raised as showing that Sex Reassignment

21    Surgery is an effective curative treatment for Sex

22    Reassignment -- for GID.

23        So he definitely made it clear -- and his point

24    was to educate the Court and the parties as to his

25    knowledge of the disorder and what was out there.  And

1    clearly he was very bothered by the fact that there is

2    not scientific evidence in support of this life-altering

3    irreversible surgery even though many people who have

4    the money can go ahead and do it without any kind of

5    scientific or psychological hurdles in their way.

6          Dr. Levine did find that Dr. Schmidt's

7    recommendations, while not popular with the advocates,

8    were within the prudent -- were within community

9    standards, were prudent decisions.

10              THE COURT:  Where -- and -- well, Dr. Levine

11   seemed to say different things at different times.  Do

12   you have a particular reference for that?

13              MR. McFARLAND:  Page 94.

14              MS. COHEN:  Excuse me, your Honor.  I didn't

15   hear the page?

16              THE COURT:  94.

17              MR. McFARLAND:  94.

18              MS. COHEN:  Thank you.

19              (Pause.)

20              MR. McFARLAND:  It's also in his report as

21   well as it gives a report, your Honor.

22              THE COURT:  Yeah.

23              (Reads.)

24              THE COURT:  Okay.

25              MR. McFARLAND:  This report is at Exhibit 98.

```
 1              (Pause.)
 2              THE COURT:  Exhibit 98?  In fact, I can't lay
 3    my hands on my copy.  Do you recall where in your report
 4    that is?
 5              MR. McFARLAND:  Um --
 6              THE COURT:  Well, I can find it.
 7              MR. McFARLAND:  I think it's on Page 98.
 8              (Pause.)
 9              THE COURT:  Okay.  Why don't you go ahead.
10              MR. McFARLAND:  Dr. Levine, also in his
11    testimony, addressed the concerns of Dr. Brown, that it
12    was inevitable that the plaintiff would kill herself if
13    denied the surgery.  And I would like to quote from
14    Dr. Levine's testimony.
15              THE COURT:  What page?
16              MR. McFARLAND:  That's Page 98 at Line 20.
17              (Pause.)
18              THE COURT:  Okay.
19              MR. McFARLAND:  "I think there are limitations
20    to the view that, you know, inevitably she will kill
21    herself.  I don't really think we should say she will
22    inevitably kill herself, but I think it's very
23    reasonable to say that she will have an existential
24    crisis and she ought to be protected and assisted
25    throughout -- through that crisis, if that is the
```

1    Court's decision about SRS, Sex Reassignment surgery."

2         Dr. Levine agreed with Dr. Schmidt's

3    recommendations, if the hormones were denied, that -- to

4    provide intensive psychotherapy, to make available

5    antidepressive medications and perhaps one-on-one

6    observation or hospitalization.  Dr. Forstein testified,

7    in rebuttal, that if the plaintiff was willing to accept

8    the therapy offered to her, after the denial of the

9    surgery, that it could be a positive thing for the

10   plaintiff, but he doubted the plaintiff would be willing

11   to accept therapy at that point in time and he would

12   describe a denial, or a refusal to cooperate with the

13   mental health people, to be a "self-inflicted wound."

14        Dr. Kaufman also agreed that should the plaintiff

15   become depressed after the denial of Sex Reassignment

16   Surgery, he would try and help the plaintiff reconcile

17   life in prison without the surgery and motivate the

18   prisoner, motivate the plaintiff to find reasons to want

19   to live, which was basically what Dr. Levine was talking

20   about in most of his testimony.

21        There was a lot of testimony at trial regarding

22   the suicide prevention procedures available in the

23   prison.  Dr. Appelbaum testified at length regarding

24   prevention procedures available at MCI Norfolk.  You

25   heard testimony of MCI Norfolk Superintendent, Luis

1    Spencer.  Exhibit 5 of the evidence is the copy of the

2    Mental Health Services' suicide prevention procedures in

3    place at MCI Norfolk.

4             THE COURT:  I think I may have written this in

5    2002, but let's say somebody had a burst appendix and

6    was in intense pain and the pain was so intense that the

7    person was considering killing himself.  It wouldn't be

8    legally sufficient, would it, to just try to give that

9    person therapy or medication to alter their mood so they

10   could endure the pain and not kill themselves, would

11   it?

12            MR. McFARLAND:  No, it wouldn't, your Honor.

13   But that's a very different case.

14            THE COURT:  Well, that's the point.  I think

15   the plaintiff argues it's the same case.  That the law

16   doesn't make a distinction between medical conditions

17   that cause pain and psychological conditions that cause

18   pain and that having these male genitalia is causing

19   pain comparable, they would argue, to having a burst

20   appendix.

21            MR. McFARLAND:  Well, that's a pain that a

22   person can live with for many, many, many, many years

23   and, in fact, the studies and Dr. Levine stated that the

24   vast majority of individuals with GID do not get Sex

25   Reassignment Surgery.  So they're able to live with that

1    pain, that anxiety, that uncomfortableness for 10, 20 or

2    30 years.  It's only the rare case where the individual

3    says, "If I don't get rid of these organs, then that's

4    it, I'm going to have to hang it up."  But that's very

5    different than an appendix, a person with an appendix

6    that bursts, who will have to get treatment.

7              THE COURT:  Well, it may be.  Well -- the

8    pages I pointed you to in Dr. Levine's testimony -- and

9    I -- I don't think he was being wishy-washy, I think he

10   was trying to communicate the complexity in this area.

11             MR. McFARLAND:  I would agree.

12             THE COURT:  Um, the pages I pointed you to

13   seemed to say that if Michelle Kosilek were in the

14   community, any prudent professional would say "You're

15   eligible for Sex Reassignment Surgery, you know, if you

16   can afford it and find somebody to do it, you know, so

17   go get it."

18             MR. McFARLAND:  Well, that assumes an awful

19   lot because Kosilek, within the confines of the prison,

20   has been able to keep the personality disorder in

21   control.  She's been able to do a lot of things that

22   certainly were not available when she was out in the

23   community and when she killed her wife.  There was a lot

24   of stuff going on then.  You cannot possibly say that

25   everything has happened to Kosilek in regard to the

1      internal -- the external controls placed on her in the

2      prison, which would -- and it would not be there in the

3      community, that she would be the same person.  That

4      person had a huge criminal record and, you know, was

5      involved in lots of things in the community.

6          In prison, Kosilek has done very well.  She's well

7      behaved, works at a job, no incident reports, gets along

8      well with others --

9              THE COURT:  Okay.  Well, that really goes to

10     whether there's a serious medical need.  If I understand

11     it, your arguments, and you only probably have to win on

12     one of them, is you first say there's no serious medical

13     need, the hormones, the female clothing, have adequately

14     addressed the issue.  And the plaintiff's argument is

15     the hormones, the clothing, and the hope of Sex

16     Reassignment Surgery has adequately addressed the issue,

17     but it will become intensely painful if there's no hope

18     of Sex Reassignment Surgery.  But that's one issue,

19     right?

20              MR. McFARLAND:  Correct.

21              THE COURT:  Then if the plaintiff wins on that

22     issue, I think I have to decide whether therapy, maybe

23     antidepressants, close monitoring or adequate medical

24     care, that is, something that prudent professionals

25     would prescribe if Kosilek were in the community, and at

1    least on the pages that I mentioned, Dr. Levine seemed

2    to say that anybody, that any prudent doctor with

3    expertise in this area would authorize the Sex

4    Reassignment Surgery, but life, reality might keep it

5    from occurring.  No money.  No insurance.

6         And then you say this person -- you know, in those

7    circumstances, sort of as a fall-back, you treat the

8    symptoms, the suicidality, the depression, the mental

9    anguish.

10        MR. McFARLAND:  And, in fact, some of the

11   doctors said that there was no guarantee that even if

12   you did provide Kosilek with the surgery, that there

13   wouldn't be a possibility of suicide after the fact for

14   a variety of reasons.  That there's no guarantee.  And

15   Dr. Levine mentioned one of his clients who had the

16   surgery and committing suicide.  There are also all

17   kinds of side effects, as described by Dr. Schecter in

18   his deposition, about what could happen in the surgery.

19        But the Department of Correction has put together

20   an extensive policy with regard to inmate suicide

21   prevention.  They hired a well-known prison suicide

22   expert, Lindsay Hayes, to look at the system, to make

23   recommendations.  That was, I think, Exhibit 100.

24   Exhibit 101 is the Department's adoption of all

25   recommendations and a plan to improve the policies and

1    the procedures and the physical plants with regard to

2    suicide.

3           THE COURT:  Well, as I expect, you know, I've

4    got another case involving whether the Department takes

5    adequate measures to prevent suicide of mentally ill

6    patients and there are now financial constraints that

7    frustrate the implementation of things that the

8    Department wanted to do.  But I think at the moment I'm

9    at a little different place than perhaps I was

10   previously.  And you've helpfully addressed it, the

11   analogy, you know, to the burst appendix.  In other

12   words, you know, even if the Department can keep

13   somebody from killing themselves, if you can give

14   somebody a pill and then they wouldn't be in such pain

15   that they're thinking about killing themselves, you'd

16   have to give them the pill.

17          MR. McFARLAND:  The testimony was that it

18   would be an existential crisis that the plaintiff will

19   experience and that we would work very hard to get her

20   through that.  And Dr. Levine talked a lot about having

21   the patient see the benefits of living on and the

22   benefits that she could impart to other people if this

23   was to happen.  And not to give up on life, but to use

24   that life to the benefit of others and impart her

25   knowledge of it.  That was a large part of his testimony

1    in talking about what would happen if the plaintiff

2    became depressed and suicidal.

3                THE COURT:  All right.  At some point I would

4    like you to get to the issue of the security concerns.

5                MR. McFARLAND:  Sure.  I can address that now,

6    your Honor.

7         As the Court is well aware, the Supreme Court in

8    *Helling vs. McKinney,* has held that the principal

9    constraints facing any corrections administrator may be

10   appropriately considered with regard to the subjective

11   prong of the Eighth Amendment inquiry.  And the

12   testimony that this court has heard throughout this

13   trial makes it clear that there are significant

14   constraints on the Commissioner with regard to providing

15   the surgery that the plaintiff is demanding.

16        Now, you heard the testimony of Commissioner

17   Dennehy for over four days and she talked at length

18   about her concerns with regard to the plaintiff having

19   to be transported to a western state, such as Arizona or

20   Colorado, and the fact that that would present an escape

21   risk -- a risk of escape for the plaintiff.  The fact

22   that that risk of escape is based upon the plaintiff's,

23   I believe, a life sentence without parole, and also

24   looking at the plaintiff's flight from the state upon

25   killing Cheryl Kosilek.

1           THE COURT:  What -- if I got to the point of

2    ordering -- I've been trying to think, over the weekend

3    primarily, of where that evidence fits in the analysis

4    and one thing that occurred to me is, you know, if Sex

5    Reassignment -- if ordering Sex Reassignment Surgery is

6    otherwise justified, I could order it, and then if the

7    Commissioner came back and said, "You know, we can't

8    find anybody who will do the surgery" or, you know, "We

9    have to transport Miss Kosilek to Illinois and that's

10   too dangerous," you know, then I would take it up

11   probably in a motion for contempt or something.  The

12   plaintiff would say, "Judge, they're not implementing

13   your order" and the defendant would say "It's not a

14   willful violation.  You ordered us to do something

15   that's practically not feasible."  And that I might

16   consider that then.

17        Why isn't that the right place to consider the

18   issue of how this surgery would be done or who would do

19   it or where it would be done?

