```
 1                 UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3                             No. 1:00-cv-12455-MLW

 4

 5    MICHELLE KOSILEK,
            Plaintiff
 6

 7    vs.

 8

 9    THE MASSACHUSETTS DEPARTMENT OF CORRECTION, et al,
            Defendants
10

11                        *********

12

13
                        For Hearing Before:
14                     Chief Judge Mark L. Wolf

15
                            Conference
16

17                     United States District Court
                       District of Massachusetts (Boston.)
18                     One Courthouse Way
                       Boston, Massachusetts 02210
19                     Thursday, August 18, 2011

20
                          ********
21

22            REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
23               United States District Court
         One Courthouse Way, Room 5200, Boston, MA 02210
24                 bulldog@richromanow.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3    FRANCES S. COHEN, ESQ.
         Bingham McCutchen, LLP
 4       150 Federal Street
         Boston, Massachusetts 02110
 5       (617) 951-8872
         Email: Frances.cohen@bingham.com
 6   and
      JOSEPH L. SULMAN, ESQ.
 7       Dechert, LLP
         John Hancock Tower
 8       200 Clarendon Street
         Boston, Massachusetts 02116
 9       (617) 654-8621
         Email: Joseph.sulman@dechert.com
10       For Plaintiff

11
      RICHARD C. McFARLAND, ESQ.
12    JOAN T. KENNEDY, ESQ.
         Department of Correction
13       70 Franklin Street, Suite 600.
         Boston, Massachusetts 02110
14       (617) 727-7403
         Email: Rcmcfarland@doc.state.ma.us
15       For the Defendants

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              (Begins, 10:30 a.m.)

 3              THE CLERK:  Criminal Matter 00-12488, Michelle

 4     Kosilek vs. the Department of Correction.  The Court is

 5     in session.  You may take your seats.

 6              THE COURT:  Good morning.  Would counsel

 7     please identify themselves for the record.

 8              MS. COHEN:  Good morning, your Honor.  Frances

 9     Cohen from Mr. Bingham McCutchen for Michelle Kosilek.

10     With me at counsel table is my co-counsel, Joseph

11     Sulman, of Sulman Law Offices, and Michelle Kosilek, the

12     plaintiff, is also at counsel table.

13              MR. McFARLAND:  Good morning, your Honor.

14     Richard McFarland on behalf of the Commissioner of

15     Correction, Luis Spencer.

16              MS. KENNEDY:  Good morning, your Honor.  Joan

17     Kennedy on behalf of the Commissioner of Correction,

18     Luis Spencer.

19              THE COURT:  Well, actually that responds to a

20     question I was going to ask you as to who the

21     Commissioner of Corrections is.  Um, Mr. Spencer is now

22     the Commissioner of Corrections?

23              MR. McFARLAND:  That's correct, your Honor.

24              THE COURT:  Should he be substituted as the

25     defendant in this case?
```

1          MR. McFARLAND:  Yes, your Honor.

2          THE COURT:  And is that the Luis Spencer who

3   was the warden at the prison at which the plaintiff has

4   been in custody all these years?

5          MR. McFARLAND:  Yes, your Honor, he testified

6   at this trial in June of 2006.

7          THE COURT:  All right.

8       Is there any objection to the substitution of the

9   defendant?

10         MS. COHEN:  None, your Honor.

11         THE COURT:  All right.  As always I'd like to

12  try to assure we have a clear and common sense of where

13  we are and what's on the agenda.

14      On August 2, the plaintiff filed a motion for a

15  status conference in part to confer regarding recent

16  relevant authority especially the First Circuit decision

17  in *Battista vs. Dennehy*, um, affirming a decision by

18  Judge Woodlock to order the Department of Corrections,

19  in that case, to provide hormone therapy to a civil

20  detainee with Gender Identity Disorder.  I allowed the

21  motion on August 3.  Yesterday the plaintiff filed a

22  memorandum relating to recent authority, not just the

23  *Battista* case, but a series of other cases.

24      I deeply regret that my decision in this case has

25  not yet been issued, but the passage of time has given

1   us the **Battista** decision that I think does have

2   implications for the legal standards to be applied.

3        So, Ms. Cohen, you asked for the conference, I

4   have a series of questions and thoughts, but why don't

5   you go ahead.

6        MS. COHEN:  Thank you, your Honor, and thank

7   you on behalf of the plaintiff for scheduling the

8   conference.  I think we wanted to call to your

9   attention, of course, the decision of the First Circuit

10  in **Battista** because that is the decision that has

11  significance, um, and I think the significance in

12  particular is that, um, that decision really defines

13  what is deliberate indifference in connection with

14  Gender Identity Disorder.

15       And I think one of the unique features of the

16  decision is that on the panel that heard the case and

17  voted for the decision was Associate Justice David

18  Souter who was the author of the Supreme Court decision

19  in **Farmer vs. Brennan** and the decision in **Battista**

20  concerns the import of **Farmer vs. Brennan** including the

21  extent to which prison officials are entitled to

22  deference with regard to medical decisions.  And what

23  the Court held specifically in that case was that the

24  prison officials, and specifically the Department of

25  Corrections and the same actors that were involved with

1    Michelle Kosilek and her treatment, had forfeited the

2    right to deference by a pattern of obstructive conduct.

3         And when you get into the cases -- and when I say

4    "cases," I refer both to the First Circuit affirmance on

5    the basis that there was ample evidence in the record

6    for the lower court, Judge Woodlock's finding that there

7    had been deliberate indifference.  When you get into the

8    cases, the characterization of the conduct, it is

9    remarkably similar to what we've been hearing in this

10   courtroom for quite some time.

11        And, Judge, um, looking at our submission of

12   yesterday, the First Circuit held that:  "The DOC had

13   forfeited the advantage of deference through a pattern

14   of delays, new objections substituted for old ones,

15   misinformation, and other negatives."  I'm reading from

16   the slip opinion at Page 15.  And --

17             THE COURT:  Yeah, essentially that's what

18   you've argued has been the behavior in this case and

19   that the stated security concerns were really

20   pretextual.

21             MS. COHEN:  That's right.  And I think what

22   the First Circuit said is for a time the Department

23   refused to take the GID diagnosis seriously and the

24   request for hormone therapy seriously and when their own

25   medical advisors supported the request for Battista, the

1    defendants went back and forth apparently looking for an

2    out.

3         It may take some education to comprehend that GID

4    is a disorder that can be extremely dangerous.  And I

5    think, just stepping out of the quotation for a moment,

6    I think we've all had an evolving education in this

7    courtroom and through hearing and reading other cases.

