1                 UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3                             No. 1:00-cv-12455-MLW

4

5    MICHELLE KOSILEK,
            Plaintiff

6

7    vs.

8

9    THE MASSACHUSETTS DEPARTMENT OF CORRECTION, et al,
            Defendants

10

11                        * * * * * * * * *

12

13
                         For Hearing Before:
14                     Chief Judge Mark L. Wolf

15
                        Conference/Motions
16

17                     United States District Court
                       District of Massachusetts (Boston.)
18                     One Courthouse Way
                       Boston, Massachusetts 02210
19                     Wednesday, October 12, 2011

20
                          * * * * * * * *
21

22            REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23                United States District Court
         One Courthouse Way, Room 5200, Boston, MA 02210
24                 bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3    FRANCES S. COHEN, ESQ.
          Bingham McCutchen, LLP
 4        150 Federal Street
          Boston, Massachusetts 02110
 5        (617) 951-8872
          Email: Frances.cohen@bingham.com
 6   and
      JOSEPH L. SULMAN, ESQ.
 7        Dechert, LLP
          John Hancock Tower
 8        200 Clarendon Street
          Boston, Massachusetts 02116
 9        (617) 654-8621
          Email: Joseph.sulman@dechert.com
10        For Plaintiff

11
      RICHARD C. McFARLAND, ESQ.
12    JOAN T. KENNEDY, ESQ.
          Department of Correction
13        70 Franklin Street, Suite 600.
          Boston, Massachusetts 02110
14        (617) 727-7403
          Email: Rcmcfarland@doc.state.ma.us
15        For the Defendants

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2              (Begins, 2:00 p.m.)

 3              THE CLERK:  Civil Matter 00-12455, Michelle

 4  Kosilek versus Luis Spencer, et al.  The Court is in

 5  session.  You may be seated.

 6              THE COURT:  Good afternoon.  Would counsel

 7  please identify themselves for the record.

 8              MS. COHEN:  Thank you, your Honor.  Frances

 9  Cohen and Joseph Sulman for the plaintiff, Michelle

10  Kosilek, and Ms. Kosilek is with us at counsel table

11  today.

12              MR. McFARLAND:  Yes, your Honor.  Richard

13  McFarland on behalf of the defendant, the Commissioner

14  of Correction, Luis F. Spencer.

15              MS. KENNEDY:  Joan Kennedy on behalf of

16  Commissioner Spencer.

17              THE COURT:  Okay.  Since I saw you in August,

18  I've received responses to the order that I issued and

19  you've each filed replies.  I see it, at the moment,

20  there are two things that this hearing would usefully

21  address.  One, is the implications concerning the law of

22  the First Circuit decision in **Battista** and some of the

23  other cases raised by the plaintiff.  The other, which

24  has come into sharper focus since I mentioned it in

25  August, is the question of whether I can rely on any of
```

1    the facts found in *Battista* or indeed on any of the

2    other evidentiary or factual matters that have been

3    submitted since the close of the evidence years ago?

4         The plaintiff argues that the *Battista* facts can

5    be considered based on nonmutual collateral estoppel.

6    If nonmutual collateral estoppel doesn't operate, then

7    I'm skeptical.  I thought briefly about whether the

8    facts found in *Battista* or any other case are hearsay

9    and if so would they be admissible under Rule 8038, the

10   public records exception.  The cases I'm familiar with,

11   and you haven't briefed this issue, indicate that the

12   factual findings are hearsay and that 8038 wouldn't

13   operate to admit them.  And I saw right at the end of

14   the plaintiff's reply that what used to be called the

15   "Harry Benjamin Standards of Care," have been updated in

16   September of 2011, and I'm asked to take judicial notice

17   of that.  But I have a question as to whether it's

18   permissible or appropriate to do that.

19        The parties have repeatedly stated that they do

20   not want me to reopen the trial and take additional

21   testimony and they've repeatedly represented, as

22   recently as at the August hearing and agreed, that there

23   are no material changes in circumstance since I think it

24   was 2006 when the evidence closed.

25        Have I correctly stated just now the parties'

1    positions that neither side wants me to reopen the

2    testimony and you want me to decide the case on the

3    understanding or agreement that nothing material has

4    changed since the end of the evidence?

5              MR. McFARLAND:  That's correct for the

6    defendants, your Honor.

7              MS. COHEN:  Yes, with regard to the plaintiff,

8    your Honor.

9              THE COURT:  All right.  So then I think, you

10   know, we would go -- there have been submissions made, I

11   think, maybe by the plaintiff to supplement the record

12   and I have a concern about whether I could properly take

13   those matters into account when they haven't been

14   subject of any testimony.

15        But is there anything else that should be on the

16   agenda for today?

17              (Silence.)

18              THE COURT:  Apparently not.

19        Well, I think there's no question, as I said in

20   August, that the First Circuit decision in *Battista* has,

21   for me, very helpfully clarified the applicable law, um,

22   and has set a framework for dealing with stated security

23   concerns.  But while the plaintiffs, both to some extent

24   in August about *Battista* and the defendants to a lesser

25   extent, I'm interested in hearing you on that and the

 1    other cases that have been raised that the defendants at

 2    least didn't address previously orally, and then why

 3    don't we go to the factual matters.  But, you know, the

 4    applicable law, at a minimum, is still evolving and I

 5    have to apply it as it's understood today.

 6         Ms. Cohen -- and I'm familiar with what you argued

 7    in August, you didn't repeat it or some of it, but why

 8    don't you go first, if you want.

 9              MS. COHEN:  Your Honor, I think, um -- I think

10    it would be hard and probably not useful for the Court

11    if I were to address the *Battista* decision in the

12    absence of the facts, so I --

13              THE COURT:  Well, you can talk about the

14    facts, but -- well, I'm not saying that you can't talk

15    about the facts, but the concern I was trying to express

16    is, in *Battista*, first Judge Woodlock found that the

17    Department of Correction's stated security concerns were

18    pretextual, in essence, and the First Circuit decision

19    talks about what to do in those circumstances.  I have a

20    question as to whether, you know, I could properly look

21    at those facts and reason that since the Department of

22    Correction behaved disingenuously in the *Battista* case,

23    it's more likely to have behaved disingenuously in the

24    *Kosilek* case.  It would be like 404(b) evidence, but

25    evidence has to be admissible.  That's the concern that

 1    I was trying to bring into sharper focus.

 2            MS. COHEN:  I guess -- and I'd be glad to

 3    discuss it from a Rule 404 lens, your Honor, but I think

 4    first it's most useful to look at it through the

 5    doctrine of collateral estoppel.

 6            THE COURT:  Okay.

 7            MS. COHEN:  And, you know, I think -- I was

 8    trying to think of where to begin today and my eye fell

 9    on the following couple of sentences from the

10    defendants' memorandum of September 16th, 2011, and I'm

11    reading it from Page 2, it's Document Number 544 on your

12    docket.  And what the Department of Corrections says

13    there is, quote:

14        "The events that took place concerning Battista's

15    access to hormone therapy shed no light upon what

16    transpired years earlier with respect to Kosilek's

17    access to SRS.  The facts in **Battista vs. Clarke** differ

18    dramatically from the facts established at trial in

19    **Kosilek** and have no relevance to the June 2005 decision

20    not to provide Kosilek with sexual reassignment surgery

21    as treatment for a Gender Identity Disorder.  As

22    described below, the only similarity between Kosilek and

23    Battista is that both were diagnosed with GID while in

24    the Department of Correction custody."

25        And when I read that, your Honor, it seemed like

1    such an alternative version of reality from the way the

2    plaintiff sees the facts that I thought it would be

3    useful to start there.  Because what we had viewed

4    *Battista* as having found is that there was a

5    predisposition against this condition and we have amply

6    shown that predisposition in the evidence that we have

7    detailed in our requests for findings of fact and

8    rulings of law.  And the purpose of calling this all to

9    your attention over the summer was not to revisit that,

10   because I know your Honor is fully familiar with that,

11   and I think that more than amply shows the deliberate

12   indifference case and that the Department of Corrections

13   was deliberately indifferent to Michelle Kosilek.  Where

14   I see the relevance of the First Circuit decision in

15   *Battista,* in Judge Woodlock's decision, is that it shows

16   that the Department of Corrections itself is

17   deliberately indifferent to this condition and Michelle

18   Kosilek is an instance of it, the treatment of Sandy Joe

19   Battista is another, and the treatment of Teresa

20   Brugliera is the third.

21            THE COURT:  I understand the relevance of it.

22   I mentioned to you in August that sudden events

23   occurring after something that's at issue can illuminate

24   intent on the earlier occasion and if, you know, there's

25   a pattern of activity by the same person, I think, it

