UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHELLE L. KOSILEK,                )
          Plaintiff,                )
                                    )
          v.                        )  C.A. No. 00-12455-MLW
                                    )
LUIS S. SPENCER, in his official    )
capacity as Commissioner of the     )
Massachusetts Department of         )
Correction,                         )
          Defendant.                )

MEMORANDUM AND ORDER ON EIGHTH AMENDMENT CLAIM

WOLF, D.J.                                September 4, 2012

I.     SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . .     1

II.    THE APPLICABLE STANDARDS    . . . . . . . . . . . . . .    21

III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW . . . . . . .    37

       A.    Kosilek has a Gender Identity Disorder . . . . .    39

       B.    Kosilek I  . . . . . . . . . . . . . . . . . . .    40

       C.    The Aftermath of Kosilek I . . . . . . . . . . .    49

       D.    The Trial of Kosilek II  . . . . . . . . . . . .    67

       E.    The Eighth Amendment Analysis  . . . . . . . . .    76

             1.    Kosilek has a Serious Medical Need  . . . .    77

             2.    Sex Reassignment Surgery is the
                   Only Adequate Treatment for
                   Kosilek's Serious Medical Need  . . . . . .    80

             3.    Kosilek Has Satisfied the
                   Subjective Prong of the
                   Deliberate Indifference Test  . . . . . . .    94

             4.    The Defendant's Stated
                   Security Concerns are Pretextual
                   and do not Justify Denying Kosilek
                   Sex Reassignment Surgery  . . . . . . . . .    98

             5.    Defendant's Deliberate Indifference
                   Will Continue and,
                   Therefore, Kosilek is Entitled
                   to a Narrowly-Tailored Injunction . . . . .   119

IV.    ORDER . . . . . . . . . . . . . . . . . . . . . . . . .   126

I.   SUMMARY

This is an unusual case for an obvious reason and another that is less evident.  This case is unusual because a transsexual prisoner, plaintiff Michelle Kosilek, seeks an unprecedented court order requiring that the defendant Commissioner of the Massachusetts Department of Correction (the "DOC") provide him with sex reassignment surgery to treat his major mental illness, severe gender identity disorder.  This case is also unusual because until recently inmates suing for medical care have typically sought treatment that prison doctors were unwilling to prescribe.  In this case, however, Kosilek is seeking the treatment that has been prescribed for him by the DOC's doctors as the only form of adequate medical care for his condition. Such cases have recently become more common in Massachusetts because the DOC has repeatedly denied transsexual prisoners prescribed treatment for reasons that the courts have found to be improper.  See Battista v. Clarke, 645 F.3d 449 (1st Cir. 2011); Soneeya v. Spencer, No. CIV.A.07-12325, 2012 WL 1057625 (D. Mass. Mar. 29, 2012); Brugliera v. Comm'r of Mass. Dep't of Corr., No.07-40323, 2009 U.S. Dist. LEXIS 131002 (D. Mass. Dec. 16, 2009); Kosilek v. Maloney, 221 F. Supp. 156 (D. Mass. 2002) ("Kosilek I").

Kosilek is serving a life sentence, without possibility of parole, for murdering his wife.  Kosilek suffers from a gender identity disorder, which is recognized as a major mental illness by

1

the medical community and by the courts.  Kosilek is, therefore, a transsexual - a man who truly believes that he is a female cruelly trapped in a male body.  This belief has caused Kosilek to suffer intense mental anguish.  This anguish has caused Kosilek to attempt to castrate himself and to attempt twice to kill himself while incarcerated, once while he was taking the antidepressant Prozac.

The Harry Benjamin Standards of Care (the "Standards of Care") are protocols used by qualified professionals in the United States to treat individuals suffering from gender identity disorders.[1] According to the Standards of Care, psychotherapy with a qualified therapist is sufficient treatment for some individuals.  In other cases psychotherapy and the administration of hormones provide adequate relief.  There are, however, some cases in which sex reassignment surgery is medically necessary and appropriate.

This fact that sex reassignment surgery is for some people medically necessary has recently become more widely recognized. For example, in 2010, the United States Tax Court held that the costs of feminizing hormones and sex reassignment surgery are for certain individuals tax deductible as forms of necessary "medical care" for a serious, debilitating condition that is sometimes

---

[1]The Harry Benjamin International Dysphoria Association has been renamed and is now known as the World Professional Association on Transgender Health (the "WPATH").  The Standards of Care have been renamed the "Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People," published by WPATH.

2

associated with suicide and self-castration, rather than non-deductible expenses for "cosmetic" treatment. See O'Donnabhain v. Comm'r of Internal Revenue, 134 T.C. 34, 70, 76-77 (U.S. Tax. Ct. 2010). Similarly, in 2010, the Seventh Circuit held that a state statute prohibiting hormone therapy and sex reassignment surgery for any prisoner violated the Eighth Amendment because such forms of treatment could be medically necessary to treat some inmates adequately. See Fields v. Smith, 653 F.3d 550, 556 (7th Cir. 2011).

In the instant case, Kosilek alleges that his rights under the Eighth Amendment are being violated by the DOC's refusal to provide him with the sex reassignment surgery that, following the Standards of Care, the DOC's doctors have found to be the only adequate treatment for the severe gender identity disorder from which Kosilek suffers. Kosilek still severely suffers from this major mental illness despite the fact that he is receiving psychotherapy and female hormones. After a long period of pretense and prevarication, DOC Commissioner Kathleen Dennehy testified in 2006 that she understood and accepted the DOC doctors' view that Kosilek is at substantial risk of serious harm and that sex reassignment surgery is the only adequate treatment for his condition.[2]

---

[2]The testimony in this case was presented primarily in 2006 and concluded in 2008. Later legal and factual developments generated further hearings, most recently in October, 2011.

The parties have repeatedly agreed, including in October,

3

However, she claimed that providing such treatment would create insurmountable security problems and that she denied Kosilek sex reassignment surgery because of those security considerations.

Kosilek has proven, however, that the Commissioner's purported security concerns are a pretext to mask the real reason for the decision to deny him sex reassignment surgery – a fear of controversy, criticism, ridicule, and scorn. Therefore, Kosilek has proven that the DOC is violating his rights under the Eighth Amendment. He has also established that this violation will continue if the court does not now order the DOC to provide the treatment its doctors have prescribed. Therefore, such an injunction is being issued.

In summary, the reasons for these conclusions are as follows. The Eighth Amendment prohibits cruel and unusual punishment. The Supreme Court has explained that "[t]he Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity,

_____

2011, that there have been no material changes in the facts since the testimony was completed and that the court should decide the case without hearing additional testimony. See Dec. 21, 2009 Tr. at 16; Nov. 2, 2010 Plaintiff's Response to Court's October 21, 2010 Order and Objection to Defendant's Motion to Supplement the Record (Under Seal); Nov. 3, 2010 Defendant's Response to the Court's Order of October 21, 2010 (Under Seal); Aug. 18, 2011 Tr. at 10; Oct. 12, 2011 Tr. at 4-5. The court also agrees that it is appropriate to decide the case without hearing any additional testimony. The court is, however, ruling on several pending motions relating to proffered evidence and admitting some, but not all, of it. See Sept. 4, 2012 Memorandum and Order on Pending Motions.

4

and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976) (internal quotation omitted).

Among other things, the Eighth Amendment does not permit the unnecessary infliction of pain on a prisoner, either intentionally or because of the deliberate indifference of the responsible prison official. Any such infliction of pain is deemed "wanton." The wanton infliction of pain on an inmate violates the Eighth Amendment.

Prisoners have long been held to have a right to humane treatment, including a right to adequate care for their serious medical needs. It may seem strange that in the United States citizens do not generally have a constitutional right to adequate medical care, but the Eighth Amendment promises prisoners such care. The Supreme Court recently explained the reason for this distinction:

> To incarcerate, society takes from prisoners the means to provide for their own needs. Prisoners are dependent on the State for food, clothing, and necessary medical care. A prison's failure to provide sustenance for inmates may actually produce physical torture or a lingering death. Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.

Brown v. Plata, 131 S. Ct. 1910, 1928 (2011) (internal quotations and citations omitted).

Nevertheless, because the Eighth Amendment prohibits only certain punishments, to establish a violation when a prisoner's health is at issue, it is not sufficient for an inmate to prove only that he has not received adequate medical care. Rather, he must also prove that the official responsible for his care has intentionally ignored a serious medical need or otherwise been deliberately indifferent to it.

The deliberate indifference test has an objective and subjective prong. To satisfy the objective prong in a case involving medical care, a prisoner must show that he has a serious medical need. A serious medical need is one that involves a substantial risk of serious harm if it is not adequately treated. Typically, it is a need that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

Adequate medical care requires treatment by qualified personnel, who provide services that are of a quality acceptable when measured by prudent professional standards in the community. Adequate care is tailored to an inmate's particular medical needs and is based on medical considerations. Absent legitimate countervailing penological considerations, adequate care addresses the cause of the person's suffering rather than merely the symptoms. As the Seventh Circuit recently wrote in finding that a

6

statute prohibiting hormones and sex reassignment surgery for all
prisoners violated the Eighth Amendment:

> Surely, had the Wisconsin legislature passed a law that
> DOC inmates with cancer must be treated only with therapy
> and pain killers, this court would have no trouble
> concluding that the law was unconstitutional. Refusing
> to provide effective treatment for a serious medical
> condition serves no valid penological purpose and amounts
> to torture.

Fields, 653 F.3d at 556 (citation omitted).

An inmate is not entitled to ideal care or the care of his
choice.  Courts must defer to the decisions of prison officials
concerning what form of adequate treatment to provide an inmate.
However, courts must decide if the care being provided is minimally
adequate.

With regard to the subjective prong, to establish deliberate
indifference it must be proven that the responsible official knows
that the prisoner is at high risk of serious harm if his condition
is not adequately treated.  In certain cases even proof that a
prison official knew that an inmate was suffering severely from a
serious condition that was not being adequately treated might not
violate the Eighth Amendment. As this court wrote in 2002:

> Because the Eighth Amendment proscribes the unnecessary
> infliction of pain on a prisoner, the practical
> constraints imposed by the prison environment are
> relevant to whether the subjective component of the
> Eighth Amendment test has been satisfied.  The duty of
> prison officials to protect the safety of inmates and
> prison personnel is a factor that may properly be
> considered in prescribing medical care for a serious
> medical need.  It is conceivable that a prison official,
> acting reasonably and in good faith, might perceive an

7

irreconcilable conflict between his duty to protect
safety and his duty to provide an inmate adequate medical
care. If so, his decision not to provide that care might
not violate the Eighth Amendment because the resulting
infliction of pain on the inmate would not be unnecessary
or wanton. Rather, it might be reasonable and reasonable
conduct does not violate the Eighth Amendment.

Kosilek I, 221 F. Supp. 2d at 161.

In 2011, the First Circuit addressed this issue in Battista. In affirming an order that the DOC provide prescribed female hormones to a transsexual prisoner, the First Circuit stated that:

Medical "need" in real life is an elastic term: security
considerations also matter at prisons . . . , and
administrators have to balance conflicting demands. The
known risk of harm is not conclusive: so long as the
balancing judgments are within the realm of reason and
made in good faith, the officials' actions are not
"deliberate indifference."

Battista, 645 F.3d at 454. However, as the First Circuit also explained in Battista, prison officials forfeit the deference to their decisions by the courts to which they are generally entitled when their stated reasons for refusing treatment are proven to be pretexts for a purpose that does not serve a legitimate penological objective. See id. at 455.

Even if a violation of the Eighth Amendment is proven, a court may not issue an injunction unless it is also established that the violation will continue in the future. In addition, if an injunction is justified, it must be narrowly drawn to remedy the constitutional violation and not otherwise displace the discretion of prison officials.

8

Therefore, in this case to obtain an order directing the DOC to provide sex reassignment surgery, Kosilek has been required to prove that: (1) he has a serious medical need; (2) sex reassignment surgery is the only adequate treatment for it; (3) the defendant knows that Kosilek is at high risk of serious harm if he does not receive sex reassignment surgery; (4) the defendant has not denied that treatment because of good faith, reasonable security concerns or for any other legitimate penological purpose; and (5) the defendant's unconstitutional conduct will continue in the future.

All of the requirements for an injunction ordering the DOC to provide Kosilek sex reassignment surgery have been met in the instant case, which is essentially a continuation of Kosilek I. In Kosilek I, a specialist retained by the DOC to treat Kosilek found that he was suffering from a severe gender identity disorder. Consistent with the Standards of Care, that doctor recommended that Kosilek be provided female hormones and, after a year of living as a female, be evaluated for possible sex reassignment surgery. After receiving that recommendation, the DOC fired the specialist and retained instead a Canadian doctor known for his view that hormones should never be prescribed for a prisoner, like Kosilek, for whom they were not prescribed before his incarceration.

After trial, the court found that Kosilek did indeed have a serious medical need. It also found that Kosilek was being denied adequate medical care. More specifically, the court found that the

9

Canadian doctor's rigid "freeze-frame" policy, which had been adopted by the DOC, effectively prohibited DOC doctors from considering whether Kosilek should have hormone therapy and sex reassignment surgery, which were forms of treatment prescribed by qualified professionals for some, but not all, individuals suffering from gender identity disorders. As a result of that policy, no individualized medical evaluation had been done for the purpose of prescribing treatment for Kosilek's serious medical need.

Nevertheless, the court did not order Michael Maloney, the Commissioner of the DOC at the time, to provide Kosilek with female hormones for several reasons. First, it found that Maloney had not adopted the Canadian doctor's policy with the intent to inflict pain on Kosilek or otherwise as a result of deliberate indifference. Rather, Maloney had not focused on Kosilek's medical condition and did not have the understanding of Kosilek's suffering necessary to justify a finding of deliberate indifference. The court also found that while Maloney had some sincere security concerns about providing Kosilek with hormones or sex reassignment surgery, his reluctance to authorize these treatments was substantially attributable to his fear of public and political criticism that any expenditure for hormones or sex reassignment surgery would be an improper use of public funds. As the court explained, however: "[S]ecurity is a legitimate consideration for

10

Eighth Amendment purposes. A concern about political or public criticism for discharging a constitutional duty is not." Kosilek I, 221 F. Supp. 2d at 162. The court also did not issue the requested injunction because it expected that, educated by the decision in Kosilek I, Maloney would make future decisions concerning Kosilek in a manner that did not violate the Eighth Amendment. Id. at 192.

The court concluded its summary in Kosilek I by stating that:

> If Maloney, in good faith, reasonably decides that there is truly no way that he can discharge both his duty to protect safety and his duty to provide Kosilek with adequate medical care, and concludes that security concerns must trump the recommendations of qualified medical professionals, a court will have to decide whether the Eighth Amendment has been violated. That question is not now before this court. If, however, concerns about cost or controversy prompt Maloney to deny Kosilek adequate care for his serious medical need, Maloney will have violated the Eighth Amendment. Kosilek will then likely be entitled to the injunction that he has unsuccessfully sought in this case.

Id. at 162 (emphasis added).

The First Circuit has cited Kosilek I as the first in a series of cases demonstrating the DOC's "resistance" to providing adequate medical care for transsexual prisoners. See Battista, 645 F.3d at 454 (citing Kosilek I, 221 F. Supp. 2d at 159-60; Brugliera, 2009 U.S. Dist. LEXIS 131002). In 2012, a district court found that the DOC continued this resistance in the case of Katheena Soneeya. See Soneeya, 2012 WL 1057625, at *15-16.

If Maloney had remained the Commissioner of the DOC, he might have heeded the court's warning that an injunction would issue if

11

he denied Kosilek adequate medical care because of a fear of controversy or criticism. Despite testifying at trial that it would be impossible to reasonably assure Kosilek's safety if he were given female hormones, Maloney subsequently revised his view. The DOC engaged a specialist in treating gender identity disorders to evaluate Kosilek and, in 2003, Maloney allowed Kosilek to begin receiving the hormone treatments that the specialist prescribed. Kosilek has since lived in the general population of a male prison, MCI Norfolk, with breasts and other feminine characteristics, without being assaulted or engaging in any sexual activity.

However, in December, 2003, Maloney was succeeded as Commissioner by Dennehy. Dennehy was determined not to be the first prison official to provide an inmate sex reassignment surgery. Indeed, she testified that she would retire rather than obey an order from the Supreme Court to do so. Acting on this determination, Dennehy engaged in a pattern of pretense, pretext, and prevarication to deny Kosilek the sex reassignment surgery that the DOC doctors prescribed after Kosilek had completed more than a year of "real life experience" living as a female in prison.

When a specialist retained by the DOC doctors recommended that Kosilek receive sex reassignment surgery, as Deputy Commissioner Dennehy participated in the decision to have him fired.  When Dennehy became Commissioner, she halted certain prescribed treatments for Kosilek and other transsexual prisoners, purportedly

12

to review their cases, and long delayed decisions on whether such treatments would be allowed. Departing from the DOC's standard practice of relying on its doctors to retain specialists, Dennehy had the DOC hire Cynthia Osborne, a social worker who worked in the Johns Hopkins psychiatric department, which was long led by a doctor known for his religious and moral opposition to sex reassignment surgery. That department was also known for its view that a prisoner should never be provided sex reassignment surgery. Osborne had advised several states that sex reassignment surgery was not appropriate for each of the prisoners she had evaluated. Dennehy was not truthful when she testified that the DOC did not hire Osborne because of her predictable position that Kosilek should not receive sex reassignment surgery. In addition, Dennehy long falsely claimed that she did not understand whether the DOC doctors were recommending sex reassignment surgery for Kosilek.

In this case, Kosilek has proven that he still has a severe gender identity disorder. Although female hormones have helped somewhat, he continues to suffer intense mental anguish because of his sincere and enduring belief that he is a female trapped in a male body. That anguish alone constitutes a serious medical need. It also places him at high risk of killing himself if his major mental illness is not adequately treated.

As the DOC doctors responsible for treating Kosilek and the experts who testified on Kosilek's behalf credibly concluded, sex

13

reassignment surgery is the only adequate treatment for Kosilek's serious medical need. The DOC's trial expert, Dr. Chester Schmidt, a psychiatrist from Johns Hopkins, proposed providing Kosilek with psychotherapy and antidepressants, rather than sex reassignment surgery. Dr. Schmidt's recent work focuses primarily on medical billing procedures rather than treatment of gender identity disorders. Dr. Schmidt does not accept the Standards of Care, which as explained earlier are followed by prudent professionals. His approach to dealing with Kosilek's condition would not be employed by prudent professionals in the community. Moreover, providing Kosilek antidepressants would not reduce his suffering to a level at which he would no longer have a serious medical need. Kosilek has already tried to kill himself once while taking Prozac and his experts credibly testified that he would remain at high risk of doing so again.

Although Dennehy long falsely claimed that she did not know whether the DOC's doctors were recommending sex reassignment surgery as medically necessary for Kosilek, she eventually testified at trial that she understood and accepted that Kosilek was at a significant risk of serious harm if not provided such treatment. She never claimed, let alone proved, that she believed that Dr. Schmidt's approach would provide adequate treatment for Kosilek. Dennehy correctly concluded that she was not competent to make clinical judgments.

14

Rather, Dennehy testified that she was denying the sex reassignment surgery prescribed for Kosilek solely because of insurmountable security concerns. Kosilek has proven, however, that this contention is not credible. As described in detail in the Memorandum, Dennehy testified untruthfully on many matters. This contributes to the conclusion that her stated reasons for refusing to allow Kosilek to receive the surgery were pretextual. In addition, Dennehy announced that security concerns made it impossible to provide Kosilek sex reassignment surgery without conducting the security review required by the DOC's established procedures. Such a review would have included a written assessment from the Superintendent of MCI Norfolk, who had previously advised Commissioner Maloney that providing Kosilek female hormones would not create unmanageable security problems. Dennehy incredibly claimed that, despite Kosilek's excellent record in prison and while being transported to medical appointments and court, there was an unacceptable risk that Kosilek would attempt to flee while being transported to get the treatment that he had dedicated twenty years of his life to receiving. In any event, Dennehy ultimately admitted that the safety of Kosilek and others could be reasonably assured by placing him in an onerous form of protective custody after receiving sex reassignment surgery.

As explained in detail in the Memorandum, Dennehy did not decide to deny Kosilek sex reassignment surgery because of a

15

sincere or reasonable concern for security. Rather, she was motivated by her understanding that providing such treatment would provoke public and political controversy, criticism, scorn, and ridicule. She had ample reasons to expect such a reaction. The Lieutenant Governor in whose administration Dennehy served publicly opposed using tax revenues to provide Kosilek sex reassignment surgery. Many members of the state legislature, including one who was close to Dennehy, did the same. In addition, the media regularly ridiculed the idea that a murderer could ever be entitled to such "bizarre" treatment. See, e.g., Brian McGrory, "A test case for a change," The Boston Globe, June 13, 2000.