20           MR. McFARLAND:  Well, because it all falls

21   within this same picture of what would happen in this

22   case.  I mean, it's never been done before and the fact

23   that they would have to transport the plaintiff to, um,

24   Arizona or Colorado, because the two places, I think, do

25   have clinics, and the huge risk of escape.  I mean, they

1    testified at length that any time an inmate leaves the

2    facility, there is a chance of escape.  When the

3    plaintiff would leave the facility to go to a medical

4    appointment or to court, there are generally two -- a

5    chase car and two cars, two vehicles, and three

6    officers.

7              THE COURT:  How do we know there's nobody in

8    Massachusetts who would do it?

9              MR. McFARLAND:  Well, the evidence at trial

10   did not show that.  There was a case where Dr. Schecter

11   had -- was looking into coming to the state to do it and

12   it was determined by UMass that, as the procedures were

13   set, that they would not be able to authorize him.  So

14   at the time of trial, that was pretty much left that

15   there is no one in the state who could do the surgery,

16   um, in which case it required looking at other states

17   and the risk to staff and the risk to plenty of others

18   in transporting, you know, for several weeks -- and

19   according to Dr. Schecter, we're talking about two

20   different visits.  His testimony was that the surgery

21   required two separate operations.  So you're doubling

22   the risk that would be required of the staff in

23   transporting someone out of state for such a surgery.

24             Commissioner Dennehy also talked about her

25   concerns about placing the plaintiff at MCI Framingham

```
 1   post surgery and that she had numerous concerns, in her

 2   testimony, regarding the fact that, um, the plaintiff

 3   would still be an escape risk, that the security

 4   perimeter at MCI Framingham is nothing like the security

 5   perimeter at MCI Norfolk, and she was concerned about

 6   that being used to escape.

 7         She also talked about the fact that inmates at

 8   Framingham who need long-term or longer-term mental

 9   health treatment are sent to a DMH facility, a

10   Department of Mental Health facility, which absolutely

11   has minimal security.  She was aware of two Framingham

12   inmates who escaped from a DMH facility while being

13   treated there.

14         She was concerned about the fact that the female

15   population would not welcome the plaintiff to the

16   facility and how the plaintiff would have an impact on

17   the climate of the facility.  Given that there are a

18   very high percentage of women there who are victims of

19   abuse, of spousal abuse, and the notoriety of the

20   plaintiff's crime, murdering Cheryl Kosilek, would

21   certainly play into some of those fears, and there was

22   concern that this would affect the climate of the

23   facility.  Also, that some inmates may take offense to

24   Kosilek and attempt bodily harm given the crime and the

25   notoriety of the plaintiff.
```

1          Lynn Bissonette, the Superintendent of the

2     facility, also mentioned the fact that there are 4200

3     new admissions at that facility every year.  There's a

4     whole new stream of people coming in and having to

5     adjust them to the plaintiff would be difficult.  She

6     mentioned talking to some inmates who expressed their

7     concern to her about having Kosilek come to the

8     facility.

9          So there was a great deal of concern raised by

10    Commissioner Dennehy, who had worked at Framingham for a

11    number of years, as well as Lynn Bissonette, who was the

12    Superintendent.  You know, there are no single cells at

13    MCI Framingham, no protective custody cells.  There is

14    simply a restrictive -- what is known as the "closed

15    custody unit," which again is very restrictive.

16         So they felt that those were sufficient concerns

17    that were raised by the idea of bringing the plaintiff,

18    post surgery, to MCI Framingham.

19         You heard the testimony of Robert Dumond, he was

20    the DOC Director of Research and planning, who, as the

21    Court remembers, testified as an expert in prison

22    violence and he helped draft the --

23              THE COURT:  I'm sorry.  Where does Dumond

24    work?

25              MR. McFARLAND:  He's the Department of

1    Correction Director -- he was the Director of Planning

2    and -- Research and Planning.  And he testified without

3    notes, as the Court might recall.  He has done extensive

4    literature research, study and research on the issue of

5    violence in male and female prisons and he testified

6    before Congress and he has testified in a number of

7    cases.  And he told the Court that he was very -- he

8    also had worked at Framingham for a number of years as a

9    clinician.  And he said that based upon his knowledge as

10   an expert and his knowledge of Framingham, he felt that

11   placing the plaintiff at MCI Framingham would

12   unstabilize the population and that Michelle would be at

13   a very high risk for assault, um, simply based upon the

14   prior crime.

15        There was also testimony from Warden Arthur

16   Beeler, at the Bureau of Prisons, who, in a 25-year

17   career at the Bureau of Prisons, had dealt with one

18   facility for both males and females, he had a facility

19   where he had treated a number of GID inmates.  He took

20   -- he came into this area, took tours of Framingham and

21   Norfolk, and he gave his opinion that he felt that the

22   prison was not secure enough for the plaintiff.

23             THE COURT:  Framingham?

24             MR. McFARLAND:  Framingham.  He felt that

25   Framingham was not secure enough for someone like

```
1    Battista -- no, someone like Miss Kosilek, and he was
2    also concerned again about the high-profile nature of
3    the plaintiff and the fact that this would lead to a
4    high risk of harm from other inmates.
5              THE COURT:  What about Norfolk?  Kosilek's
6    living there now, taking hormones, wearing female
7    clothing, and it's been uneventful.
8              MR. McFARLAND:  Well, there is testimony from
9    Superintendent Spencer that if Kosilek came back, post
10   surgery, that he thought he would be at a very high risk
11   of assault, given the nature of the population there,
12   and the change in the physical nature of the plaintiff,
13   and he would have to -- if he was sent back to Norfolk,
14   to place him in the Special Management Unit, just
15   because he was concerned that his appearance would be
16   changed dramatically, from Kosilek today, to someone
17   with female organs.
18             THE COURT:  I mean, each case is unique.  I
19   read Judge Tauro's decision and in that case the
20   plaintiff had had some sexual involvement with other
21   inmates already.  Um, there's just no record of that
22   with regard to Kosilek, is there?
23             MR. McFARLAND:  That's correct.  Nothing at
24   all.  They're very different inmates.  And the concern
25   with Kosilek is that there would be others.  Once it
```

1    became clear that Kosilek had come back to the facility,

2    in the general population, with female genitalia, that

3    creates a whole different scenario than Kosilek today.

4    So that was Superintendent Spencer's concern.

5              THE COURT:  Was Mr. Spencer consulted before

6    Commissioner -- was Commissioner -- well, was Spencer

7    consulted by Commissioner Dennehy before she developed

8    her position on security?

9              MR. McFARLAND:  I imagine.  I'm not sure.  But

10   I believe so.

11             THE COURT:  I'm trying to remember the

12   evidence.  I'd have to look at it.  I thought maybe he

13   wasn't.

14             MR. McFARLAND:  And Commissioner Clarke did

15   review the testimony of Superintendent Spencer and

16   Bissonette at your request, as well as the testimony of

17   Commissioner Dennehy.

18        There's also testimony from all the correctional

19   professionals about their concerns about a response to

20   an inmate's threats to harm themself.  They testified

21   that it is a correctional practice not to give in to an

22   inmate who threatens to kill himself or undergo a hunger

23   strike in order to get a certain assignment or a

24   transfer or any kind of treatment because, in that case,

25   that you're not treating the symptoms, you're treating

1   what the person wants, and then the message that gets

2   out to other inmates is that, "Well, if you want to get

3   a transfer to another prison, just go on a hunger strike

4   and it will work."

5        So we're very concerned that the image of

6   providing Kosilek with the surgery would be deemed to be

7   in response to the threats made by Kosilek that "If I

8   don't get the surgery, then I'm going to kill myself."

9   Um, he testified that that would be seen as a reward for

10  manipulative behavior by the inmates and staff and it

11  would help them lose somewhat control with regard to the

12  inmates and their behaviors in the prison.  This is the

13  same approach taken by the Bureau of Prisons as was

14  testified to you by Warden Beeler.

15       You should also note, speaking of Warden Beeler,

16  that he testified that the Bureau of Prisons has since

17  changed its policy with regard to treating GID inmates,

18  since the last Kosilek trial, and that's, I think,

19  Exhibit 75, a copy of the Bureau of Prisons' statement.

20  In that statement they have returned to the, quote,

21  "freeze-frame system," where they will provide treatment

22  for a GID inmate at the level of treatment when the

23  person comes into the prison and will not allow for any

24  further improvements or regressions.

25            THE COURT:  Well, it continues to strike me as

 1    legally extremely risky business to have any kind of

 2    inflexible policy.  If somebody were to come into the

 3    Bureau of Prisons, or the Department of Corrections, and

 4    their kidneys were functioning and then their kidneys

 5    were failing, I don't think anybody would view it as

 6    appropriate to say that "You can't have dialysis."  And

 7    if somebody's condition relating to Gender Identity

 8    Disorder changes when you're in prison, it seems to me

 9    there's a duty to respond to it.  But the Bureau of

10    Prisons' policy isn't in front of me.

11            MR. McFARLAND:  And, your Honor, Commissioner

12    Clarke testified for two days, in May of last year, and

13    he presented with a report, a statement to the Court,

14    prior to that, and I believe that's 107, is the report,

15    the exhibit number.  Commissioner Clarke had spent --

16    prior to coming here, spent two years as the Director of

17    Corrections, in Washington state, and 15 years as the

18    head of the Nebraska Department of Corrections.  He's

19    now the President of the American Correctional

20    Association, the largest correctional association in the

21    country.  He was asked to review certain testimony,

22    transcripts, and trial and then to provide testimony.

23        And in his testimony before this court, he again

24    reiterated the same concerns that had been raised by

25    Commissioner Dennehy with regard to transporting the

1    plaintiff out of state for surgery.  He talked about his

2    own experience with a number of inmates escaping while

3    being transported out of the prison.  He felt that the

4    plaintiff would present an escape risk.  He also stated

5    that, in his 33 years of experience as a correctional

6    official, he had never seen a state inmate be

7    transported out of state, from another state, for

8    medical care.

9         Commissioner Clarke testified that he believed

10   that the reason the plaintiff had not previously tried

11   to escape was because of the high security, the high

12   walls, the electric fence that surrounded the facility,

13   but he was very concerned that should the plaintiff be

14   transferred, post surgery, to Framingham, that the

15   facility would not be able to maintain him.  He again

16   was concerned about the transfer to a DMH facility,

17   which could also lead to a security breach or an escape

18   by the plaintiff.

19        The Commissioner was concerned that if the

20   plaintiff was to go to Framingham, that there would be a

21   climate issue raised there.  There was concern for, in

22   his testimony, a concern for, um, the plaintiff's

23   safety.  There would be many women who would have an

24   animus against him based on the crime of killing a woman

25   and that that would place Kosilek at high risk in that

```
 1    facility.

 2         And the Commissioner -- and Commissioner Dennehy

 3    and Commissioner Clarke strongly believe that the

 4    problems presented by the idea of this surgery for the

 5    plaintiff were insurmountable and they felt that they

 6    have presented the Court with their legitimate reasons,

 7    reasonable reasons why they believe that it would be

 8    impossible for them to really go through with this

 9    order.

10         THE COURT:  Okay.  Was there testimony on what

11    they would do with an individual who was incarcerated

12    and came in having already had Sex Reassignment

13    Surgery?

14         MR. McFARLAND:  I'm not sure if there was.  Um

15    --

16         THE COURT:  I thought there was some testimony

17    that if a person had had Sex Reassignment Surgery and it

18    wasn't a notorious case, then they could put that person

19    in Framingham, but part of the problem here was Michelle

20    Kosilek's notoriety?

21         MR. McFARLAND:  I believe there was testimony

22    that they may not even know if a person came in as a

23    transsexual in Framingham because -- unless there was a

24    recent case or a very famous crime, there would be no

25    reason for them to know.  Those women are on hormones
```

1    anyway, so that they may not know.

2                    THE COURT:  But --

3                    MR. McFARLAND:  But in this case the

4    plaintiff's notoriety would precede her at MCI

5    Framingham.  That was the clear consensus of all the

6    experts who testified.