8              THE COURT:  And it appears that it's not

9    unique to this particular court or this jurisdiction.

10   There's been some evolution in the jurisprudence in the

11   Seventh Circuit with the *Fields* case.

12             MS. COHEN:  Well, that's right.  And I think

13   when you say "court," I think it's the lawyers' benefit

14   as well.  I think we've all -- this has been a learning

15   experience and a long odyssey and I think what we have

16   learned from it is just how serious this disease can

17   be.

18        But going back to what the First Circuit said

19   about the Department of Corrections, they said:  "The

20   education seems to have taken an unduly long time in

21   this instance.  Once the medical prescription was clear,

22   several years passed before defendants produced a

23   substantial security justification and that was found to

24   be wholly pretextual."  And they said, in the end,

25   that:  "The District Court's conclusion that deliberate

```
 1    indifference has been established was justified by the
 2    record."
 3           When you get into Judge Woodlock's opinion, and
 4    this was an oral opinion that he dictated following a
 5    direct and cross-examination of one of the witnesses in
 6    the case and it begins, I think, at Page 47 of the
 7    transcript, and here I think it's Exhibit B in our
 8    submission, and when you read that transcript, Judge
 9    Woodlock is talking about the behavior of the Department
10    of Corrections with regard to Sandy Joe Battista, the
11    defendant before him, but he is also reading an order
12    written by Judge Tauro in the **Bruglieria** case and he
13    observes, you know, that you could substitute the name
14    "Battista" for "Bruglieria" and the Department's conduct
15    would be exactly the same.  And so here, your Honor, in
16    the First Circuit opinion in virtually everyplace you
17    could substitute the name "Kosilek" for "Battista" and
18    you would have the same conduct.
19           And Judge Woodlock's comments are throughout and
20    he talks about "result-oriented analysis," "a
21    predisposition to find results," "prevarication and
22    interference."  Describing the Department's security
23    review, he said:  "Perhaps ludicrous understates it.  It
24    was, as I indicate, toward a predictable result, in a
25    pretextual fashion, sloppy, conclusory, cobbled together
```

1    to reach the result that the DOC had chosen to pursue

2    throughout.  It was, in short, inadequate."

3          So I think that finding of deliberate indifference

4    really is based on the same conduct, the same letters,

5    the same -- Judge Woodlock had in front of him the same

6    letters from Dr. Appelbaum that you may recall are in

7    this case and once again the DOC took the position that

8    the letters --

9                THE COURT:  Well, not -- not -- let me clarify

10   that.  They weren't the same letters, were they?  They

11   were similar letters.

12               MS. COHEN:  Similar letters.

13               THE COURT:  Because they were specific to

14   Battista, I think.

15               MS. COHEN:  One was the same.

16               THE COURT:  One was the same?

17               MS. COHEN:  The September 1st, 2005 letter.

18               THE COURT:  Because this gets at something,

19   um, that I'm going to give the parties a chance to

20   address after today and it's not going to delay the

21   ultimate decision.  In *Battista*, I thought, from reading

22   it this morning again, it was very helpful in clarifying

23   the place of security concerns and the analysis,

24   something I left open in *Kosilek I,* as the parties call

25   it.  And so at a minimum it's beneficial as a matter of

1  law.  There are certain factual findings by Judge

2  Woodlock affirmed now on appeal and I have a question

3  but not an answer.

4       Each time I've seen you, and the last time I think

5  was December of 2009, the parties have confirmed that

6  they weren't asking to offer any more evidence and there

7  were no material changes in the facts since 2006 and I

8  should decide the case based on the existing evidentiary

9  record, although there were some motions to supplement,

10  I know.  But does that continue to be the Department of

11  Correction's position?

12            MR. McFARLAND:  Yes, your Honor.

13            THE COURT:  And at least as of today, is that

14  the plaintiff's position as well?

15            MS. COHEN:  Yes, your Honor, although you know

16  what?  I actually thought -- and maybe I didn't read it

17  carefully enough, but I thought that the letters were

18  different iterations of those same letters.

19            THE COURT:  Oh, no, they -- well, you've -- I

20  was just trying to clarify.  I wasn't asking a

21  rhetorical question and some of this can be clarified

22  after today, but, you know, the open question though is,

23  um, whether I could properly take into account or rely

24  on the factual findings in *Battista*?

25            MS. COHEN:  I think they're binding, your

1    Honor, in that the conduct was the same and what they

2    found was a predisposition of prejudice against this

3    disorder.

4              THE COURT:  Well, that's -- there may need to

5    be a little sort of fact preclusion, um, supplementary

6    briefing.  I mean, it's part of the --

7              MS. COHEN:  Yes.  Absolutely.

8              THE COURT:  Because -- well, as I said, the

9    decision is really helpful -- you know, it made me know

10   how the First Circuit finds these competing concerns,

11   security and serious medical needs, ought to be taken

12   into account, but the standard is, that's been

13   clarified.

14             MS. COHEN:  And we would be glad, in that, to

15   match the letters.

16             THE COURT:  Exactly.  Exactly.  Go ahead.

17             MS. COHEN:  But that -- I think that decision

18   is, um -- is, um, informative both, if not binding, on

19   the issue both of deliberate indifference and the

20   security review.  I think the parallel with regard to

21   the overall deliberate indifference finding is one that

22   is binding on this court.

23        With regard to the security review, I think it's

24   -- the circumstances relating to Ms. Battista and her

25   placement in a civil commitment facility are different

```
1    from where Michelle Kosilek is, but I think the record
2    we have, and I took the occasion to review our requests
3    for findings of fact, um, but the record that we have, I
4    think, is equally strong to the record with regard to
5    Ms. Battista.  In fact, in part because Ms. Kosilek has
6    been a model prisoner, um, the issues with regard to
7    security concerns are even clearer with respect to
8    Ms. Kosilek.
9            THE COURT:  With regard to the security
10   review, and I'll go back in the record on this, but
11   there was some testimony, I think, about some decisions
12   relating to security being made before Mr. Spencer was
13   consulted, if I remember the record?
14           MS. COHEN:  That's right, that Mr. Spencer was
15   not consulted, and I believe Mr. Spencer felt that he
16   could manage any security issues.  What has been
17   interesting is after the First Circuit decision, there
18   has been a subsequent order in Judge Woodlock's case,
19   and we've included that in the materials, and I think
20   that order and the way both parties have conducted
21   themselves really offers a road map for a similar order
22   in this case because in that case the Department of
23   Corrections agreed and told the Court that they would
24   leave Ms. Battista in the same circumstances that she
25   had been in and the Court ordered the Department to
```

1   report should there be any change in the circumstances

2   of Ms. Battista's behavior or, um, she's been ordered to

3   have hormone therapy if there is a change in the

4   recommendations of the clinicians.