```
 1    can be evidence of that person's intent.  The question I
 2    had is about the basis for admissibility.  And I didn't
 3    have this clearly in mind, but you probably thought of
 4    it, but, you know, there are a line of cases that hold
 5    that "A court judgment is hearsay to the extent that
 6    it's offered to prove the truth of the matters
 7    asserted."  The Ninth Circuit said that in *Syne*, 493
 8    F.3d 1021 at 1036.  In *Nipper*, 7 F.3d 415 at 418, the
 9    Fourth Circuit saying that "findings of fact in a prior
10    case are inadmissible hearsay not subject to the public
11    records exception."
12         So that -- I understand the relevance, I think,
13    but since I have to decide the case based on admissible
14    evidence, I want to make sure I don't go down the wrong
15    path.
16         MS. COHEN:  No, I don't view this as an
17    evidentiary issue, I think this is a "conclusive finding
18    that the Department of Corrections has behaved with
19    deliberate indifference because of a predisposition
20    against Gender Identity Disorder."
21         THE COURT:  Okay.  Actually then let me -- is
22    that a quote from *Battista*?
23         MS. COHEN:  Yes.
24         THE COURT:  I still have the Westlaw version,
25    but do you know where that quote is found?
```

1          MS. COHEN:  Well, I have the Westlaw version
2   and I'm just looking for it myself.
3          THE COURT:  Okay.
4          (Pause.)
5          MS. COHEN:  Let me just, to walk you through
6   -- and I thought we had given your Honor, and I
7   apologize, the LEXIS version.
8          THE COURT:  You have, in this huge binder.
9          MS. COHEN:  I know.  We're in the same
10  position, your Honor.
11         (Looks.)
12         THE COURT:  I know you've -- you gave it to
13  me.  Hold on a second.
14         (Looks.)
15         THE COURT:  All right.  Okay.
16         MS. COHEN:  So I'm looking now at Pages 15 to
17  17 and 19 of the LEXIS version.
18         THE COURT:  All right.  I have that.
19         MS. COHEN:  What the Court found was that "for
20  sometime the Department refused to take the GID
21  diagnosis seriously and the request for hormone therapy
22  seriously and" --
23         THE COURT:  Okay, hold on a second.
24         (Pause.)
25         THE COURT:  Are you reading that?  Those words

1    are here somewhere?

2          MS. COHEN:  Yes, it's in our memorandum at

3    Page 11, and let me just find it now in the -- and I'm

4    having trouble going back and forth.  It's in our

5    memorandum at Page 11 and I'm quoting from 15 to 17 of

6    the Court's decision verbatim, and describing the three

7    periods that Judge Woodlock found.  Judge Woodlock had

8    found a period of, um, "obdurate ignorance," which

9    covered the period from 1997 to 2004, during which it

10   "obdurately refused to be cognizant of the diagnosis of

11   GID," and one thing that is extraordinary about that

12   period is that it actually runs for two years after this

13   court's decision in *Kosilek vs. Maloney*.

14         The Court also affirmed the findings by the

15   Department of -- the findings by the District Court that

16   there was a period from 2004 to 2008 when there was an

17   "obstruction of the clinician's diagnosis and

18   treatment," and that corresponded exactly with the

19   evidence in this case.  That from 2004 when Michelle

20   Kosilek was prescribed hormones and ready to get them

21   and there was a period of delay, that was followed by a

22   period of, um, pretextual assertion of, the First

23   Circuit found, "of inadequately-considered reflexably

24   predetermined and conclusorily-framed security concerns

25   from 2008 to the present."  And it is our contention

1    that those findings, affirmed by the First Circuit, are

2    binding on the Department of Corrections and indicate a

3    predisposition, as Judge Woodlock found, that was

4    adverse to Gender Identity Disorder.  And the Court

5    said, in conclusion, I believe it's at Page 19:  "In the

6    end, there is enough evidence in this record to support

7    the District Court's conclusion that deliberate

8    indifference has been established even though it does

9    not rest on any established motive, sinister motive or

10   purpose to do harm."

11        And that finding that the Department was

12   deliberately indifferent to the diagnosis of Gender

13   Identity Disorder has been a -- it's the subject of

14   extensive testimony in this case, but it's also been the

15   subject of findings that are binding on the Department

16   of Corrections in two other cases, in **Brugliera** and in

17   **Battista**.  And the --

18             THE COURT:  Was **Brugliera** appealed?

19             MS. COHEN:  No, **Brugliera** was not appealed, a

20   preliminary injunction was entered on September 16th,

21   2009 and no appeal was taken from that.

22        And to give you the chronology in **Brugliera,** which

23   I think is very relevant because it overlaps so

24   completely with the chronology in **Kosilek**, hormones were

25   initially prescribed in 2005 by the Department of

Correction's own retained clinician.  In 2006 that
prescription was placed on hold and the Department went
out and retained Dr. Levine who in 2008 came back with a
report and recommended the triadic treatment.  That was
ultimately implemented in early 2009 by a preliminary
injunction of Judge Tauro recommending that they start
with psychotherapy.

By February 23rd, 2009, Dr. Levine wrote that
"hormones should not be delayed."  On June 29th, 2009
hormones were administered for two days and then taken
away so that the Department could complete its security
review.  On August 14th, 2009, the security review was
complete and the issue was framed for Judge Tauro, who
by December 16th, 2009 found that the Department had
been deliberately indifferent and ordered the Department
to proceed with the administration of hormones.  Those
facts are not only parallel to the facts in the *Kosilek*
case, but parallel to the facts and the timing of the
*Battista* case where in 2004 hormones were prescribed by
the Department of Correction's clinician.

In 2006, nothing had happened, so there was a
motion for a preliminary injunction, which Judge
Woodlock denied, and I think our brief really tracks
Judge Woodlock's realization of what was going on with
the Department of Corrections during this time.  When he

1   denied the preliminary injunction, he thought it was odd

2   -- he wrote that it was notable that the Department of

3   Corrections was refusing to give this inmate the very

4   prescription that had been recommended by the