Elected officials are entitled to express their views on whether a prisoner should receive sex reassignment surgery. The media has the right to comment critically on the conduct of prison officials and judges as well. Every citizen has a right to criticize public officials, including judges, too.

However, a prison official acts with deliberate indifference and violates the Eighth Amendment if, knowing of a real risk of serious harm, she denies adequate treatment for a serious medical need for a reason that is not rooted in the duties to manage a prison safely and to provide the basic necessities of life in a civilized society for the prisoners in her custody. Denying adequate medical care because of a fear of controversy or criticism from politicians, the press, and the public serves no legitimate

16

penological purpose. It is precisely the type of conduct the
Eighth Amendment prohibits.

As the Supreme Court has explained, "[t]he very purpose of a
Bill of Rights was to withdraw certain subjects from the
vicissitudes of political controversy, to place them beyond the
reach of majorities and officials and to establish them as legal
principles to be applied by the courts." W. Va. State Bd. of Educ.
v. Barnette, 319 U.S. 624, 638 (1943). Therefore, "[t]he right to
be free of cruel and unusual punishments, like other guarantees of
the Bill of Rights, may not be submitted to vote; it depends on the
outcome of no elections." Furman v. Georgia, 408 U.S. 238, 268
(1972) (Brennan, J., concurring) (internal quotation omitted).
Prisoners who have lost their liberty by murdering others may
understandably be unsympathetic candidates for the humane treatment
that they denied their victims. However, as future Supreme Court
Justice Anthony Kennedy wrote in 1979: "[T]he whole point of the
[Eighth] [A]mendment is to protect persons convicted of crimes.
Eighth [A]mendment protections are not forfeited by one's prior
acts." Spain v. Procunier, 600 F.2d 189, 194 (9th Cir. 1979). It
is despised criminals, like Kosilek, who are most likely to need
the protection of the Eighth Amendment and its enforcement by the
courts.

This court fully understands that special care should be
exercised before judges intrude on matters of prison

17

administration. It recently expressed this view in approving a settlement by the DOC of a class action in which it was alleged that the practice of placing mentally ill prisoners in prolonged segregation was unconstitutional, in part because it was causing many inmates to kill themselves. See Disability Law Ctr. v. Mass. Dep't of Corr., No. CIV.A.07-10463, 2012 WL 1237760, at *1 (D. Mass. Apr. 12, 2012). Like the district court in Battista, this court has been cautious in deciding to grant the relief sought in order to assure that it was both justified and necessary. See Battista, 645 F.3d at 455 (stating that district judge was initially "far from anxious to grant the relief sought" but did so after perceiving a "pattern of delays"). It has given the defendant many opportunities to consider relevant information and reconsider its decision to deny Kosilek sex reassignment surgery. It required Dennehy to read certain trial testimony so she could make a more fully informed decision on whether to permit the prescribed surgery. The court obtained the views of the DOC's doctors and an independent expert on whether Dr. Schmidt's proposed approach would provide Kosilek adequate medical care. In addition, it required Dennehy's immediate successor as Commissioner, Harold Clarke, to report on whether he would reverse Dennehy's decision. However, the DOC, through several Commissioners, has continued, without proper justification, to refuse to discharge its constitutional duty to provide Kosilek the adequate care required

18

for his serious condition. It is evident that the defendant will continue to violate Kosilek's Eighth Amendment rights if a court order is not issued.

As the Supreme Court has held, "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution." Procunier v. Martinez, 416 U.S. 396, 405 (1974). Rather, as the Court more recently instructed:

> If government fails to fulfill [its] obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation. Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals. Courts nevertheless must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners. Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.

Brown, 131 S. Ct. at 1928-29 (internal quotations and citations omitted).

Therefore, an injunction must issue in this case. As indicated earlier, any such order must be narrowly drawn to extend no further than necessary to correct the proven violation of the inmate's federal rights. See 18 U.S.C. §3626(a)(1)(A). In this case, Kosilek has proven that his Eighth Amendment rights have been violated by the DOC's refusal to provide the sex reassignment surgery prescribed by its doctors. The court is ordering the

19

defendant to take all of the steps reasonably necessary to provide
Kosilek that treatment as promptly as possible.

The court is not deciding where the surgery should be done or
who should perform it.  Nor is the court deciding where Kosilek
should be incarcerated after the surgery.  It is the duty of the
DOC to make those decisions reasonably and in good faith.

As indicated earlier, in another case before this court, the
DOC recently demonstrated that it could and would properly
discharge its constitutional duty to provide adequate medical care
to mentally ill prisoners who were committing suicide at a high
rate when held in segregated confinement.  See Disability Law Ctr.,
2012 WL 1237760, at *1.  In that case the DOC worked long, hard,
and successfully to develop innovative ways to address both the
serious medical needs of those inmates and the genuine concerns for
safety that they presented.  As a result, a challenging class
action was settled on a basis that this court found to be fair and
reasonable.

The DOC has an equal obligation under the Eighth Amendment to
make decisions concerning Kosilek that are not cruel and unusual.
It has long been well-established that it is cruel for prison
officials to permit an inmate to suffer unnecessarily from a
serious medical need.  It is unusual to treat a prisoner suffering
severely from a gender identity disorder differently than the
numerous inmates suffering from more familiar forms of mental

20

illness. It is not permissible for prison officials to do so just because the fact that a gender identity disorder is a major mental illness is not understood by much of the public and the required treatment for it is unpopular.

Kosilek shares with every other inmate in the DOC's custody the right to have decisions concerning him made by prison officials reasonably and in good faith in order to assure that he is not again subject to the cruel and unusual punishment that the Eighth Amendment prohibits. The court hopes that the DOC will in the future recognize and respect that right.

## II.   THE APPLICABLE STANDARDS

As the Supreme Court wrote in another case involving a transsexual inmate, "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (internal quotation omitted). The Eighth Amendment, in pertinent part, prohibits the infliction of "cruel and unusual punishments." U.S. Const., Am. VIII. Such punishments are those that are "incompatible with the evolving standards of decency that mark the progress of a maturing society" or that involve the "unnecessary and wanton infliction of pain" on an inmate. Estelle, 429 U.S. at 102-104 (internal quotations omitted); see also Gregg v. Georgia, 428 U.S. 153, 173 (1976). The

21

Eighth Amendment, therefore, "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates."   Farmer, 511 U.S. at 832 (internal quotation omitted).

The Supreme Court has recently explained the reasons for the Eighth Amendment, and the important values that it both represents and protects:

As a consequence of their own actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.

Brown, 131 S. Ct. at 1928 (internal quotations and citations omitted). Because incarceration "takes from prisoners the means to provide for their own needs," society must provide for these basic needs or cause prisoners to suffer starvation, torture, and death. Id. "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." Id.; see also Farmer, 511 U.S. at 832; Kosilek I, 221 F. Supp. 2d at 177-78.

At issue in this case is a prisoner's right to medical care. As indicated earlier, "prison officials must ensure that inmates

22

receive adequate . . . medical care." Farmer, 511 U.S. at 832. However, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle, 429 U.S. at 105. A mere accident or even negligence is insufficient. Id. at 105-06; see also Feeney v. Corr. Med. Servs., 464 F.3d 158, 162 (1st Cir. 2006). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." Estelle, 429 U.S. at 106; see also Braga v. Hodgson, 605 F.3d 58, 61 (1st Cir. 2010); Flanory v. Bonn, 604 F.3d 249, 253-54 (6th Cir. 2010). As the Supreme Court explained in Farmer, it must be proven that a prison official acted with "deliberate indifference" to a substantial risk of serious harm in order to establish a violation of the Eighth Amendment. 511 U.S. at 835-47.

The test for a violation of the Eighth Amendment has both an objective and a subjective component. See id. at 846 n.9; Wilson v. Seiter, 501 U.S. 294, 298-99 (1991); DesRosiers v. Moran, 949 F.2d 15, 18 (1st Cir. 1991); De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003). The objective component is satisfied where an inmate demonstrates that "he is incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834. In cases involving a denial of medical care, an inmate must

23

show that he has a serious medical need for which he has not received adequate medical care. See Kosilek I, 221 F. Supp. 2d at 161; see also Estelle, 429 U.S. at 104. However, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable state of mind, namely one of deliberate indifference to an inmate's health or safety." Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011) (internal quotations omitted). This requirement is subjective. A prison official must know of the substantial risk of serious harm faced by the inmate in order to violate the Eighth Amendment. See id.; see also Farmer, 511 U.S. at 837. However, even a prison official who knows of such a risk does not violate the Eighth Amendment if the denial of particular medical care is based on reasonable, good faith judgments balancing the inmate's medical needs with other legitimate, penological considerations. See Battista, 645 F.3d at 454. The deliberate indifference requirement "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 297).

As stated earlier, an inmate alleging a violation of the Eighth Amendment must first prove that he has a serious medical need. Generally, an inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm in order to prove a violation of the Eighth Amendment. See Farmer, 511 U.S. at

24

828, 835-43. Therefore, "a serious medical need" is one that involves a substantial risk of serious harm if it is not adequately treated. See McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992) ("A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" (quoting Estelle, 429 U.S. at 104)).

The First Circuit has also defined a serious medical need as one "'that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Mahan v. Plymouth Cnty. House of Corr., 64 F.3d 14, 18 (1st Cir. 1995) (quoting Gaudreault v. Mun. of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990)). Similarly, the Second Circuit has held that courts should look to the following factors in determining whether an inmate has a serious medical need:

(1) whether a reasonable doctor or patient would perceive the medical need in question as "important and worthy of comment or treatment," (2) whether the medical condition significantly affects daily activities, and (3) "the existence of chronic and substantial pain."

Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).

A serious medical need may be mental or physical. See Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991) (stating that there is "no underlying distinction between the right to medical care for

25

physical ills and its psychological or psychiatric counterpart")
(internal quotations omitted). Therefore, deliberate indifference
to an inmate's serious mental health needs violates the Eighth
Amendment.  See id.; see also Clark-Murphy v. Foreback, 439 F.3d
280, 292 (6th Cir. 2006); Steele v. Shah, 87 F.3d 1266, 1269 (11th
Cir. 1996).

    With regard to the level of care to be provided, the First
Circuit has stated that, "it is plain that an inmate deserves
adequate medical care." United States v. DeCologero, 821 F.2d 39,
42 (1st Cir. 1987). "Adequate services" are "services at a level
reasonably commensurate with modern medical science and of a
quality acceptable within prudent professional standards." Id. at
43.  Therefore, as this court wrote in Kosilek I, "reference to
established professional standards is important to determining the
adequacy of medical care." 221 F. Supp. 2d at 180.

    Adequate medical care is also treatment that is "the product
of sound medical judgment." Chance, 143 F.3d at 703.  Sound
medical judgment is based on the needs of the particular prisoner.
"The failure to consider an individual inmate's condition in making
treatment decisions is . . . precisely the kind of conduct that
constitutes a substantial departure from accepted professional
judgment, practice, or standards such as to demonstrate that the
person responsible did not actually base the decision on such a
judgment." Roe v. Elyea, 631 F.3d 843, 862-63 (7th Cir. 2011)

26

(internal quotation omitted); see also Soneeya, 2012 WL 1057625, at
*10, *16 (holding that the DOC violated a transsexual prisoner's
rights under the Eighth Amendment by relying on a blanket policy
denying certain treatment, and stating that "[a]dequate care is
based on an individualized assessment of an inmate's medical needs
in light of relevant medical considerations"); Kosilek I, 221 F.
Supp. 2d at 193 ("[D]ecisions as to whether psychotherapy,
hormones, and/or sex reassignment surgery are necessary to treat
Kosilek adequately must be based on an 'individualized medical
evaluation' of Kosilek rather than as 'a result of a blanket
rule.'") (quoting Allard v. Gomez, 9 Fed. App'x 793, 795 (9th Cir.
2001)).

Absent legitimate countervailing penological considerations,
adequate medical care typically requires addressing the cause of
the inmate's serious medical need rather than merely providing
treatment to reduce the pain it causes. See Fields, 653 F.3d at
556. As indicated earlier, in holding that a state statute
prohibiting hormone therapy and sex reassignment surgery for
inmates with severe gender identity disorders violated the Eighth
Amendment, the Seventh Circuit recently wrote that "[s]urely, had
the [] legislature passed a law that DOC inmates with cancer must
be treated only with therapy and pain killers, this court would
have no trouble concluding that the law was unconstitutional." Id.;
see also Wolfe v. Horn, 130 F. Supp. 2d 648, 653 (E.D. Pa. 2001)

27

(although transsexual inmate was prescribed Prozac for depression, there was a fact question precluding summary judgment as to whether inmate received any treatment for transsexualism); West v. Keve, 571 F.2d 158, 162 (3d Cir. 1978) (providing aspirin rather than recommended post-operative treatment may not constitute adequate medical care); Sulton v. Wright, 265 F. Supp. 2d 292, 300 (S.D.N.Y. 2003) ("[E]ven if an inmate receives 'extensive' medical care, a[n] [Eighth Amendment] claim is stated if, as here, the gravamen of his problem is not addressed.").

However, the fact that an inmate is entitled to adequate medical care does not mean that he is entitled to ideal care or to the care of his choice. See DeCologero, 821 F.2d at 42; DesRosiers, 949 F.2d at 18; Barron v. Keohane, 216 F.3d 692, 693 (8th Cir. 2000); Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997); Fernandez v. United States, 941 F.2d 1488, 1493-94 (11th Cir. 1991). Prison officials have the right to exercise discretion in deciding which of several adequate treatments is chosen for a prisoner. See DeCologero, 821 F.2d at 42-43; DesRosiers, 949 F.2d at 19-20. Therefore, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Chance, 143 F.3d at 703 (emphasis added).

Moreover, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of

confinement unless the official knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. Therefore, if a prisoner satisfies the objective component of the test by establishing the denial of adequate medical care to treat a serious medical need, he must also demonstrate that prison officials had a "sufficiently culpable state of mind" - that of "'deliberate indifference' to an inmate's health or safety." Leavitt, 645 F.3d at 497. This component of the test is subjective. It does not require deliberate intent to harm an inmate, but does require that the official know of the substantial risk of harm to the inmate. See Farmer, 511 U.S. at 837; Battista, 645 F.3d at 453. Specifically, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837; see also Flanory, 604 F.3d at 254; Chance, 143 F.3d at 702; De'Lonta, 330 F.3d at 634.

State of mind "is often inferred from behavior." Battista, 645 F.3d at 453. Deliberate indifference to the serious medical needs of an inmate may be "evidenced 'by denial, delay, or interference with prescribed health care.'" Id. (quoting DesRosiers, 949 F.2d at 19); see also Johnson v. Wright, 412 F.3d 398, 404 (2d Cir. 2005) ("[A] deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians."); Durmer v.

O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993) (sending inmate to several specialists after first doctor prescribed expensive physical therapy for a stroke could violate the Eighth Amendment, depending on doctor's motives). Similarly:

> while a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to [inmates'] agony . . . Indeed, it is well-settled in [the Second] [C]ircuit that a series of incidents closely related in time . . . may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners.

Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977) (internal quotation omitted); see also Guglielmoni v. Alexander, 583 F. Supp. 821, 826 (D. Conn. 1984) (same).

Certain constraints facing prison officials are relevant to the subjective state of mind component of the Eighth Amendment test.  See Wilson, 501 U.S. at 303.  More specifically, "assuming the conduct is harmful enough to satisfy the objective component of the Eighth Amendment claim, whether it can be characterized as 'wanton' depends upon the constraints facing the official."  Id. (internal citation omitted); see also DesRosiers, 949 F.2d at 19. As the Supreme Court reiterated in 1993, the inquiry into whether deliberate indifference has been proven is "an appropriate vehicle

to consider arguments regarding the realities of prison administration." Helling v. McKinney, 509 U.S. 25, 37 (1993).[3]

The duty to reasonably assure inmate security is one of the realities of prison administration and, therefore, is relevant to the deliberate indifference analysis. See Farmer, 511 U.S. at 833; Battista, 645 F.3d at 454-55. More specifically, in addition to an inmate's medical needs, "security considerations also matter at prisons . . . and administrators have to balance conflicting demands. The known risk of harm is not conclusive: so long as the balancing judgments are within the realm of reason and made in good faith, the officials' actions are not 'deliberate indifference.'" Battista, 645 F.3d at 454 (quoting Farmer, 511 U.S. at 844-45).

Therefore, the deliberate indifference test "leave[s] ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources." Battista, 645 F.3d at 453. Prison administrators are usually entitled to deference by the courts in their judgment concerning what is necessary to discharge their duty to maintain

---

[3]In 1991, prior to the Supreme Court's 1993 decision in Helling and the 1994 decision in Farmer, the First Circuit discussed the practical constraints facing prison officials in considering the objective adequacy of medical care. See DesRosiers, 949 F.2d at 19. Helling and Farmer indicate that these constraints should instead be considered in determining whether prison officials acted with deliberate indifference.

31

institutional security.  See Whitley v. Albers, 475 U.S. 312, 321-
22 (1986).

However, deference does not extend to "actions taken in bad
faith and for no legitimate purpose."  Whitley, 475 U.S. at 322;
see also Fields, 653 F.3d at 558.  Rather, prison officials forfeit
their right to deference when their stated, legitimate grounds for
refusing treatment are proven to be pretextual, and the plaintiff
establishes that the "balancing judgments" were not "within the
realm of reason and made in good faith."  Battista, 645 F.3d at
454-55.  This is true even if those officials were not motivated by
a "sinister motive or 'purpose' to do harm to" the inmate.  Id. at
455.

Because deference is not due to actions taken "for no
legitimate purpose," Whitley, 475 U.S. at 322, prison officials may
be found to be deliberately indifferent if they deny adequate
treatment for a serious medical need for reasons that are not
rooted in the responsibility to preserve internal order and
discipline, and maintain institutional security.  See Battista, 645
F.3d at 454-55; cf. Fields, 653 F.3d at 558 (deference not
appropriate where blanket ban on hormone therapy not shown to have
any security benefit).  Such a denial of treatment in the face of
a known risk of serious harm to an inmate, taken without
reasonable, good faith penological justification, is the sort of
"unnecessary and wanton infliction of pain" that the Eighth

32

Amendment prohibits. Hope v. Pelzer, 536 U.S. 730, 737 (2002) ("[A]mong unnecessary and wanton inflictions of pain are those that are totally without penological justification.") (internal quotations omitted); White v. Farrier, 849 F.2d 322, 325 (8th Cir. 1988) (stating, in a case involving a transsexual prisoner, that "[a]ctions without a penological justification may constitute an unnecessary infliction of pain").

As explained in Kosilek I, the cost of adequate medical care is not a legitimate reason for not providing such care to a prisoner. See 221 F. Supp. 2d at 182. More specifically:

> [I]t would not be reasonable to deny an inmate adequate medical care because it would be expensive to do so. Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 705 (11th Cir. 1985); Harris v. Thigpen, 941 F.2d 1495, 1509 (11th Cir. 1991). "Lack of funds . . . cannot justify an unconstitutional lack of competent medical care and treatment for inmates." Ancata, 769 F.2d at 705.

Id. As the Eleventh Circuit stated in 1991:

> We do not agree that "financial considerations must be considered in determining the reasonableness" of inmates' medical care to the extent that such a rationale could ever be used by so-called "poor states" to deny a prisoner the minimally adequate care to which he or she is entitled. Minimally adequate care usually requires minimally competent physicians. It may also sometimes require access to expensive equipment, e.g. CAT scanners or dialysis machines, or the administration of expensive medicines.