7          And we believe that the evidence shows that the

8    plaintiff has done very well on the current treatment

9    regime and there is an absence of anxiety and

10   depression, no suicidality, and that --

11                   THE COURT:  The plaintiff is going to argue --

12   has argued that all the security concerns you've just

13   described are pretextual, that, you know, Commissioner

14   Dennehy, um, politically didn't want to be the first

15   Commissioner to -- well, let me take a step back.  That,

16   generally speaking, politicians and perhaps most of the

17   public think that this is ridiculous to consider and

18   that there will be severe criticism.  That Commissioner

19   Dennehy was a friend and neighbor of a state Senator who

20   introduced a bill saying that this can't be paid for and

21   he called her on her cell phone.  And I'd have to track

22   down the exact exhibit.  But she sent some e-mail that

23   had many exclamation points like "Isn't this just

24   ridiculous?"  And they're going to argue that it's just

25   political controversy, that it's customary for the

1    Commissioners to get advice from doctors and they

2    uniformly, or most uniformly, follow that advice.  But

3    here, because this would be politically so unpleasant,

4    they've abdicated their responsibility to do what's

5    routinely done, that is, follow the doctor's advice.

6    How do you respond to that?

7              MR. McFARLAND:  Well, your Honor, they were

8    each asked that very question a number of times in their

9    testimony and each time they made it very clear that

10   that is not the case.  That they were not beholden to

11   the legislature, they were not looking at the cost, that

12   they were looking strictly at safety and security

13   concerns.  And that's what they testified to.  There was

14   plenty of time to cross-examine and try to find someone,

15   any witness that would say, "I heard them say that this

16   is all bogus and I just talked to the media and I just

17   talked to, you know, the Governor," but that never

18   happened.  There was no testimony that said anything

19   that it was the motive of these two commissioners to --

20   to acting on the fact that this was a costly or a

21   political controversy or a public controversy.  They

22   both testified forthrightly and testified that they did

23   not -- their decisions were not influenced by state

24   legislators or by Congressmen or the media.  And the --

25              THE COURT:  I'm sorry.  Go ahead.  But the

```
 1    plaintiff's -- well, go ahead in a second.  But the
 2    plaintiff's argument is that I shouldn't believe that.
 3            MR. McFARLAND:  Well, then that's just
 4    speculation, because you've heard the testimony.  And
 5    they've presented cogent reasons, very down-to-earth
 6    reasons why this is difficult, talking about
 7    transporting an inmate across the country and whether it
 8    takes three or four people to go there, and a nurse, and
 9    the fact that there's always a chance to escape.  And
10    those are things that correctional officials think about
11    every time an inmate leaves the prison in a car, that
12    there is a chance for somebody to get injured, a staff
13    person or the inmate, there's a chance to escape.  Those
14    are the things they're concerned about.
15        They're concerned about -- you know, they know the
16    people in Framingham, they know the inmates, they know
17    how they react.  Lynn Bissonette has been there for
18    many, many years.  She's worked there as a line officer
19    and then as a deputy and as a superintendent.  She says
20    she knows the population.  And contrary to the
21    plaintiff's belief that they'll welcome her with open
22    arms, that's not the case.
23            THE COURT:  At the moment it seems to me the
24    plaintiff -- there is a kind of common-sense appeal to
25    the testimony I've heard, "You can't leave a woman in a
```

1    man's prison and you can't put somebody who's been

2    convicted of killing his wife in a woman's prison.

3    That's not responsible."  But these arguments, to some

4    extent -- well, one of those arguments was made to me in

5    2002 when Commissioner Maloney told me, "If you give him

6    hormones, he's going to develop breasts.  You can't keep

7    somebody like that in Norfolk, a male facility."  And

8    now it's been about six years and it's been an

9    uneventful six years.  And I know I'm going to hear from

10   Miss Cohen that these are pretextual.  They -- the

11   Commonwealth should have learned something in the last

12   six years.  The first concern was not well founded, and

13   this one is not well founded either.  So I want to give

14   you a chance to respond.

15            MR. McFARLAND:  Well, your Honor, they had the

16   chance to bring in any person they wanted to counter the

17   testimony of our experts, of the Commissioners -- to

18   find any corrections person to come in here and say

19   "That's all pretextual.  There's nothing to it."  But

20   they haven't done that.

21            THE COURT:  Well, I don't think I would have

22   let anybody testify that it was pretextual.  Somebody

23   else could have testified that it was reasonable, but,

24   you know, a discerning state of mind often requires

25   looking at circumstantial evidence and judging

1    credibility.   Judge Tauro just found security concerns.

2              MR. McFARLAND:   That was based on a five-page

3    report, as opposed to the testimony here, where this is

4    a full trial, and she could have brought an expert from

5    another state who says "This is poppycock.  Of course,

6    they could handle this inmate.  All my life I've handled

7    GID inmates and we've transferred them."  That never

8    came out.  There was nothing of expert testimony to

9    contradict -- and if you look at the testimony of

10   Commissioner Clarke, he spent 34 years in Nebraska, 2 to

11   3 years in Washington, and then came here, and he's on

12   the hot seat.  So it's not like he was born and bred

13   here and indoctrinated by the so-called "Massachusetts

14   correctional mentality."  He was a -- he's a nationally

15   known leader of the corrections community.  And his --

16   and he looked open-mindedly at the evidence and came

17   down agreeing that there are significant insurmountable

18   security concerns here that he cannot just ignore.

19        So I think -- that that shows an easy response,

20   but not having been in charge of a prison, it's hard for

21   them to say what the expertise is and what their

22   experience is with regard to safety and security, escape

23   risks, and those kinds of things are things that they

24   deal with every day, and it's easy to say that it's

25   pretextual.

1          Kosilek has done well because he's in a very

2     unique setting and they kept him in Norfolk in a

3     separate room and he has done well.  There are good

4     staff there.  And that's one of the main reasons why it

5     has been so good.  But not every GID inmate will go to

6     Norfolk and other ones have had problems at other

7     facilities.

8               THE COURT:  Fortunately I have one to decide

9     and it very reasonably could be different decisions for

10    different inmates.  Thank you, very much.

11              MR. McFARLAND:  Thank you, your Honor.

12              THE COURT:  It's now 5 of 1:00.  We'll break

13    for lunch and we'll resume at 2:00.  We can go to about

14    3:30.

15         The Court is in recess.

16              (Lunch recess, 1:00 p.m.)

17              (Resumed, 2:00 p.m.)

18              THE COURT:  All right.  Miss Cohen, you look

19    like you're ready to go.

20              MS. COHEN:  Thank you, your Honor.

21

22    CLOSING STATEMENT BY MS. COHEN:  (Revisited.)

23         Well, this case really is about whether medical

24    diagnoses -- oh, wait, we're missing Miss Kosilek.  I'm

25    sorry, I --

1           THE COURT:  That's okay.

2           (Miss Kosilek brought into courtroom.)

3           THE COURT:  Mr. O'Leary almost made it the

4     whole year without forgetting an essential participant.

5           (Laughter.)

6           THE COURT:  He'll start all over again next

7     year.

8           (Miss Kosilek is seated.)

9           MS. COHEN:  Your Honor, this is a case about

10    whether doctors or prison officials should make

11    diagnoses and prescribe treatment and it's a case really

12    about whether mental health disorders should be given

13    parity with physical disorders and it's also a case

14    about whether our political or emotional feelings about

15    a diagnosis should dictate the treatment and whether the

16    prisons will afford treatment not just for garden-

17    variety diseases, but for conditions that are

18    unfamiliar, aberrant, politically controversial or

19    stigmatized.

20         The case began in 2000 and it's received a lot of

21    attention from the Court and from the litigants and I

22    think it's the time when all the parties sorely need the

23    guidance of the Court and a decision.

24         Over the course of the case we have seen an

25    evolution at least in the perception of this condition.

1    It seems like every time I pick up "People Magazine,"

2    and I have to be candid and say that I do read it

3    sometimes at the airport or maybe even when I'm not

4    traveling, that someone else has come forward and said

5    that they can't live their life in the assigned gender

6    and have sought reassignment.

7         I think in the past, as I've said, that the

8    Department of Correction's attitude has been as an

9    obstructionist.  I was reading a prior closing.  I think

10   reviewing the testimony, though, of Commissioner Clarke,

11   over the weekend, I think it's more accurate to say that

12   because of the controversial nature of the treatment and

13   the intense public feeling, it's a decision really for

14   the Court to make.

15        And I think, looking at it, there are two

16   fundamental principles that guide this case.  First,

17   that the plaintiff should be prescribed medical care

18   without interference from prison officials.  And this

19   was very much a theme that was underlined in what we

20   call *Kosilek I*.  It is deliberate indifference to

21   interfere with the medical judgment of the professionals

22   and to make that medical judgment because of other

23   concerns that are not cognizable.

24        In the legal context, I think -- and I've said

25   this many times before, that the case is unique because

```
 1    I'm not aware of any other case where the prisoner wants
 2    what not only the line doctors have prescribed, but also
 3    what the service providers have endorsed and
 4    recommended.
 5              THE COURT:  It doesn't seem to be as unique as
 6    it was when you made that argument.  That's the
 7    situation in Judge Tauro's case, isn't it?
 8              MS. COHEN:  Well -- yes.  Well, other than
 9    that, yeah.  But I think GID is the condition.
10         And I think -- you know, the second guiding
11    principle here is that the plaintiff is entitled to have
12    her individual circumstances given consideration and
13    what is troubling here is the inability or refusal of
14    the Department of Corrections to consider Michelle
15    Kosilek's specific factual history and individual
16    circumstances as it arrives at a diagnosis.
17         I think, your Honor, we talked this morning about
18    the framework that the Court has set forth and the
19    plaintiffs have adopted, which is to -- um, is one that
20    has been diagnosed by a -- a condition that has been
21    diagnosed by a physician as mandating treatment or -- "a
22    serious medical condition is one that has been diagnosed
23    by a physician as mandating treatment," and that's *Mahan*
24    *vs. Plymouth House of Correction*, 64 F. 3rd 124 at 18,
25    cited by your Honor previously.
```

1      Here the plaintiff has a serious medical

2   condition, as the evidence has shown, and we talked this

3   morning about who is the decision maker for this

4   purpose.  On the subjective prong, I believe it is

5   UMass., in the September 19th, 2007 closing in the

6   colloquy at Pages 18 and 19.  Certainly no one else has

7   been charged with and will take credit for making this

8   determination and I think we recently saw the deposition

9   transcript of Dr. Zakai, which made clear that he

10  reviewed Miss Kosilek's file only summarily and was not

11  her treating physician for purpose of recommending GID

12  treatment.

13      And I want to just step back, your Honor, and note

14  that there have been several closing arguments.  On June

15  23rd -- no, I shouldn't say "several," two, and on

16  September 12th.  June 23rd, 2006 and September 12th,

17  2007.  And it's not only not my intention to repeat

18  everything that was said on those occasions, I think at

19  this point I lack the capacity to do it.

20          THE COURT:  No, I just want you to sort of

21  refresh me.  I'm going to read them again.

22          MS. COHEN:  And the plaintiffs request that

23  the Court consider the two closing arguments and then

24  the amended findings of fact and request for rulings of

25  law, which is --

1          THE COURT:  And I think it's the second -- I

2     just want to make sure that I'm looking at the right

3     one.  You each filed second revised findings of fact and

4     conclusions of law on June 13th, 2008.  Is that what I

5     should --

6          MS. COHEN:  The timing sounds appropriate.

7     That's all I can say.

8          THE COURT:  If that's not what you want me to

9     be looking at, you'll tell me after the hearing.