5            THE COURT:  But actually I thought, in

6   **Battista**, comparable to this case, that the defendants

7   took the position, essentially before the judicial

8   decisions, that if, in that case, the hormone therapy

9   was provided, she would have to be put in isolation?

10           MS. COHEN:  That's exactly correct, your

11   Honor.

12           THE COURT:  And once the decision was issued,

13   that's not what they actually did.

14           MS. COHEN:  I think to the Department's credit

15   that once the decision was issued, they were willing to

16   leave her in her single cell, but able to access all of

17   the privileges and activities that she had been afforded

18   in the past with monitoring and the opportunity to

19   report to the Court if a change needed to be made.

20           THE COURT:  Because I've -- well, you don't

21   have my decision, but it doesn't mean I haven't thought

22   closely about this from time to time and sometimes for

23   stretches of time.  And, you know, I would think that,

24   you know, if I ordered Sex Reassignment Surgery and

25   didn't find a need for that trumped by legitimate

```
 1    security concerns, I wouldn't be deciding where
 2    Ms. Kosilek would be housed after the reassignment
 3    surgery, the defendants would decide, and if there was
 4    an objection to that, you know, we'd have *Kosilek III*.
 5          But it -- um, because I have -- well, in any
 6    event, um -- and I don't know, I have at least one more
 7    question, now maybe two.  But why don't you go ahead, I
 8    mean, to other sort of topics.
 9          MS. COHEN:  I was going to move now from the
10    *Battista* case to the *Fields* case.
11          THE COURT:  Okay.  Go ahead.
12          MS. COHEN:  A Seventh Circuit decision which
13    arose in the context of a challenge by three Wisconsin
14    inmates who had Gender Identity Disorder to a Wisconsin
15    statute that removed completely from the discretion of
16    prison officials any kind of treatment such as hormone
17    therapy or Sexual Reassignment Surgery.  And the Seventh
18    Circuit is an interesting circuit because that was the
19    circuit in which *Maggert v. Hanks* had previously been
20    one of the GID decisions.  And in this case the case
21    dealt specifically with the changes in the perception of
22    the disease in the community and the, um -- and it said
23    specifically that, um, the Court has to have -- the
24    clinicians must have the discretion to review the
25    underlying circumstances and prescribe accordingly.
```

```
1                THE COURT:  That's essentially what I
2     concluded in *Kosilek I*, I think.
3                MS. COHEN:  Yes.
4                THE COURT:  Not having found --
5                MS. COHEN:  And your Honor, of course, had the
6     precedent of *Maggert vs. Hanks,* but distinguished it in
7     that case.
8                THE COURT:  Is *Maggert* the summary judgment
9     written by Judge Posner?
10               MS. COHEN:  That's my recollection.
11               THE COURT:  Okay.  Go ahead.
12               MS. COHEN:  So I think the *Fields* decision is
13    another decision of the circuit courts, like the
14    decision in the *Battista* case, that recognizes that
15    clinicians are entitled to discretion.  And you know
16    what?  When I reread the findings, your Honor, I was
17    reminded that we have said to you many times that in
18    this case what Michelle Kosilek wants is really what the
19    Department of Correction's treating physicians have
20    prescribed for her.  It was the recommendation of the
21    UMass. clinicians that she have this treatment and of
22    other experts and clinicians that were retained by the
23    Department of Corrections not for litigation purposes
24    but for treatment purposes, and that is what she seeks
25    in this case.  And the *Fields* decision clearly
```

1    contemplated that Sexual Reassignment Surgery would be

2    one of the options that were available.

3         The next case we've cited is the Tax Court

4    decision which related to the deductibility of expenses

5    for gender treatment and in that decision the Court

6    reviewed extensively the testimony of the very same

7    experts that were called in this case.  Professor

8    Schmidt was involved in that case.  The name of the case

9    is *O'Donnabhain vs. Commissioner of Internal Revenue.*

10   And the issue is whether the treatment was necessary to

11   treat a medical defect -- to alleviate a specific

12   physical or medical defect.  So the issue, although

13   somewhat different because of the different procedural

14   and substantive context, were aligned on that issue.

15        And the Court reviewed the testimony of Dr. Brown

16   and it's reviewed, Dr. Brown's professional -- and

17   Dr. Schmidt, and the review of Mr. Schmidt's credentials

18   I think are telling, they find that Dr. Schmidt had not

19   been involved in the treatment of GID patients since the

20   1980s.  Um, an article he wrote is critical of the

21   triadic treatment, the Harry Benjamin, now the World

22   PATH Society treatment.  Um, all the other experts agree

23   that it was the generally-accepted protocol.  Um,

24   Dr. Schmidt disagreed, but they noted that the only

25   place his article had been published was in a religious

1    journal and not in a peer-reviewed article.

2            THE COURT:  And again in this -- this decision

3    I'm more familiar with and my sense is I have to make my

4    own independent judgment regarding the credibility of

5    the experts and what weight to give them that -- you

6    know, that's another jurisdiction and another -- well,

7    it was a tax matter, so --

8            MS. COHEN:  I don't think it's binding, your

9    Honor, but I do think it's very informative.  I don't

10   claim that that's binding and the --

11           THE COURT:  Well, it's not binding, it may

12   even be a little more subtle than that.  I don't know

13   that I can take, you know, as evidence -- well, I don't

14   know whether I can or I can't, but I don't think I can,

15   take facts found on other evidence and rely on them in

16   the factual analysis.  But it may point out, if I reach

17   the same conclusion, that I'm not the only judge who

18   reached that conclusion.  But I don't know that I can

19   rely on those findings of fact to reach my conclusions

20   in this case.

21           MS. COHEN:  I think your Honor is right that

22   it is not binding, although it is a very persuasive and

23   well thought-out review of the scientific evidence.  And

24   I think it's helpful to the Court, and it was helpful to

25   me as a litigant, to review the testimony of the various

1    experts seen through that lens.

2         The, um -- we also have had a legislative change

3    that I want to call to the Court's attention, or

4    actually more correctly called an "executive change,"

5    which is the Executive Order 526, and that is in this

6    book.  I think it's the last tab, Exhibit I, which

7    provides that:  "All programs and services provided,

8    performed, licensed, chartered, funded, regulated or

9    contracted by the State shall be conducted without

10   unlawful discrimination based on gender identity."