5   Department's own clinician.  Then in 2009 hormones were

6   again prescribed.  The Department of Corrections

7   refused.  And finally in 2010, Judge Woodlock issued an

8   order for a preliminary injunction.

9        Under the doctrine of collateral estoppel, those

10  are findings that were made and that demonstrate the

11  attitude towards Gender Identity Disorder that this

12  court became familiar with going back to *Kosilek vs.*

13  *Maloney*.  Commissioner Maloney testified at his

14  deposition that he had willfully excluded -- or

15  deliberately and intentionally excluded treatment of

16  Gender Identity Disorder from the Department's contract

17  with its medical vendor at that time because he didn't

18  believe that this was appropriate for prisoners and he

19  believed that it was elective or cosmetic.

20       And so what we have is a continuing attitude by

21  the Department of Corrections, notwithstanding

22  intermediate court orders, the recommendations of its

23  own clinicians, the order of this court in *Kosilek vs.*

24  *Maloney*.  There has never been an instance in which the

25  -- with respect to this disease, that the Department of

1   Corrections has taken an affirmative step without an

2   order or a decision from the Court.  Because this

3   court's ruling in 2002 was not an order, it was a

4   decision, but it was sufficiently pointed, that we had a

5   period of results, that this is what -- there is no

6   question that the Department of Corrections is bound by

7   these facts which are articulated in judicial

8   decisions.  And they had ample opportunity to litigate

9   this --

10          THE COURT:  I don't know that this -- I have a

11  question, and we're addressing the question, but, I

12  mean, I have a lot of evidence from the trial which

13  includes all the evidence, as I recall by agreement,

14  from the first trial and even before you had any of

15  these decisions you ardently argued that I should find

16  that the stated security concerns to be pretextual

17  and --

18          MS. COHEN:  At that point we only had the

19  precedent of *Kosilek vs. Maloney*, your Honor.

20          THE COURT:  Well, but this is the distinction

21  I'm trying to make, that *Battista* is a precedent for the

22  purpose of describing the applicable law and I think

23  it's extremely helpful to me.  There are a lot of

24  arguments that have been made to me that are implicitly

25  rejected in *Battista* as to what's the right standard and

1    all of that.  So with regard to precedent, **Battista** is a

2    precedent.  I don't have any misgivings about that.  But

3    with regard to the facts found, I think it's a trickier

4    issue than you do at the moment.

5            MS. COHEN:  Well, your Honor, I don't know

6    what the Court would do otherwise with findings such as

7    this finding of Judge Woodlock's in the August 23rd:

8    "The DOC has, for over a decade and continuing through

9    to the present, they're deliberately indifferent to the

10   genuine medical need of the plaintiff for hormone

11   therapy to address what I find to be a serious risk -- a

12   substantial risk of serious harm if it is not treated in

13   that fashion."

14           THE COURT:  Well, one of the things I could do

15   is ignore it because it's not in the evidence before me.

16           MS. COHEN:  I don't think the Court can ignore

17   it without confronting the doctrine of nonmutual

18   collateral estoppel.

19           THE COURT:  All right.  So -- well, I haven't

20   studied this as deeply as I do sometimes before these

21   hearings.  Why is the -- the defendants argue there is

22   sufficiently dissimilarities, different people,

23   different institutions, um, maybe different decision-

24   makers to keep that doctrine from operating and they

25   argue it doesn't operate against the federal government

1     and it shouldn't operate against the state government.

2     Um, you've raised it -- you know, you've focused on

3     certain other facts that are broader, more general than

4     being unique to **Battista**.   So why does nonmutual

5     offensive collateral estoppel apply here?

6          MS. COHEN:   Because the issue -- because the

7     first of the identity of issues, your Honor, and I think

8     -- let me just take you through those identical issues.

9     But the issue is not obviously whether Michelle Kosilek

10    has a serious medical need, that has been fully

11    litigated in this case, and whatever Sandy Joe Battista

12    or Teresa Brugliera's medical need is not important,

13    what is important, though, is that the courts found that

14    they did have it, that each of those two inmates had a

15    serious medical need, that it was, um, because of GID,

16    and that the Department of Corrections was deliberately

17    indifferent.

18         What the Court found was that there were:  "A

19    trajectory, in this litigation, a corrosive erosion of

20    the credibility of the defendant and consequently of the

21    deference which its choice would otherwise receive by

22    default as the expert in this area.  The DOC obstructed

23    clinical judgment and adopted a tactic of delay to deny

24    the plaintiff her constitutional right."  And the Court

25    concluded that all of the conduct was pretextual.  And

1    I'm reading from our brief at 6, which is quoting from

2    Judge Woodlock at 60.  "The DOC used a template

3    developed for the security review of another inmate,

4    Teresa Brugliera, that depended on a formulaic checklist

5    to justify what should have been a carefully evaluated

6    consideration of all possible ways to deliver Battista's

7    medically-necessary treatment."

8         And then the Court found at page -- and this is

9    the quote I was looking for a moment ago, at 59 to 61:

10   "We have, at the outset, a predisposition on the part of

11   the Department to view this not as a serious medical

12   need, in fact, to engage in a pattern and practice of

13   denigrating as some sort of quality-of-life issue on the

14   order of tummy-tucks and an effort at prevarication and

15   interference."

16        So what you have, the Court is saying is --

17             THE COURT:  That is Judge Woodlock?

18             MS. COHEN:  That is Judge Woodlock.  And Judge

19   Woodlock goes on to say --

20             THE COURT:  Hold on a second.

21             (Pause.)

22             THE COURT:  You're on Page 61?

23             MS. COHEN:  Yes, it's at 59 to 61.

24             (Pause.)

25             THE COURT:  Okay.