Harris, 941 F.2d at 1509 (quoting district court opinion); see also Wilson, 501 U.S. at 301-02 (Court unaware of any officials ever attempting to use a cost defense to avoid the holding of Estelle); Fields, 653 F.3d at 556 ("[A]t oral argument . . . [the state]

33

disclaimed any argument that [the statute prohibiting hormone therapy or sex reassignment surgery] is justified by cost savings"); Chance, 143 F.3d at 704 (finding that plaintiff's allegations that doctors "recommended extraction [of tooth] not on the basis of their medical views, but because of monetary incentives," if proven, would contribute to a showing of deliberate indifference on the part of the defendants); Durmer, 991 F.2d at 68-69 (finding that evidence that doctor wanted to avoid providing physical therapy to a prisoner because it "would have placed a considerable burden and expense on the prison and was therefore frowned upon throughout the prison health system" might contribute to a showing of deliberate indifference); Jones v. Johnson, 781 F.2d 769, 771 (9th Cir. 1986) ("We find no other explanation in the record than budget concerns for denying Jones's surgery. Budgetary constraints, however, do not justify cruel and unusual punishment."); Gates v. Collier, 501 F.2d 1291, 1320 (5th Cir. 1974) ("Where state institutions have been operating under unconstitutional conditions and practices, the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts."); Soneeya, 2012 WL 1057625, at *11 ("Cost of treatment, however, may not be used as a reason to deny an inmate medically necessary care."); Rosado v. Alameida, 349 F. Supp. 2d 1340, 1349 (S.D. Cal. 2004) ("[C]ase law suggests that the high

34

costs associated with the [liver] transplant procedure do not preclude success on a deliberate indifference claim."); Renelique v. Doe, No. CIV.A.99-10425, 2003 WL 23023771, at *15 (S.D.N.Y. Dec. 29, 2003) ("[C]onstitutionally deficient medical care of inmates cannot be justified by a facility's lack of funds").[4]

Nor would it be permissible for a prison official to fail to provide adequate medical care to a prisoner because it would be unpopular or politically controversial to do so. As noted earlier, the Supreme Court has explained that "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." Barnette, 319 U.S. at 638. "The right to be free of cruel and unusual punishments, like other guarantees of the Bill of Rights, may not be submitted to vote; it depends on the outcome of no elections." Furman, 408 U.S. at 268 (Brennan, J., concurring) (internal quotation omitted). "The whole point of the [Eighth] [A]mendment is to protect persons convicted of crimes.

---

[4]This court does not construe the First Circuit's brief reference in Battista, 645 F.3d at 453, in general dicta, to "administrators who have to make difficult trade-offs as to risks and resources," to contradict the conclusion that cost is not a legitimate reason to deny an inmate adequate treatment for a serious medical need. Rather, this language may, at most, suggest that cost can properly be considered in choosing between adequate options for treating a prisoner.

35

Eighth [A]mendment protections are not forfeited by one's prior acts." Spain, 600 F.2d at 194.

Finally, with regard to the generally applicable legal standards, the fact that this case only involves a request for declaratory and prospective injunctive relief, rather than monetary damages, has significance. In order to obtain an injunction, an inmate must prove that a prison official was, at the time of trial, "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and . . . will continue to do so." Farmer, 511 U.S. at 846.

In addition, if a prisoner proves that he has been deprived of adequate medical care in violation of the Eighth Amendment and that a court order is required to correct that violation, under the Prison Litigation Reform Act (the "PLRA") the injunction issued must be "narrowly drawn, extend[] no farther than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. §3626(a)(1)(A). The PLRA also provides that "[t]he court [must] give substantial weight to any adverse impact on public safety or the operation of the [prison] system caused by the relief." Id.

The foregoing general principles concerning the Eighth Amendment as applied to the alleged denial of adequate medical care provide the following framework for analyzing Kosilek's claim. To

36

prevail in this case, Kosilek must prove that: (1) he has a serious medical need; (2) sex reassignment surgery is the only adequate treatment for it; (3) the defendant knows that Kosilek is at high risk of serious harm if he does not receive sex reassignment surgery; (4) the defendant has not denied that treatment because of good faith, reasonable security concerns or for any other legitimate penological purpose; and (5) the defendant's unconstitutional conduct will continue in the future. If Kosilek proves that he is entitled to relief, the injunction issued must be narrowly tailored to remedy the violation of his Eighth Amendment rights and not unnecessarily restrict the discretion of prison officials.

III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following facts have been proven by a preponderance of the credible evidence at a 28-day trial, in which the court had the opportunity to observe the witnesses and to consider the extent to which their testimony was corroborated or contradicted by other evidence that was introduced. Some of the following facts were also found in Kosilek I, and their correctness was confirmed,

37

rather than undermined, by the credible evidence presented in the instant case.[5]  See 221 F. Supp. 2d at 156.

_____

[5]Kosilek argues that the defendant is collaterally estopped from challenging several facts that he asserts were litigated and determined in Kosilek I, specifically: (1) that gender identity disorder is a major mental illness; (2) that gender identity disorder is biological and innate and not a result of choice or upbringing; (3) that the Standards of Care describe the generally-accepted treatment for individuals with gender identity disorder; (4) that a real life experience as defined by the Standards of Care is possible in a prison setting; (5) that sex reassignment surgery is a possible, valid treatment for Kosilek despite her incarceration; and (6) that Kosilek's risk of suicide is sincere and not manipulative.  Defendant disagrees.

The First Circuit has held that "[t]he principle of collateral estoppel, or issue preclusion . . . bars relitigation of any factual or legal issue that was actually decided in previous litigation between the parties, whether on the same or a different claim." Keystone Shipping Co. v. New England Power Co., 109 F.3d 46, 51 (1st Cir. 1997) (internal quotations and emphasis omitted).  The Supreme Court has stated that "[t]o determine the appropriate application of collateral estoppel . . . necessitates three further inquiries: first, whether the issues presented by this litigation are in substance the same as those resolved against [defendant] in [the prior case]; second, whether controlling facts or legal principles have changed significantly since [the prior final judgment]; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion." Montana v. United States, 440 U.S. 157, 974-75 (1979).

It was necessary for the court to hear evidence on the disputed issues to determine whether any of the controlling facts found in Kosilek I have changed significantly.  In addition, the court must decide Kosilek's condition at the time of trial, and the defendant's knowledge and state of mind then too.  Although some of the disputed six issues might merit being given preclusive effect, the court has not done so.  Rather, it has decided these issues again based on the evidence presented in the instant case.

There are, however, historical facts found concerning Kosilek's life before the 2002 decision in Kosilek I and the prior conduct of the DOC which could not be altered by subsequent

## A.   Kosilek has a Gender Identity Disorder

It is not disputed that Kosilek has long had a gender identity disorder. As indicated earlier, gender identity disorder is widely recognized by the medical community and the courts as a major mental illness. See, e.g., Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition - Text Revisions ("DSM-IV-TR"); Farmer, 511 U.S. at 829; Battista, 645 F.3d at 450.   As also described earlier, the Tax Court has recently characterized gender identity disorder as "a serious psychologically debilitating condition." O'Donnabhain, 134 T.C. at 61.

In Kosilek I, this court found that while a gender identity disorder is a major mental illness, it is not "necessarily a serious medical need for which the Eighth Amendment requires treatment" because "[a]s with other mental illness, gender identity disorders have differing degrees of severity." 221 F. Supp. at 184.   The evidence in the instant case confirmed that "merely because someone is a transsexual, it does not inexorably follow that he or she needs" any particular form of treatment. Farmer v. Moritsugu, 163 F.3d 610, 615 (D.C. Cir. 1998); see also Kosilek I, 221 F. Supp. 2d at 184.

---

events, and which were generally not disputed by the evidence in the instant case. Some of those facts provide valuable context for the issues that must now be decided and are, therefore, included in the court's discussion of Kosilek I.

39

Therefore, it is necessary for the court to decide, among other things, the current severity of Kosilek's gender identity disorder and what is necessary to treat it adequately. These, and the other relevant questions, are best understood in the context of the facts found in Kosilek I.

## B.    Kosilek I

As described more fully in Kosilek I, "Kosilek has long held a strong and persistent belief that he is a woman trapped in a man's body." 221 F. Supp. 2d at 163. The belief was steadily manifest before Kosilek was ten years old. He suffered regular abuse, including being stabbed by his stepfather, because of his announced desire to live as a girl. Kosilek later obtained female hormones that were prescribed by a physician in exchange for sex. As a result of taking the hormones, Kosilek "'felt normal'" for the first time in his life.

While in a drug rehabilitation facility, Kosilek met Cheryl McCaul, who was working as a volunteer counselor. McCaul told Kosilek that his transsexualism would be cured by "a good woman," and married him. However, Kosilek's distress did not abate. In 1990, after McCaul became angry when she found Kosilek wearing her clothes, Kosilek murdered her. He then fled and was arrested in New York while wearing female clothing.

40

While awaiting trial, Kosilek again took female hormones in the form of birth control pills that were illegally provided by a guard. He also tried to obtain treatment, including eventually by filing the suit that resulted in the 2002 decision in Kosilek I.

Kosilek hired an expert who recommended psychotherapy with a qualified specialist in gender identity disorders, but the Bristol County Sheriff denied him this treatment. Kosilek then twice tried to kill himself before his trial, once while he was taking the antidepressant Prozac. In addition, Kosilek attempted to castrate himself.

In 1992, Kosilek was convicted of murder and sentenced to life in prison without the possibility of parole. At MCI Norfolk, a medium security male prison operated by the DOC, Kosilek began living like a woman to the maximum extent possible. He had his name legally changed from "Robert" to "Michelle" and did everything he could to present himself as a female.

Prior to 2002, Kosilek had not been assaulted sexually while in the custody of the DOC at MCI Norfolk. Nor did he voluntarily have sexual relations with any other inmate.

At the time of both Kosilek I and the instant case, the DOC contracted with the University of Massachusetts Correctional Health Program ("UMass") to provide medical services, including mental health services, to inmates at MCI Norfolk and other facilities.

41

As occurred in the instant case, UMass contracted with outside specialists when it lacked expertise in a particular area.

In Kosilek I, the court found that Kosilek had a severe form of gender identity disorder that caused him to suffer constant mental anguish. That anguish had prompted his attempts to kill and castrate himself. Kosilek's severe gender identity disorder was held to be a "serious medical need" within the meaning of the Eighth Amendment. This court also found that:

> The Harry Benjamin Standards of Care (the "Standards of Care") are protocols used by qualified professionals in the United States to treat individuals suffering from gender identity disorders. According to the Standards of Care, psychotherapy with a qualified therapist is sufficient treatment for some individuals. In other cases psychotherapy and the administration of female hormones provide adequate relief. There are, however, some cases in which sex reassignment surgery is medically necessary and appropriate.

221 F. Supp. 2d at 158-59.

Kosilek, however, had not been provided any of the treatment prescribed by the Standards of Care. This decision did not result from the DOC's established process for addressing inmates' medical needs. It was the then-Commissioner of the DOC Maloney's:

> policy and usual practice to rely on the social workers and medical professionals employed by the DOC, and the outside experts they often consult, to determine whether an inmate has a serious medical need and, if so, what is necessary to treat it adequately. Kosilek, however, [was] dealt with differently. Because of Kosilek's lawsuit Maloney, as a practical matter . . . made the major decisions relating to Kosilek's medical care.

Id. at 159.

42

The court found in 2002 that Maloney's refusal to allow Kosilek to get the female hormones DOC doctors had prescribed and possibly, sex reassignment surgery, was "rooted in sincere security concerns, and in a fear of public and political criticism as well." Id. at 162.

Maloney knew that there was substantial public and political opposition in Massachusetts to providing female hormones and sex reassignment surgery to a prisoner, particularly including Kosilek. For example, in 2000, a Boston Globe columnist prominently wrote:

Robert Kosilek is as remarkable a man as you would ever want to meet.

First, he's a certified wife killer, having been convicted of taking a wire to the throat of his beloved Cheryl, then hiding her body in the trunk of their car in the parking lot of a North Attleboro mall.

Then he showed up at his trial in a dress, calling himself Michelle, telling anyone who would listen that his inner woman was trying to overcome his, well, outer man. Even his lawyer seemed unsure whether to call him he or she.

Now in prison, serving a life term without possibility of parole, he's grown his stringy brown hair all the way down his back. He wears polish on his fingernails. He says he pines every moment of every day to be the woman he was always meant to be. And he's demanding that the state, meaning you and me, pay the $25,000 for a sex-change operation, which the more politically correct call a "sexual reassignment."

But none of this is remarkable, just standard-issue bizarre. What's truly remarkable is his ability to make a complete and utter fool out of an otherwise thoughtful and respected federal jurist, US District Judge Mark L. Wolf.

Indeed, (s)he's actually made a mockery of our entire

43

> penal system, and in the process is costing us thousands
> of dollars and dozens of hours of valuable court time.

Brian McGrory, "A test case for a change," The Boston Globe, June

13, 2000.[6] In addition, "[a]t the time of trial [of Kosilek I in

February, 2002] the DOC was supporting proposed legislation that

would prohibit inmates with gender identity from changing their

names [and] . . . had not expressed a view on another bill that

would prohibit providing inmates with hormones and sex reassignment

surgery." Kosilek I, 221 F. Supp. 2d at 171 n.8. The court

concluded that:

---

[6]The court may take judicial notice of the existence and
content of published articles, even if they are not in the record
before it, particularly when, as here, they are not being
considered for the truth of the matters reported. See Fed. R.
Evid. 201; United States v. W.R. Grace, 504 F.3d 745, 766 (9th
Cir. 2007) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544,
569 n.13 (2007)) (observing that, on appeal, courts have the
discretion to expand the existing record to take judicial notice
under Rule 201 of the existence and content of published
articles); Ieradi v. Mylan Laboratories, Inc., 230 F.3d 594, 598
n.2 (3d Cir. 2000) (taking judicial notice of an article
published in the New York Times that was not in the record);
United States v. Isaacs, No. CR.A.07-732, 2008 WL 4346780, at *2
n.4 (C.D. Cal. Sept. 19, 2008) (taking judicial notice of
articles published in the Los Angeles Times and rejecting
argument that those articles were not actually "spread on the
record in this case"); Northwest Bypass Grp. v. U.S. Army Corps
of Engineers, 488 F. Supp. 2d 2526 (D.N.H. 2007) (taking
judicial notice of newspaper article, though limiting
consideration of facts contained in article to those that
appeared undisputed); U.S. ex rel Lam v. Tenet Healthcare Corp.,
481 F. Supp. 2d 673, 680 (W.D. Tex. 2006) ("Pursuant to Rule
201(b), Courts have the power to take judicial notice of the
coverage and existence of newspaper and magazine articles."). In
this case, the quoted article is not hearsay because it is not
being considered for the truth of the matters reported in the
article, but rather as evidence that such statements were made.
See Fed. R. Civ. P. 801(c).

44

> Maloney did not regard sex reassignment surgery as an appropriate use of taxpayers' money. Maloney and his colleagues . . . thought that any such expenditure would be politically unpopular. Maloney did not want to authorize hormones or sex reassignment surgery for Kosilek or any other inmate unless he was legally obligated to do so.

Id. at 170-71.

Relying on his lawyers rather than on the DOC's doctors, Maloney did several things designed to avoid the virtually unprecedented, and foreseeably unpopular, step of providing female hormones to a male prisoner. The DOC initially engaged Dr. Marshall Forstein to serve as an expert in the litigation. Dr. Forstein recommended that Kosilek receive psychotherapy from an expert in gender identity disorders, be provided female hormones, and be given a consultation with an experienced surgeon who specialized in sexual reassignment surgery. This was not what Maloney wanted to hear. "When Dr. Forstein stated that his recommendations regarding what was required to treat Kosilek adequately were not altered by the fact that Kosilek was incarcerated, the DOC terminated its relationship with him." Id. at 173.

As part of what the First Circuit has characterized as a pattern of "resistance," to providing recommended treatment to transsexual prisoners, Battista, 645 F.3d at 454, Maloney made it clear to Dr. Ira Packer of UMass "that [he] did not want to provide Kosilek or any other inmate hormones or sex reassignment surgery."

45

Kosilek I, 221 F. Supp. 2d at 169. As a result, Dr. Packer, who had no experience with gender identity disorders, looked for an expert who would support Maloney's determination not to provide such treatment.

Dr. Packer found the published work of a Canadian doctor, Robert Dickey, who had opined that sex reassignment surgery should never be considered for an inmate. Rather, it was Dr. Dickey's view that transsexual prisoners should be frozen in the "frame" in which they entered prison and receive female hormones only if they had been prescribed prior to incarceration.

Subsequently, without having read Dr. Forstein's report, Dr. Dickey's article on treatment of transsexual inmates, Dr. Packer's memorandum summarizing Dr. Dickey's article, or the Standards of Care, Maloney adopted Dr. Dickey's recommended, inflexible "freeze-frame" policy for the DOC. Dr. Dickey was later engaged to testify at trial as the DOC's expert.

Dr. Dickey testified in support of the DOC's decision not to provide Kosilek hormones pursuant to its "freeze-frame" policy. The court did not find Dr. Dickey to be a persuasive witness, in part because he did not believe in the Standards of Care, which prudent professionals in the United States follow, and in part because his approach did not permit the individualized decision-making concerning an inmate's medical care that is required by the Eighth Amendment.

46

Rather, the court relied on the testimony of Kosilek's experts, Drs. George Brown and Forstein, and professionals employed by the DOC, including Dr. Packer and Kosilek's social worker Mark Burrowes, in finding that certain facts important to the Eighth Amendment analysis had been proven. Those facts included the following. In 2002, Kosilek's severe, untreated gender identity disorder was causing him intense mental anguish. As a result, he was at high risk of killing himself if his mental illness was not properly treated. Thus, Kosilek had a serious medical need. Id. at 160, 184-85. In addition, Kosilek had not been offered adequate medical treatment. Rather, the mere counseling Kosilek was being provided was found to be "'so clearly inadequate as to amount to a refusal to provide essential care.'" Id. at 185 (quoting Torraco, 923 F.2d at 234). Therefore, the objective component of the Eighth Amendment standard had been proven. Id. at 161, 189.

However, the court found that Kosilek had not satisfied the subjective component of the deliberate indifference test. Rather, it found that "Maloney knew many facts from which it could have been inferred that Kosilek was at substantial risk of serious harm if he did not receive adequate treatment. Maloney did not, however, actually draw that [required] inference." Id. at 161.

The court concluded its summary of Kosilek I by writing:

This court's decision [in Kosilek I] puts Maloney on notice that Kosilek has a serious medical need which is not being properly treated. Therefore, he has a duty to respond reasonably to it. The court expects that he will.

47

In essence, the court expects that Maloney will allow qualified medical professionals to recommend treatment for Kosilek. At a minimum, psychotherapy with, or under the direction of, a professional with training and experience concerning individuals with severe gender identity disorder is required. Such therapy should raise no security concerns.

If hormones or sex reassignment surgery are recommended, Maloney may properly consider whether security issues make it impossible to provide adequate medical care in prison for Kosilek's serious medical need. The court expects that any such consideration will include the following facts.

Kosilek is already living largely as a woman in a medium security male prison. This has not presented a security problem. The policy Maloney adopted contemplates continuing female hormones for transsexuals for whom they have been prescribed prior to incarceration. Maloney expects that he would keep such inmates in the general population of a male prison. This has, evidently, been done safely in several states, in the United States Bureau of Prisons system, and in Canada.

If Maloney, in good faith, reasonably decides that there is truly no way that he can discharge both his duty to protect safety and his duty to provide Kosilek with adequate medical care, and concludes that security concerns must trump the recommendations of qualified medical professionals, a court will have to decide whether the Eighth Amendment has been violated. That question is not now before this court. If, however, concerns about cost or controversy prompt Maloney to deny Kosilek adequate care for his serious medical need, Maloney will have violated the Eighth Amendment. Kosilek will then likely be entitled to the injunction that he has unsuccessfully sought in this case.

Kosilek I, 221 F. Supp. 2d at 162 (emphasis added).

The court also explained the reasons for its expectation that, having been educated by the Kosilek I decision, Maloney would provide proper treatment for Kosilek's serious medical need. The court anticipated that Maloney would in the future follow the DOC's

48

usual practice of allowing medical professionals, including experts retained by UMass, to decide what was necessary to treat Kosilek. The court relied upon Maloney's testimony that if the doctors for the DOC who were engaged to provide mental health care to inmates decided to bring in a specialist to treat Kosilek, he would not interfere. Maloney asserted that such medical judgments are "what [he was] paying them for." Id. Maloney claimed he had "never in [his] career interfered with a doctor's order for treatment and [had] no intention of doing so in the future," with regard to Kosilek or anyone else. Id. In 2002, the court relied upon these representations.

Therefore, the court did not order the DOC to do anything. Rather, it expected that the DOC would begin to treat Kosilek's situation as a medical matter and rely on qualified professionals to decide what care was necessary to adequately address his serious medical needs.