10          MS. COHEN:  So for purposes of the subjective

11     prong, I think there's no doubt that there is a serious

12     medical condition in the view of the various treating

13     physicians and experts retained by the Department of

14     Corrections for nonlitigation purposes.  Nonetheless,

15     the Department of Corrections is refusing to provide the

16     treatment.  So at this point there are the two questions

17     that --

18          THE COURT:  Let me ask you this.  As you

19     understand it, does Dr. Schmidt dispute that there's a

20     serious medical need, that is, a condition involving a

21     substantial risk of serious harm?

22          MS. COHEN:  I don't believe he does.  He

23     acknowledges that she has Gender Identity Disorder.  He

24     disagrees as to the appropriate treatment.  But I don't

25     think he disputes it either.

1      The question --

2           THE COURT:  And as a practical matter -- and I

3    will look at those pages, the closings, but it also came

4    up a number of times during the trial.  As I said, you

5    stipulated that the Commissioner, Dennehy, at the time,

6    was the decision maker for the subjective prong.  That

7    she testified, I think, to two pertinent things.  One,

8    she relied on the doctors for the medical judgment and

9    eventually they told her explicitly that Kosilek has a

10   serious medical need that requires Sex Reassignment

11   Surgery.

12        So I -- at the moment I think whether or not I'm

13   looking at the UMass doctors or at least Commissioner

14   Dennehy, and I think also Clarke, but I'd have to

15   refresh myself on what he said, that the subjective

16   prong is probably met.  But the objective prong is more

17   hotly in dispute.

18           MS. COHEN:  That's right, your Honor.  And --

19   but you do put me in mind that with respect to

20   Dr. Schmidt, he also does not dispute that she has GID

21   and requires treatment.  The dispute there is what is

22   objectively the correct treatment.

23        Now -- and so that is one of the two remaining

24   issues.  The other remaining issue is the security

25   concerns.

1         THE COURT:  Well, let me ask, actually -- and

2    I may have been too quick to say that the subjective

3    factor is met.

4         This morning Mr. McFarland mentioned the Supreme

5    Court decision in *Helling vs. McKinney* and I've looked

6    at it again, but I haven't studied it the way I had

7    previously, but it says:  "On remand, the subjective

8    factor" -- and I'm reading on Page 36, I think.  "On

9    remand, the subjective factor, deliberate indifference,

10   should be determined in light of the prison authority's

11   current attitudes and conduct.  The inquiry into this

12   factor also would be an appropriate vehicle to consider

13   arguments regarding the realities of prison

14   administration."

15        That's a little different than the way I had it

16   organized analytically.  The way I wrote it in *Kosilek*

17   *I:*  "If deliberate indifference to a serious medical

18   need were established, it would be necessary to

19   determine whether prison realities trump the inmate's

20   usual entitlement to medical treatment."  And -- but I

21   wonder how, you know, you react to this and how this can

22   be reconciled with the subjective prong being, you know,

23   knowing facts -- essentially knowing facts that indicate

24   that there is a serious risk and drawing that

25   conclusion.  Because the way this is described in

1    *Helling* -- well, that's 1993.  Is that before -- that's

2    before *Farmer,* I guess.  It may be the same --

3              MS. COHEN:  *Farmer* was January 12th, 1994.

4              THE COURT:  Yeah, *Farmer* is after *Helling*.

5              MS. COHEN:  And I'm not remembering what the

6    facts were in *Helling vs. McKinney*.

7              THE COURT:  *Helling* is a smoking policy.

8              MS. COHEN:  I do remember the realities of

9    prison administration being afraid.  So I think we would

10   have to respond to that in a more focused way, your

11   Honor.

12             THE COURT:  Yeah.  Well, that may be helpful.

13   It's pre *Farmer*, but not that much before *Farmer*.

14        Okay.  Go ahead.

15             MS. COHEN:  But I think -- um, continuing to

16   analyze it as your Honor has and referring to the

17   objective standard, I think one question your Honor

18   asked, which I want to weave in -- you asked of

19   Mr. McFarland, which I want to weave into my remarks, is

20   whether the plaintiff has to establish suicidality?

21   What the plaintiff has to establish is a serious medical

22   need that causes distress for which there is medical

23   treatment and that is something that each expert has

24   talked about, of the experts retained by the Department

25   of Corrections, other than for purposes of litigation,

1    and by the plaintiff's experts.  It's something that

2    would not -- that Sexual Reassignment Surgery would not

3    just be palliative, but would actively treat Miss

4    Kosilek's condition.

5        And I want to refer back to the testimony of two

6    witnesses in particular on this issue, Dr. Appelbaum and

7    Dr. Levine.  And Dr. Appelbaum is, I think -- and what

8    they both have in common is that neither of them had any

9    particular bias, neither was called by either side as an

10   adversarial witness.

11       Dr. Appelbaum was a consultant to the Department

12   of Corrections that the plaintiff called at the second

13   trial.  At the first trial he was the witness for the

14   Department of Corrections.  And I, having reread his

15   testimony over the weekend, I refer the Court back to

16   it.  He is a very neutral, careful witness who spends a

17   lot of time and I think did not come to the subject with

18   any particular preconception.

19       In terms of bias, your Honor had at one point

20   said, "Well, maybe he was concerned that he would be

21   sued," and I think that would be a motive, of course,

22   that might make him more compliant as a plaintiff, but I

23   think that more equally plausible is --

24            THE COURT:  Well, he had been sued and the

25   case against him was dismissed, wasn't it?

1          MS. COHEN:  It was dismissed.  And so I don't

2     think there's any motive to suggest anything other than

3     an honest witness.  In fact, I think the biased factor

4     goes the other way, that he would have been inclined to

5     do what he could to keep his position and to, um -- for

6     that reason to testify in a manner consistent with the

7     Department of Corrections.

8          And there was a lot of testimony by

9     Dr. Appelbaum.  He was put on the stand by the plaintiff

10    to explain the minutes of the E-staff meetings and how

11    he actually insisted each week on correcting the minutes

12    of the E-staff meetings so that they appropriately

13    reflected, I think, what I would characterize as "the

14    Commonwealth's effort to lean on the treatment."  And

15    what he testified was -- and with regard to

16    Dr. Schmidt's testimony -- and now I'm referring to his

17    testimony from October 3rd, 2006, Page 42, Line 11.

18         "Do you agree or disagree with Dr. Schmidt's

19    statements that the level of dysphoria does not rise to

20    a level requiring surgery to eliminate it?"  Answer:

21    "Again, for all of the reasons I have mentioned, I

22    disagree with the conclusion that Sex Reassignment

23    Surgery, as a clinical matter, is not medically

24    necessary."  Question:  "And is one of the bases for

25    that disagreement that, in your opinion, a level of

1    distress or dysphoria is sufficiently severe that it

2    does require Sex Reassignment Surgery to eliminate it?"

3    Answer:  "It is in part based on the conclusion that Sex

4    Reassignment Surgery would be the intervention that, and

5    likely the only intervention, that has any likelihood of

6    eliminating that dysphoria."

7         "In your opinion" -- I'm sorry.  Question:  "And

8    do you believe that" -- and now I'm reading on Page 43.

9         "Do you believe that the dysphoria is severe,

10   doctor?"  Answer:  "Yes.  For the reasons I've

11   mentioned, I believe it is."  Question:  "And is that

12   your opinion, as a clinician, to a reasonable degree of

13   medical certainty?"  Answer:  "Yes."

14        Now, the letter goes on and I'm referring now, at

15   the time of the examination, to Exhibit 90, which was

16   Dr. Appelbaum and Dr. Brewer's letter to Commissioner

17   Dennehy when she had complained about a lack of clarity

18   in their recommendations.  And they were asked to

19   comment on Dr. Schmidt's opinion.

20        Now, the letter goes on, at to the top of Page 4,

21   referring again to Dr. Schmidt.  Quote:  "He believes

22   that any emotional distress or depression that may

23   result from the denial of SRS can be appropriately

24   managed with psychotherapy and/or medication," end

25   quote.  "Do you see that?"  Answer:  "Yes, I do."

1    Question:  "In your opinion, is that an opinion that

2    conforms to adequate medical care for Kosilek, meaning

3    services at a level reasonably commensurate with medical

4    science and at a quality acceptable within prudent

5    professional standards?"  And he answered:  "Again,

6    psychotherapy and medication can play a role and in the

7    absence of the availability of Sex Reassignment Surgery,

8    those are the treatments we would primarily rely on to

9    try to mitigate and relieve the dysphoria and distress.

10   However, even from a clinical standpoint, there is no

11   reason to deny access to Sex Reassignment Surgery if it

12   is otherwise available, and to the extent that

13   Dr. Schmidt's opinion would deny that access, that is

14   not consistent with the Standards of Care."  Question:

15   "Why would a reasonably prudent professional, in your

16   clinical opinion, Doctor, offer Sexual Reassignment

17   Surgery to a patient in these circumstances?"  Answer:

18   "The essential answer is that, as our expert consultants

19   have repeatedly advised us, the multiple consultants and

20   all of the experts appear to agree in this case that

21   Miss Kosilek has Gender Identity Disorder.  I don't

22   think that diagnosis is in any reasonable doubt at this

23   point.  It is causing her distress.  All of the experts,

24   including Dr. Schmidt, have been in agreement with

25   that.  Sex Reassignment Surgery is the recognized and

1    appropriate treatment for this disorder and the experts

2    have indicated to us repeatedly that it is likely the

3    only treatment that will significantly relieve, if not

4    eliminate, Miss Kosilek's distress.  And, again, even

5    Dr. Schmidt, if I understand his testimony, has

6    indicated that in the absence of Sex Reassignment

7    Surgery, Miss Kosilek's distress and dysphoria will

8    likely increase and that could happen or could be to the

9    extent that it includes suicidal thinking.  And all of

10   the experts, including Dr. Schmidt, have indicated that

11   the choice of this treatment should be made by the

12   patient.  So for all of these reasons, the consistency

13   and lack of doubt about the diagnosis, the presence of

14   stress, and the appropriateness of this treatment, and

15   the fact that the patient should have the option of

16   making that choice, all of that suggests, from a purely

17   clinical standpoint, it is appropriate to offer this

18   treatment and would not be appropriate, as a clinical

19   matter, to not make it available."