11        So if there was any doubt that Gender Identity

12   Disorder must be treated the same as every diagnosis --

13   which is what all of these decisions -- that's really

14   the import of all of these decisions, including *Battista*

15   and the tax case and --

16             THE COURT:  I mean, that's essentially what I

17   said in *Kosilek I*, you have to apply these clearly-

18   stated principles relating to what correctional

19   officials are constitutionally obligated to do for an

20   inmate with a serious medical need to what is an

21   unfamiliar area to most people, including most public

22   officials, although maybe not as unfamiliar as it was 10

23   years ago.

24             MS. COHEN:  There has certainly been an

25   evolution over the past 10 years since your Honor

1    brought this case into this courtroom.

2         The other material that we've included, we filed a

3    while ago, it came out in 2009, and we called it to the

4    Court's attention in a motion to supplement the record

5    back in March of 2010, which is the position statement

6    of the National Commission on Correctional Health Care,

7    which is at Tab G in your materials.  And that position

8    statement, um, I think also echoing *Kosilek vs. Maloney*

9    or *Kosilek I*, provides that:

10        "There should be no blanket administrative or

11   other policies that restrict specific medical treatments

12   and when determined to be medically necessary, as there

13   has been a determination by the DOC's own treating

14   clinicians in this case and the experts they retained,

15   when there has been a determination that it is medically

16   necessary, hormone therapy should be initiated and Sex

17   Reassignment Surgery considered on a case-by-case

18   basis."

19        And that is the standard, I believe, that the

20   Department of Corrections has agreed to follow the

21   National Commission on Correctional Health Care's --

22             THE COURT:  I don't think I have any evidence

23   on that.  Do I?

24             MS. COHEN:  -- position statement.

25             THE COURT:  Well, let's see.  Did the

1   Department of Corrections rely on the earlier version

2   during the --

3           MS. COHEN:  I believe they did, but we will

4   address that, your Honor.

5           THE COURT:  Because again it raises this

6   question for me.  I believe the Department has argued --

7   you know, has opposed my making that -- supplementing

8   the record by making that evidence in this case and

9   unless I were to reopen the evidence and conceivably

10  have more testimony, which I don't think anybody's

11  asking for, um, including me, at the moment, um, I just

12  have a question as to -- you know, I have to decide the

13  case based on what's in the record, so I have to decide

14  what I can do with that.

15          MS. COHEN:  Understood, your Honor.  I think

16  that is something to be addressed.  My understanding is

17  there is a consent decree, but I haven't been able to

18  find it, that specifically agrees to adopt the NC -- the

19  National Commission on Correctional Health Care

20  standards.

21          THE COURT:  Well, I might be able to take

22  judicial notice if there's a consent decree, if we have

23  a court order, rather than the standards of something.

24          MS. COHEN:  Yes, but I'm not prepared to tell

25  you that there is today.  Mr. McFarland may know better.

1          THE COURT:  All right.

2          MS. COHEN:  So I think, you know, all of these

3    things really come back to a situation in which Michelle

4    Kosilek has been subject to the deliberate indifference

5    of this department for some time.  It was not until your

6    Honor's decision in *Kosilek vs. Maloney* that hormone

7    treatment was started or that any real treatment was

8    started.  I think your Honor may remember some of the

9    suggested treatments that were described in *Kosilek vs.*

10   *Maloney* including "thinking positive thoughts," um, and

11   "wishing the disease away."

12         We are now at a juncture where Michelle Kosilek

13   has been on hormone therapy for some time.  It's not --

14   she has never veered for an instant from her wish to

15   have Sexual Reassignment Surgery.  The medical

16   recommendations have been unequivocal.  And --

17         THE COURT:  And she's been living uneventfully

18   at Norfolk -- uneventfully in the sense that, in

19   contrast to Battista, as far as I know there still

20   haven't been any sexual incidents or any assaults or

21   anything?

22         MS. COHEN:  That's my understanding as well,

23   your Honor.  And she has been living uneventfully, but

24   her inner turmoil has been extraordinary.

25         THE COURT:  Oh, I've -- no, I -- I understand

1    that.  What I meant was it was implicit in the parties'
2    agreeing that there have been no material change in the
3    circumstances.  The evidence at the trial in this case
4    was that despite predictions that she would be
5    vulnerable to sexual assaults if she got the hormones,
6    that there hadn't been any sexual assaults.
7              MS. COHEN:  No, your Honor.
8              THE COURT:  That's what -- I was imprecise.
9    That's what I had in mind.
10         Okay, Mr. McFarland -- well, let me see.
11         What's the status of the electrolysis?  None?
12              MS. COHEN:  There's been no further
13    electrolysis.  There was ordered and there will be
14    electrolysis in the **Battista** case, your Honor.
15              MR. McFARLAND:  That's not correct.
16              THE COURT:  Okay, well -- well, maybe -- here,
17    let me let Mr. McFarland -- you can start wherever you
18    want to start and we'll see where we are.
19              MR. McFARLAND:  Let me just start with the
20    last thing we talked about, your Honor, the National
21    Commission on Correctional Health Care.  That is a
22    position statement from that agency.  It's not a
23    standard.  It's a recommendation for, um, prisoners to
24    look at.  And it is a -- it has no effect upon the
25    presence of this type of data required to adhere to

```
 1    that.
 2              THE COURT:  Is there some consent decree where
 3    the --
 4              MR. McFARLAND:  There is not, your Honor.  I
 5    was asked by Ms. Cohen to check that out and I did look
 6    at that case that she had mentioned about this and there
 7    is no consent decree in that case.
 8              THE COURT:  And were the standards, as they
 9    existed several years ago, introduced at trial in this
10    case?
11              MR. McFARLAND:  I don't -- I'm not sure, your
12    Honor.  I could go through the record.  I really don't
13    know.  This is a fairly recent statement by the NCCAC,
14    and again it's a position statement, a recommendation.
15    I'm not aware of any statement that has followed this
16    recommendation by ordering that an inmate be provided
17    with Sex Reassignment Surgery.
18         But with regard to the decision in the *Battista*
19    case, your Honor, um, we think that decision should be
20    applied quite narrowly, as the Court did say in its
21    decision.  It was limited to the facts of that case.
22    Those facts are very different from the facts in the
23    instant case.  First and foremost, that case involved
24    hormone therapy.  Kosilek has been on hormones since
25    2003.  It did not involve Sex Reassignment Surgery
```

1    whatsoever.  The case looked at the unique circumstances

2    of the Massachusetts Treatment Center as well as the

3    commitment for Mr. Battista.