```
1            MS. COHEN:  And Judge Woodlock connects the
2      attitude toward the other inmates:
3            "What did the DOC do?  Well, they got a template,
4      a template that was developed in another security review
5      involving Teresa Brugliera, his own circumstances were
6      subject to review by Judge Tauro, who reached the same
7      conclusions I do with the preliminary injunction that
8      the security review was pretextual and that they used
9      what I might call a 'formulaic checklist' to justify
10     what should have been a carefully evaluated
11     consideration of all the alternative ways to deliver to
12     plaintiff the therapy that the clinicians had identified
13     as necessary for her serious medical review."
14            THE COURT:  Her serious medical needs.
15            MS. COHEN:  -- medical needs."  Excuse me.
16       And the Court went on to say, and I think I'd
17     discussed this with you the last time, that in some ways
18     one could simply substitute the name "Brugliera" for
19     "Battista," and now I'm on Page 64, to see what is going
20     on here.
21            (Pause.)
22            THE COURT:  I don't know whether Judge
23     Woodlock had, in the evidence before him in the hearing
24     or trial he conducted, evidence concerning the **Brugliera**
25     case?
```

1              MS. COHEN:  He was reading from Judge

2      Woodlock's findings on preliminary -- excuse me, from

3      Judge Tauro's findings on preliminary injunction.  I

4      don't think your Honor is required here to conduct a

5      mini trial of what happened in **Battista** and **Brugliera**.

6      What happened there was adjudicated, there were findings

7      made, and in a situation in which the Department of

8      Corrections had ample opportunity to litigate those

9      findings.  But for your Honor to rule in a vacuum and

10     say that the Department -- that what those judges found

11     was done, um, didn't occur, I don't think the Court is

12     obliged to do because the Court has discretion under the

13     collateral estoppel doctrine to find that those findings

14     as to whether those events occurred are binding.  The

15     inference left for this court to draw is what that means

16     and I think it is relevant that they engaged in the same

17     conduct, the same date.  And when we were before your

18     Honor in August, there was a question even of whether

19     the letter was identical.  Yes, the letter was

20     identical.  It referred to several different inmates.

21     We have now --

22              THE COURT:  I'm sorry.  Which letter?

23              MS. COHEN:  The September 1st, 2005 letter

24     that we introduced in evidence.  It was Exhibit 42 in

25     our trial.  It's appended to the affidavit of Neil

1    Minahan, who was the lawyer in the **Battista** case, and it

2    is Exhibit 131 attached to Mr. Minahan's affidavit.  And

3    that was the very letter where the Department of

4    Corrections claims that it was unclear as to what the

5    position was with regard to the University of

6    Massachusetts Medical Center.  Not only was there an

7    identity of issues, there was an identity of factual

8    circumstances of episodes and of evidence on that, and

9    that was -- and what Judge Woodlock found was that that

10   letter was written as part of the period of, um -- that

11   he referred to from 2004 to 2008, um, as "a period of

12   obstruction of the clinician's diagnosis and treatment

13   followed by a period of pretextual assertion of

14   inadequately considered security concerns."

15        So not only is the issue itself identical, but the

16   same letter has Battista's name blocked out, and on one

17   exhibit, and Kosilek's name blocked out on another, and

18   presumably Brugliera's name blocked out in another

19   place, although only the Department of Corrections has

20   control of that information.

21        What the First Circuit found when it affirmed

22   Judge Woodlock, reading from Page 15 of the LEXIS

23   version, "The DOC had forfeited its pattern of deference

24   through its pattern of delays, new objections

25   substituted for old ones, misinformation, and other

 1   negatives."  I don't see how this court can consider the

 2   conduct that we showed in the three-week trial, plus

 3   additional days, um, that your Honor was gracious enough

 4   to indulge and patient enough to sit through, when the

 5   conduct is exactly the same.

 6          THE COURT:  Well, you say you don't see how I

 7   can do it.  I can see how I can do it.  If nonmutual

 8   offensive collateral estoppel doesn't operate and the

 9   information, which I agree is relevant, is not in

10   evidence, under the Rules of Evidence, because it's

11   hearsay, then I wouldn't be able to rely on it even

12   though it's relevant.

13          MS. COHEN:  But your Honor has the discretion

14   under that doctrine.

15          THE COURT:  Well, I'm going to -- I haven't

16   studied the doctrine, um, you're educating me on it and

17   the defendants are going to further educate me on it.

18   So this is bringing the issue into sharper focus,

19   though.

20          (Pause.)

21          THE COURT:  Go ahead.

22          MS. COHEN:  I didn't mean, your Honor, to be

23   disrespectful by my rhetorical question, but this is a

24   case where the issues are identical for the reasons that

25   we just described.  And we've traced them 40 pages

1   across --

2           THE COURT:  But I'm understanding your

3   argument now to be more nuanced than I appreciated it to

4   be.  There are only certain facts that you're asking

5   that I find the defendant be collaterally estopped from

6   trying to refute or omit from evidence, in effect, and

7   they're the facts at a certain level of generality that

8   are not particular to **Battista** personally, but refer to

9   the -- you know, a pattern of conduct evidently.

10          MS. COHEN:  Exactly.

11          THE COURT:  Okay, so those are the facts you

12  want me to --

13          MS. COHEN:  That's right.  And those are the

14  facts that were actually litigated in **Battista**.  Nothing

15  was litigated in **Battista** that related to Michelle

16  Kosilek directly.  On the other hand, the pattern of

17  delay which was affirmatively litigated in findings made

18  in two cases do not have to be retried in the **Kosilek**

19  case.  Under the doctrine of collateral estoppel your

20  Honor can find that those were conclusively litigated.

21  And that's what we're asking, that those facts are

22  relevant not just because they were precedential, that

23  they were in in the sense that they were described by a

24  court, but actually that this, the same defendant,

25  engaged in the same conduct and, in fact, even in one