## C.   The Aftermath of Kosilek I

Following the August 28, 2002 decision in Kosilek I, under Maloney the DOC began to respond, equivocally, to the court's ruling. In December, 2002, the DOC replaced its inflexible freeze-frame policy for inmates with gender identity disorders with a presumptive policy that would provide inmates hormones if they had been previously prescribed, but allowed increased or decreased

49

treatment if it was determined by UMass to be medically necessary, and approved by both the Director of the Department's Health Services Division and the Commissioner.  This policy and procedure is unique.  It makes gender identity disorder the only condition that presumptively would not be treated differently as it became more or less severe.  In addition, gender identity disorder is the only condition that requires DOC doctors to obtain approval of the Commissioner to provide treatment that they find to be medically necessary.

In February, 2003, after consultation with DOC staff, UMass engaged a gender identity disorder specialist, Dr. David Seil, to evaluate Kosilek and make recommendations for his care.  Dr. Seil evaluated Kosilek and submitted his report on about February 23, 2003.  Dr. Seil, like every other specialist who had evaluated Kosilek, found that he suffered from a severe gender identity disorder.  He also found that Kosilek was not then suicidal because the hope of getting hormone therapy and sex reassignment surgery was sustaining him.  However, Dr. Seil wrote that, "[s]he has made two serious suicide attempts around this issue and an attempted mutilation in the past . . .  If transitioning to female is not within her control, she may take control of the situation by ending her own life."  Ex. 10 at 4.

50

Dr. Seil also wrote that the Standards of Care had "been implemented for tens of thousands of individuals with GID[7] internationally for decades." Id. He opined that those "Standards of Care need to be observed" in Kosilek's case. Id. He reached this opinion after considering possible security concerns, writing, "[i]n respect to security, Ms. Kosilek already is living as a female within a male environment without threat to herself or others." Id.

Therefore, consistent with the Standards of Care, Dr. Seil recommended that Kosilek be provided estrogen therapy; electrolysis to remove facial hair, which "is a major signifier of male gender"; and access to female clothing and makeup. Id. at 5. With regard to possible sex reassignment surgery, Dr. Seil wrote:

> Such surgery is the final step in the treatment of GID.
> As it is highly traumatic and painful surgery, and is
> irreversible, evaluation of its necessity must wait until
> the year of living as a female has occurred. Ms. Kosilek
> has lived for many years as female, but not with the
> beneficial effect of hormone therapy and electrolysis.
> A future assessment needs to be made by an experienced
> gender specialist with Ms. Kosilek after treatment with
> hormones for a year as to whether this step definitely
> need be taken.

Id.

Dr. Seil's report put the DOC on notice that Kosilek might require sex reassignment surgery after a year of real life experience on hormones and living even more fully as a female in

---

[7]Gender identity disorder is often referred to as "GID" in both the medical and legal communities.

prison.    Once again Maloney and his staff, including Deputy
Commissioner Dennehy, had received advice they did not like. Just
as the DOC in 2000 had terminated Dr. Forstein as its litigation
expert after he recommended that Kosilek be treated in accordance
with the Standards of Care, it decided not to employ Dr. Seil any
longer.

In March, 2003, Dr. Kenneth Appelbaum, the Director of Mental
Health at UMass, was directed by DOC staff to seek other
psychiatrists to evaluate Kosilek and other inmates with gender
identity disorders in the future.    At the same meeting, the
National Commission on Correctional Health Care (the "NCCHC")
position that sex reassignment surgery should not be done in prison
was discussed with Dr. Appelbaum in what he understood to be an
effort to direct him to find a specialist who agreed with this
view.[8]

---

[8]On October 18, 2009, the NCCHC revised its Position
Statement on "Transgender Health Care in Correctional Settings."
It now states that, "[t]he management of medical (e.g. medically
necessary hormone treatment) and surgical (e.g. genital
reconstruction) transgender issues should follow accepted
standards developed by professionals with expertise in
transgender health," and cited the Standards of Care. See
Kosilek's Mar. 2, 2010 Motion to Supplement the Record at Ex. A.
Kosilek moved to have the NCCHC Position Statement made part of
the record in this case.    See id.  The Defendant opposed this
request.  Kosilek's motion is being denied because the Position
Statement is hearsay, and there has been no testimony or cross-
examination concerning it.  While the court has not relied on the
revised Position Statement in making its findings, it is
consistent with the conclusions the court has reached based on
the evidence that was admitted in this case.

In addition, after Dr. Seil's report was received, following established DOC security procedure regarding gender identity disorder, see Ex. 8, Maloney asked Luis Spencer, the Superintendent of MCI Norfolk where Kosilek was incarcerated, to prepare a written report on whether providing Kosilek hormones would create any security risks. In Kosilek I, Maloney had expressed serious concerns about security in the prison if Kosilek or any other inmate were to receive hormones or sex reassignment surgery. Maloney reasoned that many inmates were sex offenders and was worried that a prisoner with breasts, living as a female in a male prison, would create a risk of violence that could injure prison guards, as well as inmates. He testified that even allowing an inmate to have make-up could facilitate attempts to escape.

However, on July 29, 2003, Spencer reported to Maloney, in a memorandum delivered to then Deputy Commissioner Dennehy, that he had considered the proposal for estrogen therapy. He stated:

I have reviewed the possible cause and effect as it relates to the security and operations of MCI Norfolk and do not feel that there are any concerns at this time. However, as these treatments continue and Inmate Kosilek begins to develop physical changes, our security concerns may have to be re-evaluated.

Ex. 21.

Therefore, Spencer approved providing Kosilek hormones from a security perspective. In August, 2003, Kosilek began taking estrogen hormones. In October, 2003, Kosilek was allowed to begin wearing female undergarments. In addition, Kosilek was scheduled

53

to begin laser removal of his masculine hair. As planned, Spencer monitored the situation to see if Kosilek's increasing feminization raised any security issues. Three years later, by 2006, there had been no reported issues or problems.[9]

However, in December, 2003, Deputy Commissioner Dennehy became the Acting Commissioner of the DOC. She received the position permanently in March, 2004. Dennehy had been an integral part of the DOC's previous efforts to deny Kosilek treatment for his severe gender identity disorder. She knew that such treatment for prisoners was unpopular with the public and many politicians. Dennehy was determined not to be the first prison official in the United States to authorize sex reassignment surgery for an inmate. Indeed, she testified in the instant case that she would retire rather than obey an order from the Supreme Court to do so. Therefore, as described below, Dennehy began taking a series of actions intended to delay, and ultimately deny, the medical care that was being prescribed for Kosilek.

Promptly upon becoming Commissioner, Dennehy told her staff that she wanted to "regroup" on the treatment being provided to prisoners with gender identity disorders. Ex. 47 at 196. Among other things, she ordered a reevaluation of Kosilek "before approving laser hair removal or anything else." Id. at 199. There

---

[9]Nor have there been any issues or problems resulting from Kosilek's feminization since Kosilek and Spencer testified in 2006.

54

was no medical reason, or other justification, for the reevaluation concerning the hair removal. The direction was a substantial departure from Dennehy's practice, pursuant to the UMass contract, of playing no role in the treatment of inmates.

In September, 2004, Kosilek had been taking hormones for a year and, under the Standards of Care, was due to be evaluated for possible sex reassignment surgery. Kosilek had not yet been reevaluated for laser hair removal. Under its contract with the DOC, UMass was solely responsible for selecting outside specialists with expertise in medical and mental health matters that the UMass staff did not have. UMass decided to retain doctors at the Fenway Community Health Center of Massachusetts (the "Fenway Clinic"), which is the foremost referral center in New England for individuals with gender identity disorders. However, in view of the Fenway Clinic's reputation, it was foreseeable that Fenway doctors might recommend laser hair removal and sex reassignment surgery for Kosilek. Therefore, Dennehy's representative, Greg Hughes, expressed reservations to Dr. Appelbaum of UMass about retaining Fenway. He relented, however, when Dr. Appelbaum explained that he had no other options.

Within a week, however, Dennehy had taken the unprecedented step of having the DOC, on its own, find an expert to potentially evaluate Kosilek and other inmates with gender identity disorder for treatment, rather than relying on UMass to do so. Hughes

55

informed Dr. Appelbaum that the DOC was planning to retain Cynthia Osborne, a Licensed Social Worker, who was assisting Virginia and Wisconsin in litigation brought by transsexual prisoners seeking treatment that those states did not wish to provide. Hughes communicated to Dr. Appelbaum that Osborne was being selected because she was more "sympathetic" to the DOC's opposition to providing sex reassignment surgery and other treatment. See June 1, 2006 Tr. at 93; Ex. 47 at 223.

However, UMass continued to work with the Fenway Clinic, and in the fall of 2004, Drs. Randi Kaufman and Kevin Kapila of the Fenway Clinic began their evaluation of Kosilek for possible sex reassignment surgery. Drs. Kaufman and Kapila are specialists on gender identity disorders, and have treated many individuals with that mental illness. Dr. Appelbaum correctly characterized them as "well trained, credentialed . . . [and] very knowledgeable." June 1, 2006 Tr. at 88.

On February 24, 2005, the Fenway doctors issued a report on their evaluation of Kosilek. See Ex. 25 (the "Fenway Report"). Applying the Standards of Care, Drs. Kaufman and Kapila found that Kosilek had demonstrated his ability to live as a female in a male prison while taking prescribed hormones. Despite the hormones, however, they found that continued to be "quite distressed" about his male anatomy. Id. at 5-6. The doctors opined that "[g]iven her previous suicide attempts, her ongoing distress, and the lack

56

of other goals in her life, it is quite likely that Michelle will attempt suicide again if she is not able to change her anatomy." Id. at 5.    Therefore, Drs. Kaufman and Kapila stated that it was their "recommendation . . . that Michelle be able to have sex reassignment surgery."  Id. at 6.

Dennehy and her staff received the Fenway Report from UMass and read it shortly after it was issued. The court finds that Dennehy understood, from the report, that Kosilek was still suffering from a severe gender identity disorder, that the experts retained to advise the DOC were recommending sex reassignment surgery, and that there was a significant risk that Kosilek would try to kill himself if his hope of getting that surgery was lost.

On April 12, 2005, the DOC retained Osborne to complete a peer review of the Fenway Report. Osborne was then on the faculty of the John Hopkins School of Medicine, whose Psychiatry Department had long been led by Dr. Paul McHugh. Dr. McHugh was well-known for his strongly held view that sex reassignment surgery is "religiously abhorrent." Dec. 19, 2006 Tr. at 162.  Indeed, Dr. McHugh was an advisor to the Vatican and had urged it to condemn sex reassignment surgery. June 8, 2006 Tr. at 165.   The John Hopkins psychiatric department was substantially influenced by Dr. McHugh's views.

Prior to being hired by the DOC in April, 2005, Osborne had opined that an inmate could not have the real life experience

required by the Standards of Care to be eligible for sex reassignment surgery and, in any event, such surgery was rarely medically necessary. After the Virginia Department of Corrections retained Osborne and terminated hormone therapy for a transsexual inmate named Ophelia De'lonta, De'lonta mutilated his genitals and Osborne was replaced by Dr. Brown. See De'Lonta, 330 F.3d at 632; May 30, 2006 Tr. at 102; May 31, 2006 Tr. at 15; June 8, 2006 Tr. at 161-62. After Osborne advised the Wisconsin Department of Corrections that sex reassignment surgery was not necessary for an inmate named Donna Dawn Konitzer, Konitzer castrated himself. See June 8, 2006 Tr. at 163.

Dennehy testified that Osborne's opposition to providing sex reassignment surgery to prisoners was not a factor in her selection. This court finds that this contention is not credible or correct. Rather, the court concludes that Osborne's known positions and foreseeable advice that Kosilek should not be provided sex reassignment surgery were precisely the reasons that Dennehy decided to hire her.

As Dennehy's hiring of Osborne indicates, Dennehy remained determined to delay and defeat Kosilek's effort to get the surgery that had been prescribed. Among other things, she falsely claimed that she did not know whether the Fenway Clinic doctors viewed sex reassignment surgery as medically necessary.

58

On April 15, 2005, in a status report to the court, UMass referenced the Fenway Report's recommendation that Kosilek receive sex reassignment surgery and stated that UMass, Dr. Arthur Brewer, and Dr. Appelbaum "are presently unaware of any known medical or mental health contraindication to providing sex reassignment surgery to [Kosilek], although they are also unaware of any other case in which an inmate has undergone sex reassignment surgery while incarcerated." Ex. 23 at 2. Nevertheless, Dennehy pretended that she did not understand whether UMass was recommending sex reassignment surgery for Kosilek.

In successive responses to inquiries prompted by Dennehy, UMass confirmed and clarified that it was indeed recommending sex reassignment surgery for Kosilek. On May 10, 2005, UMass wrote that, "[w]e have consistently indicated . . . that we defer to the Fenway staff regarding the propriety of sexual reassignment surgery in the case of Michelle Kosilek." Ex. 15 at 2. However, on May 25, 2005, the DOC again asked UMass for its recommendation. Ex. 18. UMass responded on June 14, 2005, that "[b]ased on the opinions of Dr. Kapila and Dr. Kaufman, and notwithstanding the report of Dr. Osborne, we would again suggest that solely from a clinical perspective it appears that sex reassignment surgery should be offered to Michelle Kosilek." Ex. 16 at 3.

On September 1, 2005, in response to letters from Peter Heffernan, Acting Director of the DOC's Health Services Division,

regarding the treatment of Kosilek and other inmates with gender
identity disorder, Drs. Brown and Appelbaum wrote to the DOC that,
"[f]rom what we have been told by Dr. Kapila and Dr. Kaufman, it is
our understanding that further delay in providing the recommended
treatment likely will result in continued or increased levels of
distress for each afflicted individual, with the possibility of
self-inflicted injury.  To that extent, we also view the treatment
recommendations as medically necessary."  Ex. 42 at 3.

Dennehy was fully informed of the communications from UMass
and understood that the DOC's doctors were recommending sex
reassignment surgery as the only adequate treatment for Kosilek's
condition.  For example, on November 23, 2005, she wrote the
Director of the United States Bureau of Prisons that, "[o]ur
medical providers[,] the Commonwealth's medical school, is
supporting their consultant's recommendation for the surgery
!!!!!!."  Ex. 88; June 20, 2006 Tr. at 39. Nevertheless, eight
months later at trial in June, 2006, Dennehy testified that she was
still "awaiting clear recommendations and directions from UMass.
Medical."  June 19, 2006 Tr. at 88-89.

The court finds, however, that Dennehy at all relevant times
knew that the DOC's doctors viewed sex reassignment surgery as the
only adequate treatment for Kosilek's severe gender identity
disorder and, therefore, were recommending it.  She also knew that
Kosilek was suffering mental anguish as a result of his severe

gender identity disorder, and that he was at high risk of attempting again to kill himself if not given sex reassignment surgery. However, she remained determined not to be the first corrections official to authorize such treatment, which she believed would be unpopular with elected officials, the media and the public. Therefore, she continued, and indeed intensified, her effort to resist, delay, and interfere with the DOC's doctors' prescription for providing Kosilek what she understood was the only adequate, and therefore the essential, medical care for his condition.

In the spring of 2005, during the period in which Dennehy falsely claimed that she did not understand whether UMass was recommending sex reassignment surgery for Kosilek as the only adequate treatment, Dennehy selectively gave interviews to some members of the media in an effort to demonstrate that she was responsive to the political and public opposition to using tax revenues to provide a prisoner sex reassignment surgery. Dennehy denied a request from an independent producer to do a documentary on inmates with gender identity disorder because the "matter was in litigation." June 19, 2006 Tr. at 79-80; Ex. 85. At the same time, however, she provided wide access to DOC facilities and inmates, and an interview, to the Channel 4 "Eyewitness News Team," so it could do a news piece that she knew would be hostile to providing treatment to inmates suffering from gender identity disorders.

61

On May 16, 2005, Dennehy was interviewed for the Channel 4 piece, which was broadcast on May 25, 2005.  The piece reported that the DOC would, later that week, inform the court of the security concerns posed by providing sex reassignment surgery to Kosilek.  Although Dennehy made only brief remarks in the Channel 4 piece, she coordinated her comments to Channel 4 with a State Senator, who lived in the same town as Dennehy and called her on her cell phone to discuss the television piece.  The piece reported that, prompted by Kosilek's case, the Senator was sponsoring proposed legislation to prohibit the use of tax revenues to provide sex reassignment surgery for prisoners in Massachusetts.  June 19, 2006 Tr. at 64; Ex. 64.  It featured the Senator as saying: "I think it's unconscionable that the Commonwealth of Massachusetts . . . would have to pay for any type of elective sex change operations for any prisoners."  Ex. 64.  The head of Citizens for Limited Taxation echoed this theme, stating: "I can't even imagine seriously considering this.  Never mind doing this.  Never mind paying for it."  Id.  The piece reported that "[s]ex changes for all [12 prisoners diagnosed with gender identity disorder] would cost [taxpayers] at least a quarter of a million dollars."  Id.

The Channel 4 piece ended by reporting that:

Later this week, the state will tell the federal court that sex surgery for Michelle Kosilek would result in a security nightmare.  When that happens, expect Kosilek to pursue her lawsuit.  Then a federal judge will eventually decide whether you will pay the bill for Kosilek's

> operation and beyond that, sex surgeries for other
> convicts serving time for horrendous crimes.

Id.

The Channel 4 piece made it clear that Dennehy opposed the
provision of sex reassignment surgery to Kosilek on the basis of
purported security concerns. However, when the piece was recorded
on May 16, 2005, Dennehy had not conducted the security review
included in the DOC's written procedures for making decisions
concerning prisoners with gender identity disorders. Nor had she
had any discussion about security concerns with key DOC personnel,
including Spencer, the Superintendent of MCI Norfolk where Kosilek
was incarcerated.[10] According to the DOC's established procedures,
if UMass prescribed treatment for a prisoner's gender identity
disorder, the Superintendent of the facility in which the inmate
was incarcerated was to be asked to assess the impact such
treatment would have on security and make a written recommendation
to the Commissioner on whether the treatment should be allowed.
See Ex. 8. Spencer understood that this was the standard operating
procedure with regard to Kosilek and anyone else similarly
situated. Dennehy also knew that this was the DOC's standard

---

[10]As described below, Dennehy's position that insurmountable
security concerns precluded providing Kosilek with sex
reassignment surgery was also not based on the advice of any
experts. The officials who provided expert testimony for the
defendant at trial, one from the DOC and one from the Bureau of
Prisons, were not retained until six months after Dennehy
announced her position.

63

decision-making process with regard to inmates with gender identity disorders. She testified that having Superintendents complete such security assessments was valuable because the Superintendents had the security background and familiarity with their respective institutions to make informed, accurate judgements.

As described earlier, although Commissioner Maloney had testified in Kosilek I that it would be too dangerous to provide female hormones to Kosilek, following the court's decision in that case Maloney asked Spencer to conduct a security assessment in accordance with the DOC's established procedure. Spencer did so and determined that the provision of hormones to Kosilek would not create any security concerns. That prediction proved to be correct. Although Spencer was aware in 2005 that the DOC doctors had recommended sex reassignment surgery for Kosilek, he was not asked to provide Dennehy with the written security assessment and recommendation that established procedure included.

Rather, only after indicating to Channel 4 on May 16, 2005, that she would deny sex reassignment surgery for Kosilek because of purported security considerations did Dennehy meet for the first time with her lawyers, Spencer, and Lynn Bissonette, the Superintendent of the woman's prison, MCI Framingham, on May 19, 2005, to discuss security matters in preparation for a report to

64

the court that was then due on May 27, 2005.[11]  At the time of this meeting, Dennehy had not received any written materials from either Spencer or Bissonette concerning any possible security concerns.

Following the May 19, 2005 meeting, trial counsel for the DOC drafted a report concerning the security implications of sex reassignment surgery for Kosilek, which was reviewed by Dennehy a day or two before being filed on June 14, 2005.  June 19, 2005 Tr. at 63.  The report described a series of purported security concerns and concluded that it was necessary for the Commissioner to deny Kosilek sex reassignment surgery because the DOC would be unable to protect his safety if the surgery was performed. However, as explained below, Dennehy's stated security concerns were largely false and, in any event, were not her real reason for denying the surgery.  Rather, the real reason was to avoid public and political criticism that providing the prescribed treatment would foreseeably provoke.

In the fall of 2005, the DOC had already engaged Osborne to prepare a peer review of the Fenway Report, and decided to retain her as a medical expert at trial.  In addition, based on her recommendation, the DOC also retained Dr. Schmidt, a psychiatrist

---

[11]In deciding that Dennehy met with Spencer and Bissonette to discuss the security implications of sex reassignment surgery for Kosilek for the first time on May 19, 2005, the court credits her deposition testimony and does not find to be believable her testimony that the first such meeting occurred on September 14 or 19, 2004.

at the Johns Hopkins University School of Medicine, to serve as a
medical expert.