20          And then --

21              THE COURT:  And let's see, you were reading

22   there Dr. Appelbaum's --

23              MS. COHEN:  Dr. Appelbaum's testimony --

24              THE COURT:  October 3, 2006, beginning at Page

25   42?

```
 1              MS. COHEN:  Yeah.

 2         And then your Honor got into the game with a few

 3    questions.  And at Page 49, the Court's questions, and

 4    I'm going to skip the earlier lines of the question

 5    because they have nothing -- they're extraneous.

 6         Quote:  "Do you have an opinion as to whether

 7    psychotherapy and psychotropic medications -- do you

 8    have an opinion as to whether psychotherapy and

 9    psychotropic medications will, if not eliminate the

10    distress in this case, diminish it to the point that

11    there's no longer a substantial risk of serious harm?"

12    The witness:  "Our consultants have indicated that they

13    do not believe it will, that psychotherapy medications

14    alone would have that effect.  And I think that all the

15    opinions and data in this case, again including

16    Dr. Schmidt's, suggest that the risk of suicide will

17    increase without Sex Reassignment Surgery.  I can't

18    quantify that risk.  I can't put a percentage on it or

19    tell you how likely it is.  However, I don't think

20    there's any disagreement in this case, from any of the

21    experts, including Dr. Schmidt, that the risk of

22    potential suicide will increase without Sex Reassignment

23    Surgery being available.  How significant that is?

24    Well, certainly some of the experts have indicated, in

25    their opinion, that it's more likely than not.  I don't
```

1    know how to quantify that level of risk, but it is, I

2    think, not disputed by anyone who has done an evaluation

3    or has been involved in this case, including

4    Dr. Schmidt, that the risk of self harm and suicide does

5    go up and will go up for Miss Kosilek if Sex

6    Reassignment Surgery is not an option."

7         And then your Honor asked a question, um:  "So

8    now" -- and this is at Page 50, beginning in the middle

9    of Line 19.  "So now I want to go back to what I was

10   asking you before about whether, in layman's terms, it

11   would be fair to say that Dr. Schmidt's approach focuses

12   on treating the symptoms rather than trying to eliminate

13   the cause of Gender Identity Disorder dysphoria of the

14   emotional distress.  In the psychiatric profession, are

15   there other circumstances not involving, say, GID where

16   there's an identifiable cause and a major mental

17   illness, psychiatrists will treat the symptoms, say,

18   prescribe drugs, but not take steps to try to eliminate

19   the underlying cause.  Is there any analogous

20   circumstances?"  The witness:  "I can't think of a

21   situation in which one would treat a patient solely

22   symptomatically and not offer treatment for the

23   underlying cause of these symptoms except perhaps if

24   there were a situation where the treatment itself, to

25   treat the underlying cause, would, the benefits would be

```
 1    outweighed by the risk, that somehow the treatment
 2    itself was too risky to utilize.  But otherwise I can't
 3    think of a situation in which one would have a treatment
 4    for a disorder, whether it's psychiatric or some other
 5    medical disorder, and essentially say to the patient,
 6    'We're not going to give you the definitive treatment
 7    for the disorder, we're going to treat the symptoms that
 8    you're having'."
 9              THE COURT:  Well, that's an issue that I was
10    and remain very interested in, but I've thought about
11    that a little further, and I don't know how this
12    observation operates in this case.
13         But let's say somebody had kidney failure, perhaps
14    a kidney transplant would be optimal, but dialysis is
15    frequently used.  Is it unreasonable -- and I don't -- I
16    mean, the evidence doesn't really answer this question,
17    I suppose.  I don't know whether, you know, if some
18    people get dialysis even if there's somebody available
19    to give them a compatible kidney.  But I was thinking of
20    that as sort of a range of treatments that -- that
21    prudent professionals might prescribe or permit.
22              MS. COHEN:  Well, first of all, there is, I
23    think, a kidney transplant case from California that we
24    had cited early on and the Court required the patient to
25    be put on the list for the transplant.
```

```
 1            THE COURT:  If you could, I'll read the
 2    findings of fact.  But in a brief post-trial submission,
 3    if you could point that out to me, I'd be interested in
 4    seeing it.
 5            MS. COHEN:  Yes.  But I think -- um, I don't
 6    think the time would permit me to go through all of the
 7    analogies that your Honor gave to Dr. Appelbaum, but I
 8    commend the four volumes of his testimony, because I
 9    think a number of these questions were on the Court's
10    mind, they were on the party's mind, and I think
11    Dr. Appelbaum dealt with them in a very thoughtful,
12    well-reasoned way giving a sense of how doctors think in
13    analyzing these problems.
14        I also want to turn to Dr. Steven Levine, who was
15    not a witness --
16            THE COURT:  Actually, I want to take a brief
17    break.  There's a quick phone call I need to make from
18    my office.  I'll be -- Miss Kosilek should stay right
19    there.  I'll be right back.
20        The Court is in recess.
21            (Recess, 2:35 p.m.)
22            (Resumed, 2:45 p.m.)
23        THE COURT:  Did we lose Mr. McFarland?
24        THE CLERK:  The Court is back in session.  You
25    may be seated.
```

```
 1                MS. COHEN:  Your Honor, I just want to make
 2      sure that this is off.  I'm going to give it to
 3      Mr. Sulman for this purpose.
 4                (Hands cell phone to counsel.)
 5                THE COURT:  We'll wait for Mr. McFarland.
 6                (Pause.)
 7                (Mr. McFarland enters.)
 8                THE COURT:  Okay.
 9                MS. COHEN:  I want to comment on Dr. Levine's
10      testimony as well.  They're addressed in our requests
11      for findings of fact at Page 69 beginning at Paragraph
12      169.
13            And Dr. Levine, I think, commented usefully with
14      regard to Dr. Schmidt.  And what he said is:
15      "Dr. Schmidt's opinion is not a popular opinion among
16      people who have devoted the majority of their life to
17      the treatment of patients, but it is an opinion held by
18      many, many people who do not emerse themselves in the
19      treatment of Gender Identity Disorder."  And I think
20      that's a remarkable and critical statement.
21            According to Dr. Levine, Dr. Schmidt's opinion is
22      one that is not held -- that it's held by doctors who do
23      not regularly treat GID and it is not an opinion that is
24      held by people who do regularly treat GID.  I don't
25      think there's any other way to interpret "emerse
```

```
 1     themselves" or "have devoted the majority of their
 2     life."  It's well settled that a prudent professional
 3     treating Miss Kosilek must be a GID specialist and in
 4     *Kosilek I*, this court found that the DOC should use a
 5     "qualified specialist."
 6          So I think, for that reason, it would be absurd to
 7     say that a patient who had cancer should receive an
 8     opinion regarding cancer treatments that was not held by
 9     doctors who had emersed themselves in cancer treatment.
10               THE COURT:  Well, Dr. Schmidt, though, has
11     been involved with individuals with Gender Identity
12     Disorder for decades, hasn't he?
13               MS. COHEN:  I'm not saying that he has or
14     hasn't, I think he testified that he had, and, um --
15     although he was involved with them in an odd way because
16     he would only be involved with them up to the point
17     where they wanted Sexual Reassignment Surgery and then
18     he would do nothing more.  What I'm saying is that
19     Dr. Levine said that Dr. Schmidt's opinion was an
20     opinion that was held by people who did not -- were not
21     emersed in Gender Identity Disorder.
22          And I want to also talk about a couple of things
23     that came up during Mr. McFarland's closing.  First of
24     all --
25               THE COURT:  With regard to Dr. Levine?
```

1          MS. COHEN:  Yes, and to the comments about --

2     I was surprised to hear Mr. McFarland dismiss -- say

3     that Dr. Levine had dismissed the Harry Benjamin group

4     as an advocacy group.  In fact, Dr. Levine had been the

5     chair for the fifth version of the Standards and

6     testified that after the issuance of Version 6, he had

7     been invited back.  I think on Page 12, Line 19, he

8     testified that he had been invited back to chair the

9     Standards committee.

10          THE COURT:  But I think he did say -- and he

11     did use the word "advocacy."

12          MS. COHEN:  But I think there's no question

13     that -- I think what he was referring to is that there

14     are many advocates there.  I don't think he intended to

15     demean the Standards in any way as being anything other

16     than the standards of treatment.  He expressed

17     frustration with patients and advocacy groups putting

18     pressures on the Standards, but I don't think he

19     expressed any doubt with the standards that he had

20     written or the subsequent standards which were identical

21     for -- which were materially identical for purposes of

22     this case.

23          In his report, Dr. Levine had taken the position

24     that Dr. Schmidt's opinion was prudent because he

25     believed that the legitimacy of the real-life experience

 1   was open to debate.

 2        This court found, in *Kosilek I*, for the reasons

 3   very cogently articulated this morning, that the real-

 4   life experience in prison is her only real-life

 5   experience that Michelle Kosilek has and it's an

 6   effective real-life experience.  I was surprised to hear

 7   Mr. McFarland say that the community is more

 8   confrontational.  I would have thought, and I think many

 9   of those of us in this room who have visited the prisons

10   know that very few environments are more

11   confrontational, and either in terms of the interactions

12   with the -- those employed by the prison or with the

13   community of prisoners.

14        She has declared herself to be female

15   unequivocally throughout her entire tenure there, even

16   refusing to take, when offered, the most highly paid and

17   sought-after job in the prison because the title was

18   "House Boy" and she did not want to have the title of

19   "House Boy" when she thought that she was "House Girl."

20   She has been "in the face," to use the vernacular, of

21   every corrections officer who has tried to refer to her

22   as male or by the male gender or by a male name and she

23   has also dealt with the inmates who have made fun of her

24   or mocked her for her gender identity.  So I think she

25   has truly lived a real-life experience and defined

1    herself as female.

2          Dr. Levine acknowledged that a real-life

3    experience is possible in prison when a prisoner like

4    Michelle Kosilek is in prison for life.  And that's at

5    volume -- at Page 53, Line 8 to Page 54, Line 21.

6                THE COURT:  Of --

7                MS. COHEN:  Of Dr. Levine's testimony.

8                THE COURT:  December 19th?  I think that's the

9    only day he --

10               MS. COHEN:  Yeah, December 19th, 2006.

11         Dr. Levine was also critical of Dr. Schmidt's

12   approach in refusing to write a recommendation letter

13   for Sexual Reassignment Surgery and he stated, at Page

14   164, Line 21 to 165, Line 1, also of December 19th:  "If

15   someone wants to present themselves as a qualified

16   mental health professional to work in this very

17   difficult area, I think that person needs to be willing

18   to -- under individual case circumstances, to

19   acknowledge that there's no reason to stand in this

20   person's way and to write the letter."  And Dr. Schmidt

21   testified on June 7th, 2006, at Page 23, Lines 1 through

22   3, and 76 -- Page 76, Lines 22 through 77, Line 24, that

23   he and his group would not write such a letter.

24         The letter, of course, is recognized in Exhibit 9,

25   the Standards of Care, at Pages 7 through 8, and it

1     lists seven specifications for the letter.  It is

2     clearly more than a cover letter passing on the

3     patient's life, it requires the doctor to take a stance

4     as to whether the patient is eligible for Sexual

5     Reassignment Surgery.  And in that way Dr. Schmidt is of

6     no help to the Court because he does not -- he has not

7     given individual -- he is not capable of giving

8     individual consideration to Michelle Kosilek's

9     circumstances because he, in his practice, has taken a

10     blanket view with regard to Sexual Reassignment Surgery.

11         And Dr. Levine also testified --

12         THE COURT:  Well, what do you say is his

13     blanket view, that it's never medically necessary or

14     that he recognizes that there are some people with

15     Gender Identity Disorder whom Sex Reassignment Surgery

16     is appropriate, but he doesn't want to be the one

17     writing the letter that would, in effect, authorize it?

18         MS. COHEN:  That he doesn't want to -- the

19     latter, your Honor.  And I think that does what

20     Dr. Levine said when he commented at Page 164, Line 21:

21     "If someone wants to present themself as a qualified

22     mental health professional to work in this very

23     difficult area, I think that person needs to be willing

24     to -- under individual circumstances, to acknowledge

25     that there's no reason to stand in this person's way and

1    to write that letter."

2          And Dr. Levine also acknowledged that

3    antidepressants do not treat GID, they treat the lack of

4    treatment.  And what he said is:  "The body of evidence

5    is" -- and let me give you a line and page first.  It's

6    Page 174, Line 23, to 175, Line 9.

7          "The body of evidence is that gender dysphoria is

8    not significantly ameliorated across the population of

9    patients by treating them with a Prozac-like drug

10   alone.  I think that's reasonably agreed upon.  I

11   thought what we were talking about is if the Court

12   decided not to grant Sex Reassignment Surgery and

13   Michelle Kosilek distended into an understandable period

14   of despair when she was trying to decide whether to live

15   or die, to mutilate or not to mutilate, could

16   antidepressants be of assistance to her until she

17   resolved that state and agreed to live?"

18         This is critical, your Honor.  As Dr. Levine

19   explains:  "Dr. Schmidt's recommendation does not

20   actually treat Miss Kosilek's GID, but the lack of

21   treatment, the failure to treat her GID and the

22   resulting psychological deterioration that it is

23   anticipated by everyone that she will suffer."  And in

24   that way I think the dialysis analogy also is a little

25   off because dialysis actually does treat the disease in

1     terms of doing what is necessary to clean the kidneys.

2     And I obviously have not gone to medical school, but I

3     think what is being recommended here is more in the

4     nature of a Band-Aid or something to palliate suffering

5     rather than to treat -- actively treat a problem.