4              THE COURT:  At the Mass. -- I'm sorry.

5              MR. McFARLAND:  The treatment center.

6              THE COURT:  Yeah, but those circumstances, as

7    described by the First Circuit, and I think by Judge

8    Woodlock, would have weighed in favor of the Department

9    of Correction because the treatment center houses a

10   large number of similarly-committed sexually dangerous

11   people, doesn't it?

12             MR. McFARLAND:  Well, that was the concern,

13   your Honor.  The concern, of course, was that when you

14   provide an individual with hormones that would result in

15   breasts in a very volatile population consisting of

16   rapists of women and child offenders -- this was an

17   individual who's was very sexually active and, at one

18   point, claimed that she was raped.  That was the basis

19   for the security concerns raised by the defendants.

20             THE COURT:  Yeah, but here -- well, I don't

21   think the evidence showed that there were unusually

22   dangerous people at Norfolk.  That's a medium security

23   prison, as I recall, right?

24             MR. McFARLAND:  Correct.

25             THE COURT:  And the evidence, unaltered by the

1   passage of time since it closed, um, was that even after

2   being on hormones and having feminine features, Kosilek

3   wasn't assaulted?

4           MR. McFARLAND:  Correct.  It's our position

5   that when we -- there have been no problems, as far as

6   we know, with, um, Kosilek's status at the time in

7   Norfolk and he was able to avoid any kind of problems.

8   A very different kind of situation in **Battista**.  And the

9   fact that the treatment center does house a very

10  sexualized population.  And also, in the **Battista** case,

11  there were initially clinicians who did question and

12  challenge the diagnosis of GID for Battista.  That's not

13  -- that did not happen in this case.

14          In this case the facts are different.  Kosilek --

15  as we said, Kosilek is at MCI Norfolk, he's been there

16  since 1994, without any problems.  He's lived in a

17  single cell and has worked in the dormitory.  We're not

18  aware of any incidents of violence or aggression against

19  Kosilek.  He's not subject to any restrictions as to

20  where he could be transferred in the prison system

21  currently if there was a need for his protection or

22  something else.

23          So what may have just made a difference in the

24  **Battista** decision versus the current case is that that

25  case also applied the Eighth Amendment substantive due

1   process clause in that case.

2           THE COURT:  Oh, I don't think so.  I think the

3   First Circuit said that it didn't matter whether it was

4   under the Fourteenth Amendment or the Eighth Amendment.

5   I think, in fact, I wrote about that in -- well, I know

6   I wrote about that in the *Sampson* death penalty case in

7   August of 2003.

8           MR. McFARLAND:  But the Court did interplay

9   between the two standards throughout the decision in

10  saying that the substantive due process may have led to

11  reinforce, of course, the Eighth Amendment decision.

12  And in the instant case we're only relying on the Eighth

13  Amendment standard of deliberate indifference.

14       Another important factor in this case is that the

15  Prison Litigation Reform Act would apply in the Kosilek

16  case where it did not apply in the, um, in the case of

17  *Battista*.  And, of course, the PLRA requires that any

18  requests for relief must be considered as to the impact

19  on public safety or that version of the criminal justice

20  system.

21       Now, the District Court and the Appeals Court in

22  the *Battista* case found that the DOC had engaged in, um,

23  that their responses to his treatment involved delays,

24  missteps and changing of objections.  For example, the

25  Court pointed to the fact that the superintendent's

1    security review contained a number of mistakes made with

2    regard to counting different events in that facility and

3    that was later corrected, but that played a role.

4         THE COURT:  Yeah, I think I'll have to decide

5    that issue on the unique evidence in this case, but

6    that's something that the plaintiff has ardently argued

7    throughout, that -- I mean, didn't the evidence show

8    that -- and I'll have to go back, I've been emersed in

9    this at various times, but that, for example,

10   Mr. Spencer, who ordinarily would have been consulted,

11   wasn't consulted?  The lawyers were consulted.

12   Something that I think was in the First Circuit decision

13   in *Battista*.

14        MR. McFARLAND:  Well, Commissioner Dennehy did

15   present her -- as the Commissioner, her safety and

16   security concerns with regard to providing Kosilek with

17   the Sex Reassignment Surgery.

18        THE COURT:  What --

19        MR. McFARLAND:  And that was done in April or

20   May of 2005.  Um --

21        THE COURT:  That -- and I -- the *Battista*

22   decision clarifies and confirms my sense that I have to

23   decide whether those stated concerns were sincere or

24   pretextual and to the extent, if any, that they were

25   sincere, were they exaggerated to justify a preordained

1  result, that the Commissioner didn't want to be the

2  first correctional official in the United States to

3  authorize Sex Reassignment Surgery.  I mean, I think

4  that's the question.

5          MR. McFARLAND:  Well, your Honor, the

6  testimony -- well, you heard live testimony of

7  Commissioner Dennehy and she said -- well, she went into

8  all the reasons why she put that information into her

9  security review.  She also, in no uncertain terms, said

10  that her decision was not based on a concern for costs

11  or political influence or on, um, public controversy.

12  So she made that very clear in her testimony.

13      You also have the testimony of three other -- you

14  have the testimony of also former Commissioner Clarke,

15  who set forth very similar concerns, as well as, um, now

16  Commissioner Luis Spencer, and we had the testimony of

17  Arthur Beeler, who was a warden of the Federal Bureau of

18  Prisons, who testified at length that he shared the same

19  concerns, um, based on the circumstances that were

20  raised by the three commissioners.  And we have the

21  testimony of Lynn Bissonette, the superintendent of MCI

22  Framingham, who has been there for many years in many

23  different roles and explained to the Court her serious

24  concerns and the basis for those concerns.

25      The problem potentially that I should mention with

1    regard to the **Bruglieria** and the **Battista** cases with

2    regard to the actual format of the security reviews is

3    at that point the Department decided to make a form and

4    use that form for all future security review questions.

5    So that was, in hindsight, a mistake, but it was an

6    attempt to make sure everyone covered the same bases and

7    looked at the same issues that faced the prisons.  But

8    that was not the case with regard to the 2005 security

9    review by Commissioner Dennehy.

10            And nor was there any significant delay in the

11   DOC's response to the recommendation in February of 2005

12   that Ms. Kosilek have the Sex Reassignment Surgery.

13   Within four months the Commissioner had completed --

14   within three months completed a security review.  And in

15   light of the fact that UMass. was unwilling to render

16   their own opinion as to the medical necessity of the

17   surgery, that the DOC went out a got a peer-review

18   evaluation from Cynthia Osborne.

19            THE COURT:  You say that UMass. was unwilling

20   to render their own view?