```
 1    instance wrote the same letter saying that he couldn't

 2    understand what UMass had approved and the testimony of

 3    UMass on the subject and the finding of the First

 4    Circuit was that that was pretextual and was intended to

 5    obstruct the administration of medical treatment for

 6    serious medical needs.  And it is that context which was

 7    litigated and decided adversely to the Department of

 8    Corrections that had relevance to this case because it

 9    further illustrates the pattern of conduct.  You already

10    have one judge of this court saying that he could

11    substitute the name of "Brugliera" for "Battista"

12    because the pattern was so similar and we have put in

13    the evidence here relating to Michelle Kosilek.  And it

14    is very reinforcing that you have a case that not only

15    describes deliberate indifference, but actually found

16    that the conduct was deliberately indifferent with

17    regard to an inmate with GID.

18              THE COURT:  And "reinforcing" to me is an

19    important term because it's your contention that I

20    should reach this conclusion of pretext independent of

21    consideration of *Battista*.

22              MS. COHEN:  I think you have to, your Honor.

23              THE COURT:  Well, you argued it before -- I'm

24    sorry.  You argued it before *Battista* was decided --

25              MS. COHEN:  That's right.
```

1        THE COURT:  -- that you had plenty of evidence

2   to demonstrate pretext and then you had -- I think you

3   just said this reinforces the conclusion but is not

4   essentially in your view to reaching that conclusion?

5        MS. COHEN:  That's right.  But I also don't

6   think that the case should be decided in a vacuum with

7   this record of -- that has been adjudicated of what the

8   defendant's conduct has been.  That evidence is highly

9   relevant and the Court can consider it because it was

10  something that was conclusively litigated against the

11  Department of Corrections in one instance with an appeal

12  and in another instance no appeal having been taken

13  therefrom.

14        THE COURT:  Do the cases relating to this

15  doctrine address whether an appeal has to have been

16  taken?

17        MS. COHEN:  Yes, they do, and they say that it

18  does not, that it has to be -- it has to have been

19  finally litigated resulting in a valid and final

20  judgment.

21        THE COURT:  All right.  Well, maybe this is

22  the time for me to let Mr. McFarland address this issue.

23        MS. COHEN:  Yes, your Honor.

24        MR. McFARLAND:  Thank you, your Honor.

25      We believe that the doctrine of collateral

1    estoppel is not available in this case.  The plaintiff

2    seeks to use the doctrine of nonmutual collateral

3    estoppel to prevent the Commissioner from presenting his

4    defenses to the claims of the Eighth Amendment.

5    However, the doctrine of collateral estoppel --

6              THE COURT:  Actually, I'm sorry to interrupt

7    you so quickly, but I don't understand that that's -- I

8    don't now understand -- right now I don't understand

9    that to be the plaintiff's argument, I understand the

10   plaintiff's argument to be more focused.  Um, the

11   plaintiff wants me to take from *Battista* the finding

12   that in this period there was a pattern of pretextual

13   security concerns being expressed about a treatment for

14   inmates with Gender Identity Disorder.  That would just

15   be one fact that I would include among all the others in

16   deciding whether deliberate indifference would be

17   proven.

18        Did I understand that right?

19              MS. COHEN:  You have got it exactly, your

20   Honor, yes.  And I apologize if there was any lack of

21   clarity.  I didn't understand that that was the issue,

22   but, yes.  It's nothing more than is set forth -- your

23   Honor can take nothing more than what is actually

24   determined in the various decisions by the First Circuit

25   and the two district judges.

1          THE COURT:  Go ahead.

2          MR. McFARLAND:  Well, your Honor, the hallmark

3   of collateral estoppel is that you must have identity of

4   issues, it must be the exact same issue that was

5   litigated in Suit 1 and is now being applied in Suit 2

6   to prevent the parties from relitigating those issues

7   that were decided in Suit 1.

8          THE COURT:  I'm sorry to do this.

9          (Pause.)

10          THE COURT:  Go ahead.

11          MR. McFARLAND:  And I cite the case of **Fagan**

12   **vs. Kelly** and **Gonzalez-Pena vs. Rodriguez**, which are in

13   my memorandum, saying that that is the hallmark of this

14   doctrine is that there must be identical issues.  And

15   that was also found by a decision by Judge Gertner in

16   the **Hilberg vs. McDonald Douglas Corporation** case, 529

17   F. Supp. 2nd at 187.

18          THE COURT:  I'll see Judge Gertner tomorrow.

19   We're having a dinner to honor her.  I'm sure she'll be

20   gratified and surprised to hear that the Department of

21   Correction is citing her.

22          (Laughter.)

23          MR. McFARLAND:  Once in a while, your Honor --

24          THE COURT:  Even a broken clock tells the

25   right time twice a day, right?

1          MR. McFARLAND:  Again, the issues have to be

2    identical.  And in this case there is no identical issue

3    between, um, the **Kosilek** case, or **Battista,** or

4    **Brugliera**.

5          THE COURT:  If it's -- hold on just a second.

6          (Pause.)

7          THE COURT:  Okay.  Go ahead.

8          MR. McFARLAND:  There are significant

9    differences between the type of GID treatment sought

10   between Inmate Kosilek and Battista as well as Inmate

11   Brugliera.  Kosilek has sought sex reassignment surgery,

12   having already been on hormone surgery since 2003, and

13   there are also the issue of the benefits that were

14   received by these individuals, particularly Battista,

15   um, prior to the court order.  Um, clearly there are

16   also differences between the nature and location of the

17   confinements of Kosilek and the other inmates as well as

18   the safety and security issues that were raised in each

19   of these cases.

20          Now, for example, in looking at, um, the **Battista**

21   case, it involved hormone therapy.  Battista was

22   confined to the Treatment Center for Sexually Dangerous

23   Persons, a day-in-the-life commitment.  There was a --

24   the Treatment Center houses men who are adjudicated to

25   be sexually dangerous persons likely to reoffend.

1    Battista had a history of engaging in sexual activities

2    with other residents and leading to an alleged rape as

3    well as other sexual and physical assaults.  As compared

4    to Ms. Kosilek, who has been in the same unit for the

5    past nine or so years, no disciplinary reports, no

6    incidents of violence that we are aware of, no

7    restrictions in the housing or -- and obviously she

8    could be moved to another prison, if necessary.

9          A major difference between Battista and Kosilek as

10   well as the other cases, Brugliera, is that Brugliera

11   and Battista sought hormone therapy for a number of

12   years, 2004 to 2008, while Kosilek began receiving the

13   hormone treatment in 2003 as well as had access to

14   female clothing and canteen items, laser hair removal,

15   and a long-term psychotherapist.

16         During the delays in providing the security review

17   for Inmate Battista, Battista engaged in self-injurious

18   behavior, some depression.  On the other hand, at trial

19   in this case every clinician and every GID expert that

20   testified agreed that Ms. Kosilek had experienced a

21   significant reduction in dysphoria based on the hormone

22   therapy, the psychotherapy, and access to canteen

23   items.  So every one of the therapists agreed that there

24   was a significant reduction in the dysphoria.  This is

25   doctors Brown, Levine, Forstein, Schmidt, Ms. Osborne,

1    and Mr. Burroughs all testified as to the remarkable

2    benefits that Ms. Kosilek had received from the existing

3    treatment.

4           THE COURT:  But as I recall, certainly the

5    plaintiff's witnesses, at least, linked that to the hope

6    of sex reassignment surgery and opined that there would

7    be a high risk -- or there would be intense anguish and

8    a significant risk of suicide if that hope was

9    extinguished.

10          MR. McFARLAND:  Yes, your Honor, there is

11   testimony -- there is also testimony as to how that

12   could be treated within the context of the prison.

13        The security and safety concerns raised in the

14   *Battista* case are very different from the security

15   concerns raised in the *Kosilek* case.  That's been

16   acknowledged by Ms. Cohen in her pleadings.

17        Another difference between the two cases.  Um, in

18   *Battista,* at trial, there was no issue raised with

19   regard to the medical necessity of providing Battista

20   with the female hormones.  But in the case at bar,

21   there's been testimony from GID experts, including

22   Dr. Schmidt, Cynthia Osborne, and Dr. Levine, the

23   independent consultant, that the GID treatment available

24   to Kosilek was adequate and sexual reassignment surgery

25   is not medically necessary.  So another major

1    distinction between the two cases.