The court-ordered deadline for disclosure of experts and their
opinions was December 2, 2005. On November 23, 2005 Dennehy
contacted Harley Lappin, the Director of the United States Bureau
of Prisons, looking for trial experts. Dennehy clearly
communicated to Lappin her opposition to providing Kosilek sex
reassignment surgery. The DOC subsequently retained Robert Dumond
of the DOC and Arthur Beeler of the Bureau of Prisons as litigation
experts on security issues. Each opined that insurmountable
security problems would make it impossible to protect Kosilek's
safety if he were provided sex reassignment surgery. However,
Beeler formed his opinion before visiting any DOC facility or
learning anything specific to Kosilek. In addition, although
Dumond testified as to the risks of sexual assault and violence to
transsexuals in prison and to Kosilek specifically, he failed to
consider Kosilek's history of living safely as a woman at MCI
Norfolk in forming his opinion.

In February, 2006, Dr. Loren Schechter, a Chicago surgeon with
substantial experience in performing sex reassignment surgery who
was found by Kosilek's lawyers, testified in a deposition that he
would be willing to evaluate Kosilek, and if appropriate, perform
sex reassignment surgery on Kosilek in Massachusetts. Schechter is

66

not licensed to practice in Massachusetts, but could perform the surgery in the state if he receives a sponsorship to do so.

D.   The Trial of Kosilek II

As the trial began in the spring of 2006, the Lieutenant Governor of the Commonwealth of Massachusetts publicly stated her opposition to using tax revenues to fund sex reassignment surgery for a prisoner.    Dennehy, who served under the Governor and Lieutenant Governor, was well aware of the Lieutenant Governor's position.

The media also continued to oppose sex reassignment surgery for Kosilek.  For example, a June 11, 2006 The Boston Globe column began:

The [Kosilek] trial underway in federal court in Boston is not about the rights of transsexuals.  It's about the manipulations of a murderer.

Ex. 95, "Eileen McNamara, "When gender isn't relevant," The Boston Globe, June 11, 2006.  Soon after, The Boston Globe opined in an editorial that:

Kosilek's case is not compelling for reasons even beyond the obvious distastefulness of a wife killer angling to serve out his sentence of life without parole in a women's prison.  Private insurers rarely pay for sex-change operations . . . . Kosilek, like any inmate, deserves proper mental health care, including hormone treatment and expert therapy.   If he is at risk of suicide, he should be placed under constant observation. But that's sufficient.

67

Ex. 94, "Set limits on sex change," The Boston Globe (June 15, 2006). Dennehy was aware of these statements, and the wide-spread public hostility to providing sex reassignment surgery for prisoners that they expressed as well.

Because Kosilek is seeking only injunctive relief, his case must be decided by a judge alone, rather than by a jury. The trial of Kosilek II before this court began on May 30, 2006.

Several doctors testified at trial. Each one opined that Kosilek has a gender identity disorder. Dr. Brown, a specialist in gender identity disorders who was on the board of directors of the Harry Benjamin International Gender Dysphoria Association at the time of the trial, testified for Kosilek. Dr. Brown estimated that, at the time of trial, he had treated or evaluated over 1,000 patients with gender identity disorders. He had then authored or co-authored 25 peer-reviewed articles and fourteen book chapters on gender identity disorder. After reviewing Kosilek's medical records, conducting a clinical interview with Kosilek, and speaking with Kosilek's treating mental health professional at MCI Norfolk, Burrowes, Dr. Brown diagnosed Kosilek with "chronic and severe" gender identity disorder. May 30, 2006 Tr. at 94.

Dr. Kaufman, a psychotherapist at the Fenway Clinic from 1999 to July 2005, who specializes in therapy with transsexual patients, also testified for Kosilek. At the Fenway Clinic, Dr. Kaufman served as the co-chair of the Transgender Clinical Team from 1999

to 2003, and the coordinator of the transsexual health program. See Ex. 56. Dr. Kaufman estimated that, at the time of trial, she had evaluated and treated about 300 patients for gender identity disorder. After reviewing Kosilek's medical record, speaking with Burrowes, and conducting an in-person evaluation with Kosilek, Dr. Kaufman also diagnosed Kosilek with severe gender identity disorder.

Osborne, a social worker and assistant professor at Johns Hopkins School of Medicine, testified for the defendant, and agreed that Kosilek has a severe gender identity disorder. June 8, 2006 Tr. at 186. Dr. Schmidt, Director of Psychiatry at Johns Hopkins Bayview Medical Center, a satellite facility of the Johns Hopkins School of Medicine, also testified for the defendant. At the time of the trial, Dr. Schmidt was the medical director of the managed care group known as Johns Hopkins Health Care, and was an associate director at the Center for Sexual Health and Medicine at Johns Hopkins School of Medicine. His recent professional focus was then on "Coding Procedural Technology," a technical script used by psychiatrists to communicate with third-party providers, such as managed care companies, for the purposes of billing services. Dr. Schmidt also diagnosed Kosilek with gender identity disorder, though he stopped short of characterizing it as severe.

Kosilek testified regarding his gender identity disorder and the extreme mental anguish and emotional distress it causes him.

69

He testified that he would not want to continue living if he were denied sex reassignment surgery. As indicated earlier, Drs. Kaufman and Kapila, in their evaluation of Kosilek, reported that, despite receiving hormones, Kosilek "continues to feel quite distressed, both with having male genitalia, as well as not having female genitalia." Ex. 25 at 5. They opined that "[g]iven her previous suicide attempts, her ongoing distress, and the lack of other goals in her life, it is quite likely that Michelle will attempt suicide again if she is not able to change her anatomy." Id. Burrowes testified that, even after taking hormones, Kosilek continued to be "distressed" and "disgusted" by his male genitalia. June 7, 2006 Tr. at 115.

Several of the doctors testified that the Standards of Care are the generally accepted, widely-used treatment standards for gender identity disorder. In accordance with the Standards of Care, many of the doctors testified that sex reassignment surgery is medically necessary and the only adequate treatment for Kosilek's gender identity disorder. The Fenway clinicians, Drs. Kaufman and Kapila, had written that "[g]iven her continued psychological distress, despite the treatment she has already had for GID in making a social and hormonal transition, sex reassignment surgery is the only treatment at this point that would ameliorate Kosilek's continued gender dysphoria." Ex. 53 at 159. Dr. Kaufman testified that, even though Kosilek had received

70

hormones and hair removal and was dressing like a woman, "she still shows a level of dysphoria that really can't be treated in any other way but surgery." June 5, 2006 Tr. at 104. Dr. Kaufman also testified that if Kosilek does not receive sex reassignment surgery, "she would be at great risk for committing suicide." Id. at 104-05. Dr. Brown opined that sex reassignment surgery, together with hormones and psychotherapy, is necessary to provide Kosilek with "minimally adequate medical care." May 31, 2006 Tr. at 13. Dr. Brown testified that he could say, to a reasonable degree of medical certainty, that there is a substantial risk of serious harm to Kosilek if he does not receive sex reassignment surgery. Finding the opinions of Drs. Kaufman and Kapila to be reliable, Dr. Appelbaum of UMass concluded that sex reassignment surgery "is not only clinically appropriate and should be offered to Miss Kosilek, but . . . it is medically necessary." Oct. 3, 2006 Tr. at 36.

On the other hand, Dr. Schmidt, who as described below does not follow the Standards of Care, testified that sex reassignment surgery was not medically necessary for Kosilek. Dr. Schmidt opined that if Kosilek were denied sex reassignment surgery and became depressed, his depression and distress could be treated with antidepressants and psychotherapy, and that this would alleviate his distress to a point at which he was no longer at substantial risk of serious harm. However, Dr. Schmidt also acknowledged that Kosilek's distress will probably intensify and become severe if he

71

is denied sex reassignment surgery. Osborne also testified that sex reassignment surgery was not medically necessary for Kosilek, in part because she believed that it was not possible to have the "real life experience" required by the Standards of Care in prison.

After hearing this evidence, the court instructed Dennehy to review the medical evidence and consider further whether the DOC would permit the sex reassignment surgery that UMass had prescribed for Kosilek. Dennehy did not, however, revise her position. The court also instructed Dr. Appelbaum to review Dr. Schmidt's testimony and inform the court of his opinion concerning whether Dr. Schmidt's recommendations were within prudent professional standards. After consulting Drs. Kaufman and Kapila, in whom he continued to have confidence, Dr. Appelbaum concluded that "[t]he recommendations of Dr. Schmidt do not meet prudent professional standards." Ex. 90 at 6-7.

In a further effort to ascertain whether Dr. Schmidt's treatment recommendations were within prudent professional standards, the court, pursuant to Federal Rule of Evidence 706, appointed Dr. Stephen Levine as an expert witness. Dr. Levine is a psychiatrist and co-director at the Center for Marital and Sexual Health in Cleveland, Ohio. Dr. Levine was the chairman of the Harry Benjamin International Gender Dysphoria Association committee for the fifth version of the Standards of Care. At the time of trial, Dr. Levine testified that he had evaluated about 325 to 400

72

individuals with gender identity disorders and had recommended sex
reassignment surgery for approximately 24 of them.

In his initial report to the court, Dr. Levine stated that,
"[i]t is my opinion that Dr. Schmidt's view, however unpopular and
uncompassionate in the eyes of some experts in GID, is within
prudent professional standards." Ex. 98 at 18.  However, when he
testified, Dr. Levine clarified this statement and testified that,
in  his  view,  Dr.  Schmidt's  recommendations  would  be  a
professionally prudent response to Kosilek's condition only if, for
some reason such as cost or the fact that Kosilek was incarcerated,
sex reassignment surgery was not an option. See Dec. 19, 2006 Tr.
at 190-91, 200-01.  Despite instructions by the court to the
contrary, see Oct. 31, 2006 Order, in formulating his initial
report Dr. Levine had assumed Kosilek had not had the real life
experience required by the Standards of Care and that Kosilek could
not afford to pay for sex reassignment surgery.  Id. at 179-80,
189-91.  Eliminating these considerations and any security
concerns, Dr. Levine opined that a prudent professional would not
deny Kosilek sex reassignment surgery.  Id. at 179, 190.

Dennehy also testified during the trial, after reviewing the
medical testimony pursuant to the court's order.  Although she
initially testified that it was not clear to her that UMass was
recommending sex reassignment surgery as medically necessary, she
eventually, and credibly, testified that she understood that UMass

73

had found that Kosilek had a serious medical need and required sex reassignment surgery. See Oct. 18, 2006 Tr. at 11-18. At that point, Dennehy also testified that, because she had no clinical background, she was not in a position to question the DOC's doctors' evaluation of Kosilek's condition and recommendation concerning what was necessary to treat it properly. In essence, she understood that Kosilek was at significant risk of suffering serious harm if he did not receive sex reassignment surgery. Id. at 11.

Dennehy further testified that she was not influenced by cost or controversy, and only safety and security concerns were preventing her from allowing Kosilek to receive sex reassignment surgery. Id. at 17-18; June 19, 2006 Tr. at 45-46. Specifically, Dennehy claimed to be concerned about safety and security both during and after the surgery, with regard to the risk of escape and whether Kosilek would either pose a danger to or be at risk of assault from other inmates after surgery at either a male or female prison. Id. at 21. Dennehy also testified that she would retire rather than obey a Supreme Court order requiring her to provide sex reassignment surgery to Kosilek. June 20, 2006 Tr. at 117.

With regard to security, defendant provided two expert witnesses: Dumond, director of the Research and Planning Division at the DOC, and Beeler, Warden of the Federal Medical Center in Butner, North Carolina. Both testified as to the general risks of

74

violence and sexual assault facing transsexuals in prison. Although Dumond provided some testimony about Kosilek, he failed to consider his history of living safely as a woman at MCI Norfolk when forming his opinion. In addition, Beeler was not permitted to testify as to Kosilek's specific situation because he was not sufficiently informed about the facts concerning Kosilek to be qualified to express an opinion concerning any risk to, or posed by, Kosilek particularly. See Fed. R. Evid. 702.

Susan Martin, Director of the Health Services Division of the DOC until July 2005, and Greg Hughes, the Regional Director of Mental Health for the DOC until July 2005, also testified regarding the DOC's decision-making process on the provision of treatment to Kosilek.

Dennehy resigned on April 30, 2007, and was replaced by Acting Commissioner James R. Bender, who did not testify. Harold W. Clarke became Commissioner on November 26, 2007. The court directed Clarke to consider some of the evidence presented at trial and decide whether he would permit Kosilek to have the sex reassignment surgery that had been prescribed. Clarke submitted a report on May 7, 2008, stating that, like Dennehy, he did not profess to have any clinical expertise regarding the appropriate treatment for Kosilek. Also like Dennehy, he claimed that he was not influenced by cost or controversy. Rather, he stated that "the safety and security concerns presented by the prospect of

75

undertaking sex reassignment surgery for Michelle Kosilek [we]re insurmountable" and precluded the provision of sex reassignment surgery. Ex. 107 at 1. He subsequently testified and reiterated these views. As a result, the testimony at trial did not conclude until May, 2008.

The court has not taken any testimony since then. As described earlier, see fn. 2, supra, the parties have agreed that there have been no material changes in the facts since the testimony was completed and that the court should decide this case without hearing any additional testimony. However, to address more recent judicial decisions and developments, further arguments were heard in 2009 and 2011.

In May, 2011, Luis Spencer, the former Superintendent of MCI Norfolk, became Commissioner of the DOC, and was substituted as the defendant.

E.    The Eighth Amendment Analysis

As stated earlier, in order to prevail in this case, Kosilek must prove that: (1) he has a serious medical need; (2) sex reassignment surgery is the only adequate treatment for it; (3) the defendant knows that Kosilek is at high risk of serious harm if he does not receive sex reassignment surgery; (4) the defendant has not denied that treatment because of good faith, reasonable security concerns or for any other legitimate penological purpose;

76

and (5) the defendant's unconstitutional conduct will continue in the future.

### 1. Kosilek has a Serious Medical Need

The credible evidence at trial has proven that there is a substantial risk that Kosilek will suffer serious harm if his continuing severe gender identity disorder is not adequately treated and, therefore, that he now has a serious medical need. See Farmer, 511 U.S. at 828, 835-47. Kosilek has been functioning better since being provided female hormones and retaining the hope of receiving sex reassignment surgery. However, he continues to suffer intense mental anguish because of his belief that he is a female trapped in a male body. As indicated earlier, Kosilek testified that he will kill himself if the hope of getting sex reassignment surgery as a result of the instant case is lost. This is a credible threat, resulting from genuine mental anguish, rather than a calculated effort to manipulate prison officials or deceive the court.

The court concludes Kosilek has a serious medical need. The reasons for this conclusion include the following. As described earlier, a serious medical need may be mental as well as physical. See Torraco, 923 F.2d at 234; Clark-Murphy, 439 F.3d at 292; Steele, 87 F.3d at 1269. A serious medical need is, among other things, one "'that has been diagnosed by a physician as mandating

77

treatment.'" Mahan, 64 F.3d at 18 (quoting Gaudreault, 923 F.2d at 208); see also Brock, 315 F.3d at 162.

As also described earlier, the medical community and the courts have recognized that a gender identity disorder can cause intense mental anguish and require further treatment for some individuals who are already receiving psychotherapy and hormones. See, e.g., Fields, 653 F.3d at 559; O'Donnabhain, 134 T.C. at 38-40. Severe gender identity disorder, when not adequately treated, may lead to self-mutilation and suicide.

The highly qualified doctors employed and retained by the DOC have diagnosed Kosilek as having such a condition. Their diagnosis is supported by the credible testimony of Drs. Brown and Forstein. The court is persuaded that Kosilek is now suffering a degree of mental anguish that itself constitutes a serious harm that requires adequate treatment. See Farmer, 511 U.S. at 828, 835-47; McGuckin, 974 F.2d at 1059. The court also finds that Kosilek's severe emotional distress will intensify if he loses the hope of receiving sex reassignment surgery. The genuine high risk that he will again try to kill himself if denied sex reassignment surgery indicates the intensity of his mental anguish.

The finding that Kosilek's severe gender identity disorder is a serious medical need is consistent with the conclusions regularly reached in comparable cases. As the Tax Court wrote in 2010:

Seven of the U.S. Courts of Appeals that have considered
the question have concluded that severe GID or

transexualism constitutes a "serious medical need" for purposes of the Eighth Amendment. See De'Lonta [], 330 F.3d [at] 634 []; Allard[], 9 Fed. Appx. [at] 794 []; Cuoco v. Moritsugu, [222 F.3d 99, 106 (2d Cir. 2000)]; Brown v. Zavaras, 63 F.3d 967, 970 (10th Cir. 1995); Phillips v. Mich. Dept. Of Corr., 932 F.2d 969 (6th Cir. 1991), affg. 731 F. Supp. 792 (W.D. Mich. 1990); White[], [849 F.2d at 325]; Meriwether v. Faulkner, 821 F.2d 408, 411-413 (7th Cir. 1987); see also Maggert v. Hanks, 131 F.3d 670, 671 (7th Cir. 1997) (describing gender dysphoria as a "profound psychiatric disorder"). No U.S. Court of Appeals has held otherwise.

O'Donnahbain, 134 T.C. at 62 (footnote omitted). Since the Tax Court's decision, the First Circuit has also found severe gender identity disorder to be a serious medical need in the context of a civil commitment. See Battista, 645 F.3d at 452. Other courts have reached comparable conclusions. See Soneeya, 2012 WL 1057625, at *12; Fields, 653 F.3d at 555; Norwood v. Tobiasz, No. CIV.A.11-507, 2012 WL 506580, at *4 (E.D. Wis. Feb. 15, 2012) (slip copy); Norington v. Daniels, No. CIV.A.11-282, 2011 WL 5101943, at *2 (N.D. Ind. Oct. 25, 2011); Adams v. Federal Bureau of Prisons, 716 F. Supp. 2d 107, 112 (D. Mass. 2010); Konitzer v. Frank, 711 F. Supp. 2d 874, 905 (E.D. Wis. 2010); Briones v. Grannis, No. CIV.A.09-08074, 2010 WL 3636139, at *5 (C.D. Cal. Sept. 14, 2010); Barnhill v. Cheery, No. CIV.A.06-922-T-23TGW, 2008 WL 759322, at *11 (M.D. Fla. Mar. 20, 2008); Sundstrom v. Frank, 630 F. Supp. 2d 974, 983 (E.D. Wis. 2007); Gammett v. Idaho State Bd. Of Corr., No. CIV.A.05-257, 2007 WL 2186896, at *3 (D. Idaho Jul. 27, 2007); Brooks v. Berg, 289 F. Supp. 2d 286, 287 (N.D.N.Y. 2003); Barrett v. Coplan, 292 F. Supp. 2d 281, 286 (D.N.H. 2003). These decisions "reflect

a clear consensus that GID constitutes a medical condition of sufficient seriousness that it triggers the Eighth Amendment requirement that prison officials not ignore or disregard it." O'Donnabhain, 134 T.C. at 63 (footnote omitted).

## 2. Sex Reassignment Surgery is the Only Adequate Treatment for Kosilek's Serious Medical Need

As described earlier, Kosilek is entitled to adequate care for his serious medical need, but not to ideal care or to the care of his choice. See DeCologero, 821 F.2d at 42; DesRosiers, 949 F.2d at 18. Therefore, it is necessary to decide whether the DOC has offered an adequate alternative to the sex reassignment surgery Kosilek is seeking and the DOC's doctors have prescribed.

As also explained earlier, "adequate services" are "services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." DeCologero, 821 F.2d at 43. Such services are "the product of sound medical judgment." Chance, 143 F.3d at 703. Absent legitimate countervailing penological considerations, adequate medical care requires addressing the causes of a prisoner's serious medical need rather than merely providing treatment to reduce the pain it causes. See Fields, 653 F.3d at 556; West, 571 F.2d at 162; Sulton, 265 F. Supp. 2d at 300; Wolfe, 130 F. Supp. 2d at 653. Adequate medical care also requires an individualized assessment of a patient's medical needs. See Roe, 631 F.3d at 862-63; Soneeya, 2012 WL 1057625, at *10; Kosilek I, 221 F. Supp. 2d at 193.

80

As this court wrote in Kosilek I, "reference to established professional standards is important to determining the adequacy of medical care." 221 F. Supp. 2d at 180. In Kosilek I, the court found that the Standards of Care "describe the generally accepted treatment for individuals with gender identity disorders in the community." Id. at 166. The credible evidence in the instant case demonstrates that the Standards of Care continue to describe the quality of care acceptable to prudent professionals who treat individuals suffering from gender identity disorders.