6          And Dr. Levine said as much.  He said, at Page

7     200, Line 23, to 201, Line 2, and this was in response

8     to your Honor's question:  "Dr. Schmidt's treatment is

9     inadequate in providing the relief that Kosilek seeks

10    from the distress of having male genitalia.  They're

11    inadequate for providing relief from the distress that

12    Kosilek seeks from having a penis and a scrotum."

13         And Dr. Levine also acknowledged that prudent

14    professionals do not deny SRS if someone is ready and

15    eligible.  In response to a question from the Court, and

16    now I'm on --

17              THE COURT:  Now you're on 190.

18              MS. COHEN:  Yes.

19         "Do other prudent professionals deny SRS if

20    somebody is ready and eligible?"  Levine:  "I don't

21    think so.  They do, it's on the basis of something of

22    what we call" -- "If they do, it's on the basis of

23    something of what we call 'counter transference' of

24    their own ethical beliefs and usually they, I think,

25    hopefully excuse themselves from the care and get

1    somebody who doesn't have the tormented" --

2              THE COURT:  Where are you reading?

3              MS. COHEN:  I think it's -- well, let's see.

4    It's at 191.  I have the excellent index that

5    Mr. Romanow has provided and it's leading me to 191,

6    Line 23.

7              THE COURT:  Okay.  That's where it is.

8              MS. COHEN:  -- "who doesn't have the tormented

9    soul that, you know, they're breaking some religious

10   tenet."

11        So there, again, the testimony was not to deny

12   SRS, if someone is ready, in the sense of having

13   completed a real-life experience and is eligible.

14        Now, the reference to "counter transference" and

15   to "religious principles" was with regard to

16   Dr. Levine's testimony about Dr. Schmidt, that he

17   "operated in an environment where his hospital and the

18   Chairman of his department had taken the position that

19   SRS was absolutely banned because he found it aberrant

20   and, in fact, was advising the Vatican on this

21   subject."  I think you may remember that Dr. Schmidt is

22   the Chair of Psychiatry at a tiny satellite Hopkins

23   hospital, but the Chairman of Psychiatry at Hopkins --

24             THE COURT:  Dr. McCue.

25             MS. COHEN:  Dr. McCue.  And that was

1   Dr. Levine's testimony and it was raised by Dr. Levine

2   spontaneously and not in response to any question by

3   plaintiff's counsel that that was the climate at the

4   Hopkins institution with which Dr. Schmidt is

5   affiliated.

6          THE COURT:  Well, let me see if I understand

7   this argument in a larger context.

8       Am I correct that it's your argument that after

9   Kosilek won, the Department of Corrections began

10  treating, um, the plaintiff's Gender Identity Disorder

11  as a medical issue, which led to doctors prescribing

12  hormones and the plaintiff getting hormones and female

13  clothing?

14         MS. COHEN:  That's right.  In fact, there were

15  certain clear steps that were enumerated by this court

16  and they implemented them.

17         THE COURT:  And then the doctors felt that

18  there had been a real-life experience with the hormones

19  and the female attire, and so they recommended Sex

20  Reassignment Surgery, and you argued at this point, um,

21  that the Commissioner balked and when this matter arose

22  for litigation again, the defendants shopped around the

23  country for the one or two people with experience in

24  Gender Identity Disorder who would never authorize or

25  facilitate Sex Reassignment Surgery.  Is that your

1    argument?

2             MS. COHEN:  That's right, your Honor.

3             THE COURT:  And that -- and that language on

4    Page 190 that precedes what you were just reading,

5    Dr. Levine seems to be -- well, I mean, in his report,

6    for example, he says that Dr. Schmidt's within the range

7    of prudent professionals.  But one way to interpret

8    that -- well, what I thought he was saying on 190, and

9    he may say different things at different places, is that

10   no prudent professional would fail to permit -- well, he

11   says:  "I don't think we would prudently deny Sex

12   Reassignment Surgery."  And then he goes on to say:

13   "Life, reality would deny Sex Reassignment Surgery and

14   we would prudently use the things that were begun to be

15   outlined by Dr. Schmidt to bring her there, to help her

16   get through that existential crisis."

17        And at the moment I interpret that to mean that if

18   Michelle Kosilek were not a prisoner and had -- you

19   know, otherwise all the other facts were the same, that

20   every prudent professional would write a letter

21   authorizing Sex Reassignment Surgery unless they had

22   some religious or philosophical objection to it, but

23   then perhaps they're not a prudent professional.  It may

24   be that somebody who could obtain such a letter, is

25   entitled to such a letter, would nevertheless not have

1   Sex Reassignment Surgery, perhaps there's no insurance

2   or money to pay for it, and in that case I thought

3   Dr. Levine was saying that you would treat that person

4   or deal with that person the way Dr. Schmidt

5   recommended.

6            MS. COHEN:  As best you could.

7            THE COURT:  As best you could.

8            MS. COHEN:  Whatever.  And I think -- and I

9   think that every expert says, you know, that if she's in

10   distress, then -- then you would treat her with whatever

11   you had.

12       And I think, your Honor, that it's not just money,

13   I think there are many GID patients who may find

14   themselves eligible and ready, but who decide that it is

15   not for them, and that is a patient's option.  And I

16   think Dr. Appelbaum testified on that.  That it's the

17   same with cancer treatments.  That a patient may decide

18   not to pursue, whether it's a bone marrow transplant or

19   -- in addition to chemotherapy or in addition to

20   radiation, but that doesn't mean that the professional

21   should deny that treatment to them.  There are patients

22   who decide not to have transplants.

23            THE COURT:  And then how do you respond to

24   this observation, um, all right, if Michelle Kosilek

25   were not a prisoner, she'd be eligible for Sex

1   Reassignment Surgery and if she had the means, could go

2   and get it, but she killed her wife, she's a prisoner,

3   and you lose various rights when you're in prison?

4          MS. COHEN:  That is precisely why there's an

5   Eighth Amendment right to medical treatment, because

6   when you are in prison you don't have that choice to get

7   it for yourself.  It is not an elective treatment.  It

8   is a medical treatment.  And the State takes on this

9   obligation.  If Miss Kosilek was in the community, she

10  could pursue that.

11         THE COURT:  Well, I think it's half the reason

12  the Supreme Court has articulated it.  I think I

13  addressed both of them in **Kosilek I** and I wonder whether

14  there's more I should read that would either vary or

15  confirm this view.

16         I thought there were two reasons that -- I mean,

17  we live -- it's a very odd situation.  I think people

18  would rightly regard it as odd.  We live in a country

19  where you don't have a Constitutional right to adequate

20  medical care if you're a law-abiding citizen, but here

21  is somebody who's in prison for murdering his wife and

22  the issue, to me, is does the Constitution compel the

23  government and the taxpayers to provide Sex Reassignment

24  Surgery which perhaps couldn't be afforded by a

25  law-abiding person?  And I thought that the way the

1    Supreme Court answers that has the following two parts.

2         One, because when we lock somebody up, we've taken

3    away their right to go and buy their own medical care,

4    um, the government has an obligation to provide adequate

5    medical care for a serious medical need.  And, two, it's

6    the sort of principle of the Eighth Amendment that

7    forbids cruel and unusual punishment.  The punishment

8    that somebody is to receive for a crime is the

9    punishment prescribed by some judge, in this case, life

10   in prison, but no civilized society, intentionally, or

11   as a result of deliberate indifference, permits

12   extrajudicial punishment in the form of paying for a

13   medical condition that can be alleviated.  I mean, I

14   think that's essentially what I wrote in 2002.

15        Is there, A -- is that the reasoning of the

16   Supreme Court, as you understand it, and, B, is there

17   any jurisprudence on this issue that I ought to look at

18   since 2002?

19             MS. COHEN:  I'm not aware of any, your Honor.

20   I think what you stated -- and I didn't mean to conflate

21   the two principles, but, I mean, I think those are the

22   two important principles in the Eighth Amendment context

23   relating to the provision of medical care.

24             THE COURT:  You see, that's why I wonder

25   whether that line at the end of *Helling* is -- well, it's

1    not exactly right, but -- well, okay.  So then -- but

2    then one would have to get to what you -- you can't

3    inflict harm -- a prison official cannot inflict harm

4    intentionally, or as a result of deliberate

5    indifference, but there's a line of cases that say that

6    if a prison official behaves reasonably, he or she

7    hasn't violated the Eighth Amendment, right?  There are

8    such cases?

9           MS. COHEN:  There are such cases.  They

10   generally arise in the context of a confrontation where

11   the prison guards act in haste and the issue is whether

12   it has been adequate or appropriate and dictated not

13   by -- by appropriate penological concerns rather than

14   the desire to inflict harm.  I don't think there are any

15   in the Eighth Amendment context involving medical

16   conditions.

17        And I think we have previously noted for your

18   Honor the footnote in, um, I think it's **Johnson vs.**

19   **California,** and I know I discussed this, in some length,

20   in the June, 2006 closing and we talked about the

21   footnote itself.  Although -- well, I'm going to ask

22   Mr. Sulman to give me that case.

23           (Pause.)

24           MS. COHEN:  I'm not finding the footnote.  You

25   should --

```
1              THE COURT:  Well, hold on.  I may be able to.
2    All right.  Okay.  *Johnson* is the first one.  Okay.  Why
3    don't you just go ahead.
4              MS. COHEN:  But I think, you know, in *Johnson*
5    *vs. California*, at 543 U.S. 499 at 511, 2005, the
6    Supreme Court said:  "We evaluate Eighth Amendment
7    claims not under the *Turner vs*." -- referring to the
8    *Turner vs. Safley* reasonableness standard.  "We evaluate
9    it under strict scrutiny."  Quote:  "When practical
10   constraints of prison administration are weighed against
11   Eighth Amendment rights, *Johnson* teaches that the
12   balance must be strictly scrutinized because the rights
13   guaranteed under the Eighth Amendment are not," quote,
14   "'rights that are inconsistent with proper prison
15   administration'," closed quote.
16             THE COURT:  Except in this case, perhaps, if
17   there are genuine security concerns.
18        But I think that -- and this is the outline I gave
19   you earlier.  Let's say that you've got me as far as --
20   hypothetically let say that you've got me as far as
21   finding that the subjective and objective prongs are
22   met, then there's the question of whether there's any
23   cognizable consideration that needs to be weighed
24   against the interest in medical care, either under
25   strict scrutiny or some balancing test, some
```

1    reasonableness test.

2         Is cost a cognizable consideration?

3              MS. COHEN:  No, it is not, your Honor.  I

4    think we have cited to you a host of cases that say that

5    cost is not.  From *Kosilek I*, I think you cite many of

6    the cases that we referred you to.  In addition to

7    *Kosilek I*, I think is *Brock*, the Second Circuit decision

8    written by Judge Calabrese, and, um, my recollection is

9    this California kidney transplant case, if I can find

10   it.

11              (Pause.)

12              MS. COHEN:  So I'm going to get to that, but

13   just to finish --

14              THE COURT:  Okay.  Go ahead.

15              MS. COHEN:  Just to finish out on Dr. Levine.

16              THE COURT:  Okay.

17              MS. COHEN:  When he testified, at Page 194, he

18   said:  "That it was undoubtedly correct that SRS

19   provides the best prospect to assure that Miss Kosilek

20   does not suffer intense emotional distress and

21   suicidality in the near future."  And that was in

22   response to questions asked by this court at Page 194 on

23   Lines 11 through 17.

24              THE COURT:  That an inmate's not entitled to

25   ideal care, an inmate's only entitled to adequate care.

1    And a prison official can choose less than ideal care if

2    it's adequate, right?