21            MR. McFARLAND:  No, UMass. was --

22            THE COURT:  UMass. went to the Fenway Clinic,

23   the experts, and correct me if I'm wrong, but my memory

24   is that UMass. repeatedly confirmed and clarified for

25   the Commissioner that they were relying on the experts

1   they had consulted, as they consult experts in other

2   areas, and therefore the UMass. recommendation was the

3   recommendation -- they essentially adopted the Fenway

4   recommendation which was that there should be Sex

5   Reassignment Surgery.

6           MR. McFARLAND:  Well, they said that they had

7   no experience in the area of Sex Reassignment Surgery or

8   GID treatment and they were referring to the Fenway

9   Clinic and the DOC wanted something more than that, they

10  wanted their provider to look at the other issues.  So

11  when that didn't happen, they sought another GID

12  professional to do the peer review of the evaluation and

13  then from that point on we moved into litigation.  But

14  it was clear from the beginning that the Commissioner

15  set out the safety and security concerns with regard to

16  providing the surgery to Ms. Kosilek.  And it wasn't

17  like we spent three or four years trying to -- well, the

18  two years that that had happened in *Battista*, it was a

19  fairly immediate response from the DOC, Commissioner

20  Dennehy, saying up front, "These are the concerns that I

21  have, as a correctional professional, with the

22  recommendation for Sex Reassignment Surgery."

23          And then they went to UMass. and they said, you

24  know, "Where would this surgery take place?"  And UMass.

25  came back with --

1          THE COURT:  Well, let me -- and this is not,

2     for anybody, a final answer -- I doubt any of us have

3     got totally reemersed, but I have a memory of evidence

4     that Mr. Spencer was not consulted until the position

5     with regard to security was developed.

6          Is that your memory of the evidence as well or am

7     I misremembering it?

8          MR. McFARLAND:  I'm not sure, your Honor.  I

9     don't really remember that.

10          THE COURT:  Because I -- (Pause.)  I think

11     there was testimony that there was no written report

12     from Mr. Spencer.  But I'll check it.

13          But this -- I almost hesitate to ask this

14     question, but I really think it's fundamental here.  The

15     essence of the **Battista** decision, as I see it, is that

16     Judge Woodlock found and the First Circuit agreed there

17     was ample reason to find that the Department of

18     Corrections, particularly the Commissioner, had

19     abdicated her constitutional responsibility, um, to, in

20     good faith, evaluate whether there was a serious medical

21     need, something that put an inmate at the risk of

22     serious harm, against legitimate security concerns, you

23     know, maybe because this is such a controversial area or

24     for whatever motive, but it was an abdication and --

25          MR. McFARLAND:  Well, your Honor --

```
 1              THE COURT:  Well, let me just finish.  I'm
 2     talking slower than I usually do.  I try to --
 3              MR. McFARLAND:  Well, I --
 4              THE COURT:  Let me finish.  Let me finish.
 5              MR. McFARLAND:  I'm sorry.  I'm sorry, your
 6     Honor.
 7              THE COURT:  I know we've been at this a long
 8     time but I'm not going to assume I know what you're
 9     going to say, so you shouldn't assume you know what I'm
10     going to say.  And when Governor Patrick was elected and
11     Commissioner Clarke became the Commissioner, remember I
12     ordered him to read the relevant documents to see if he
13     was going to maintain the position taken by Commissioner
14     Dennehy.  You know, now there's yet another Commissioner
15     and this hadn't occurred to me before I came in, but,
16     you know, Mr. Spencer has got more experience with
17     Michelle Kosilek than any correctional officer -- you
18     know, in a high position could have.  Um, this is
19     somebody who might have characterized Judge Woodlock's
20     decision as, you know, "judicial activism."  But it's
21     not improper judicial activism, in my view, you know,
22     when public officials abdicate hard decisions on
23     constitutional issues to courts, the courts have to
24     decide the issues and decide them candidly and without
25     any concern for the possible controversy.
```

1          But, I mean, have you talked to Mr. Spencer about,

2     you know, whether he wants a shot at deciding this issue

3     before I do?

4               MR. McFARLAND:  He's advised us that his

5     opinions have not changed from his earlier testimony.

6          Um, your Honor, getting back to Commissioner

7     Dennehy, I think she did make the hard choice.  She made

8     a written statement, a report, of all the concerns that

9     she had that would warrant her to say no to the Sex

10    Reassignment Surgery.  She also went out and got a GID

11    expert to look at the facts again, look at the case, and

12    remind her --

13              THE COURT:  Well, that's one of the disputed

14    issues as to whether Osborne and Schmidt are GID experts

15    or people who, as Judge Woodlock and the First Circuit

16    found in *Battista*, you know, were hired because they had

17    well-known religiously-based views so they would, you

18    know, provide a supportive answer.  It's a question.

19    And until I issue a decision, I can't know how I'm going

20    to decide all these questions.  I reach judgments, I sit

21    down I draft, and then things interrupt.  Go ahead.

22              MR. McFARLAND:  I would also say that the

23    Court appointed an independent GID expert, Dr. Levine,

24    to look at those issues and to determine whether or not

25    the recommendations that Dr. Schmidt made were within

1   the prudent standards.  And Dr. Levine, the Court came

2   back, and said, "Yes, they're within the prudent

3   standards.  They may not be liked by many advocates, but

4   they are within prudent standards."

5           THE COURT:  Yeah, his testimony unfortunately

6   was not -- he didn't say the same thing in his long

7   testimony.  He said a number of different things.

8           MR. McFARLAND:  Yes, he also said that based

9   on compassion, not science, but compassion, that it

10  would also be prudent to provide the Sex Reassignment

11  Surgery.  But the question I asked of the Court at that

12  time was "Were Dr. Schmidt's recommendations within

13  prudent objective standards?"  And his response to that

14  question was, "Yes, they are."

15      So I think the evidence -- we have three GID

16  experts who have said that, um, there are medical

17  reasons, there's medical concerns in this case and that

18  they did not believe that the, um -- the surgery was a

19  medical necessity in this case.  So in addition to the

20  correctional officials' concerns for surgery, you have a

21  number of experts, including the court-appointed expert,

22  who said that the treatment being provided to Kosilek,

23  including hormones and everything else, was adequate

24  treatment.

25      And so I think that's a -- you know -- so with

1    those things I just don't think there's enough evidence

2    in this case to show that there are significant delays

3    by the Department or missteps or changes in philosophy,

4    it's been a pretty straightforward shot since 2005 --

5    2003 when the hormones were given to Kosilek.  And we

6    believe that the focus appears to -- certainly there's

7    nothing in the facts that we see, of this trial, which

8    would warrant a decision that, um, the DOC has forfeited

9    the deference normally given it, as a correctional

10   agency, making judgments regarding security issues.