2              THE COURT:  Well -- I'm sorry.  Go ahead.

3              MR. McFARLAND:  Now, a further distinction

4    concerns the issues that the *Battista* decision raised

5    with regard to the finding of deliberate indifference on

6    the part of the Department of Correction.  They -- as

7    Ms. Cohen read, they looked at the inordinate delays in

8    providing treatment for Battista, missteps,

9    misinformation, changing objectives, but in the instant

10   case there has been no evidence of extreme delays with

11   regard to the providing of the security review.  Um, in

12   fact, the recommendation from the Fenway Clinic came at

13   February 26th, 2005 and by the beginning of June the

14   Court had a report from the DOC outlining its major

15   security concerns indicating that they would not be

16   willing to pursue the sex reassignment surgery.  So we

17   have had, on the one hand, a delay of four or five

18   years, and on the other hand a delay of three or four

19   months.  That's a significant difference, your Honor.

20        There is nothing in the record that I'm aware of

21   that shows that the security reviews presented by the --

22   by Commissioner Dennehy and Commissioner Clarke were

23   full of missteps, mistakes, or were done with bad

24   faith.  There is --

25              THE COURT:  Well, that's something -- well,

1  the parties disagree on that.  That's something I'm

2  going to have to decide.

3           MR. McFARLAND:  Now, we feel there was no

4  evidence at trial which showed that the report done in

5  June by the DOC was based on formulaic checklists.

6  There is no evidence pointing to erroneous information

7  in the reports, nor of any shifting positions by the

8  Department with regard to providing Ms. Kosilek with

9  sexual reassignment surgery.

10         At least, your Honor, there are numerous

11  differences between these two cases such that it would

12  be impossible to determine that these are identical

13  issues.  Even looking at such things as a letter between

14  the two parties, they're in different contexts.  One's a

15  letter regarding Battista who has not received hormone

16  therapy versus a letter talking about Kosilek who has

17  received hormone therapy, laser hair removal, and

18  advanced psychotherapy, as well as access to female

19  clothing and canteen items.

20         THE COURT:  Well, it seems to me you've got

21  another point that might be a strong one, it depends on

22  the facts.  I'm looking at *Fagan*, Page 78.  "The fourth

23  prong is the centrality of the adjudication, that is,

24  that the determination of the issue in the prior

25  proceeding is essential to the final judgment or

1   order."  What's come into sharper focus for me today is

2   that the plaintiff wants me, for example, to accept for

3   the purposes of this case the finding in **Battista** that

4   the Department of Corrections engaged in a pattern of

5   expressing pretextual security concerns during a period

6   relevant to this case, um, when -- you know, to deny

7   treatment for GID.  And one of the questions will be, if

8   I've stated that correctly, is whether that finding was

9   central to the adjudication?

10          The ultimate finding was that it was pretextual --

11   that the stated security concerns in Battista's case

12   were pretextual and that's why the Department of

13   Corrections forfeited the deference that would

14   ordinarily be due.  I don't know that the pattern -- and

15   this is just off the top of my head, but I don't know

16   that the pattern could be said to be central, it was one

17   of the things that evidently contributed to Judge

18   Woodlock's credibility determination.

19                MR. McFARLAND:  Well, certainly, your Honor,

20   in his decision he was upset by the delay that took

21   place, of course, before the -- we did the security

22   review, it took years, he was concerned about, um,

23   mistakes made in the security reviews, that they were

24   cursory, using erroneous information, he was concerned

25   about a lot of things.  But another major difference is

1    if you look at the security concerns that are raised by

2    the defendant at trial in the **Kosilek** case, they were

3    totally different from the defenses raised in the

4    **Battista** case.  There was the concern of transporting

5    Ms. Kosilek out of state to a clinic in Arizona, the

6    concerns for an escape risk, the concerns for the

7    logistics of housing the person in a private clinic, in

8    a jail somewhere, um, they said they'd never done that

9    before, transporting an inmate out of state.  There were

10   concerns of --

11        THE COURT:  They transported Kosilek many

12   times without a problem.

13        MR. McFARLAND:  Well, that's locally, that's

14   to the Shattuck Hospital or to another place.  But if

15   you're talking Arizona, that's a whole different, um --

16        THE COURT:  This is not the time to reargue

17   the --

18        MR. McFARLAND:  Okay --

19        THE COURT:  Oh, no, I'm talking to myself.  I

20   shouldn't be going perhaps in this direction.  But, you

21   know, one of the questions I've got to deal with is

22   whether I think she's really going to -- you know, if

23   somehow she's on her way to get this sex reassignment

24   surgery, which is literally the goal of her life, you

25   know, she's not going to screw it up by trying to run

1  away.

2      Go ahead.

3          MR. McFARLAND:  Well, correction officials

4  have a goal of making sure that people don't escape and

5  when they see someone -- an individual who's serving a

6  life sentence who has a history of escaping, um,

7  initially, when she was first picked up for the crime,

8  that creates a problem.  And these concerns are all

9  reinforced by not only Commissioner Dennehy,

10  Superintendent Spencer, and Ms. Bissonnette, but we had

11  Arthur Beeler from the Federal Bureau of Prisons and we

12  had Robert Dumond, the Director of Research, all

13  reinforced these concerns.  Commissioner Clarke had

14  spent 34 years in Nebraska becoming the Commissioner of

15  Correction there and two years at Washington.  He was

16  certainly not someone who had been in this state for

17  many, many years and was going to tow the line, he

18  certainly was asked by the Court to give a fresh

19  perspective on these issues and the Commissioner did,

20  Commissioner Clarke did that.

21      So I think that those security concerns that were

22  unopposed by the plaintiff certainly held a lot of

23  weight and distinguish it between the *Battista* case and

24  the *Brugliera* case, and the fact that Battista has --

25  Kosilek has done well on the current treatment modality

1    as all the experts have testified at trial.

2        We'd also like to address, your Honor, the case of

3    the -- *Mendoza -- U.S. vs. Mendoza*, which I think is

4    applicable to the claim that nonmutual offensive

5    collateral estoppel should be used against the

6    Department of Correction, an agency of the

7    Commonwealth.

8        In the *U.S. v. Mendoza* case, the Supreme Court

9    held that nonmutual offensive collateral estoppel could

10   not be used against the federal government, and cited a

11   number of reasons, the size of the government, the fact

12   that they, um, differ greatly in the approach than

13   private individuals, that a collateral estoppel, the

14   kind of freezing it at one decision, thwarts the

15   development of important questions of law and the fact

16   that there are numerous agencies and parts of the

17   federal government that would be impacted by the use of

18   this doctrine.  And while the First Circuit and the

19   Supreme Court have not ruled on this issue and extended

20   -- in the cases have extended *Mendoza* to other states,

21   some circuits, including the Sixth, the Ninth, the

22   Eleventh, the D.C. Circuit, have expanded the *Mendoza*

23   rationale to apply to state courts, to state cases, to

24   agencies, and have held that -- have held at bar to

25   prevent private litigants from raising nonmutual

1   offensive collateral estoppel against their governments

2   based on similar concerns that were outlined in the

3   *Mendoza* case.

4       So we would argue that this court should apply the

5   rationale of *U.S. v. Mendoza* and determine that

6   nonmutual offensive collateral estoppel should not be

7   used against the Commonwealth and its agencies.

8       A couple of quick issues, your Honor.

9           THE COURT:  Okay.

10          MR. McFARLAND:  With regard to the National

11  Commission of Correctional Health Standards, um, I went

12  through the record and I don't believe there is an

13  exhibit entered in this trial for the National

14  Commission of Correctional Health Standards.

15          THE COURT:  There is no exhibit.

16          MR. McFARLAND:  I did not find it.  And so

17  that would also rule out that as an exhibit.

18      We also maintain that the position statement that

19  has been pointed to by Ms. Cohen, as a position

20  statement, does not have the effect of a standard of

21  care and does not add anything but -- does not provide

22  any value but for guidance.  And nor am I aware of any

23  state in this nation which has adopted this position

24  statement of the NCCHC and is now requiring that GID

25  inmates upon request be given sex reassignment surgery.