This conclusion has subsequently been confirmed in other cases. For example, the Seventh Circuit recently characterized these standards as "[t]he accepted standards of care." Fields, 653 F.3d at 553. In addition, in 2010 the Tax Court concluded that:

> The Benjamin standards are widely accepted in the psychiatric profession, as evidenced by the recognition of the standards' triadic therapy sequence as the appropriate treatment for GID and transexualism in numerous psychiatric and medical reference texts. Indeed, every psychiatric reference text that has been established as authoritative in this case endorses sex reassignment surgery as a treatment for GID in appropriate circumstances. No psychiatric reference text has been brought to the Court's attention that fails to list, or rejects, the triadic sequence or sex reassignment surgery as the accepted regimen for GID.

O'Donnabhain, 134 T.C. at 65-67; see also Alexander v. Weiner, 841 F. Supp. 2d 486, 488-89 (D. Mass. 2012); Battista v. Dennehy, No. CIV.A.05-11456, 2006 WL 1581528, at *10 n.18 (D. Mass. Mar. 22, 2006); Barrett, 292 F. Supp. 2d at 286; Hare v. Dep't of Human Servs., 666 N.W.2d 427, 429 n.1 (Minn. Ct. App. 2003).

The Standards of Care "triadic sequence is comprised of: (1) hormone therapy; (2) a real-life experience of living as a member of the opposite sex; and (3) sex reassignment surgery." Kosilek I, 221 F. Supp. 2d at 166. Although the Standards of Care have been revised somewhat since Kosilek I was decided in 2002, the prerequisites for complete sex reassignment surgery remain the same.[12]   See Ex. 9; Alexander, 841 F. Supp. 2d at 488-89.

The Standards of Care recognize that, "[m]any adults with gender identity disorder find comfortable, effective ways of living that do not involve all of the components of the triadic sequence." Ex. 9 at 11.  Therefore, "[n]ot all persons with gender identity disorders need or want all these elements of triadic therapy." Id. at 3.  For some, taking cross-sex hormones may be sufficient.  Id.

---

[12]In September, 2011, WPATH published the Seventh Version of the Standards of Care.  See WPATH, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, 7th Version, http://www.wpath.org/documents/SOC V7 03-17-12.pdf.

Kosilek requested that the court take judicial notice of the Seventh Version of the Standards of Care.  See Kosilek's Oct. 4, 2011 Response to Defendant's Memorandum of Law in Response to Court's August 18, 2011 Order.  However, it is not appropriate for the court to do so because the Standards of Care do not qualify as facts not subject to reasonable dispute.  See Fed. R. Evid. 201.  Rather, the testimony in the instant case demonstrated that the parties disputed various facts in the Sixth Version of the Standards of Care.  Because there was no testimony or opportunity for cross-examination regarding the Seventh Version of the Standards of Care, the court has not considered it in making its findings.  However, the court notes that the Seventh Version continues to require hormones and a one-year real life experience as prerequisites for the complete sex reassignment surgery Kosilek seeks.

82

at 14. If they are not, the Standards of Care provide for a "real life experience" in which a male suffering from a gender identity disorder must live for a year as a woman to test his determination and ability to do so. Id. at 17-18.

The credible evidence in the instant case confirmed the conclusion in Kosilek I that a person can have a "real life experience" in prison.[13] For someone like Kosilek who is serving a sentence of life without the possibility of parole, prison is, and always will be, his real life. See 221 F. Supp. 2d at 167.

The Standards of Care address the third possible stage of the treatment of gender identity disorder, surgery. They state:

Sex Reassignment is Effective and Medically Indicated in Severe GID. In persons diagnosed with transsexualism or profound GID, sex reassignment surgery, along with hormone therapy and real life experience, is a treatment that has proven to be effective. Such a therapeutic regimen, when prescribed or recommended by qualified practitioners, is medically indicated and medically necessary. Sex reassignment is not "experimental," "investigational," "elective," "cosmetic," or optional in any meaningful sense. It constitutes very effective and appropriate treatment for transsexualism or profound GID.

---

[13]The Seventh Version of the Standards of Care states that the Standards of Care in their entirety "apply to all transsexual, transgender, and gender nonconforming people, irrespective of their housing situation," and that "[h]ealth care for transsexual, transgender, and gender nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community." Standards of Care, Seventh Version at 67. Although the court did not consider the Seventh Version of the Standards of Care in reaching its conclusions, it is consistent with the court's finding that a transsexual prisoner can have the required real life experience in prison.

83

Ex. 9. at 18.

As indicated earlier, Drs. Brown, Kaufman, and Forstein, who each specialize in treating individuals with gender identity disorders, all testified that sex reassignment surgery is medically necessary for some individuals suffering from severe gender identity disorders. By contrast, Dr. Schmidt testified that he disagreed with the Standards of Care to the extent they provided that sex reassignment surgery is medically necessary for some transsexuals.[14] The court finds the views of Drs. Brown, Kaufman, and Forstein to be persuasive on the issue of whether such surgery is ever medically necessary. As previously described, the Standards of Care are accepted by prudent professionals in the community and provide that sex reassignment surgery is medically necessary for some individuals.

All of the doctors who testified at trial, except for Dr. Schmidt, provided evidence that sex reassignment surgery for Kosilek is both medically necessary and the only adequate treatment for his severe gender identity disorder. For example, the Fenway clinicians, Drs. Kaufman and Kapila, wrote that "[g]iven her

---

[14]Osborne also testified in a manner consistent with Dr. Schmidt, her colleague at Johns Hopkins. As she is a social worker rather than a medical doctor, there is a question concerning whether she should be regarded as among those eligible to be found a prudent professional for the purpose of diagnosing what is medically necessary and prescribing treatment for Kosilek. However, the court's assessment and analysis of Dr. Schmidt's testimony is equally applicable to Osborne. Therefore, while the court has fully considered Osborne's testimony, it is not discussing it separately.

84

continued psychological distress, despite the treatment she has already had for GID in making a social and hormonal transition, sex reassignment surgery is the only treatment at this point that would ameliorate Kosilek's continued gender dysphoria." Ex. 53 at 159. Finding the opinions of Drs. Kaufman and Kapila to be reliable, Dr. Appelbaum of UMass concluded that sex reassignment surgery "is not only clinically appropriate and should be offered to Miss Kosilek, but . . . it is medically necessary." Oct. 3, 2006 Tr. at 36. Dr. Brown opined that sex reassignment surgery, together with hormones and psychotherapy, is necessary to provide Kosilek with "minimally adequate and medically necessary" care. May 31, 2006 Tr. at 13. Dr. Forstein testified that "the only prudent treatment for Michelle Kosilek at this point is Sexual Reassignment Surgery." Mar. 15, 2007 Tr. at 116. Dr. Forstein further explained that sex reassignment surgery is "the only reasonable treatment to prevent the potentially catastrophic effect of refusing treatment to her at this point in her life." Id. at 132.

In contrast, as indicated earlier, Dr. Schmidt testified that he did not agree with the Standards of Care to the extent that they state, "Sexual Reassignment is Effective and Medically Indicated in Severe GID." See June 7, 2006 Tr. at 82. Nor did he agree with the Standards of Care that sex reassignment surgery "when prescribed or recommended by qualified practitioners, is medically indicated and medically necessary." Id.

85

In addition, the Standards of Care provide that in order to obtain sex reassignment surgery an individual must obtain two "letters of recommendation" from qualified mental health professionals.   See Ex. 9 at 7-8.   Accordingly, prudent professionals who treat individuals suffering from severe gender identity disorders write such letters of recommendation when sex reassignment surgery is necessary to treat a particular patient adequately. However, consistent with his view that sex reassignment surgery is never medically necessary, Dr. Schmidt never recommends sex reassignment surgery for any patients. See June 7, 2006 Tr. at 77, 80.   At most, Dr. Schmidt writes letters taking a neutral position on sex reassignment surgery for a particular patient. Id. at 77, 80.

Dr. Schmidt also opined that sex reassignment surgery is not medically necessary for Kosilek particularly.  Dr. Schmidt based his opinion in part on his general opposition to sex reassignment surgery. He also relied on his view that it is impossible to have a "real life experience" in prison and, therefore, Kosilek is not eligible for sex reassignment surgery under the Standards of Care.

Dr. Schmidt recognized that Kosilek would likely suffer severe emotional distress if denied sex reassignment surgery, become depressed, and be at risk of committing suicide. Id. at 103. However, as described earlier, Dr. Schmidt recommended that instead of sex reassignment surgery, Kosilek be provided psychotherapy and

86

antidepressants, and be put on a "suicide watch" to keep him from succeeding in killing himself. Id. at 38-39, 91, 106.   As Dr. Schmidt described it, his approach would not be aimed at curing the mental illness that caused Kosilek's suffering, but at managing the symptoms of that illness to reduce the intensity of the suffering and the risk of suicide. Id. at 106.   In his opinion, this approach would be sufficient to diminish Kosilek's mental anguish to a point at which he no longer suffers serious harm from his gender identity disorder and, therefore, no longer has a serious medical need. Id. at 106-07.

Although Drs. Brown, Kaufman, Kapila, Appelbaum, and Forstein recommended sex reassignment surgery for Kosilek, if Dr. Schmidt's recommended alternative treatment for Kosilek is "of a quality acceptable within prudent professional standards," it would constitute adequate medical care for the purpose of the objective prong of the Eighth Amendment deliberate indifference standard. See DeCologero, 821 F.2d at 43.   Therefore, as described earlier, the court ordered the DOC to have UMass review the transcripts of the medical testimony and address, among other things, whether the "approach advocated by [Dr.] Schmidt constitutes 'adequate medical care' for Kosilek, meaning 'services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards.'"   June 29, 2006 Order at ¶2 (quoting Kosilek I, 221 F. Supp. 2d at 180).   After consulting Drs.

87

Kaufman and Kapila, in whom he continued to have confidence, Dr. Appelbaum explained in a lengthy letter, and credibly concluded, that "[t]he recommendations of Dr. Schmidt do not meet prudent professional standards." Ex. 90 at 6-7.

As also explained earlier, in a further effort to make a well-informed decision concerning whether Dr. Schmidt's recommended treatment for Kosilek constituted adequate medical care, pursuant to Federal Rule of Evidence 706, the court appointed Dr. Levine as an additional expert.

Dr. Levine's credible testimony at trial also contributes to the court's conclusion that Dr. Schmidt is not a prudent professional and his recommendations concerning Kosilek are not within the range that would be acceptable by prudent professionals. In his initial report to the court, Dr. Levine stated that, "[i]t is my opinion that Dr. Schmidt's view, however unpopular and uncompassionate in the eyes of some experts in GID, is within prudent professional standards." Ex. 98 at 18.  However, Dr. Levine's testimony demonstrated that the opinion expressed in his report was based on several erroneous assumptions and that in his view there were many respects in which Dr. Schmidt was not a prudent professional.[15]

---

[15]Even when the testimony is unequivocal, "[t]he court may not rubber stamp the conclusions reached by a court-appointed expert." Gonzalez v. Galvin, 151 F.3d 526, 535 (6th Cir. 1998). Rather, the court must recognize "that even an impartial expert can be wrong, and that the impartial expert must be subjected to the same evaluation of credibility as any other witness."

Most significantly, Dr. Levine testified that he did not believe a prudent professional would deny Kosilek sex reassignment surgery. In his view, Dr. Schmidt's recommendations would be a professionally prudent response to Kosilek's condition only if, for some reason such as cost or the fact that Kosilek was incarcerated, sex reassignment surgery was not an option. See Dec. 19, 2006 Tr. at 190, 201. Despite instructions by the court to the contrary, see Oct. 31, 2006 Order, in formulating the opinion expressed in his report Dr. Levine relied on the assumptions that Kosilek had not had the real life experience required by the Standards of Care and that Kosilek could not afford to pay for sex reassignment surgery. Id. at 180, 190. Eliminating these considerations and any security concerns, Dr. Levine opined that a prudent professional would not deny Kosilek sex reassignment surgery. Id. at 179, 190. Rather, he stated that, as contemplated by the Standards of Care, a prudent professional would write a letter recommending sex reassignment surgery, and stated that a "qualified mental health professional" working with patients with gender identity disorders would not adopt a uniform policy of refusing to write letters of recommendation, as Dr. Schmidt did. Id. at 164-65.

---

DeAngelis v. A. Tarricone, 151 F.R.D. 245, 247 (S.D.N.Y. 1993). This means, among other things, that the court must consider the reasons for the impartial expert's opinions and disregard them to the extent that they rely on unproven or erroneous assumptions. The court must also "decide how much of [the] witness's testimony to believe, and how much weight it should be given." First Circuit Pattern Jury Instr. 2.07 (6/14/02).

Dr. Levine also testified that antidepressants would not provide treatment for Kosilek's gender identity disorder. Id. at 174-75. According to Dr. Levine, a prudent professional would not deny an eligible individual in the community sex reassignment surgery and provide him with antidepressants instead. Id. at 176.

As indicated earlier, based on the credible evidence, the court finds that Dr. Schmidt is not a prudent professional and that the treatment that he proposed for Kosilek is not "of a quality acceptable within prudent professional standards." DeCologero, 821 F.3d at 43. Therefore, the court concludes that Dr. Schmidt's proposal would not provide adequate medical care for Kosilek's condition.

The court finds that Dr. Schmidt is not a prudent professional for several reasons. First, he does not accept certain fundamental features of the Standards of Care, which "describe the generally accepted treatment for individuals with gender identity disorders in the community." Kosilek I, 221 F. Supp. 2d at 166; see also Fields, 653 F.3d at 553; O'Donnabhain, 134 T.C. at 65-67. Contrary to the Standards of Care, Dr. Schmidt does not believe that sex reassignment surgery is ever medically necessary. In further contrast to prudent professionals who follow the Standards of Care, Dr. Schmidt will not write a letter recommending that an eligible patient receive sex reassignment surgery.

90

In addition, contrary to this court's conclusion, Dr. Schmidt does not believe that Kosilek has had the real life experience required by the Standards of Care because, in his view, it is not possible to have the required real life experience in prison. See June 7, 2006 Tr. at 78-79. This is one reason that he believes that sex reassignment surgery has not been shown to be medically necessary for Kosilek. See June 7, 2006 Tr. at 79. However, as Drs. Kaufman and Kapila wrote, in their response to Osborne's peer review of their evaluation of Kosilek, "[t]he point of having a [real life experience] is to provide the person with an awareness of what to expect in a different gender role." Ex. 53 at 154. Kosilek's real life experience living as a woman in prison provides him with an awareness of what to expect in a different gender role, as he is serving a life sentence and will never have the opportunity to live as a woman outside of prison. Indeed, the evidence at trial indicated that the prison environment has provided Kosilek with a an even more stringent "real life experience" test than many transsexuals have outside prison, because inmates are constantly under observation and any failure to live as a woman would be readily noted. Except for his assumption that Kosilek has not had a real life experience, Dr. Schmidt acknowledges that there are no medical contraindications to providing Kosilek sex reassignment surgery. See June 7, 2006 Tr. at 79.

91

In addition, Dr. Schmidt's opinion that Kosilek should not be provided sex reassignment surgery is not based on Kosilek's unique circumstances, but on Dr. Schmidt's categorical view, unsupported by the Standards of Care, that sex reassignment surgery for a prisoner is never justified. Such a "failure to consider an individual inmate's condition in making treatment decisions is . . . . precisely the kind of conduct that constitutes a substantial departure from accepted professional judgment, practice, or standards such as to demonstrate that the person responsible actually did not base the decision on such a judgment." Roe, 631 F.3d at 862-63 (internal quotation omitted); see also Soneeya, 2012 WL 105625, at *16; Kosilek I, 221 F. Supp. 2d at 193.

Moreover, the treatment Dr. Schmidt recommends, psychotherapy and antidepressants, would not treat the cause of Kosilek's intense mental anguish, but rather would only attempt to diminish its symptoms. As both Drs. Kapila and Appelbaum credibly testified, prudent medical professionals typically treat the cause of a disease or disorder, not merely the symptoms. Once again, absent genuine countervailing penological considerations, adequate medical care requires addressing the cause of the inmate's serious medical need rather than merely providing treatment to reduce the pain it causes. See Fields, 653 F.3d at 556; Wolfe, 130 F. Supp. 2d at 653; West, 571 F.2d at 162; Sulton, 265 F. Supp. 2d at 300.

92

In any event, the approach proposed by Dr. Schmidt would not reduce Kosilek's suffering to the point that he no longer had a serious medical need. As Drs. Kapila, Kaufman, Appelbaum, and Brown persuasively testified, antidepressants and psychotherapy would not eliminate Kosilek's distress or diminish it to the point where there was no longer a significant risk of serious harm.    Indeed, antidepressants could increase, rather than diminish, the risk of serious harm to Kosilek.   At times antidepressants may, as Dr. Kaufman testified, give a depressed person the emotional energy to kill himself that he would otherwise lack.   Kosilek has already attempted to kill himself while taking Prozac.[16]

Accordingly, the court finds that Dr. Schmidt is not a prudent professional.   His approach is not within the range of treatment that a prudent professional would prescribe, and the treatment he recommends is not adequate to treat Kosilek's serious medical need. While based on the evidence in this case, the court's conclusion concerning whether Dr. Schmidt is a prudent professional and his proposal for treating Kosilek is comparable to the Tax Court's assessment of his testimony in O'Donnabhain.   There, the Tax Court rejected Dr. Schmidt's characterization of the Standards of Care as "merely guidelines" rather than a true "community standard."

---

[16]At least one other transsexual prisoner reportedly also attempted suicide while taking Prozac.   See Wolfe, 130 F. Supp. 2d at 650-51.   In addition, it appears that De'lonta attempted to mutilate himself while taking Prozac. See De'Lonta, 330 F.3d at 635.

93

O'Donnabhain, 134 T.C. at 45. It also characterized Dr. Schmidt's view that sex reassignment surgery was not ever medically necessary, or medically necessary for O'Donnabhain, as "idiosyncratic and unduly restrictive." Id. at 75. This court agrees with that characterization of Dr. Schmidt's views.

In any event, Kosilek has proven that he has a serious medical need that has not been adequately treated because sex reassignment surgery is the only adequate treatment for it. Kosilek has, therefore, satisfied the objective prong of the deliberate indifference test. See Farmer, 511 U.S. at 835-47; Wilson, 501 U.S. at 298-99; DesRosiers, 949 F.2d at 18; De'Lonta, 330 F.3d at 634.

### 3. Kosilek Has Satisfied the Subjective Prong of the Deliberate  Indifference Test

As explained earlier, a prison official cannot be found to be deliberately indifferent to a prisoner's serious medical need unless he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837; see also Flanory, 604 F.3d at 254; Chance, 143 F.3d at 702; De'Lonta, 330 F.3d at 634.

As a threshold matter, it is usually necessary to identify the decisionmaker whose state of mind is to be analyzed. See Kosilek I, 221 F. Supp. 2d at 190; cf. Farmer v. Moritsugu, 163 F.3d at 614-15. Prior to trial the DOC stipulated that the defendant,

Commissioner Dennehy, was "the sole decision-maker for determining whether safety and/or security concerns prevent the provision of sex reassignment surgery to Kosilek." May 26, 2006 Second Amended Stipulations at ¶10. During trial, it was confirmed that this stipulation means that Dennehy should not be the focus for the court's determination of whether the defendant knew that Kosilek had a serious medical need for which sex reassignment surgery was medically necessary, but only for the purpose of deciding whether safety and security concerns precluded the provision of sex reassignment surgery. Ultimately, the defendant agreed that the court should focus on Dr. Appelbaum of UMass, rather than Dennehy, to determine whether the DOC knew that Kosilek was at a substantial risk of serious harm if not provided sex reassignment surgery. See Oct. 18, 2006 Tr. at 16; May 13, 2008 Tr. at 44. However, it was also confirmed that the court should focus on Dennehy to determine the relevant facts regarding the existence and implications of any good faith security concerns for the purpose of the subjective prong of the deliberate indifference standard. See Oct. 18, 2006 Tr. at 16. In Battista, however, the First Circuit stated that where, as here, the suit is against defendants only in their official capacities and seeks injunctive relief, it is unnecessary to sort out "the separate roles of individual defendants." 645 F.3d at 452.[17]

---

[17]UMass, Dr. Appelbaum, Dr. Arthur Brewer, Dr. Harrison O'Connor, Karen Dewees, and Correctional Medical Services, Inc.