3                MS. COHEN:  If it's adequate.  And no one has

4    come forward in this case with evidence that any other

5    treatment would be adequate.  And both Dr. Levine and

6    Dr. Appelbaum, the two were neutral witnesses,

7    specifically disavowed that.  And the testimony of

8    Dr. Brown and Dr. Kapila -- excuse me, Dr. Kaufman, I

9    think, were probably the two most cogently developed of

10   the testimony.  They both had put substantial attention

11   into this.  Dr. Kapila was surprised to hear that there

12   weren't any studies of this.  Dr. Kapila wrote a long

13   rebuttal report to Dr. Schmidt in which she reviewed all

14   of the studies.  There is -- although this is

15   undoubtedly an orphan condition like orphan cancers,

16   there is also no --

17               THE COURT:  What's an orphan condition?

18               MS. COHEN:  An orphan cancer is a cancer -- to

19   choose one that I'm familiar with from familial

20   experience, is the salivary glands, which is such a rare

21   cancer that it is not -- that there is no National

22   Institute of Health funding to study it and so there are

23   no statistical studies.  But it doesn't mean that when

24   confronted with it, a doctor doesn't treat cancer of the

25   salivary glands, but he simply is the best evidence that

1   it's available.  Here there is substantial statistical

2   evidence, reviewed by Dr. Kaufman in her report, that

3   support the likelihood of a good outcome that many of

4   the clinicians intuitively share.

5           I heard reference, in Mr. McFarland's closing, to

6   "a pain that she can live with," and I think that is

7   certainly not the Eighth Amendment standard.  And your

8   Honor may remember **Brock**, which is the Judge Calabrese

9   case, with a scar that had formed a keloid, which was

10  causing pain to the patient on a daily basis.  And there

11  was discussion in there about whether it would be

12  adequate care to simply remove a tooth in lieu of

13  filling it because that would be one way of curing the

14  situation.  And the Court held -- said that it would not

15  be adequate.

16          I wanted to talk now about deliberate indifference

17  and about the security concerns.

18              (Pause.)

19          MS. COHEN:  You know, I think the evidence of

20  deliberate indifference in this case that we've seen is

21  evidence that they have treated -- that the Department

22  of Corrections, under the Commissioner's guidance, has

23  treated this as not a medical, but a political or a

24  controversial situation and the level of medical

25  discussion, I think, is what's new in this regard, which

1    is the decision relating to electrolysis, where a note

2    was actually put in Miss Kosilek's medical records

3    stating that her response to electrolysis was "not as

4    good as hoped."  But as your Honor observed on the

5    record, on November 25th, quote:  "However, it was not

6    clear who expressed this opinion or what the basis of it

7    was nor was it clear that this assessment affected the

8    decision not to continue the electrolysis," closed

9    quote.  And that's at Page 16.  And your Honor also

10   observed that the record, quote, "Does not reflect any

11   particularized consideration of Miss Kosilek's unique

12   circumstances in reaching the decision to deny her

13   request to resume electrolysis," closed quote, at Page

14   17.

15       Dr. Zakai testified, at his deposition, as your

16   Honor observed, that he understood from the meeting that

17   Michelle Kosilek had received maximal benefits from the

18   treatment that she had received, but there was no

19   evidence that anyone ever said this, and the conclusion

20   is inconsistent with what the electrolysist told

21   Dr. Lubelczyk.  It was not clear whether the decision

22   was made by a medical professional or by another

23   Department of Correction's official, Terre Marshall.

24       And your Honor said, on the same day, at Page 18:

25   "The DOC will run a great risk of violating the Eighth

```
 1    Amendment if it makes medical decisions based on

 2    inflexible policies or allows nonmedical considerations

 3    that are not rooted in legitimate penological objectives

 4    to motivate such medical decisions."

 5         In addition, there have been the security

 6    reviews.  And I found it startling when Mr. McFarland

 7    said that we had not brought any commissioner of another

 8    state in who could -- who had had experience in his home

 9    state with respect to a post-operative transsexual and

10    security concerns, because Commissioner Clarke had

11    exactly that experience in his home state with the

12    notorious post-operative transsexual, Miss Shanley.

13              THE COURT:  Shanley from New Hampshire?

14              MS. COHEN:  Yes, who was transferred and was a

15    model prisoner there.

16              THE COURT:  Well, what evidence do I have of

17    that?  Did Clarke, um --

18              MS. COHEN:  You have Commissioner Clarke's

19    testimony and the prison records that were prepared at a

20    time when he was the Commissioner.

21              THE COURT:  Didn't Clarke testify that he

22    wasn't aware of Shanley, at least while he was the

23    Commissioner?

24              MS. COHEN:  But those reports were business

25    records of that department under his supervision.
```

1              (Pause.)

2              MS. COHEN:  And then prior to Mr. Clarke,

3    Dr. Clarke --

4              THE COURT:  Well, let me just see if I'm

5    remembering this right.  Shanley had Sex Reassignment

6    Surgery, was transferred from New Hampshire to the State

7    of Washington, was confined in a male prison

8    uneventfully?

9              MS. COHEN:  In a female prison.

10             THE COURT:  In a female prison.

11             MS. COHEN:  Not only uneventfully, was a model

12   prisoner.  And Commissioner Clarke noted, um, in

13   discussing the Shanley case, her age.  He had not even

14   troubled himself to ascertain Miss Kosilek's age and was

15   surprised to hear that she turned 60 on April -- I think

16   April 10th of 2009 of this year.  So many of the

17   hallmarks of the Shanley experience, which Commissioner

18   Clarke could have satisfied himself to, at any point in

19   his testimony, are directly relevant to Miss Kosilek.

20        Going back to --

21             THE COURT:  Well, let me ask you this.  To

22   properly decide this case, do I have to decide where

23   Michelle Kosilek would be housed after she has Sex

24   Reassignment Surgery?

25             MS. COHEN:  I don't think that you do, your

1    Honor.  I think that there is this proper sphere for

2    prison authorities and that that would be one of them.

3              THE COURT:  So I'm just sitting here listening

4    to you thinking that if the Department of Corrections

5    doesn't prevail in this case and leaves Michelle Kosilek

6    -- if she has the Sex Reassignment Surgery, but she's

7    left in Norfolk, do we get *Kosilek III*?

8              MS. COHEN:  I don't know what the claim would

9    be.  I think Miss Kosilek would vastly prefer to be

10   treated as a woman in all respects.  It's been done in

11   New Hampshire.  I think -- you know, I'm not aware of

12   what the claim would be.  I think that would probably be

13   outside of the sphere of the prison doctors and a

14   subject legitimately for the -- if it were retaliatory,

15   maybe, but I think we'd only be speculating.

16             THE COURT:  But I --

17             MS. COHEN:  I also think, however, that

18   there's a record which suggests that there's every

19   reason that she could be well housed in Framingham.

20             THE COURT:  I know.  But, here, focus -- well,

21   maybe this is part of it, but continue to focus on why

22   you say I should find the stated security concerns to be

23   pretextual.

24             MS. COHEN:  Well, let's see.  I think, first

25   of all, going back to Commissioner Dennehy, she spent

1  considerably more time, in April of 2006, building the

2  case and then the security report was hastily performed

3  and without consultation.  She claims the Fenway report

4  --

5        THE COURT:  Without consultation with whom?

6        MS. COHEN:  With Superintendent Spencer.

7     She claims that the Fenway report lacked clarity,

8  it needed a peer review, but then she never read the

9  peer review.  When she had Dr. Schecter's testimony

10  about the logistics of surgery, she never read his

11  testimony.  And I'm referring to her testimony on June

12  20th, 2006 at Page 57, Line 25 to 59, Line 5.

13        THE COURT:  Did she say she was told about it,

14  though, that it would have to be out of state?

15        MS. COHEN:  Just that it -- that she was told

16  that it had to be out of state.  She also testified

17  that, on another occasion, the Department of Corrections

18  had transported prisoners to Arizona and that she had

19  gone there to inspect medical facilities.  She hasn't

20  done that in this case.

21     On the medical necessity issue, um, there has been

22  no showing, no -- on the security review issue, there's

23  been no consideration given to whether Miss Kosilek

24  could be transferred to Federal authority and

25  Dr. Schecter could operate on her here or as to whether

1   Miss Kosilek could be transferred to another state to

2   have Sexual Reassignment Surgery.  There was -- she has

3   been transported for medical purposes hundreds of times

4   without any incident on the issue of transport for

5   medical purposes.

6        On the issue of her personal security within

7   whatever facility she's placed in, she has never been

8   attacked or raped in a male prison while living as a

9   woman and dressed for 16 years -- and dressing as a

10  woman for the past 6 years.  If this is an issue --

11  well, Judge Tauro found that security concerns were

12  exaggerated.  And, your Honor, these were the very

13  arguments that were made to your Honor in advance of the

14  2002 decision and Miss Kosilek was put on hormones and

15  none, literally none of the security concerns, has

16  materialized.

17       With regard to the notion that other prisoners

18  would attack her if she were placed in the female

19  population at MCI Framingham, Dr. Appelbaum said that

20  there was no reason to believe that female prisoners

21  there would be hostile to her or that it would cause

22  them more mental distress than other issues in their

23  lives.

24       She is 60 now.  Commissioner Clarke, not knowing

25  Miss Kosilek's age, testified that Shanley and Kosilek

1    were not similar because Shanley was in his 50s and

2    inmates over 50 tend to present fewer security

3    concerns.  And I think that speaks to the willingness of

4    the Commissioner to draw analogies that were not rooted

5    in fact.  That was May 12th, 2008 at Page 100.

6         And Commissioner Dennehy acknowledged that she

7    didn't review the survey of other states' policies on

8    housing GID inmates, at the first trial, prior to her

9    security report.  At the second trial, she hadn't

10   contacted any states to update their policy.

11        There were no written security reviews performed

12   for hormone therapy.  Superintendent Spencer testified

13   that no one had asked him and if he had been asked, he

14   would have said that it could have been managed without

15   any problems.

16             THE COURT:  Are you talking about before 2002?

17             MS. COHEN:  Yeah, at this trial he testified

18   that no one had asked him in 2002.

19             (Pause.)

20             MS. COHEN:  The other evidence of deliberate

21   indifference has been Commissioner Dennehy's insistence

22   for months that the recommendations of Dr. Appelbaum and

23   Dr. Brewer were not clear.

24        Another example has been the effort to direct

25   medical care.  The Department of Corrections, in the

1    E-staff minutes, the chronology of the E-staff minutes

2    that we took Dr. Appelbaum through in his testimony,

3    reflect a constant effort to get an expert who would not

4    recommend Sexual Reassignment Surgery.  After the

5    Dr. Seil report is received, the Department of

6    Corrections immediately began looking for other experts,

7    and that's Exhibit 47, at Page 167, which are in the

8    E-staff minutes, and at Page 29 in the findings of

9    fact.  At that meeting they discussed Dr. Seil's

10   recommendations that Miss Kosilek might need Sexual

11   Reassignment Surgery.

12        Mr. Hughes, Greg Hughes, who at that time was

13   active for the administration, said that it was the

14   NCHHC's position not to do surgery while GID individuals

15   were in prison and a decision was made to look for

16   another specialist other than Dr. Seil to do the

17   initial -- to do further evaluations.  Greg Hughes

18   thereafter suggested making a comparison among GID

19   specialists prior to choosing a long-term evaluator.  He

20   suggested hiring Dr. Victoria Russel, a psychoanalyst,

21   to consider psychodynamic issues related to providing

22   Sexual Reassignment Surgery.  Dr. Appelbaum disagreed.

23        They retained Cynthia Osborne before the Fenway --

24   for forensic or litigation purposes, before the Fenway

25   doctors had even evaluated Michelle Kosilek because Greg

1    Hughes had heard that she might be more sympathetic to

2    the Department of Correction's position, and I'm

3    referring to the E-staff minutes, Exhibit 47, at Page

4    223 and Page 35 of the findings of fact.  The E-staff

5    meeting was the meeting between the DOC administration

6    and UMass Correctional Health Services and Dr. Appelbaum

7    started taking notes of his own to clarify the minutes

8    because he didn't think that the Department of

9    Correction's staff, which was taking the minutes, were

10   accurately reflecting the discussion there.