11        Now, your Honor, with regard to the other cases

12   mentioned by my sister, the *O'Donnabhain* case, we, of

13   course, have determined -- we believe that that case is

14   irrelevant.  It's a tax case.  The fact that Schmidt and

15   Brown testified is not relevant to this court.  This

16   court heard from both witnesses and will have to

17   determine the applicability based on their testimony,

18   not on what --

19             THE COURT:  Yeah, I agree with that.  The fact

20   that some other factfinder found Dr. Brown to be more

21   credible than Dr. Schmidt, I think is not evidence in

22   this case, although many of the same arguments about

23   credibility have been made because -- so there's some

24   instructive value.

25             MR. McFARLAND:  But certainly there are, you

1    know, both sides and there are -- you know, someone may

2    determine that one was an advocate, some person would

3    question other -- Dr. Schmidt.  But they certainly --

4    and Dr. Levine said that both of them had different

5    polarizing opinions.  Dr. Levine, I'm sorry, came in the

6    middle, saying that both of them had pluses and minuses

7    but they were both on either side and he would come down

8    in the middle of the case.

9        As to the **Fields vs. Smith** case, this involves a

10   statute passed in Wisconsin which prohibited the DOC in

11   Wisconsin from giving inmates hormones who already had

12   been on hormones or who wanted them with Sex

13   Reassignment Surgery.  The case did not get into Sex

14   Reassignment Surgery because that wasn't an issue.  And

15   in this case there is no statute which prohibits the,

16   um, hormones that -- and certainly we have a case where

17   there's been an individual assessment of Kosilek's

18   recommendation for Sex Reassignment Surgery and it's

19   been reviewed and examined by mental health and GID

20   experts as well as correctional experts.

21       The **Adams vs. Federal Bureau of Prisons**, again,

22   there's no relevance to this case involving an issue of

23   hormones, this inmate does have access to hormones.  The

24   DOC does not have a prescreen policy.  That's not an

25   issue.  And as to Kosilek, there had been no -- she's on

1    the hormones, we've evaluated the -- we looked at the

2    SRS -- the surgery aspect, and the view and

3    determination was made that it presents a number of

4    issues and we don't think surgery is necessary.

5            And Executive Order 526, um, talks about Gender

6    Identity Discrimination in the workplace and some

7    programs in the executive agencies.  Does that provide a

8    substantial right to Ms. Kosilek?  Um, and certainly

9    there's no evidence of discrimination where in this case

10   Kosilek is receiving treatment for GID, including access

11   to clothing, um, access to hormones, access to

12   psychotherapy.

13           THE COURT:  I haven't studied the order.  I

14   would assume that the discrimination, if it existed,

15   would be that if you have a serious medical need that

16   requires even expensive treatment -- I think there was

17   testimony in this case about the cost of hepatitis

18   drugs, um, that you would get it, but if your serious

19   medical need is as a result of a Gender Identity

20   Disorder, you don't get it.  So inmates with hepatitis

21   or kidney failure, I think the argument would be, are

22   treated differently and more favorably than inmates who

23   are suffering from severe Gender Identity Disorder.

24           MR. McFARLAND:  Well, not everyone gets the

25   ultimate treatment either.  Doctors may, to a lesser --

1              THE COURT:  It has to be adequate.  It doesn't

2    have to be optimum.

3              MR. McFARLAND:  And we are arguing that the

4    treatment provided to Ms. Kosilek is adequate and the

5    decision not to provide the surgery is based upon a

6    consideration of the circumstances of her case, the lack

7    of medical necessity as well as the significant security

8    issues involved, and those aren't things of

9    discrimination, your Honor.

10         I think that's about it, unless you may have some

11   questions for me, your Honor.

12             THE COURT:  Um, I think -- there's one case

13   that isn't in the package that was provided but was

14   referenced by Ms. Cohen, the *Bruglieria* case.  Is there

15   anything you want to say about that?

16             MR. McFARLAND:  Well, that was a case, similar

17   to the *Battista* case, that they had an inmate in

18   population, um, and their concern was that he was very

19   sexually active and, um, the concern was that providing

20   that individual with breasts and female features would

21   create a significant security risk for that individual.

22   And that was the premise of the decision not to

23   authorize the hormones.

24             THE COURT:  Judge Tauro ordered the hormones?

25             MR. McFARLAND:  Yes, he disagreed with the

1    security concerns and ordered us to provide the

2    hormones.

3              THE COURT:  This is -- I'm sorry.  Ms. Cohen,

4    is there more you would like to say at this point?

5              MS. COHEN:  Well, I have a few responses, but

6    I didn't want to preclude your Honor's observations.

7              THE COURT:  No, I -- no, go ahead.

8              MS. COHEN:  I just -- to clarify on the

9    standard -- um, actually before I go there, let me just

10   say, um -- in *Fields*, there was a case of a de jure

11   exclusion, the Wisconsin legislature had said, as a

12   matter of law, um, prison officials could not consider

13   these treatments.  I think what the record that we have

14   here, including the remarks that we've just heard from

15   the Department of Corrections, shows that there is a de

16   facto treatment of this, that it's, in some ways, more

17   insidious because it has been persuasive.  Every single

18   decision at every point along the way has been

19   challenged.

20       I think in contrast to the security record in the

21   *Battista* case, which we've cited, which I think is

22   different, it was a civil commitment situation and as

23   your Honor noted there were sexually dangerous persons.

24   And we've developed the security records here, including

25   the security review, and in our request for findings of

1    fact and conclusions of law, Paragraph 295, it does

2    address -- at Page 113, it does address the Spencer

3    situation.  Um, and what happened there with now

4    Commissioner Spencer, then Superintendent Spencer, was

5    that there was a flowchart which clearly required a

6    report by Superintendent Spencer prior to review by

7    upper levels of the administration and we requested that

8    this court enter a finding of fact that his review was

9    not solicited.  According to his own testimony, no

10   review was done and he was simply called to a meeting

11   where there was a result-oriented announcement about how

12   this should be handled.

13        And so all of these circumstances and the

14   resistance in all of these cases is a de facto treatment

15   of this condition that shows the result-oriented

16   predisposition that the First Circuit found.