```
 1           THE COURT:  Well, I don't think they're
 2    arguing that every inmate who asked for it is entitled
 3    to it, but it does -- you know, this is another example
 4    of the same issue, what were then called the "Benjamin
 5    Standards of Care," that came into evidence.  I heard
 6    testimony about them.  But with regard to this standard,
 7    I'm asked to supplement the record, but not have them
 8    admitted through any witness who can testify about
 9    them.  If you stipulated and agreed, I would rely on it,
10    but I do have a concern about whether it's permissible
11    for me to take additional evidence now in this form
12    without reopening the testimony.
13           MR. McFARLAND:  We would oppose it if you
14    reopened it, your Honor, for this organization's
15    standards, especially when the whole purpose is to get
16    the position statement into evidence, which is not
17    binding on anyone and is just mere guidance to
18    correctional authorities.
19           And we would also have the same objection to
20    entering the Version 7 of the World Professional
21    Association of Transgender Healthcare statements.  That
22    was just introduced, I think, a few weeks ago.  And
23    again if it would involve additional testimony to
24    explore all of the areas of this new standard, then I
25    would argue that it's hearsay and should not be
```

1   admitted.

2       I think that's about it for me right now, your

3   Honor.

4           MS. COHEN:  Thank you, your Honor.

5       I think, you know, the issue on the collateral

6   estoppel is this:  Should the Department of Corrections

7   now be allowed to come into a trial, in this courtroom,

8   and say, with regard to Sandy Joe Battista, 'We were not

9   deliberately indifferent'?"  That is the issue.  Should

10  they be allowed to come in here now and say:  "As far as

11  the conduct with regard to Sandy Joe Battista or Teresa

12  Brugliera or whomever, we did not have a predisposition

13  against GID"?

14          THE COURT:  Well, now you're giving me a

15  teaching moment.  I always tell my law clerks that the

16  essence of good lawyering is defining the question.

17  And, you know, essentially the -- well, not

18  essentially.  By agreement the trial has ended, you

19  don't have my decision, but the trial ended, you're

20  waiting for the decision.  Um, whether evidence of

21  Battista could have come in at trial is not the same --

22  you know, through the way evidence is introduced

23  pursuant to the Rules of Evidence, is not the same as

24  whether information, you know, can be taken properly by

25  the Court at this point and relied upon in reaching a

```
 1   decision.
 2           MS. COHEN:  That's right, your Honor, and I
 3   didn't mean it in that literal way, about literally
 4   calling them, although we could have certainly, at
 5   trial, expanded the scope of the trial and asked your
 6   Honor for leave to call information and tried the
 7   Department's testimony as to other witnesses.  But the
 8   collateral estoppel issue is whether the Department of
 9   Corrections would be allowed to deny, in the
10   circumstances, the findings of another court?  We don't
11   have to expand the evidence, we don't have to call those
12   witnesses, we don't have to make a long trial, a long
13   proceeding even longer because those issues have been
14   adjudicated finally and --
15           THE COURT:  Right.  And, in fact, if it didn't
16   come up, I think if you had said, "You know, we want to
17   tell you about *Brugliera* and *Battista*," I'd say, "Gee,
18   we're not going to have a mini trial in this trial," but
19   now you have those decisions.
20           MS. COHEN:  Now we have those decisions, so we
21   don't have to.  And it is for your Honor to decide, as
22   part of the ruling in the *Kosilek* case, whether those
23   findings -- factual findings against the Department of
24   Corrections are relevant to what happened in *Kosilek,*
25   and I think for all of the reasons that we've talked
```

 1    about, they are, because it shows what the attitude was

 2    of the Department of Corrections towards this illness

 3    and towards this condition and that it was not treated

 4    as a serious medical need and that the Department of

 5    Corrections has had a pattern of delay in two other

 6    cases and the same pattern of delay in *Kosilek*.   And

 7    it's for that reason that the decision is not just

 8    precedential, but those are points that the Department

 9    of Correction should not be permitted to deny because

10    they were adjudicated fully following an appeal in one

11    case and following a final decision in the other.   And

12    those facts may be taken by this court under the

13    doctrine of collateral estoppel.

14              THE COURT:   Were they -- do they meet the

15    centrality of the adjudication prong --

16              MS. COHEN:   Absolutely.

17              THE COURT:   -- the determination that the

18    issue of the prior proceeding was essential to the final

19    judgment or order?

20              MS. COHEN:   Yes, these were facts that were

21    cited by the District Court and in many cases either

22    summarized or quoted by the First Circuit in reaching

23    its decision that the District Court was -- um, properly

24    found that there was deliberate indifference.

25              THE COURT:   All right.