95

On the record before the court, it does not matter whether Dennehy or Dr. Appelbaum is the focus for determining whether the relevant decisionmaker actually knew that Kosilek was at substantial risk of serious harm if he did not receive sex reassignment surgery. The evidence on the record clearly establishes that both Dr. Appelbaum and Dennehy were aware of facts from which they could infer that a substantial risk of serious harm to Kosilek existed, and drew the inference. See Farmer, 511 U.S. at 837.

As explained earlier, Dr. Appelbaum held this view and repeatedly expressed it to Dennehy. Dr. Appelbaum read the court's decision in Kosilek I at the time it was issued. Therefore, he was aware of the court's conclusion that "there is a high risk that Kosilek will harm himself if he does not receive adequate treatment for his severe mental illness." See 221 F. Supp. 2d at 165. Dr. Appelbaum also read and accepted the February 24, 2005 report of Drs. Kaufman and Kapila, which concluded that it was "quite likely" that Kosilek would attempt to commit suicide again if unable to change his anatomy. See Ex. 25 at 5.

Dr. Appelbaum communicated to the DOC on "many occasions" that there were risks of suicide and self harm if the recommendations of Drs. Kaufman and Kapila were not followed. See June 2, 2006 Tr. at 9. In a June 14, 2005 letter on which Dennehy was copied, Drs.

---

were originally named as defendants in this case in their official capacities. The claims against them were dismissed before trial.

Appelbaum and Brewer recommended sex reassignment surgery from a clinical perspective, describing, among other things, Drs. Kaufman and Kapila as having concluded that Kosilek "would likely attempt suicide in the event she were denied such treatment." Ex. 16. On September 1, 2005, Drs. Appelbaum and Brown wrote to the DOC regarding treatment recommendations involving Kosilek and other inmates with gender identity disorder, stating that "further delay in providing the recommended treatment likely will result in continued or increased levels of distress for each afflicted individual, with the possibility of self-inflicted injury." Ex. 42. Dennehy was copied on this letter too. In response to a court order, Drs. Appelbaum and Brewer also reviewed certain trial testimony and wrote to Dennehy on September 18, 2006, endorsing the testimony of Dr. Kaufman that Kosilek would face a substantial risk of serious harm if he did not receive sex reassignment surgery. See Ex. 90.

Dennehy also read the court's decision in Kosilek I, including the court's conclusion that Kosilek's gender identity disorder was causing him severe emotional distress, and accepted that as an accurate statement of Kosilek's condition. See June 19, 2006 Tr. at 86-87. In addition, Dennehy read the report of Drs. Kaufman and Kapila, and Dr. Appelbaum's letters about Kosilek, each of which discussed the likelihood that Kosilek's gender identity disorder could cause him to attempt suicide or inflict injuries upon himself. See Exs. 16, 25, 90. Finally, after being ordered to read the

97

medical testimony at trial, Dennehy stated that she credited the opinions of the clinicians and did not dispute that Kosilek's gender identity disorder constituted a serious medical need. See Oct. 18, 2006 Tr. at 11. Instead, she testified that only safety and security concerns were preventing Kosilek from receiving the prescribed treatment. Id. at 17.[18]

Kosilek has proven that both Dr. Appelbaum and Dennehy actually knew that Kosilek faced a substantial risk of serious harm. See Farmer, 511 U.S. at 837. Therefore, each knew that Kosilek had a serious medical need. See id.; McGuckin, 974 F.2d at 1059.

### 4. The Defendant's Stated Security Concerns are Pretextual and do not Justify Denying Kosilek Sex Reassignment Surgery

In view of the foregoing, Kosilek has proven that: he had a serious medical need; sex reassignment surgery is the only adequate treatment for it; and both the Commissioner of the DOC and UMass, which is responsible for making medical decisions for the DOC, know that Kosilek is suffering serious harm and will continue to do so

---

[18]This was the same position taken by Clarke. On May 7, 2008, Clarke informed the court that, like Dennehy, he did not "profess to have any clinical training that would enable [him] to render an opinion regarding the validity of the clinical opinions expressed at trial." Ex. 107. Those opinions included Dr. Appelbaum's advice to Dennehy that Kosilek was at substantial risk of serious harm if not provided sex reassignment surgery. Also like Dennehy, however, Clarke stated in his report to the court that "the safety and security concerns presented by the prospect of undertaking sex reassignment surgery for Michelle Kosilek are insurmountable." Id. Clarke subsequently testified and reiterated these views.

if not provided such surgery. However, the Commissioner claims that security considerations preclude providing the treatment DOC doctors have prescribed for Kosilek.

In essence, the court is required to determine whether the issue anticipated in Kosilek I truly exists and, if so, how it must be decided. As indicated earlier, in Kosilek I, the court wrote:

> It is conceivable that a prison official, acting reasonably and in good faith, could perceive an irreconcilable conflict between his duty to protect the safety of inmates and his duty to provide a particular inmate with adequate medical care. If so, his decision not to provide that medical care might not violate the Eighth Amendment because the resulting infliction of pain on the inmate would not be unnecessary or wanton. Rather, such a decision might be reasonable. The Supreme Court has held that "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Farmer, 511 U.S. at 845; see also White[], 849 F.2d [at] 325 [] ("Denial of medical care that results in unnecessary suffering in prison is inconsistent with contemporary standards of decency and gives rise to a cause of action under 42 U.S.C. §1983. Actions without penological justification may constitute an unnecessary infliction of pain.") (emphasis added).

221 F. Supp. 2d at 182.

This statement of the law has been confirmed and clarified by decisions since Kosilek I, particularly the First Circuit's 2011 decision in Battista, which, as explained previously, also involved the treatment of a transsexual by the DOC during the time Kosilek has been denied sex reassignment surgery. 645 F.3d at 449.

As indicated earlier, the Supreme Court has stated that to violate the Eighth Amendment "the offending conduct must be wanton." Wilson, 501 U.S. at 302. Where, as here, "the conduct is harmful

enough to satisfy the objective component of the Eighth Amendment claim, whether it can be characterized as 'wanton' depends upon the constraints facing the official."  Id. at 303 (internal citation omitted).

The duty to reasonably assure the security of the inmate, and others, is one of the realities of prison administration which may compete with a prison official's duty to provide an inmate medical care.  See Farmer, 511 U.S. at 833; Battista, 645 F.3d at 454-55. As the First Circuit stated in Battista:

> [S]ecurity considerations also matter at prisons . . . and administrators have to balance conflicting demands. The known risk of harm is not conclusive: so long as the balancing judgments are within the realm of reason and made in good faith, the officials' actions are not deliberate indifference.

645 F.3d at 454 (internal quotation omitted).  Therefore, if the decision to deny Kosilek sex reassignment surgery has been made in good faith and is based on reasonable security concerns, the court must defer to the DOC.  Id. at 454-55; Whitley, 475 U.S. at 321-22.

Deciding whether an official has acted in good faith requires that the court determine subjective intent.  "[S]ubjective intent is often inferred from behavior."  Battista, 645 F.3d at 453.  Among other things, deliberate indifference may be "evidenced by 'denial, delay, or interference, with prescribed health care.'"  Id. (quoting DesRosiers, 949 F.2d at 19).

As described below, in the instant case the court is persuaded that defendant's stated reasons for denying Kosilek the care the DOC

doctors have prescribed are not reasonable and made in good faith. Rather, they are pretextual. More specifically, Kosilek has not been denied sex reassignment surgery because of a good faith belief that his security, or anyone else's, could not be reasonably assured if he is provided sex reassignment surgery. Rather, the defendant has refused to provide the only adequate treatment for Kosilek's serious medical need in order to avoid public and political criticism. This is not a legitimate penological purpose. Therefore, the defendant's conduct is wanton and violates the Eighth Amendment.

This conclusion is based on a combination of corroborating considerations. They include the following.

Dennehy was the Deputy Commissioner of the DOC at the time of Kosilek I. She was then integrally involved in decisions by Maloney that the court found were motivated in part by the belief that sex reassignment surgery was not an appropriate use of taxpayer's money and that any such expenditure would be unpopular. See Kosilek I, 221 F. Supp. 2d at 162. She also participated in the decision to terminate the employment of Dr. Seil after he recommended sex reassignment surgery for Kosilek.

As described earlier, when Dennehy became Acting Commissioner in 2003, she immediately halted the provision of certain prescribed treatments for Kosilek and other transsexual prisoners, purportedly to review their cases, and long delayed decisions on such

101

treatments.    When Kosilek had completed a year of real life
experience taking hormones, Dr. Appelbaum, despite reservations
expressed on behalf of Dennehy, decided to engage the Fenway Clinic
doctors to perform an evaluation to determine whether Kosilek should
be provided sex reassignment surgery.   Departing from the DOC's
standard practice of relying on its doctors to retain specialists,
Dennehy had the DOC hire Osborne, who Dennehy knew opposed sex
reassignment surgery and had testified against allowing inmates
prescribed treatment for gender identity disorder in two other
states, to counter the Fenway Clinic's recommendation.   Dennehy then
testified falsely that her decision to  hire Osborne was not based
on Osborne's known opposition to ever providing a prisoner sex
reassignment surgery.

     Dennehy also testified falsely that she did not understand that
the DOC's doctors were recommending sex reassignment surgery as the
only adequate treatment for Kosilek.   Although Dennehy testified in
June 2006 that up to and during the trial UMass had not clearly
communicated to her whether it recommended sex reassignment surgery
as the only adequate treatment for Kosilek, this contention is not
credible.  As discussed earlier, on November 23, 2005, about eight
months before the trial, Dennehy wrote to Lappin, the Director of
the Bureau of Prisons that, "[o]ur medical providers[,] the
Commonwealth's medical school, is supporting their consultant's
recommendation for the surgery !!!!!!."  Ex. 88.   The court finds

that Dennehy was pretending not to understand UMass's treatment recommendations in order to delay having to announce that she would not allow Kosilek to receive sex reassignment surgery.

In addition, the court finds that Dennehy's purported safety and security concerns regarding the provision of sex reassignment surgery to Kosilek are pretextual and unreasonable. The process by which Dennehy decided that security concerns precluded the provision of sex reassignment surgery contributes to this conclusion. In making the initial security determination, Dennehy departed from the DOC's established, written procedure and did not get a recommendation from Spencer, as Superintendent of MCI Norfolk, before declaring to the media, and later to the court, that providing sex reassignment surgery for Kosilek would create insurmountable security problems. Dennehy did not get any advice from the experts that the DOC retained to testify on security issues at trial, Beeler and Dumond, before stating her position. Therefore, she did not rely on their opinions in forming her position and they are not relevant to the question of her good faith.

Similarly, Clarke did not consult Spencer about these security concerns or claim to have relied on the DOC's trial experts in deciding that he agreed with Dennehy's position. Rather, he merely reviewed some testimony, responded to questions posed by the DOC's trial counsel, and provided comments on the report that they

103

prepared for submission to the court.  As with Dennehy, Clarke's
position did not result from a process pursued with an open mind in
a good faith effort to determine whether security considerations
required denying Kosilek sex reassignment surgery.

In addition, the court finds that the purported security
considerations that Dennehy and Clarke claim motivated their
decisions to deny Kosilek sex reassignment surgery are largely false
and any possible genuine concerns have been greatly exaggerated to
provide a pretext for denying the prescribed treatment. Dennehy and
Clarke each ultimately accepted the DOC doctors' assessment that
Kosilek is suffering genuine mental anguish, and that there is a
substantial risk that he will again attempt to kill himself if not
provided sex reassignment surgery.  Yet they claim that they will
not permit him to receive that treatment in part because doing so
would encourage other prisoners to try to manipulate prison
officials by pretending to be similarly situated to Kosilek.
However, Dr. Brown testified in this case that he had "never seen"
a patient seek to remove his genitals, as Kosilek has, for the
purpose of gaining some other benefit.  May 30, 2006 Tr. at 113; see
also Kosilek I, 221 F. Supp. 2d at 164-65 ("As Dr. Marshall Forstein
persuasively put it, he has never known a 'heterosexual man want to
voluntarily give us his penis to get something like hormones.'").
The court agrees that there is no real risk that a male prisoner
will attempt to cut off his testicles unless he is suffering from

104

a severe gender identity disorder.   The court understands that some prisoners may threaten suicide in order to obtain something of value to them.   However, the court finds that a desire to deter such efforts by others did not motivate Dennehy's decisions concerning Kosilek and, in any event, would not be a reasonable justification for denying him adequate medical care for his serious medical need.

Dennehy also claimed that she was motivated to deny Kosilek sex reassignment surgery by her understanding that there is no one in Massachusetts to perform the sex reassignment surgery Kosilek requires and her belief that there is too great a risk that Kosilek would flee if transported to another state to receive it.   As discussed below, it is not now necessary or, indeed, permissible for the court to decide where Kosilek should receive such surgery.   That is a decision to be made by the DOC.   However, Massachusetts is a medical mecca and there may now be a doctor who regularly practices in the state who could perform the surgery.   In addition, Dr. Schechter, who is experienced in performing sex reassignment surgery, expressed a willingness to provide it to Kosilek in Massachusetts if he receives the sponsorship to do so that is required because Dr. Schechter is not licensed to practice in Massachusetts.

In any event, Dennehy knew that there are other states in which Kosilek's sex reassignment surgery could be performed, including Illinois, where Dr. Schechter is licensed.   Dennehy claimed,

105

however, that there is an unacceptable risk that Kosilek would flee if transported out of Massachusetts for the procedure. She justified her position in part on the fact that Kosilek fled Massachusetts after murdering his wife. Dennehy's purported concern that Kosilek would flee if transported to receive treatment is plainly pretextual. The DOC's Male Classification Manual, which is used to determine the level of the security risk posed by a prisoner, states with regard to how past flight should influence an inmate's security classification that "escapes or attempts to escape . . . do not include . . . fugitive from justice, resistance at time of arrest or other incidents in which custody is not determined." See Classification Manual at 2.[19]   More significantly, Dennehy knew

---

[19]On June 2, 2008, Kosilek moved to supplement the record to add the Classification Manual as an exhibit. See Plaintiff's Mot. for Leave to Supplement Record and for Rule 37 Sanctions. Defendant opposed its admission on relevance grounds. The court finds that the Classification Manual is relevant to Commissioners Dennehy and Clarke's assessment of Kosilek as a flight risk, which in turn is relevant to the credibility of their stated security concerns. Neither party challenges the reliability of the Classification Manual. The Classification Manual is admissible under the public records exception to the hearsay rule. See Fed. R. Evid. 803(8).

Moreover, the court may take judicial notice of the Classification Manual, as it is a record of a state agency not subject to reasonable dispute. See Brown v. Valoff, 422 F.3d 926, 931 n.7 (9th Cir. 2005) (taking judicial notice of the California Department of Corrections Operations Manual and stating, "'[w]e may take judicial notice of a record of a state agency not subject to reasonable dispute'" (quoting City of Sausalito v. O'Neill, 386 F.3d 1186, 1224 n.2 (9th Cir. 2004))).   The court may also take judicial notice of state regulations.   See Getty Petroleum Marketing, Inc., v. Capital Terminal Co., 391 F.3d 312, 325 n.19 (1st Cir. 2004) (Lipez, J., concurring) (stating that "[f]ederal courts and most state courts take judicial notice of

that Kosilek had never attempted to flee during the many times he was transported to medical appointments and court.   She did not truly believe that Kosilek would do so while being transported to get the treatment he had dedicated the past twenty years of his life to receiving.   Nor did she have a genuine fear that Kosilek would flee after the procedure, while still recovering from it.

Clarke too initially opined that Kosilek posed an unacceptable risk of flight if transported out of Massachusetts in part because he had fled the state after killing his wife.  See Ex. 107. However, Clarke ultimately testified that he could say "[w]ith some degree of certainty" that the DOC would "take all the precautions necessary to secure that transport, secure the place where it's going to take place, and care for [Kosilek] in terms of providing appropriate custody prior to returning [Kosilek] back to the state."   May 12, 2008 Tr. at 114.   Clarke also admitted that, in characterizing Kosilek as an escape and security risk, he had not reviewed

---

[state administrative] regulations" and citing McCormick on Evidence §335 ("State and national administrative regulations having the force of law will also be noticed, at least if they are published so as to be readily available.")); Roemer v. Board of Public Works of Maryland, 426 U.S. 736, 742 n.4 (1976) (taking judicial notice of rules and regulations adopted by the Board of Public Works of Maryland). Although the DOC's Classification Manual is not published in a regulation, it is referenced in two published regulations: 103 Mass. Code Regs. §420.06 and 103 Mass. Code Regs. §420.08(3)(d).

Accordingly, the court has considered the Classification Manual to be evidence in this case.   It is not essential, however, to the court's conclusions.

107

Kosilek's disciplinary record and classification history, reflecting Kosilek's record of excellent behavior in prison, and was unaware that Kosilek was in his late fifties and, therefore, was likely to be less dangerous than younger inmates. He acknowledged that these factors weigh in favor of a finding that Kosilek posed fewer security risks than he originally claimed.

Dennehy and Clarke also claimed that they denied Kosilek sex reassignment surgery because they could not reasonably assure his safety, or the safety of others, after the surgery. The court continues to recognize, as it did in Kosilek I, that "[p]rison officials must 'take reasonable measures to guarantee the safety of inmates,' as well as to provide them adequate medical care.'" 221 F. Supp. 2d at 194 (quoting Farmer, 511 U.S. at 832, and Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)); see also Battista, 645 F.3d at 454 (quoting Farmer, 511 U.S. at 833). As the DOC's experts, Beeler and Dumond, testified, there are real risks of sexual assault and other violence in prison. However, as indicated earlier, those experts did not express these views to Dennehy before she announced that security presented an insurmountable obstacle to providing sex reassignment surgery to Kosilek. Nor was Beeler sufficiently informed about the facts concerning Kosilek to be permitted to testify concerning any risk to, or posed by, Kosilek particularly.[20]

---

[20]The court has given little weight to the testimony of Dumond and Beeler because both experts failed to consider material aspects of Kosilek's history and personal characteristics in forming their opinions. Although Dumond

108

Nevertheless, there is superficial appeal to Dennehy's claim that there is an unacceptable security risk involved in either incarcerating someone who is anatomically a female in a male prison or placing a person who has murdered his wife in a female prison. The court, however, finds that these concerns were not reasonable, and did not actually motivate the decisions of Dennehy or Clarke to deny Kosilek sex reassignment surgery.   Rather, each of them ultimately agreed that it would be possible for the DOC to reasonably assure the safety of Kosilek and others after sex reassignment surgery by housing Kosilek in a segregated protective custody unit.

As explained below, it is not now necessary or permissible for the court to decide where Kosilek should be incarcerated after receiving sex reassignment surgery.   That is a matter that must be decided, reasonably and in good faith, by the DOC.   However, there are a range of potentially viable options, and this contributes to

_____

testified as to the general risks of sexual assault and violence in prisons and provided some testimony concerning Kosilek particularly, his opinions did not take into account Kosilek's history of being safely incarcerated in a male prison, while long living as a woman.   In addition, although Dumond testified as to the risks of housing Kosilek at MCI Framingham, this testimony was not based on any studies or literature, and was speculative. With regard to Beeler, as indicated earlier, he did not review Kosilek's medical records as he would normally do before making a decision regarding prescribed medical treatment for an inmate, and did not have sufficient facts concerning Kosilek to be qualified to express an opinion on any risk to, or posed by, Kosilek particularly.   Accordingly, the court limited his testimony to general security concerns and the reasonableness of those concerns.

109

the conclusion that the defendant's position that safety considerations present an insurmountable barrier to providing sex reassignment surgery is pretextual.

First, Kosilek could continue to be housed in the general population at MCI Norfolk, a male prison. Prior to the decision in Kosilek I, the defendant claimed it would be too dangerous to provide Kosilek female hormones, or even make-up, and allow him to remain at MCI Norfolk. See 221 F. Supp. 2d at 170. However, after the court's decision Superintendent Spencer found that doing so would not present any security concerns. See Ex. 21. Kosilek was then provided with hormones, make-up, and feminine apparel. He has been living at MCI Norfolk with breasts, long hair, makeup, and feminine clothes for many years. This has not provoked any assaults or created any other problems. In view of this history, neither Dennehy nor Clarke has provided a credible explanation for their purported belief that if Kosilek's genitalia are altered the risk to him and others at MCI Norfolk will be materially magnified.