11        Susan Martin of the DOC asked Dr. Appelbaum to

12   contact the Fenway to see how they would factor criminal

13   history and specifically violence against women into the

14   evaluation, and that's at Exhibit 47, at 233, and Page

15   36 of the findings of fact.  And Dr. Appelbaum assured

16   Hughes and Martin that the Fenway doctors were more the

17   norm than the exception in the GID field, at Pages 36 to

18   37 of the findings of fact.

19        And Susan Martin of the DOC told Dr. Appelbaum and

20   Dr. Brewer that due to their lack of thorough review of

21   the Fenway report, the DOC was forced to hire

22   Dr. Osborne for peer review.

23        These are some examples.  I think, you know,

24   another example is, later on, when they hired -- when

25   Dr. Schmidt was brought in, it's been one after another

1    and it's been well documented through Dr. Appelbaum's

2    testimony.  And I think the post-surgery concerns are

3    just as "Chicken Little," in the sense that we're being

4    told that the sky is falling and the sky hasn't fallen,

5    as they were prior to *Kosilek I*.

6         Michelle Kosilek -- defendants' position is that

7    Miss Kosilek could not be safely housed at MCI

8    Framingham, and that was what Miss Bissonette and

9    Commissioner Dennehy testified.  But the Department of

10   Corrections has appropriate policies and Dr. Appelbaum

11   testified and told the Department of Corrections

12   officials, during weekly executive staff meetings, that

13   any negative effect on the climate would be purely

14   speculative, and that's in Exhibits 47 and 242 referring

15   to the executive staff meetings and to Dr. Appelbaum's

16   testimony on June 2nd, 2006 at 26 to 27.

17        The Department of Corrections, at one point, as

18   Commissioner Dennehy testified, it cited the murder of

19   Father Geoghan, the pedophile priest, as the reason why

20   Michelle Kosilek couldn't be safely housed.  I'm

21   referring to the June 19th, 2006 transcript, Page 35,

22   Line 10 to Page 36, Line 12.  That happens really

23   because of a lack of adequate protection policies.  So

24   there is no reason to believe that the Department of

25   Corrections would fall down again.

```
 1            THE COURT:  Well -- okay.  Go ahead.
 2            MS. COHEN:  In any case, none of these
 3   concerns is something that the prison authorities
 4   cannot, in their discretion, deal with, just as they
 5   have appropriately and adequately dealt with the issues
 6   that were raised, the security concerns that were raised
 7   in Kosilek I.  Wherever Miss Kosilek is housed, she will
 8   be -- there's no reason to believe that at Age 60 she
 9   will become a security threat or that she will not be
10   able to deal with the very same problems that she has
11   had for the last 16 years living as a self-declared
12   woman and more recently as a hormone-transitioned woman
13   in the housing.
14        If the -- I think, your Honor, the Court asked
15   what medical arrangements could be made?  She could be
16   transported.  Dr. Schecter has testified that he would
17   be willing to come here to perform the surgery.
18            THE COURT:  With all the brilliant doctors we
19   have in Massachusetts, would it really be --
20            MS. COHEN:  It seems incredible.
21            THE COURT:  Would it really be necessary?
22   Perhaps one who is already here will do it.
23            MS. COHEN:  I think that would undoubtedly be
24   the case, your Honor.
25        So whether analyzed under the strict scrutiny
```

1    standard or under the reasonableness standard of **Turner**,

2    these security claims cannot trump the -- what every

3    doctor has testified to as the distress and anguish of

4    her situation.

5            THE COURT:  If you persuaded me that the

6    security concerns were pretextual, they were not a

7    reasonable excuse, then I wouldn't have to decide

8    whether strict scrutiny or reasonableness is the

9    standard, is that correct?

10           MS. COHEN:  That's correct.

11           THE COURT:  And what if I found that the

12   security concerns were sincere, but greatly

13   exaggerated?

14           MS. COHEN:  Then they would not be reasonable,

15   your Honor, and evaluated under **Turner,** they would not

16   trump the Eighth amendment rights.  But we have gone

17   through extensively, in the findings of fact and

18   requests for conclusions of law, the reasons why they

19   should be evaluated under the strict scrutiny standard.

20           THE COURT:  And I will study that.

21           MS. COHEN:  And we will reply to you on the

22   **Helling vs. McKinney**.

23           THE COURT:  And I think, in that sense, I

24   guess the question is are there any cases after **Farmer**

25   that did define the deliberate indifference standard

1    with precision?  And it's been applied in many First

2    Circuit cases as well as **Kosilek I.**  That language in

3    **McKinney** has that employed in a medical case as opposed

4    to some other case.

5             MS. COHEN:  No, and I think I can -- I'm

6    remembering the language, but I don't want to respond to

7    you here.  I would like to put it in in the context of

8    the other relevant decisions, like **Johnson vs.**

9    **California.**

10             THE COURT:  Okay.  Thank you, very much.

11             MS. COHEN:  Thank you, your Honor.

12             THE COURT:  All right.

13        Mr. McFarland, is there anything to which you'd

14   like to respond?

15             MR. McFARLAND:  There's a lot, your Honor, but

16   I covered a lot of it earlier.  Just a few things.

17             THE COURT:  Well, why don't you let Miss Cohen

18   get relocated.

19             MR. McFARLAND:  Okay.

20             (Pause.)

21             MS. COHEN:  I thought maybe Mr. McFarland

22   would like to come back?

23             MR. McFARLAND:  I'm fine just talking from

24   here, your Honor.

25             Um, I take issue with the comments that the

1    commissioners were relying entirely on public scrutiny,

2    public controversy concerns.  There's no evidence of

3    that whatsoever.  It's pure speculation on the part of

4    plaintiff's counsel.  They testified to that -- well,

5    they were asked directly those questions.  And again

6    there's no evidence that Commissioner Clarke received

7    certain letters from legislators, which he didn't even

8    read or respond to, because he felt it was not

9    appropriate for him to look at those.

10         Um, with regard to Inmate Shanley and Washington,

11   Commissioner Clarke testified that he -- that she came

12   there before he was there.  He didn't know anything

13   about her.  He also testified that this person, from

14   what he understood, based on this trial, had spent 20 or

15   30 years already as a post-operative transsexual before

16   committing a crime.  So that would be a factor.  He also

17   mentioned that the women's prison in Washington was very

18   secure, much more secure than the prison in Framingham,

19   at least to his knowledge.

20         The fact that allegations of these are pretextual,

21   there's testimony from Lynn Bissonette who said she

22   spent 30-some years at Framingham in corrections and

23   that she knew the facility very well and she was

24   insulted that they were arguing that her concerns were

25   exaggerated and that she did not know the facility.  And

1     it's clear that -- um, Superintendent Spencer and

2     Bissonette know the facilities very well and that they

3     testified as to their concerns about taking --

4              THE COURT:  What did Spencer testify as to

5     whether Michelle Kosilek could continue to be

6     accommodated at Norfolk?

7              MR. McFARLAND:  You mean post surgery?

8              THE COURT:  Yes.

9              MR. McFARLAND:  He said he would not feel

10    comfortable with that except if she was in the Special

11    Management Unit.  That he felt that the change in her

12    sex and having sexual organs of a female would make her

13    at extreme risk of assaults.

14             THE COURT:  And the Special Management Unit is

15    what, like solitary?

16             MR. McFARLAND:  Well, it's 23 hours in, and

17    they bring the law library to them, the meals are eaten

18    in the cells.  It's a very restrictive setting, but very

19    protective in that sense.

20        Um, I think that the Commissioner -- well, both

21    commissioners, but Commissioner Clarke had a little

22    different background, at least in different

23    jurisdictional areas, and he testified, after reading

24    the materials that the Court ordered, that he felt very

25    comfortable in those concerns -- that were raised in

1    those security concerns.  These are issues he's been

2    dealing with for 35, 40 years.  And just to write them

3    off as being pretextual without any other

4    counter arguments from any other correctional people and

5    say, you know, that this is, um, exaggerated or a

6    nonissue is not fair to their testimony.

7         Which brings us to Dr. Appelbaum.  Certainly

8    Dr. Appelbaum testified -- well, he acknowledged that he

9    had absolutely no background in GID.  He relied entirely

10   on the physicians within the family clinic.  That was

11   his testimony all along.  He also has spent very little

12   time at MCI Framingham.  So how he would know about the

13   climate issues over the Superintendent is beyond me.

14   Certainly the correctional officials who had spent time

15   in Framingham felt that Kosilek's presence would create

16   a significant climate issue.

17            THE COURT:  Were the commissioners or Spencer

18   asked what they would do if a post-operative transsexual

19   was committed to their custody?

20            MR. McFARLAND:  You mean like Kosilek?

21            THE COURT:  No, if somebody already had Sex

22   Reassignment Surgery and then was sentenced.  They would

23   have to put the person somewhere.  What was the evidence

24   on that?

25            MR. McFARLAND:  Well, I guess the testimony

1    was that if the person was not known -- if it was a male

2    or a female and there was no knowledge that this person

3    was a transsexual, that it may not even raise a ripple.

4    But the big difference in this case is that there is

5    some notoriety and there is a lot of concern and Kosilek

6    is well known throughout the system based on this case.

7    So that would not be the situation where Kosilek could

8    kind of slip into Framingham and not be noticed.  But if

9    someone was not known, they would have no reason to

10   question them or segregate them if there were no issue

11   or concerns of a risk of assault by other inmates.

12          Now, we do believe that the safety and security

13   arguments have been raised by many, many witnesses in

14   this trial and they are valid, and while there may have

15   been questions earlier by some health services employees

16   as to finding ways of dealing with this issue, it's

17   clear that when it comes to Commissioner Clarke and

18   Commissioner Dennehy, they did not deal with the medical

19   issues, but they dealt with the safety and security

20   concerns that they saw and, um, that was the basis of

21   their opinions and their decisions.

22          And I think that's the -- that's the majority of

23   our concerns, your Honor.

24                THE COURT:  Thank you.

25          All right.  This is helpful and refreshing and is

1  sharpening my understanding.  But if there's anything

2  further the parties would like to file, um, not

3  extensive, but for points that arose today, why don't we

4  say by January 5th.  And --

5           MS. COHEN:  Um, if I may ask for another week

6  on that, your Honor?  Mr. Sulman reminded me that he was

7  taking a two-week vacation.

8           THE COURT:  Isn't he lucky.  Okay, January

9  12th.  Or you can even do it incrementally.  There were

10  one or two things you said you wanted to get me, the

11  name of the kidney case, and something else.  Okay.

12  January 12th.

13      Mr. Sulman is going on vacation and I'm going to

14  go back and read the preliminary injunction motion that

15  came in while you've been arguing.

16           MS. COHEN:  We don't want to lose our place in

17  line, your Honor.

18           THE COURT:  No, you're not going to lose your

19  place in line by January 12th.  We're talking now in the

20  margins.  I have a lot to do.  Sometimes the immediate

21  puts pressure on the complicated.

22      All right.  Is there anything further in this

23  matter for today?  The Court is in recess.

24           (Adjourned, 3:45 p.m.)

25

1                    C E R T I F I C A T E

2

3

4

5          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

6     do hereby certify that the foregoing record is a true

7     and accurate transcription of my stenographic notes,

8     before Chief Judge Mark L. Wolf, on Monday, December 21,

9     2009, to the best of my skill and ability.

10

11

12

13    /s/ Richard H. Romanow 1-22-10
      _____
14    RICHARD H. ROMANOW    Date

15

16

17

18

19

20

21

22

23

24

25