17        Let me just touch briefly on the standard.  Your

18   Honor is correct that it was a civil commitment

19   situation but it was decided under the deliberate

20   indifference standard.  The case refers to the civil

21   commitment standard, I think it's *Youngblood* -- it's

22   outside my area -- *Youngbird* was the civil commitment

23   standard where, um -- which refers to the failure to

24   exercise a reasonable professional judgment rather than

25   deliberate indifference under the Eighth Amendment

```
 1    standard.  And what the Court held at the end and,
 2    quote:  "In the end, there is enough in this record to
 3    support the district court's conclusion that deliberate
 4    indifference has been established or an unreasonable
 5    professional judgment exercised."
 6              THE COURT:  I'm sorry.  Where are you
 7    reading?
 8              MS. COHEN:  I'm reading now from the last
 9    paragraph, it's page 7 of Exhibit A.
10              THE COURT:  Right now I'm looking at a
11    different --
12              MS. COHEN:  And actually, your Honor, if
13    you're in Exhibit A, um, I don't have the official --
14              THE COURT:  I have it.
15              MS. COHEN:  We've given you the LEXIS -- let
16    me see if I --
17              THE COURT:  No, I have it.
18              MS. COHEN:  Okay.  But the Court set up the
19    difference between the two standards at Page 5 of my
20    copy when it said, um, Battista's civilly committed and
21    -- but it goes on to say that the two standards are not
22    all that far apart.
23         Now, if the *Youngbird* phrasing were followed, then
24    it would be more helpful to Battista.  But the Court
25    goes on to find that it met the deliberate indifference
```

1    standard outlined it **_Farmer,_** and that's in the end where

2    the court says:  "In the end, there's enough on this

3    record to support the District Court's conclusion that

4    deliberate indifference has been established," plainly

5    referring back to its setting up of the Eighth Amendment

6    standard at the beginning.

7          I think with regard to the resistance,

8    Mr. McFarland referred just now to the Department of

9    Corrections as having, in some way, sought other

10   opinions.  We went through in elaborate detail the

11   E-Staff minutes which in some ways provided the factual

12   spine of the trial in this case.  Those E-Staff minutes

13   detailed the efforts that were made by the

14   administration of the Department of Corrections to lean

15   on UMass. and cause Dr. Appelbaum, in some instances,

16   even to dissent from the minutes because the Department

17   of Corrections was trying to make, he felt, result-

18   oriented choices in the selection of experts, and that

19   is also detailed in our requests for findings of fact.

20              (Pause.)

21              THE COURT:  Okay.  Well, this has been very

22   helpful and -- well, I'll never forget this case because

23   I have four boxes relating to it sitting by my desk,

24   but, of course, it's been for a -- too long a time.  But

25   there are some issues that have emerged from this

1    hearing that I'm going to order the parties to address.

2         It would be helpful to have in writing some -- and

3    it doesn't have to be -- it can be whatever you think it

4    should be, on reflection, but some discussion of these

5    new authorities -- but in writing.  But I wouldn't order

6    that, I think, if it was the only issue.

7         To me, at the moment, the more significant issue

8    is -- I think if you go to these cases and think

9    about -- and *Battista* certainly helps with regard to the

10   legal standard and because we had a clarification of the

11   legal standard and because there almost inevitably will

12   be an appeal or there foreseeably may be an appeal of

13   whatever I decide, that I think having the guidance of

14   the First Circuit on the legal standard may actually get

15   to the end of this and get this case concluded at every

16   level sooner rather than later, and it's helpful to me

17   to have that.  So I can use *Battista* to some extent and

18   the discussion in other jurisdictions on the law.

19   That's clear.

20        What's not perfectly clear to me at the moment is

21   the implications of the factual findings in *Battista* and

22   whether I can properly rely on any of those, whether

23   they can be treated as evidence or a substitute for

24   evidence?

25        If you look, and I happen to have it in mind

1     because I'm dealing with it, um, in another matter, a

2     First Circuit case called *Sutton*, for example, events

3     that occur -- later occurring events, in certain

4     circumstances, can be used as evidence of intent on

5     earlier occasions.  So the plaintiff would argue -- is

6     arguing that if -- and in *Battista* it was found tha the

7     Department of Correction created pretextual security

8     concerns because it just didn't want to give the

9     hormones, and then the plaintiff wants me to reason, I

10    think, that that is added evidence supporting the

11    finding the plaintiff would like me to make of pretext

12    concerning the security concerns in this case.  I know

13    the law says that later events can illuminate earlier

14    intent, but I don't know if I can take the factual

15    findings into account.

16          And similarly when you go to -- maybe you have a

17    consensus on this, but other jurisdictions like the

18    Seventh Circuit, um, again the discussion of the law or

19    the criticism of *Maggert*, which is, I think, something I

20    did toward the end of *Kosilek I,* um, I can take into

21    account, but is anybody urging me to rely on any of

22    those factual findings, or *O'Donnabhain,* where Dr. Brown

23    was found more credible than Dr. Schmidt and Dr. Schmidt

24    was found not credible?  I know that could possibly go

25    in the legal analysis, but I have a question about

1    whether that could possibly go in the factual analysis.

2    But I have plenty independently to make my own decisions

3    on Dr. Schmidt and Dr. Brown and I just need to write

4    them.

5         But my intention, and this won't end up delaying

6    the ultimate decision, it might actually expedite it in

7    getting the boxes off the floor more often, but my

8    present intention is to give you a date in September to

9    do this supplementary -- to provide this supplementary

10   briefing and perhaps see you again in early October.  I

11   think that will help.

12        Does anybody want to -- well, let me see your

13   book.

14             (Pause.)

15             MS. COHEN:  Your Honor, while you're doing

16   that may I just confer with Ms. Kosilek for a moment?

17             THE COURT:  Yes.

18             (Pause.)

19             THE COURT:  All right.  I'm going to order

20   that that supplementary briefing be done by September

21   16th.  If there are any replies that anybody feels are

22   necessary, they should be filed by October 4th.  And I'm

23   going to order or plan a further hearing, if necessary,

24   at 3:00 on October 11th.  And between now and then, it's

25   my expectation that I will have decided some major

1     matters in the **Sampson** death penalty case, one way or

2     another finish with Mr. DiMasi, I no longer have

3     Mr. Bulger, and, um -- I know that this case is

4     extremely important, unusually important to all parties,

5     and I'll continue to keep that in mind.

6          The Court is in recess.

7               (Ends, 11:45 a.m.)

8

9                    C E R T I F I C A T E

10

11          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

12    do hereby certify that the foregoing record is a true

13    and accurate transcription of my stenographic notes,

14    before Chief Judge Mark L. Wolf, on Thursday, August 18,

15    2011, to the best of my skill and ability.

16

17    /s/ Richard H. Romanow 08-23-11
      _____
18    RICHARD H. ROMANOW    Date

19

20

21

22

23

24

25