```
 1          MS. COHEN:  And for those reasons the doctrine
 2    of collateral estoppel should be applied here to admit
 3    those facts adverse to the Department of Corrections.
 4          I want to just talk briefly about the National
 5    Correctional Health Standards and what the state of the
 6    record is with regard to those.
 7          There is a supplement to the contract which was
 8    not introduced during the trial and perhaps it should
 9    have been, which is a public record, and it is, um,
10    dated December of 2006, and what that request for
11    response provides is that the, um, medical services
12    provided by the vendor to the Department of Corrections
13    shall be compliant with the standards of the NCCHC.
14    That was submitted to your Honor on October 4th, 2006 as
15    Exhibit B.
16          The state of the information on --
17               THE COURT:  As Exhibit B?
18               MS. COHEN:  Exhibit B to the plaintiff's
19    response to the defendant's memorandum of law, Document
20    Number 548 on your docket filed on October 4th.
21               THE COURT:  Okay.
22               MS. COHEN:  The state of the record on this is
23    the following.  After the conclusion of the trial, the
24    National Commission on Correctional Healthcare reissued
25    a new position statement on Gender Identity Disorder
```

1     which clearly approved sexual reassignment surgery as

2     part of the triadic treatment and was consonant really I

3     think with what we've seen at other places as the

4     recommended treatment and the Benjamin standards.

5             In light of, um, the provision in the, um, update

6     to the RFP from December of 2006 staying that the

7     Department was going to require its vendor to be, um,

8     consonant, to supply medical services that were

9     consistent with the National Correctional Healthcare

10    standards, I asked Mr. McFarland for a stipulation in

11    *Allston vs. Faire,* which Ms. Kosilek believes is, um,

12    the stipulation that was binding on the Department of

13    Corrections to comply with the NCCHC standards.

14                THE COURT:  For GID or for something else?

15                MS. COHEN:  Across the board.

16                THE COURT:  I noticed that.  What year do you

17    think that stipulation was?

18                MS. COHEN:  I don't have the date, but -- oh,

19    excuse me, 1987, I'm informed by my colleague.

20                THE COURT:  There's a stipulation in a case --

21                MS. COHEN:  In *Allston vs Faire.*  I have been

22    all over the records for the federal court and have been

23    unable to come up with the stipulation.  I asked

24    Mr. McFarland --

25                THE COURT:  Were you able to find *Allston vs.*

1    *Fair?*

2            MS. COHEN:  Oh, yes, and, in fact, that was

3    the Hill & Barlow case, your Honor, but I have been

4    unable to obtain a copy of the stipulation.

5            THE COURT:  Does it show up on the docket?

6            MS. COHEN:  Oh, yes.  Yes.  It's Number

7    773519-G.  And Ms. Kosilek has asked me to submit, and I

8    can do this by ECF filing later, um, the affidavit of

9    another inmate which says that -- as a condition of the

10   dismissal of the Department of Correction's defendants,

11   they agreed to abide by the NCCHC standards.

12       I would like to know what is the position of the

13   Department of Corrections?  And before I ask that

14   question and leave it out there, I understand that there

15   is a difference between the Department of Corrections

16   and the plaintiff with respect to position statements

17   versus standards and that seems like something that

18   could fairly be argued, that what the NCCHC issued was a

19   position statement and the contract language refers to

20   standards.

21       But I would like to -- it's very hard for me to

22   understand what exactly was agreed to in ***Allston vs.***

23   ***Fair***, which is not an evidentiary issue because that's

24   another judicial admission by the defendant agreeing to

25   something, unless I have, um -- unless I know what is

1    the substance of that stipulation or whether there is,

2    in fact, a stipulation or whether this is something that

3    the Department of Corrections gratuitously included in

4    its RFP that there would be compliance with the NCCHC

5    standards.

6              MR. McFARLAND:  Your Honor, my understanding

7    of the stipulation of dismissals in the *Allston* case

8    pertain to staffing levels at the MCI Cedar Junction's

9    Health Services Unit and that's the extent of it.  I'm

10   told that there is no reference to NCCHC and it applied

11   to the Health Services Unit at MCI Cedar Junction.

12             THE COURT:  And this should be a court

13   record.  When you say you haven't been able to find it,

14   Ms. Cohen, have you asked the court for it?

15             MS. COHEN:  Yes, I have asked the court for

16   it.

17             THE COURT:  And we've told you what?

18             MS. COHEN:  I was directed to *Iron Mountain*.

19   I have not been able to find it in the files at *Iron*

20   *Mountain*.  I thought the most expeditious way was to ask

21   the Department of Corrections whether there is any

22   stipulation available, and I have so asked, and I have

23   not gotten a comprehensive answer.

24             THE COURT:  Mr. McFarland, has somebody looked

25   for the document?  Have you seen the document?

```
 1              MR. McFARLAND:  Um, I saw the first pages of

 2      it, I haven't -- it's not -- it's not something that's

 3      in my files.  I can --

 4              THE COURT:  How did you see the first pages of

 5      it?

 6              MR. McFARLAND:  It was used in the Health

 7      Services, it's attached or it's applied to their FARR,

 8      their contract, because it sets out standards of number

 9      of nurses, number of doctors.

10              THE COURT:  Is the whole stipulation attached

11      to the contract or just the first few pages?

12              MR. McFARLAND:  Um, I'm not sure.  I'll have

13      to doublecheck, your Honor, and go through it entirely.

14      But we do have a copy of it somewhere in our --

15              THE COURT:  Yeah, I'll hear you, if you want

16      to object to this, but I don't know whether this is

17      admissible.  You can see that I'm -- and this may be

18      different, that is, it may be that something, you know,

19      that's a record of the Court, not a fact, but the fact

20      of a -- I don't know.  Each of these things I think have

21      to be analyzed carefully.  But if it's only about

22      staffing at Cedar Junction, then everything's moot or

23      it's --

24          I'm going to order you to provide the plaintiff

25      two weeks or, at minimal, a reasonable time, um, a copy
```

1    of this stipulation, and then if the plaintiff wants to

2    do something with it, you'll make a filing and I'll get

3    a response.

4              MS. COHEN:  And we'd also just like to know

5    whether there is any legal obligation of the Department

6    of Corrections to comply with the NCCHC standards and it

7    bound itself to -- or it has been found to or been bound

8    to by the Court.

9              THE COURT:  Who do you want to know from?

10             MS. COHEN:  Mr. McFarland and the Department

11   of Corrections.

12             MR. McFARLAND:  I'm not sure what she's -- if

13   the trial is over, I'm not sure what she wants me to

14   testify to?

15             MS. COHEN:  I'm not asking for testimony, I'm

16   asking the defendant whether there is an existing order

17   that binds it to comply with the NCCHC standards.

18             THE COURT:  An order in the *Allston* case?

19             MS. COHEN:  Either in the *Allston* case or in

20   any other case or whether it was simply gratuitously

21   adopted as part of this contract RFP.

22             THE COURT:  If they filed it with the Court,

23   and I'm just speculating, I don't know if it was some

24   consent order or what.  Apparently not if it's part of

25   the dismissal.  But I think you need to get the document

1   and go one step at a time.

2        All right.  Is there anything else the parties

3   would like to address today?

4            (Silence.)

5            THE COURT:  All right.  You know, we've been

6   talking about issues that have emerged.  They're

7   certainly relevant issues.  They are not the heart of

8   the matter.  The heart of the matter is all the

9   testimony that I've heard that at various times I have

10  delved into deeply and I will delve into deeply again.

11  I know I need to and I will.  I don't know how long that

12  will take, but I'll do it.  Although as always, and as

13  in every case, at the moment it can't be the only thing

14  that I'm doing.

15       The Court is in recess.

16           (Ends, 3:20 p.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5   do hereby certify that the foregoing record is a true

6   and accurate transcription of my stenographic notes,

7   before Chief Judge Mark L. Wolf, on Wednesday, October

8   12, 2011, to the best of my skill and ability.

9

10  /s/ Richard H. Romanow 10-14-11
    _____
11  RICHARD H. ROMANOW    Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25