Kosilek would much prefer to be incarcerated in the women's prison, MCI Framingham. That, however, is not his decision to make. The claims of Dennehy and Clarke that they have denied sex reassignment surgery for Kosilek in part because MCI Framingham is not sufficiently secure to prevent an escape by Kosilek, who has never attempted to flee, are not credible. There is conflicting testimony on whether Kosilek's mere presence at MCI Framingham would

110

disturb the "climate" of the prison and possibly provoke violence. The Superintendent, Bissonette, testified that it would. Dr. Appelbaum, who was in charge of the UMass mental health program at the DOC and was, therefore, familiar with the provision of mental health treatment in the DOC's prisons, stated that it was at most uncertain whether Kosilek would disrupt the "climate" at MCI Framingham, but that any "climate" issues could be managed.

In any event, as Dennehy and Clarke each acknowledged, there are alternatives to placing Kosilek in the general population of either MCI Norfolk or MCI Framingham. As they knew, the Interstate Corrections Compact, M.G.L. c. 125, App. §2-1 (2006) (the "ICC") could be used to transfer Kosilek to a prison in another state, where he would be less notorious and, therefore, at less risk of harm.    The ICC was used to transfer Joseph/Josephine Shanley, a transsexual who murdered his sister, from New Hampshire to Washington. Shanley was housed there in a women's prison so uneventfully that while Clarke was Commissioner of Corrections in Washington he did not know Shanley was in his custody.    The Commissioners' refusal to explore the option of an interstate transfer further undermines their credibility concerning the reason Kosilek has been denied sex reassignment surgery.

Most significantly, all of the responsible DOC officials testified that after sex reassignment surgery the safety of Kosilek and others could be reasonably assured if Kosilek was placed in a

111

segregated unit at either MCI Norfolk or MCI Framingham, in a form of protective custody.[21]  The conditions of incarceration they contemplated would be onerous for Kosilek.  After sex reassignment surgery, it may foreseeably be argued that keeping Kosilek in segregation is unnecessary and a form of extrajudicial punishment that is prohibited by the Eighth Amendment.

That issue, however, is not now before the court.  Indeed, it may never be.  In Battista, "for some time, the defendants portrayed the choice facing the court as one between keeping Battista in a severely constraining protective custody unit and denying her hormone therapy."  645 F.3d at 455.  However, "[f]inally faced with a decision by the district court to require therapy, defendants . . . offered to create a modified protective custody arrangement that would provide Battista and others with both protection from

---

[21]More specifically, Dennehy testified that it was not "truly impossible" for the DOC to provide a safe and secure place of incarceration for Kosilek if he had sex reassignment surgery. See June 20, 2006 Tr. at 53.  Rather, after sex reassignment surgery "the only acceptable result from [Dennehy's] perspective would be placement in either . . . at Norfolk, the Special Management Unit, or at Framingham in the Closed Custody Unit, in 23 hour lock down." Id.; see also id. at 77.

Clarke agreed, stating that he could and would place Kosilek in the Special Management Unit at MCI Norfolk after surgery.  See May 12, 2008 Tr. at 50-51; Ex. 107.  As then Superintendent of MCI Norfolk, Spencer also testified that he could and would place Kosilek in that unit at MCI Norfolk.  See June 9, 2006 Tr. at 52-53.  Bissonnette testified that if Kosilek were assigned to MCI Framingham after sex reassignment surgery, she would place Kosilek in the Closed Custody Unit at MCI Framingham "for as long as [Bissonnette] felt that the security and operation of the institution were at risk." June 21, 2006 Tr. at 42.

112

other residents and 'access to treatment, work, educational programs, and recreation.'" Id. at n.5. The DOC may decide that the same measures would be appropriate for Kosilek after he receives sex reassignment surgery.[22]

The immediate issue is limited to whether the defendant reasonably and in good faith determined that security concerns required denying Kosilek the only adequate treatment for his serious medical need. See Battista, 645 F.3d at 454. Kosilek has proven the defendant did not make that decision in good faith or reasonably, but rather delayed and interfered with the prescribed treatment based on pretextual and unreasonable security concerns. Such a pattern of prevarication, "denial," "delay," and "interference" has contributed to judicial findings that the DOC had violated the Eighth Amendment rights of other transsexual inmates. See Battista, 645 F.3d at 455 ("It was only after what the judge perceived to be a pattern of delays, new objections substituted for old ones, misinformation and other negatives that he finally concluded that he could not trust the defendants [with regard to whether hormones should be provided]. . . . [T]he record contains support for [this] conclusion.");[23] Soneeya, 2012 WL 1057625, at *5

---

[22]The possibility of a special unit for transsexual prisoners was discussed in the testimony at the trial of Kosilek I and of the instant case.

[23]As the First Circuit further explained in Battista:

First, for some time, the Department refused to take the GID diagnosis and request for hormone therapy seriously.

(finding deliberate indifference where the DOC's response to transsexual plaintiff's "requests for treatment has been characterized by a series of delays, bureaucratic mismanagement, and seemingly endless security review with no clear rhyme or reason"); Brugliera, 2009 U.S. Dist. LEXIS 131002, at *33 (finding that defendant had acted with deliberate indifference in relying on "exaggerated security risks" to avoid providing adequate care to inmate and defendant had demonstrated no willingness to consider abiding by the treatment advice of the DOC's medical professionals for over three-and-a-half years); see also Todaro, 565 F.2d at 52 ("[A] series of incidents closely related in time . . . may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners.") (internal quotation omitted).

Accordingly, the court finds that defendant's decision to deny Kosilek sex reassignment surgery was not based on good faith

---

Its representatives resisted it in other cases, and when their own medical advisers supported the request for Battista, the defendants went back and forth apparently looking for an out.   It may take some education to comprehend that GID is a disorder that can be extremely dangerous.   But the education seems to have taken an unduly long time in this instance, especially in light of the self-mutilation attempt.

645 F.3d at 455.

District Judge Douglas P. Woodlock characterized the period from about 2004 to 2008, which included all of Dennehy's tenure as Commissioner, as "the period of obstruction of the clinicians' diagnosis and treatment." Battista v. Dennehy, 05-11456-DPW, Aug. 23, 2010 Tr. at 52. As described above, this court has relied on the evidence in the instant case to reach the same conclusion.

114

and reasonable security concerns, and is not entitled to deference. Rather, the court finds that the decision to deny Kosilek sex reassignment surgery was made to avoid political and public criticism. Dennehy and her successor, Clarke, had an unusual motive to deny Kosilek the treatment that DOC doctors prescribed and to testify falsely about their reason for doing so. Issues concerning medical care for prisoners rarely attract political or public attention. In this case, however, the Lieutenant Governor in whose administration Dennehy served publicly expressed her opposition to Kosilek receiving sex reassignment surgery. A State Senator, who was close to Dennehy, called her to discuss the television piece Dennehy was facilitating and then introduced legislation to prohibit the DOC from paying for sex reassignment surgery.

When the court ordered Clarke to reconsider the issue when he became Commissioner, many Senators and State Representatives immediately wrote to him to express their strong opposition to the idea of public funds being used for a prisoner's sex change operation. See Ex. 111, 112. More specifically, on April 4, 2008, three days after the court instructed Clarke to review some of the testimony and reconsider the issue, seventeen State Senators sent a letter to Clarke, stating:

> We write to you today to express our concern about recently published reports pertaining to your interest in reviewing the sex-change/hormone therapy case of convicted murderer Robert Kosilek. It is our opinion that taxpayer's money should not be used for such procedures.

115

> Due to the present condition of our state's economic situation, along with our opposition to Mr. Kosilek's argument that the state should bear responsibility for paying for these treatments, we urge you to deny his request.
>
> The granting of this request would not only be an affront to the taxpayers of the Commonwealth, but would also raise a significant security risk. A decision in favor of Mr. Kosilek would lead to negative consequences for his safety and send the wrong message to the citizens of Massachusetts in the ability of their government to effectively use state funds to manage corrections facilities.

Ex. 111. The Senators' reference to "the wrong message" would have reasonably been interpreted as a veiled threat that appropriations for the DOC might be reduced if Clarke reversed Dennehy's position. On April 8, 2008, 25 State Representatives wrote to Clarke to express "outrage" at the request that taxpayers fund a "sex-change" operation for Kosilek. Ex. 112.

In addition, as described earlier, over many years, the media consistently published articles, columns, and editorials opposing the provision of sex reassignment surgery to prisoners generally and Kosilek particularly, often ridiculing the idea and specifically opposing the expenditure of taxpayer funds to provide such treatment.

As stated earlier, elected officials, the media, and members of the public have every right to express their opinions on matters of interest to them. Nevertheless, prison officials must comply with the Eighth Amendment, and cannot deny prisoners adequate

116

medical care because of cost concerns, or fear of political controversy or public criticism.

As explained previously, it is not legally permissible to deny a prisoner adequate medical care because the required treatment would be expensive. See Ancata, 769 F.2d at 705; Harris, 941 F.2d at 1509; Durmer, 991 F.2d at 68-69; Chance, 143 F.3d at 703-04; Jones, 781 F.2d at 771; Rosado, 349 F. Supp. 2d at 1349; Renelique, 2003 WL 230323771, at *15; Gates, 501 F.2d at 1320. In the instant case, however, the court does not find that the defendant has denied Kosilek the sex reassignment surgery prescribed for him primarily because it would be expensive. The DOC provides many prisoners with Hepatitis B medication that costs $18,000 a year. Other prisoners receive dialysis, which is also costly.

In this case, the defendant has denied Kosilek sex reassignment surgery because of the belief that the idea of providing such treatment for a transsexual who murdered his wife is offensive to many members of the community, many of their elected representatives, and to the actively interested media as well. Dennehy, who formulated the position of the DOC, and her successors have denied Kosilek the prescribed sex reassignment surgery to avoid controversy, criticism, and, indeed, ridicule, and scorn. This represents an abdication of the defendant's responsibility to obey the requirements of the Eighth Amendment.

117

Once again, it is important to recognize that, "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials, and to establish them as legal principles to be applied by the courts." Barnette, 319 U.S. at 638. Therefore, "[t]he right to be free of cruel and unusual punishment, like other guarantees of the Bill of Rights, may not be submitted to vote; it depends on the outcome of no elections." Furman, 408 U.S. at 268 (Brennan, J., concurring) (internal quotation omitted). Even prisoners who have committed the most despicable or controversial crimes are protected because "Eighth [A]mendment protections are not forfeited by one's prior acts." Spain, 600 F.2d at 194.

In summary, the court is persuaded that the decision to deny Kosilek sex reassignment surgery is not the result of a good faith balancing judgment and is not reasonable. See Battista, 645 F.3d at 454. Rather, that decision was based on fear of criticism and controversy, articulated at times as a concern about cost to the taxpayer. Neither cost nor fear of controversy is a legitimate penological objective. This court may not defer to the defendant's decision to deny Kosilek sex reassignment surgery because deference does not extend to "actions taken in bad faith and for no legitimate purpose." Whitley, 475 U.S. at 322; see also Battista, 645 F.3d at 454. Because there is no penological justification for denying

Kosilek the treatment prescribed for him, he is now being subject to the "unnecessary and wanton infliction of pain" prohibited by the Eighth Amendment.  Hope, 536 U.S. at 737 (internal quotation omitted); see also White, 849 F.2d at 325.  Therefore, Kosilek has proven that, as in Battista, the DOC has violated the Eighth Amendment by being deliberatively indifferent to his serious medical need. 645 F.3d at 455.

> 5.  Defendant's Deliberate Indifference Will Continue and, Therefore, Kosilek is Entitled to a Narrowly-Tailored Injunction

In Kosilek I, the court warned that:

If . . . concerns about cost or controversy prompt [the Commissioner] to deny Kosilek adequate medical care for his serious medical need, [the Commissioner] will have violated the Eighth Amendment. Kosilek will then likely be entitled to the injunction that he has unsuccessfully sought in this case.

221 F. Supp. 2d at 162. This warning was not heeded and the requirements for an order directing the DOC to provide Kosilek sex reassignment surgery have now been met.

The Supreme Court stated the standards for obtaining injunctive relief in Farmer, writing in part:

In a suit such as petitioner's, insofar as it seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct: their attitudes and conduct at the time suit is brought and persisting thereafter. . . . [T]o establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.  In so doing, the inmate may rely, in the district court's

119

discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction. If the court finds the Eighth Amendment's subjective and objective requirements satisfied, it may grant appropriate injunctive relief. Of course, a district court should approach issuance of injunctive orders with the usual caution, and may, for example, exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction.

511 U.S. at 845-47 (internal quotations, citations, and footnote omitted).

This court understands and shares the Supreme Court's view that "a district court should approach the issuance of injunctive orders with . . . caution." Id. at 846-47. Indeed, when asked during the pendency of the instant matter to mediate a case brought in response to the high number of suicides by mentally ill inmates in the custody of the DOC, this court:

informed the parties of its view that judges should become involved in the administration of prisons only as a last resort and then only to the most limited extent necessary. It urged the parties to develop a settlement that would be consistent with these principles or risk having any proposed resolution requiring judicial approval rejected by the court.

Disability Law Ctr., 2012 WL 1237760, at *1 (footnote omitted).

Like the district judge in Battista, this court has been "far from anxious to grant the relief sought" unnecessarily because of its strong preference for having prison officials discharge their duties by properly making decisions concerning the medical care inmates require. 645 F.3d at 455. However, beginning with hormone

therapy, for more than a decade the DOC has refused to provide
Kosilek with the medical care its doctors deemed necessary and
prescribed. Although the court found Commissioner Maloney to have
been motivated in part by concerns about cost and controversy, in
Kosilek I the court did not find him deliberately indifferent in
part because it found that he had not actually drawn the inference
that Kosilek was at substantial risk of serious harm if he did not
receive adequate treatment. See 221 F. Supp. 2d at 161, 189-192.
In addition, the court found that, instructed as to his obligations
by the decision in Kosilek I, the Commissioner was not likely to be
indifferent to Kosilek's serious medical needs in the future. Id.
at 193-95.

The court's trust proved to be misplaced when Dennehy succeeded
Maloney as Commissioner. In Kosilek I, "[t]he court fully accept[ed]
Maloney's testimony that if the doctors from the University of
Massachusetts who are engaged to provide mental health care to
inmates decided to bring in a specialist to treat Kosilek, he would
not interfere . . . Indeed, Maloney sincerely believe[d] that he
ha[d] 'never in [his] career interfered with a doctor's order for
treatment and [had] no intention of doing so in the future,' with
regard to Kosilek or anyone else." Id. at 176.

However, as described earlier, immediately upon becoming Acting
Commissioner Dennehy began interfering with the treatment prescribed
by the specialists engaged by UMass. In an effort to ascertain

121

whether Dennehy would refuse to permit Kosilek to have sex reassignment surgery if more fully informed, the court ordered her to read certain trial testimony. However, Dennehy persisted in denying Kosilek the treatment the DOC doctors had prescribed. In an attempt to determine whether the treatment advocated by Dr. Schmidt was, or was believed to be, within prudent professional standards, the court ordered Dr. Applebaum of UMass to provide his view on this question for the purpose of both the objective and subjective prongs of the deliberate indifference test. When Dr. Applebaum opined that Dr. Schmidt was not a prudent professional, the court appointed Dr. Levine as an impartial expert to assist it in deciding that question as it related to the objective prong of the test. When Clarke succeeded Dennehy as Commissioner, the court ordered him to review the matter and state his position on whether Kosilek would be provided sex reassignment surgery.

However, the DOC has persisted in presenting pretexts for impermissible reasons for denying Kosilek the treatment its doctors have prescribed. This is part of a pattern of unconstitutional conduct by the DOC with regard to transsexual prisoners that has been demonstrated in other cases. See Battista, 645 F.3d at 455 ("In the end, there is enough in this record to support the district court's conclusion that 'deliberate indifference' has been established – or an unreasonable professional judgment exercised – even though it does not rest on any established sinister motive or

'purpose to do harm.'"); Soneeya, 2012 WL 1057625, at *17 ("[G]iven the DOC's long history of obstruction and delay, it is likely that the DOC will persist in not providing Ms. Sooneya with an individualized evaluation by a qualified medical professional.")[24]; Brugliera 2009 U.S. Dist. Lexis 131002, at *26, *33 (granting preliminary injunction after finding that purported security

---

[24]In Soneeya, the court was addressing, in part, a policy the DOC adopted in 2010 which categorically prohibits sex reassignment surgery because of "overwhelming safety and security concerns." 2012 WL 1057625, at *8. As demonstrated, such concerns are pretextual and do not exist in Kosilek's case. The DOC policy described in Soneeya is just the type of categorical approach to denying treatment that this court found to be unlawful in Kosilek I, 221 F. Supp. 2d at 171, 186-87, and the Seventh Circuit condemned in Roe, 631 F.3d at 862-63. The fact that the DOC adopted this categorical prohibition after the decision in Kosilek I and the trial of this case reinforces the court's conclusion that it is not appropriate to give prison officials further time to rectify the situation before issuing an injunction. See Farmer, 511 U.S. at 847.

Kosilek filed a motion to supplement the record with and/or take judicial notice of the DOC's 2010 policy, published as 103 DOC 652 on the DOC's website, on gender identity disorder. See Feb. 2, 2010 Plaintiff's Mot. to Supplement the Record or in the Alternative Request for Judicial Notice. The defendant did not file an opposition. The policy is admissible under the public records exception to the hearsay rule. See Fed. R. Evid. 803(8).

In addition, the court may take judicial notice of the policy, as a record of a state agency not subject to reasonable dispute, see Brown, 422 F.3d at 931 n.7, or as a state regulation, see Getty, 391 F.3d at 325 n.19 (Lipez, J., concurring). However, while the 2010 policy prohibiting sex reassignment surgery for inmates is consistent with the court's conclusion that the DOC will not provide the prescribed treatment for Kosilek in the future without a court order, the court has not relied upon it in reaching its factual and legal conclusions, largely because it has not heard any testimony concerning that policy.

123

concerns about providing hormones were pretextual and stating that, "given that [the DOC] has demonstrated no willingness to consider abiding by the treatment advice of the DOC's medical professionals for over three-and-a-half years now, the court sees no reason to believe that the [DOC's] deliberate indifference is likely to cease in the future").

In these circumstances, even without regard to the DOC's conduct in other cases, the court is persuaded that defendant's violation of Kosilek's Eighth Amendment rights will continue in the future unless the court grants Kosilek relief now. This court believes deeply in the principle of judicial restraint. However, as explained earlier, the Supreme Court has instructed that, "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution." Procunier, 416 U.S. at 405. Therefore, an appropriate injunction must issue.

The PLRA establishes the proper scope of injunctive relief. See 18 U.S.C. §3626. It provides, in part, that:

Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

124

18 U.S.C. §3626(a)(1)(A).

The federal right violated in the instant case is Kosilek's Eighth Amendment right to the only adequate treatment for his serious medical need, sex reassignment surgery. Therefore, the DOC is being ordered to provide Kosilek that treatment. The court finds that there is no less intrusive means to correct the prolonged violation of Kosilek's Eighth Amendment right to adequate medical care.

In part because of the requirement that prospective relief be narrowly drawn, the court is not deciding who should perform the necessary surgery or where it should be done. That is up to the DOC.

Similarly, the court is not now deciding where Kosilek should be incarcerated after the surgery. The DOC has the discretion to make good faith, reasonable decisions concerning security if the surgery genuinely creates or increases any risk to Kosilek or others. If the DOC decides that Kosilek must be segregated and locked up 23 hours a day to reasonably assure his safety, it is foreseeable that the court may be asked to decide whether that decision is reasonable and made in good faith. See Battista, 645 F.3d at 454. That issue, however, is not now ripe for resolution.

Rather, the court is issuing only an injunction that is narrowly drawn, extends no further than necessary to correct the continuing violation of Kosilek's Eighth Amendment right to adequate

medical care for his serious medical need, and is the least intrusive means necessary to correct the violation of that right. See 18 U.S.C. §3626(a)(1)(A). It is doing so after carefully considering the defendant's purported security concerns and finding that with regard to Kosilek they are either pretextual or can be dealt with by the DOC. The court is allowing the DOC to decide how any real security issues, or other issues, should be addressed. Id. Therefore, the injunction being issued satisfies the requirements of the PLRA.

IV. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Judgment shall enter for plaintiff Michelle Kosilek.

2. Defendant shall take forthwith all of the actions reasonably necessary to provide Kosilek sex reassignment surgery as promptly as possible.

3. The possible award of reasonable costs and attorneys fees, pursuant to 42 U.S.C. §1988, is reserved for future consideration.


                           /s/ MARK L. WOLF
                           UNITED STATES DISTRICT JUDGE


126