UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHELLE L. KOSILEK,                )
         Plaintiff,                 )
                                    )
         v.                         )  C.A. No. 00-12455-MLW
                                    )
LUIS S. SPENCER, in his official    )
capacity as Commissioner of the     )
Massachusetts Department of         )
Correction,                         )
         Defendant                  )

ORDER

WOLF, D.J.                                      May 29, 2013

     The court has read Plaintiff Michelle Lynne Kosilek's Response
to the Court's May 3, 2012 Order and Defendant's April 30, 2013
Status Report, which was filed under seal ("Kosilek's Response").
A redacted version of that submission is being made part of the
public record.

     Kosilek's Response demonstrates that plaintiff has violated
paragraph 2(b) of the November 20, 2012 Order, which states in
pertinent part that, "Each report [of defendant Luis Spencer], and
the information it contains, may be provided by counsel to Kosilek
and those assisting counsel in this case, and may be used solely
for the purpose of monitoring and litigating matters in this case."
More specifically, Kosilek's Response reveals that in violation of
the November 20, 2012 Order Kosilek disclosed information contained
in Spencer's reports to a friend who serves as Kosilek's health
care proxy. In addition, also in violation of that Order, Kosilek

used the information improperly shared with his friend to communicate with a doctor being consulted by defendant as a possible candidate to perform the Sex Reassignment Surgery that the court has ordered.

Kosilek's Response suggests that he may claim a lack of knowledge of the terms of paragraph 2(b) of the November 20, 2012 Order as a defense in any possible civil and/or criminal contempt proceedings. Kosilek represents that he now "understand[s] that the information contained in the DOC's status reports is confidential and cannot be shared with or disclosed to any individuals other than the parties to this case, their counsel and those acting at counsel's direction." Aff. of Michelle Lynne Kosilek in Response to the Court's May 3, 2013 Order ¶11. Therefore, a finding of civil contempt does not appear to be necessary to coerce future compliance with the Order Kosilek violated. In addition, contempt proceedings are necessarily time-consuming and, as Kosilek is already serving a life sentence, even if justified, a finding of criminal contempt may not be meaningful.

In order to provide the court an opportunity to consider how to proceed in these circumstances, the defendant is being relieved of his obligation to provide counsel for Kosilek a copy of the monthly report due to be filed on May 31, 2013. In addition, Kosilek is admonished to understand that, as the Supreme Court reiterated in Farmer v. Brennan, "'[a]n appeal to the equity

2

jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity.'" 511 U.S. 825, 847 (1994) (quoting Meredith v. Winter Haven, 320 U.S. 228, 235 (1943)). As an injunction is an equitable remedy, this means that future inequitable conduct by Kosilek could threaten the injunction mandating Sex Reassignment Surgery that Kosilek persuaded the court is necessary and appropriate in this case. Cf. Cablevision of Boston, Inc. v. Pub. Improvement Comm'n of the City of Boston, 38 F. Supp. 2d 46, 53 (D. Mass. 1999) (citing cases).

In view of the foregoing, it is hereby ORDERED that:

1. The attached redacted version of Kosilek's Response is made part of the public record.

2. Unless and until otherwise ordered, defendant shall not serve on Kosilek's counsel the report for May 2013, to be filed pursuant to paragraph 2(b) of the November 20, 2012 Order, as modified by the January 18, 2013 Memorandum and Order.

UNITED STATES DISTRICT JUDGE

REDACTED VERSION

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHELLE LYNNE KOSILEK, <br><br> Plaintiff, <br><br> v. <br><br> LUIS S. SPENCER, in his official capacity as Commissioner of the Massachusetts Department of Correction, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) Civil Action <br> ) No. 00-12455-MLW <br> ) **FILED UNDER SEAL** <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF MICHELLE LYNNE KOSILEK'S RESPONSE TO THE COURT'S MAY 3, 2013 ORDER AND DEFENDANT'S APRIL 30, 2013 STATUS REPORT (REDACTED)

Plaintiff Michelle Lynne Kosilek ("Kosilek") submits this pleading: (1) to respond to this Court's May 3, 2013 Order and (2) to address the April 30, 2013 status report filed by defendant Luis S. Spencer, Commissioner of the MA Department of Corrections (the "DOC"). The May 3, 2013 Order required Kosilek to: "file, under seal, an affidavit addressing: whether the referenced email was sent on [her] behalf; if so, attaching a copy of the email; and, if so, seeking to explain why the message did not constitute a violation of paragraph 2(b)" of this Court's November 20, 2012 Order. May 3, 2013 Order, ¶ 2. In compliance with the May 3, 2013 Order, Kosilek files herewith an affidavit, as well as redacted versions of her affidavit and of this response, that the Court may make part of the public record.

For the reasons stated in Part I, this Court should not enter a finding of contempt as to Kosilek. For the reasons stated in Part II, however, the defendant is in violation of this Court's orders of November 20, 2012 and January 18, 2013 and this Court should require compliance.

REDACTED VERSION

**I.**     **Plaintiff's Response to this Court's May 3, 2013 Order**

**A.**     **The Circumstances and Contents of Plaintiff's Email to Dr. ███.**

1.     On November 20, 2012, this Court entered an Order requiring the defendant to file monthly reports "describing the actions he has taken, and any progress he has achieved, in preparation to provide Kosilek sex reassignment surgery promptly if the September 4, 2012 decision is affirmed." November 20, 2012 Order, ¶ 2(b). The Order further stated that "[e]ach report, and the information it contains, may be provided by counsel to Kosilek and those assisting counsel in this case, and may be used solely for the purpose of monitoring and litigating matters in this case. Any disclosure of a report or the information that it contains which is not authorized by this Order may be deemed a civil and/or criminal contempt." *Id.* Pursuant to this Court's November 20, 2012 Order, plaintiff and her counsel have reviewed the DOC's monthly status reports to monitor whether the DOC is making appropriate progress in preparing for her surgery. *See* Michelle Lynne Kosilek's Affidavit in Response to the Court's May 3, 2013 Order ("Kosilek Aff."), ¶¶ 9-10.

2.     After reviewing the DOC's April 1, 2013 status report, Kosilek learned that Dr. ██████████, M.D. of ███████████ was under consideration to perform her sex reassignment surgery ("SRS") in the event that this Court's September 4, 2012 Order is affirmed. On April 3, 2013, Kosilek sent an email to Dr. ███ and the following exchange ensued:



> April 3, 2013 email from Kosilek to Dr. ███: "Dear Dr. ███,
> I have been informed that you have been chosen to do my surgery.
> Please share your opinion about the necessity of ███████
> ████████ with the Department of Corrections
> and ███████████, to avoid any more unnecessary delays.
> My concern about delay is because of the six week wait between
> treatments if ███ is chosen over ███████. Thank you very

REDACTED VERSION

much.  Looking forward to meeting with you.  Sincerely, Michelle
Lynne Kosilek"

April 7, 2013 email response from Dr. ███ to Kosilek (at 12:25
PM): "M: Thanks for you[r] email.  You are correct, there is a need
to ██████████████████████ prior to a penile inversion
vaginoplasty and either ██████████ or ████████████ both
work well.  However, I have not received any word from the
Department of Corrections, so I am reluctant to start giving you
specific advice until we have confirmation.  I will get the needed
information out as soon as I hear from them.  Thx. ███"

April 7, 2013 response from Kosilek to Dr. ███ (at 2:04 PM):
"My impression was that the DOC told the court that they were
only waiting for a response from you to Dr. Groblewski on your
compensation, and that they are not considering any other surgeons
at this point.  Thank you [f]or your response, and I will patiently
wait, as I have for 22 years!  Sincerely, Michelle  PS- This email is
coming to you through my friend who is also my Health Care
Proxy…"

April 7, 2013 response from Dr. ███ to Kosilek (at 3:07 PM): "I
have been away for over a week, so there may be some hard-copy
correspondence waiting when I get back to the office on Tuesday.
███"

Kosilek Aff., ¶ 8 and Exhibit B attached thereto.

3.      Kosilek's emails were sent on her behalf by Dr. ████████████, a licensed

psychologist in private practice in ██████████, who has been a friend of Kosilek's for many

years and is her designated health care proxy.  *See* Kosilek Aff., ¶ 5.  Dr. ███ has established

and administers an email account in Kosilek's name that Kosilek uses from time to time to make

inquiry of experts in the field regarding issues in her treatment.  Kosilek first contacted Dr.

███, a recognized specialist, with such an inquiry several years ago after SRS was

recommended by UMass consultants in 2006.  *Id.*, ¶ 7.

4.      Plaintiff was generally familiar with the terms of the Court's November 20, 2012

confidentiality order.  She reached out to Dr. ███ regarding the pre-surgical preparation

3

REDACTED VERSION

necessary for her treatment, an issue of enormous concern to her particularly since this Court's order of September 4, 2012. Plaintiff has not communicated any of the confidential information set forth in the DOC's status report to any other prisoner, or to anyone else, other than to Dr. ▆▆▆ as necessary for communication with Dr. ▆▆▆. *Id.*, ¶ 4.

5.      After receiving this Court's Order of May 3, 2013, Kosilek conferred with her counsel regarding the November 20, 2012 confidentiality order. Kosilek Aff., ¶¶ 10-11. As a result of that conference, Kosilek understands that she may not communicate with Dr. ▆▆▆ or with anyone else identified by the DOC in a status report except through such protocols as may be expressly approved by the DOC, or the Court, at such time as such person is officially retained in connection with her treatment. *Id.* Kosilek will not attempt further direct communications except pursuant to such protocols. *Id.*

**B.      Plaintiff's Email Did Not Constitute A Violation of Paragraph 2(b) of the November 20, 2012 Order.**

6.      This Court's November 20, 2012 Order provides that: "Each report, and the information it contains, may be provided by counsel to Kosilek and those assisting counsel in this case, and may be used solely for the purpose of monitoring and litigating matters in this case. Any disclosure of a report or the information that it contains which is not authorized by this Order may be deemed a civil and/or criminal contempt." November 20, 2012 Order at 2.

**i.      Plaintiff's Communication With Dr. ▆▆▆, Although Perhaps Not Of The Type Or Content That Either The Court Or Counsel Envisioned, Was Made In Her Good Faith Belief That She Was "Monitoring And Litigating Matters In This Case."**

7.      Plaintiff actively monitors her own health care and treatment. Kosilek Aff., ¶ 7. Since the Court's September 4, 2012 decision ordering surgery, she has been anxious about the deferral of surgery and eager to have her procedure this year, in the event that the decision is

REDACTED VERSION

affirmed. *Id.*, ¶ 12. She worries that the DOC will not make timely pre-surgery preparations, including not only decisions regarding the logistics of which physician is to be retained to perform the surgery, where it will take place, transport, etc., but also regarding a pre-surgical plan to prepare her physically. *Id.* Among other things, plaintiff is concerned (apparently validly so) that the need for ███████████████ prior to surgery, a multi-month treatment process, may substantially delay her surgery. *Id.*, ¶ 18. In early January 2013, Plaintiff had brought this issue to the attention of the DOC through her long-time treating staff clinician Mark Burrowes, but received no response.[1] *Id.*, ¶ 13.

8.      The need for a pre-surgical plan addressing ███████████████ was the subject of plaintiff's April 3, 2013 email to Dr. █████. Indeed, Dr. ██████ responded to plaintiff's email, confirming ██████████ or █████████████ is a medically necessary pre-surgery procedure. Plaintiff is concerned that such ██████████████ or █████████ could materially delay her surgery because these treatments take time. Kosilek Aff., ¶ 18. ███████████ often requires several treatments, with up to a six-week wait in between treatments to determine efficacy by ruling out ██████████. *Id.* The lack of response from the DOC has increased her anxiety and frustration that the proper pre-surgery preparations are not (and seemingly would not be) taking place without her bringing it to the DOC and Dr. █████'s attention. *Id.*, ¶ 17-18.

## ii.   The Communication Did Not Apparently Contravene Any Of The Concerns Articulated By The Court Or Defendant When The Order Was Entered.

9.      In seeking a confidentiality order, defendant argued that "if information identifying possible surgeons and surgery locations were leaked to members of the public, it could adversely impact the willingness of surgeons and facilities to agree to participate in the

---

[1] Plaintiff received confirmation as early as December 18, 2012 from GID specialist Dr. ████████that plaintiff would "definitely require ████████████████████████ prior to surgery. *See* Kosilek Aff., ¶ 13 and <u>Exhibit C</u> attached thereto. Plaintiff forwarded Dr. ██████letter to DOC officials Drs. Groblewski, Weiner and Deiner on January 15, 2013. *Id.*

REDACTED VERSION

surgery . . . ." Defendant's Reply to Plaintiff's Response to the Court's November 9, 2012
Memorandum and Order and to Defendant's Submission of November 2, 2012 at 11.  According
to the Court, "[t]his was the sole reason the court allowed the monthly reports to be filed under
seal." *See* January 18, 2013 Memorandum and Order at 2; November 19, 2012 Hearing Tr. at
111:15-113:17.

10.     The tenor of Dr. ███████'s responses suggests that plaintiff's email did not, in fact,
harass or embarrass Dr. ███████, nor has it apparently affected his willingness to perform the
surgery.  Indeed, his response suggests that he viewed Kosilek's email as an ordinary course,
quotidian doctor-patient communication intended to address topics of concern to a patient
progressing towards a surgical procedure.

11.     As the Court observed, "the plaintiff [has] a legitimate interest in knowing what's
being done and bringing to my attention whether there's any possible basis for contempt of my
order." November 19, 2012 Hearing Tr. at 112:22-25.  The Court rejected defendant's
contention that the Court would be best able to monitor the DOC's surgery preparation process,
stating: "I actually I don't think I am. . . . this is a place where the adversary process would need
to work." *Id.* at 112:6-10.  At the November 19, 2012 hearing, the Court articulated that its
"order placing [the monthly reports] under seal, orders parties not to disclose the information.  It
would mean that [Kosilek] can't tell another prisoner what's in the report." *Id.* at 120:22-121:5.
In compliance with the Court's directive, Kosilek has not disclosed any report or any information
contained in any report to other prisoners or unauthorized individuals.  A fair gloss on plaintiff's
exchange with Dr. ███████ is that she was "monitoring" the litigation in order to "bring[] to [the
court's] attention" deficiencies in the DOC's progress in making preparations for her surgery so
that it may take place "promptly."

REDACTED VERSION

### iii.   Kosilek's Conduct Does Not Warrant A Finding Of Civil Or Criminal Contempt

12.    The circumstances do not merit a finding of civil or criminal contempt. "Civil contempt is a forward-looking penalty meant to coerce compliance" whereas criminal contempt "punish[es] past noncompliance." *Hawkins v. Dep't of Health & Human Servs. for New Hampshire, Comm'r*, 665 F.3d 25, 32 (1st Cir. 2012). To find civil contempt, a court must find clear and convincing evidence that the putative contemnor "violated a clear and unambiguous order that left no reasonable doubt as to what behavior was expected and who was expected to behave in the indicated fashion." *In re Grand Jury Investigation*, 545 F.3d 21, 25 (1st Cir. 2008) (internal citation omitted). "[A]ny ambiguities or uncertainties in such a court order must be read in a light favorable to the person charged with contempt." *Id.* "The court retains the authority to eschew the imposition of a contempt sanction if it deems such eschewal to be in the interests of justice in the particular case." *Id.*; *see Langton v. Johnston*, 928 F.2d 1206, 1221-23 (1st Cir. 1991) (affirming denial of civil contempt when, despite noncompliance with court's order, defendant had made good-faith efforts to comply).

13.    Criminal contempt proceedings are held when the "subject of an order" "willfully flout[s]" or "ma[kes] a deliberate decision to refuse a court order." *AngioDynamics, Inc. v. Biolitec AG*, No. 09-CV-30181-MAP, 2013 WL 1567739, at *6 (D. Mass. Apr. 11, 2013). Courts require evidence of willfulness in order to find criminal contempt. *See, e.g., N.L.R.B. v. Hosp. San Francisco, Inc.*, 989 F.2d 484, at *2 (1st Cir. 1993) ("As this is a proceeding in civil, rather than criminal, contempt, the Board need not establish willfulness or bad faith.").

14.    In this case, the Court's order did not "clear[ly] or "unambiguous[ly]" proscribe the conduct that occurred. The Order stated that "[e]ach report, and the information it contains, may be provided by counsel to Kosilek . . . and *may be used solely for the purpose of monitoring*

7

REDACTED VERSION

*and litigating matters in this case.*"  November 20, 2012 Order, ¶ 2(b) (emphasis added).  Here, Plaintiff used the information solely "to monitor and litigate matters in this case," even though the manner in which she did so may have been outside the contemplation of the Court and counsel.  Plaintiff contacted Dr. ▆▆▆▆, discussed in the reports as the likely surgeon to perform her surgery, in furtherance of the litigation and to monitor the progress of the DOC in making preparations for her surgery.  In these circumstances, a civil contempt finding will not lie.  *See United States v. Saccoccia*, 433 F.3d 19, 29 (1st Cir. 2005) (affirming denial of civil contempt when "the words of the court's order [did not] clearly and unambiguously forbid[] *the precise conduct on which the contempt allegation [was] based*"; the Order "could have been interpreted in various ways"; and "there was ambiguity about what the Order required.") (emphasis in original); *Langton*, 928 F.2d at 1220 (1st Cir. 1991) ("substantial" and "good faith effort[s] at compliance" with a court order "can avert a finding of [civil] contempt"); *In re Grand Jury Investigation*, 545 F.3d at 27 (attorney "had not deliberately violated a known sealing order" and thus "extreme remedy" of civil contempt was not proper).

15.    Moreover, no apparent harm has resulted to the process established by the Court to allow the DOC to implement a confidential plan for surgery.  Dr. ▆▆▆▆'s email response shows no reluctance to participate.  Rather, his responses both voluntarily provide information about the process and state that he is expecting confirmation of his role from the DOC.  *See In re Grand Jury Investigation*, 545 F.3d at 27 (refusing to find contempt where no "proceeding had been prejudiced as a result" of the disclosures).

16.    Moreover, there is no further risk of non-compliance.  Since this Court's May 3, 2013 Order, plaintiff has conferred with her counsel; understands that she may not contact Dr. ▆▆▆▆, or any other individual identified in the DOC status reports, other than according to such

REDACTED VERSION

protocol as may be established by the Court, the DOC or its counsel; and will not do it again. Kosilek Aff., ¶¶ 10-11.  After conferring with counsel, Kosilek attests that she will not further contact Dr. ███████ until a formal relationship has been established and the DOC confirms that Dr. ███████ has been officially retained to perform her surgery.  *Id.*, ¶ 10.  Plaintiff will only contact the selected surgeon through such protocol as shall be established by the Court or the DOC.  *Id.* No further measures need to be taken to ensure compliance.  *See Hawkins*, 665 F.3d at 32 (district court appropriately found no additional measures were necessary to ensure compliance with decree).  As this Court has noted, it is quite "preposterous" that Kosilek would do anything to intentionally jeopardize the "surgery that [s]he [has] spent 20 years of [her] life dedicating [her]self to get."  *See* November 19, 2012 Hearing Tr. at 113:5-10.

17.   Because plaintiff's conduct resulted from a misunderstanding of this Court's Order, and not from a conscious or wilful disobedience, a finding of criminal contempt is not proper.  *United States v. Mourad*, 289 F.3d 174, 180 (1st Cir. 2002) ("To convict a defendant of criminal contempt under 18 U.S.C. § 401(3), the government must prove beyond a reasonable doubt that the defendant *willfully* violated a lawful order of reasonable specificity.") (emphasis added); *United States v. Wefers*, 435 F.2d 826, 829 (1st Cir. 1970) (finding criminal contempt conviction not supported because of the "absence of direct evidence that Wefers intentionally violated the order" and defendant's "subjective intent" and belief that the court order was not directed towards him).

18.   Accordingly, this Court should not enter a finding of contempt as to Kosilek.

REDACTED VERSION

**II.    Defendant Spencer Has Violated the Conditions Of The Stay By Failing To "Take Forthwith All Of The Actions Reasonably Necessary To Provide Kosilek Sex Reassignment Surgery As Promptly As Possible If The September 4, 2012 Decision Ordering Such Treatment Is Affirmed."**

19.    On November 20, 2012, the Court issued an order allowing defendant's Motion to Stay Execution of Final Judgment Pending a Decision on Defendant's Appeal pursuant to two conditions: (1) that "*Defendant shall take forthwith all of the actions reasonably necessary to provide Kosilek sex reassignment surgery* as promptly as possible if the September 4, 2012 decision ordering such treatment is affirmed"; and (2) that Defendant shall file monthly reports "describing the actions he has taken, and any progress he has achieved, in preparation to provide Kosilek sex reassignment surgery promptly if the September 4, 2012 decision is affirmed." November 12, 2012 Order, ¶ 2 (emphasis added).  Prior to granting the stay, the Court cautioned defendant that "one of the key issues for me is to assure, if I grant the stay, that the Department of Corrections really is taking forthwith, which means right now . . . the steps necessary to provide that surgery . . . and not tell me, if and when I'm affirmed in my decision, 'It's going to take us a couple of years to figure out how to do this surgery.'"  November 19, 2012 Hearing Tr. at 108-109.  Defendant's counsel stated that defendant understood. *Id.* at 109:25.

20.    Following entry of the November 20, 2012 Order, defendant filed two status reports, both of which continued the defendant's longstanding pattern of foot-dragging and delay. Plaintiff filed a response and, on January 18, 2013, "concerned that the pattern of resistance and delay regarding adequate medical care for transsexual prisoners . . . may be continuing," this Court entered an order requiring defendant to provide "more detailed monthly reports, signed under oath by [Commissioner] Spencer, in order to provide the information necessary for the court to monitor compliance with the November 20, 2012 Order and to determine whether there

REDACTED VERSION

is any possible willful disobedience of it that should be addressed." January 18, 2013 Memorandum and Order at 5-6.

21.     Thereafter, defendant filed three status reports (on January 31, February 28, and April 1, 2013) that showed evidence of progress.  In brief, these status reports showed that defendant had: (1) found a Massachusetts hospital suitable for plaintiff's SRS; (2) identified Dr. ███████ as an appropriate surgeon; (3) spoken to the MA Board of Registration in Medicine about an appropriate credentialing mechanism for an out-of-state surgeon; and (4) begun taking steps to address security and logistical concerns at the hosting hospital.  Thus, after years of claiming that SRS was impossible because of insurmountable difficulties transporting Kosilek out-of-state for surgery, within three months of the Court's January 18, 2013 Order, defendant found a potential solution for those difficulties and a way in which Kosilek can receive surgery in a secure and nearby facility.  That potential solution, although a very positive development, underscores the contumacy with which the defendant has approached this procedure for the past seven years.

A.     **Although A Solution Is In Sight, Substantially More Needs to Be Done to Prepare Plaintiff For Surgery.**

22.     Defendant's February and March status reports identified several outstanding issues, among many others, that need to be addressed before defendant has taken "all of the actions reasonably necessary to provide Kosilek sex reassignment surgery as promptly as possible."

23.     The March status report (filed April 1, 2013) stated that "ADC Weiner contacted Dr. ████ on March 27, 2013 to discuss the logistics and financial requirements concerning SRS, if he were selected as the surgeon to perform the SRS.  He is awaiting a return phone call from Dr. ████." April 1, 2013 Status Report, ¶ 8.

REDACTED VERSION

24.     Since that report, defendant has taken no apparent steps to follow-up with Dr.
████. Dr. ████'s email response to plaintiff, dated April 7, 2013, confirmed both that (1)
Kosilek has a need for ████████████ prior to surgery and (2) Dr. ████ has not heard
further from the DOC on any matter. It stated in pertinent part:

> You are correct, there is a need to ████████████
> prior to a penile inversion vaginoplasty and either ████████ or
> ████████████ both work well. However, I have not received
> any word from the Department of Corrections, so I am reluctant to
> start giving you specific advice until we have confirmation. I will
> get the needed information out as soon as I hear from them.

Kosilek Aff., ¶ 8 and Exhibit B attached thereto.

25.     Contrary to defendant's report stating the DOC is awaiting Dr. ████'s reply, Dr.
████'s emails suggest that the DOC owes Dr. ████ a response. The subsequent email from
Dr. ████ of the same date again states he is waiting to hear from the DOC: "I have been away
for over a week, so there may be some hard-copy correspondence waiting when I get back to the
office on Tuesday." Id.

26.     The February 28, 2013 status report states that the DOC contacted the
Massachusetts Board of Registration in Medicine regarding the required licensing and
credentialing process for an out-of-state physician seeking to perform surgery in a Massachusetts
hospital. Defendant reports that this process will take between three and six months. February
28, 2013 Status Report, ¶ 8. In its April 1, 2013 report, when the DOC identified Dr. ████ as
the likely surgeon to perform plaintiff's SRS, it stated, without more, that: "[i]t appears that Dr.
████'s credentialing and privileging at ████████████ may be facilitated by ████████
████████████████████] recommendation of him." April 1, 2013
Status Report, ¶ 6.

Case 1:00-cv-12455-MLW   Document 626   Filed 05/30/13   Page 16 of 60
Case 1:00-cv-12455-MLW   Document 625 *SEALED*   Filed 05/23/13   Page 13 of 17
REDACTED VERSION

27.    Now, in mid-May, the DOC apparently has yet to initiate the multi-month licensing process for its identified surgeon, Dr. █████, despite reporting in its most recent April 30, 2013 status report, that Dr. █████ has not "identified any medical obstacles to performing the surgery, including hospital credentialing and privileging." April 30, 2013 Status Report, ¶ 5.

28.    The April 1, 2013 report also states that on March 20, 2013, DOC Deputy Commissioner Peter Pepe met with ██████████████████████████ ███████████████████████ to "discuss security concerns and logistics" if plaintiff's surgery were to take place at ████████████. April 1, 2013 Status Report, ¶ 9. As a result of the meeting, the DOC identified "[a] number of questions regarding security at the hospital remain[ing] to be answered, including whether the DOC will be provided with access to hospital staff rosters to help ensure that no unauthorized hospital personnel gain access to inmate Kosilek." *Id.*, ¶ 14. The report advised that "additional meetings with hospital ████████ ████████ will be needed to further discuss pre- and post-surgery logistics" should Kosilek's surgery take place at ████████████. *Id.*, ¶ 15. Since the March 20, 2013 meeting, no apparent follow-up action to further address security concerns and/or develop a security plan for pre- and post-surgery has taken place.

29.    Thus, defendant has yet: (1) to take steps to officially retain Dr. █████ to perform plaintiff's surgery; (2) to secure officially ████████████ as the location where plaintiff's surgery will take place; (3) to initiate the licensing and credentialing process for Dr. █████; (4) to obtain a pre-surgery plan that details a timeline and steps that need to be taken to prepare plaintiff for her surgery, which, based on recent email correspondence between plaintiff and Dr. █████, appears, at a minimum, to include the multi-month process of ████████

REDACTED VERSION

██████ ; and (5) to follow-up with ████████████████ to address any remaining security

questions and concerns and develop both a pre- and post-surgery security plan.

**B.  Notwithstanding All Of These Outstanding Issues, Defendant's April 30, 2013
Status Report Indicates No Progress Whatsoever.**

30.   On January 18, 2013, this Court ordered defendant to provide "more detailed

monthly reports." January 18, 2013 Order at 6. Notwithstanding that order, Defendant's most

recent status report filed on April 30, 2013 fails to provide detail regarding any substantive

progress since its last report submitted on March 29, 2013. The bewildering single substantive

paragraph states only: "ADC Weiner has advised me that he has had had further positive

conversations with ███████████████████████████████████ , and ███

████████████████████████████████ . Neither doctor has identified any

medical obstacles to performing the surgery, including hospital credentialing and privileging."

April 30, 2013 Status Report, ¶ 5. The substantive update ends here. Defendant does not explain

why he is not taking steps "forthwith" to initiate the licensing process for Dr. ██████ ; and

initiating the credentialing and privileging process with Dr. ██████ so that the surgery can take

place at ████████████████ . Defendant provides no additional detail on next steps, meetings,

financial requirements, or any obstacles that would delay initiating the credentialing process.

31.   As credentialing and privileging is a several month process, any unreasonable

delay would not comport with this Court's November 20, 2013 directive that defendant "prepar[e]

to provide Kosilek sex reassignment surgery *promptly*." To comply with this "clear and

unambiguous" order, defendant should supplement its April 30, 2013 report with its planned next

steps. If defendant offers no good faith reason to delay the credentialing and privileging process,

this Court should order defendant to begin such processes immediately.

Case 1:00-cv-12455-MLW   Document 626   Filed 05/30/13   Page 18 of 60
Case 1:00-cv-12455-MLW   Document 625 *SEALED*   Filed 05/23/13   Page 15 of 17
REDACTED VERSION

32.   Similarly, Dr. ███'s email suggests that implementation of pre-surgical treatment may be a many month process. This Court should order the DOC to retain a surgeon and to work with the selected surgeon to develop a pre-surgical plan that details a timeline and steps that need to be taken to prepare plaintiff for her surgery, including, at a minimum, scheduling ████████ treatments. Simply confirming that "[n]either doctor has identified any medical obstacles," meets neither the letter nor the spirit of this Court's November 20, 2012 and January 18, 2013 orders. *See* January 18, 2013 Order at 2 ("As the court repeatedly told counsel for Spencer, 'forthwith' means 'right now.'").

C.   **Given the First Circuit's Imminent Ruling, Defendant's Progress To-Date Likely Will Not Allow Surgery to Take Place "Promptly."**

33.   Defendants' appeal of this Court's September 4, 2012 decision ordering sex reassignment surgery has been fully briefed and the First Circuit Court of Appeals heard oral argument on April 2, 2013. An unofficial transcript of the argument is attached as Exhibit A to the Affidavit of Frances S. Cohen in Response to the DOC's April 30, 2013 Status Report. It is likely that the Court of Appeals' ruling will be forthcoming within the next few months.

34.   Given the relative imminence of the First Circuit's ruling, the defendant's lack of progress on at least two already-identified pre-surgery issues is unsatisfactory. First, the licensing and credentialing process for Dr. ███, would at a minimum take three months. And, second, pre-surgery treatments may be a multi-month process. *See* Kosilek Aff., ¶ 18. Defendant has ignored all of plaintiff's efforts, beginning in January 2013, to alert him to medically necessary pre-surgery requirements. *See* Kosilek Aff., ¶¶ 13-17. Most recently, in March 2013, plaintiff requested that DOC Health Services begin ████████ treatment in preparation of her SRS. *Id.*, ¶ 15. On March 21, 2013, the DOC denied plaintiff's request, stating the DOC's "legal team [has] no court order to start your ███." *Id.*, Exhibit D. If

REDACTED VERSION

defendant insists on waiting for a court order for every necessary element of pre-surgical preparation, he will be in flagrant disregard of this Court's orders. *See AngioDynamics, Inc.*, 2013 WL 1567739, at *6 ("[O]nce the subject of an order willfully refuses to meet the court's order, criminal contempt has been committed . . . .").

35.    Given defendant's substantially slowed rate of progress, it seems highly unlikely that either of these two steps (among many others) will be completed within the time frame established by the Court. Defendant's conduct does not comport with this Court's admonition to defendant that it "expect[s] there to be a good faith, energetic effort" to take all steps reasonably necessary to prepare for providing the SRS so that SRS can be provided promptly should the DOC's appeal be ultimately unsuccessful. November 19, 2013 Hearing Tr. at 113:14.

36.    Accordingly, Kosilek asks that this Court order the following, as well as any other relief it deems proper:

A. require Defendant to confirm arrangements with either Dr. ███ or such other appropriate professional as the DOC may select as appropriate to perform Kosilek's surgery if this Court's September 4, 2012 decision is affirmed;

B. require Defendant to confirm arrangements with the hosting hospital;

C. begin the licensing, credentialing and privileging process for the selected surgeon; and

D. obtain and implement a pre-surgical plan for Kosilek.

**REDACTED VERSION**

Dated: May 23, 2013

/s/Frances S. Cohen
Frances S. Cohen (BBO No. 542811)
Jeff Goldman (BBO No. 660870)
Christina Chan (BBO No. 677703)
BINGHAM MCCUTCHEN LLP
One Federal Street
Boston, Massachusetts 02110
Phone: (617) 951-8000
Fax: (617) 951-8736
frances.cohen@bingham.com
christina.chan@bingham.com
jeff.goldman@bingham.com

Joseph L. Sulman (BBO No. 663635)
David I. Brody, Esq. (BBO No. 676984)
Law Office of Joseph L. Sulman, Esq.
185 Devonshire Street, Suite 502
Boston, MA 02110
Phone: (617) 521-8600
Fax: (866) 514-4839
jsulman@sulmanlaw.com

*Attorneys for the Plaintiff Michelle Lynne Kosilek*

## CERTIFICATE OF SERVICE

I, Frances S. Cohen, hereby certify that this motion was served on all counsel of record by UPS mail on May 23, 2013.

/s/Frances S. Cohen
Frances S. Cohen

**REDACTED VERSION**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHELLE LYNNE KOSILEK,<br><br>　　　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>LUIS S. SPENCER, in his official capacity as<br>Commissioner of the Massachusetts Department of<br>Correction,<br><br>　　　　　　　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action
No. 00-12455-MLW
**FILED UNDER SEAL**

## AFFIDAVIT OF MICHELLE LYNNE KOSILEK IN RESPONSE TO THE COURT'S MAY 3, 2013 ORDER (REDACTED)

Michelle Lynne Kosilek ("Kosilek") deposes and says as follows:

1.　　　　I make this affidavit in response to this Court's May 3, 2013 Order directing that I file an affidavit addressing "whether the referenced email [in paragraph 6 of Commissioner Spencer's April 30, 2013 affidavit] was sent on [my] behalf; if so, attaching a copy of the email; and, if so, seeking to explain why the message did not constitute a violation of paragraph 2(b) [of the November 20, 2012 Order]."

2.　　　　I authored two emails to Dr. ████████████  The emails were sent on my behalf by Dr. ████████████, my longtime friend and designated Health Care Proxy.

3.　　　　Dr. ████, a licensed psychologist, was █████████████ while I was employed at █████████████ from █████████. Dr. ████ is currently in private

A/75571594.1

REDACTED VERSION

practice in ████████. I did not share a copy of either the DOC's April 1, 2013 report with

Dr. ████, or of any other status reports.

      4.         I have not disclosed any of the information contained in any of the DOC's

status reports to any other inmates or to anyone other than Dr. ████.

      5.         Dr. ████ has been my health care proxy since February 8, 2013. A true

and accurate executed copy of the Massachusetts Health Care Proxy form is attached hereto as

Exhibit A.

      6.         Dr. ████ has established an email account for me:

████████████. Through her, I use the email account to communicate with

medical experts regarding my medical condition.

      7.         In the past several years, I have regularly contacted qualified health care

providers in the United States with inquiries about my mental health condition and sexual

reassignment surgery. My first contact with Dr. ████ was several years ago after sexual

reassignment surgery was first recommended for me in 2006.

      8.         On April 3, 2013, Dr. ████ used my email account to contact Dr. ████

on my behalf. A true and accurate copy of the emails sent from that email account (by Dr.

████) to Dr. ████, as well as the response emails sent by Dr. ████ to this email account are

attached hereto as Exhibit B.

      9.         My belief, based on my review of the DOC's recent April 1, 2013 status

report, was that Dr. ████ was the physician who would be selected by the DOC to perform my

sex reassignment surgery if this Court's September 4, 2012 decision is affirmed.

A/75571594.1

REDACTED VERSION

10.     Subsequently, I conferred with my counsel and I now understand that I cannot contact Dr. ███, or any other individual identified in the DOC status reports, other than according to such protocol as may be established by either the Court, or the DOC. I will not further contact Dr. ███ until a formal relationship has been established and the DOC confirms that Dr. ███ has been officially retained to perform my surgery.

11.     I have conferred with my counsel and understand that the information contained in the DOC's status reports is confidential and cannot be shared with or disclosed to any individuals other than the parties to this case, their counsel and those acting at counsel's direction.

12.     I have been very anxious and concerned about when my surgery will take place and about any delays that may occur.

13.     I have been attempting to alert the DOC to the pre-surgical requirement of ███████████ for several months since early January, 2013. Dr. ███'s confirmation reinforced a prior December 18, 2012 letter I received from Dr ████████ which also confirmed the necessity of ██████████ before sex reassignment surgery. On January 15, 2013, I had given Mark Burrowes, my long-time UMass staff treating clinician, a copy of Dr. ███letter. Mr. Burrowes then emailed that letter to DOC Drs. Robert Deiner, Thomas Groblewski and Lawrence Weiner shortly thereafter. A true and correct copy of the December 18, 2013 letter form Dr.███ is attached hereto as Exhibit C.

14.     On February 8, 2013, I sent a follow-up letter to UMass referral management nurse Kathleen Wiwatoski, inquiring about the need for pre-operative █████ ████████████████. This letter also went unanswered.

3

REDACTED VERSION

15.      In March 2013, I also requested that DOC Health Services start my treatment of ███████████ in preparation of my sex reassignment surgery should the District Court's September 4, 2012 Order be affirmed.  On March 21, 2013, the DOC denied my request for ███████████ because the DOC's "legal team [has] no court order to start your ████████."  A true and correct copy of the March 21, 2013 DOC Health Services "Medical Results Notice" detailing the denial of ████████ is attached hereto as Exhibit D.

16.      Thereafter, I sent the April 3, 2013 email to Dr. ████.  Shortly after sending my email, on April 6, 2013, I notified the DOC by mail that I had contacted Dr. ████ to try to prevent further delays in my preparations for surgery.  A true and accurate copy of the April 6, 2013 letter to the DOC is attached hereto as Exhibit E.

17.      I have received no response from Drs. Deiner, Weiner or Groblewski since January 15, 2013 regarding ███████████ or any indication that steps would be taken to address this pre-surgical requirement.

18.      My concern is that such ████████ is a rate-limiting step and would allow the DOC to delay my surgery.  I asked Dr. ████ to advise the DOC that: (1) ████████ ████ is medically necessary before any reconstructive surgery to prevent ████████ ████████████████████; (2) that if ███ is the chosen method, a six-week delay between treatments may be required to determine efficacy by ruling out ████████; and (3) that up to six treatments may be required to prepare ████ for surgery.

4

19.     On a related matter, I also have not seen, been evaluated or received treatment from a GID-specializing endocrinologist for almost two years.

20.     In an October 14, 2011 letter from Dr. Padma Balasubramanian, my last treating endocrinologist, Dr. Balasubramanian stated she was not experienced enough to treat my GID condition and that Dr. Groblewski was in the process of seeking alternative clinical coverage for my GID care. A true and accurate copy of Dr. Balsubramanian's October 14, 2011 letter is attached hereto as Exhibit F .

21.     To this date, I have not seen an endocrinologist since my treatment with Dr. Balsubramanian was terminated in October 2011. The past practice relating to medical management of hormones had been an appointment every three to four months. On April 9, 2013, my primary care provider, Nurse Practitioner Linda Booth, reported my blood lab values were outside of tolerance. A true and accurate copy of the lab results is attached hereto as Exhibit G.

Executed under the penalties of perjury this 18th day of May, 2013.

_Michelle Jaynne Kosilek_
Michelle Lynne Kosilek

MASSACHUSETTS DEPARTMENT OF CORRECTION
HEALTH SERVICES

# *MASSACHUSETTS HEALTH CARE PROXY*

TO MY FAMILY, DOCTORS AND ALL THOSE CONCERNED WITH MY CARE:

**1.    Appointment of Agent**

I, Michelle Lynne Kosilek of Massachusetts (a state prisoner), (the "Principal") being a competent adult at least eighteen (18) years of age, of sound mind and under no constraint, duress or undue influence, hereby appoint the following person to be my Health Care Agent (HIPAA Personal Representative under the Health Insurance Portability Accountability Act of 1996, as the same may be amended from time to time), under the terms of this document:



Name: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Address: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮
Phone: (h) ▮▮▮▮▮▮▮ (w) ▮▮▮▮▮▮▮
Email: ▮▮▮▮▮▮▮

In so doing, I intend to create a Health Care Proxy according to Chapter 201D of the Massachusetts General Laws. In making this appointment, I am giving my Health Care Agent the authority to make any and all health care decisions on my behalf, subject to any limitations I state in this document, in the event that I should at some future time become incapable of making health care decisions for myself.

**2.    Alternate Agents (Optional)**

I hereby appoint the following person or persons in succession to serve as my Health Care Agent in the event that my former Health Care Agent is not available, willing or competent to serve, or is disqualified from acting on my behalf. Each Alternate Health Care Agent is to act alone and in the order listed.

Alternate #1:                                          Alternate #2:
Name: _____          Name: _____
Address: _____          Address: _____
_____          _____
Phone: (h) _____ (w) _____          Phone: (h) _____ (w) _____
Email: _____          Email: _____

Exhibit A

MASSACHUSETTS DEPARTMENT OF CORRECTION
HEALTH SERVICES

# *MASSACHUSETTS HEALTH CARE PROXY*

### 3.  Powers Given to Health Care Agent

I give my Health Care Agent full authority to make any and all health care decisions for me, including decisions about life-sustaining treatment, subject only to any limitations I state below.

My Health Care Agent will have the authority to act on my behalf if, when and for so long as a determination has been made that I lack the capacity to make or to communicate health care decisions for myself. This decision must be made in writing by the physician responsible for my care according to accepted standards of medical judgment and the requirements of Chapter 201D of the Massachusetts General Laws.

The authority of my Health Care Agent will cease if my physician determines that I have regained capacity. The authority of my Health Care Agent will recommence if I later lose capacity.

I am to be notified of any determination that I lack capacity to make or communicate health care decisions where there is any indication that I am able to comprehend this notice.

My Health Care Agent will make health care decisions for me only after consultation with my health care providers and after full consideration of acceptable medical alternatives regarding diagnosis, prognosis, treatment and their side effects.

My Health Care Agent will have the right to receive any and all medical information necessary to make informed decisions regarding my health care, including relevant confidential medical information that I would be entitled to receive.

My Health Care Agent will make health care decisions for me only in accordance with my Health Care Agent's assessment of my wishes, including my religious and moral beliefs, or, if my wishes are unknown, in accordance with my Health Care Agent's assessment of my best interests.

The decisions made by my Health Care Agent for me will have the same power as my own decisions would have, if I were competent, over the decisions by any other person, including a person acting pursuant to a durable Power of Attorney, except any limitation I set forth below or by specific Court Order overriding this Health Care Proxy.

If I object to a health care decision made by my Health Care Agent after I have been determined to lack capacity by my physician, my decision will prevail unless it is determined by Court Order that I lack capacity to make health care decisions.

I specifically limit my Health Care Agent's authority as follows:

*No limits, including no limits on end-of-life decisions or any situation where anyone attempts to maintain me in a persistent vegetative state. I would rather die in such a situation.*

I may revoke this Health Care Proxy by executing a later Health Care Proxy or by notifying my Health Care Agent or health care provider orally or in writing or by any other act showing a specific intent to revoke this Health Care Proxy.

8080 2 OF 5

MASSACHUSETTS DEPARTMENT OF CORRECTION
HEALTH SERVICES

# *MASSACHUSETTS HEALTH CARE PROXY*

**4.     HIPAA (Health Insurance Portability Accountability Act) Compliance**

A.  I authorize any physician, health care professional, dentist, health plan, hospital, clinic, laboratory, pharmacy, or other covered health care provider, any insurance company, and any health care clearinghouse that has provided treatment or services to me or that has paid for or is seeking payment from me for such services, to give, disclose and release to my Personal Representative (or Alternate), without restriction, all HIPAA protected health information, including without limitation, past, present, or future medical and hospital records or communications for all my individually identifiable health information, whether physical or mental, as well as all information relating to the diagnosis and treatment of HIV/AIDS/ARC, sexually transmitted diseases, abortion, genetic testing, physical abuse, and substance abuse, including drug or alcohol abuse, mental retardation, developmental disability, mental illness, mental deficiency, psychiatric illness, and psychotherapy treatment.

B.  I authorize my HIPAA Personal Representative (or Alternate) to request, receive, and review the above information; to sign, seal, execute, and deliver such authorizations, releases, or other documents as may be required; and, generally, to do all acts and take all steps which in the judgment of my HIPAA Personal representative (or Alternate) are necessary, convenient, or expedient.  A copy of this HIPAA Health Care Proxy shall have the same force and effect as the original.

**5.     Signature of Principal.**

I have this day attached a Statement of Personal Wishes to my Health Care Proxy and I hereby sign my name to this Health Care Proxy in the presence of two witnesses.

Date:  _____2-8-13_____

*Name*

8080 3 OF 5

MASSACHUSETTS DEPARTMENT OF CORRECTION
HEALTH SERVICES

# *MASSACHUSETTS HEALTH CARE PROXY*

**5.    Witnesses:**

We, the undersigned, have each witnessed the signing of this document by the Principal or at
the direction of the Principal and state that the Principal appears to be at least eighteen years
of age, of sound mind, and under no constraint, duress or undue influence. Neither of us is
named as a Health Care Agent in this document.



**Witness 1:**

Signature:

Address:

**Witness 2:**

Signature:

Address:

**6.    Statement of Health Care Agent and Alternates (Optional)**

I have been named by the Principal as the Principal's Health Care Agent or as an alternate
Health Care Agent in this document.

I have read this document carefully and accept the appointment. I have had or plan to have a
discussion with the Principal about the Principal's health care wishes.

I am not an operator, administrator or employee of a hospital, clinic, nursing home, rest
home, Soldiers' Home or other heath care facility where the Principal is presently a patient or
resident or has applied for admission, or if I am a person so described, I am also related to the
Principal by blood, marriage or adoption.

Health Care Agent:

Alternate Health Care Agent 1:

Alternate Health Care Agent 2:

MASSACHUSETTS DEPARTMENT OF CORRECTION
HEALTH SERVICES

# *MASSACHUSETTS HEALTH CARE PROXY*

## STATEMENT OF PERSONAL WISHES

I, Michelle L. Kosi lek sign this form to offer my Health Care Agent guidance so that he or she may make decisions based on an assessment of my personal wishes as well as medical information provided by my physicians. My Health Care Agent has authority to make such decisions in accordance with my Health Care Proxy and applicable Massachusetts Law. This form is an expression of my wishes and not legally binding.

*If there is no hope for my recovery and, in the opinion of my physician, I will die without life sustaining treatment that only prolongs the dying process; I ask that my Health Care Agent consider the following expression of my wishes:*

1.  Treatment should be given to maintain my dignity, keep me comfortable and relieve my pain.

2.  If my heart stops beating I **do/do not** wish it to be restarted.

3.  If I stop breathing, I **do/do not** want to have a breathing tube put into my throat and be connected to a breathing machine.

4.  My physician **may/may not** withhold or withdraw treatment that only serves to prolong the dying process.  For instance:

    A.  If I cannot drink, I **do/do not** want to receive liquids through a needle placed in my vein unless it is necessary to keep me comfortable.

    B.  If I cannot eat, I **do/do not** want a tube inserted in my nose, mouth, or surgically placed to give me food.

    C.  If I have an infection, I **do/do not** want antibiotics administered to prolong my life without hope of recovery or cure unless necessary to keep me comfortable.

5.  If possible, I **would/would not** like to die at home with hospice care, if needed.

6.  Unless necessary for my comfort, I would not prefer to be hospitalized. Agreed

7.  I **do/do not** want spiritual support. My faith tradition is *very unusual*  . My spiritual contact person is *no one*  who can be reached at

9.  If possible, I **do/do not** wish to be an organ donor.

10. Please notify my health care agent to be present at all major surgeries.

Michelle Lynne Kosilek                    2-8-13

Name********                               Date

**Chan, Christina**

| | |
|---|---|
| **From:** | Michelle Lynne Kosilek ◄ ███████████ |
| **Sent:** | Wednesday, May 08, 2013 11:26 AM |
| **To:** | ████████████ |
| **Subject:** | Fwd: ████████ Pre-Op |

1st of 4
---------- Forwarded message ----------
From: **Michelle Lynne Kosilek** < ███████████ >
Date: Wed, Apr 3, 2013 at 3:38 PM
Subject: ████████████ Pre-Op
To: ████████████

Dear Dr. ██████.
I have been informed that you have been chosen to do my surgery. Please share your opinion about the
necessity of ████████████████ with the Department of Corrections and ████
████████, to avoid any more unnecessary delays.  My concern about delay is because of the six week
wait between treatments if ████ is chosen over ████████.
Thank you very much.  Looking forward to meeting with you.
Sincerely,
Michelle Lynne Kosilek

1

Exhibit B

## Chan, Christina

| | |
|---|---|
| **From:** | Michelle Lynne Kosilek <██████████████> |
| **Sent:** | Wednesday, May 08, 2013 11:26 AM |
| **To:** | ████████. |
| **Subject:** | Fwd:████████Pre-Op |

2nd of 4

---------- Forwarded message ----------
From: █████████████████████
Date: Sun, Apr 7, 2013 at 12:25 PM
Subject: Re:█████████Pre-Op
To: Michelle Lynne Kosilek <████████████████

M:

Thanks for you email.  You are correct, there is a need to███████████████prior to a penile inversion vaginoplasty and either████████or████████████both work well.  However, I have not received any word from the Department of Corrections, so I am reluctant to start giving you specific advice until we have confirmation.  I will get the needed information out as soon as I hear from them.

Thx.

████

From: Michelle Lynne Kosilek <████████████████>
Date: Wednesday, April 3, 2013 3:38 PM
To:█████████████████
Subject:█████████Pre-Op

Dear Dr.████
I have been informed that you have been chosen to do my surgery.  Please share your opinion about the necessity of█████
████████████████████with the Department of Corrections and████████████, to avoid any more unnecessary delays.  My concern about delay is because of the six week wait between treatments if████is chosen over

Thank you very much.  Looking forward to meeting with you.
Sincerely,
Michelle Lynne Kosilek

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
Electronic Mail is not secure, may not be read every day, and should not be used for urgent or sensitive issues

1

## Chan, Christina

| | |
|---|---|
| **From:** | Michelle Lynne Kosilek ◀ ██████████ ▶ |
| **Sent:** | Wednesday, May 08, 2013 11:26 AM |
| **To:** | ██████████ |
| **Subject:** | Fwd: ██████████ Pre-Op |

3rd of 4

---------- Forwarded message ----------
From: **Michelle Lynne Kosilek** ◀ ██████████ ▶
Date: Sun, Apr 7, 2013 at 2:04 PM
Subject: Re: ██████████ Pre-Op
To: ██████████

My impression was that the DOC told the court that they were only waiting for a response from you to Dr.Groblewski on your compensation, and that they are not considering any other surgeons at this point.  Thank you or your response, and I will patiently wait, as I have for 22 years!
Sincerely,
Michelle

PS- This email is coming to you through my friend who is also my Health Care Proxy...


On Sun, Apr 7, 2013 at 12:25 PM, ██████████ wrote:
M:

Thanks for you email.  You are correct, there is a need to ██████████ prior to a penile inversion vaginoplasty and either ██████████ or ██████████ both work well.  However, I have not received any word from the Department of Corrections, so I am reluctant to start giving you specific advice until we have confirmation.  I will get the needed information out as soon as I hear from them.

Thx.

██████

From: Michelle Lynne Kosilek ◀ ██████████
Date: Wednesday, April 3, 2013 3:38 PM
To: ██████████
Subject: ██████████ Pre-Op

Dear Dr. ██████
I have been informed that you have been chosen to do my surgery.  Please share your opinion about the necessity of ██████
██████████ with the Department of Corrections and ██████████ to avoid any more unnecessary delays.  My concern about delay is because of the six week wait between treatments if ██████ is chosen over
██████████
Thank you very much.  Looking forward to meeting with you.
Sincerely,
Michelle Lynne Kosilek

1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Electronic Mail is not secure, may not be read every day, and should not be used for urgent or sensitive issues

**Chan, Christina**

| | |
|---|---|
| **From:** | Michelle Lynne Kosilek ███████████████████ |
| **Sent:** | Wednesday, May 08, 2013 11:27 AM |
| **To:** | |
| **Subject:** | Fwd: ███████████ Pre-Op |

---------- Forwarded message ----------
From: ██████████████████████████
Date: Sun, Apr 7, 2013 at 3:07 PM
Subject: Re: ████████████ Pre-Op
To: Michelle Lynne Kosilek ◄███████████████████

I have been away for over a week, so there may be some hard-copy correspondence waiting when I get back to the office on Tuesday.███████

**From:** Michelle Lynne Kosilek ███████████████████
**Date:** Sunday, April 7, 2013 2:04 PM
**To:** ███████████████████
**Subject:** Re: ██████████████ Pre-Op

My impression was that the DOC told the court that they were only waiting for a response from you to Dr.Groblewski on your compensation, and that they are not considering any other surgeons at this point.  Thank you or your response, and I will patiently wait, as I have for 22 years!
Sincerely,
Michelle

PS- This email is coming to you through my friend who is also my Health Care Proxy...

On Sun, Apr 7, 2013 at 12:25 PM, ████████████████████████████ wrote:
M:

Thanks for you email.  You are correct, there is a need to ████████████████████ prior to a penile inversion
vaginoplasty and either ███████████ or ███████████ both work well.  However, I have not received any word from the
Department of Corrections, so I am reluctant to start giving you specific advice until we have confirmation.  I will get the
needed information out as soon as I hear from them.

Thx.

███████

**From:** Michelle Lynne Kosilek ◄███████████████████
**Date:** Wednesday, April 3, 2013 3:38 PM
**To:** ███████████████████
**Subject:** ████████████████ Pre-Op

Dear Dr ████████

1

I have been informed that you have been chosen to do my surgery.  Please share your opinion about the necessity of █████████████████████████████ with the Department of Corrections and █████████████ to avoid any more unnecessary delays.   My concern about delay is because of the six week wait between treatments if ██████ is chosen over ████████.

Thank you very much.  Looking forward to meeting with you.

Sincerely,

Michelle Lynne Kosilek

**************************************************************

Electronic Mail is not secure, may not be read every day, and should not be used for urgent or sensitive issues

**************************************************************

Electronic Mail is not secure, may not be read every day, and should not be used for urgent or sensitive issues

4th of 4

2

██████████████████████████████████

December 18, 2012

Dear Michelle:

    I have spoken to a consultant regarding your questions. I will convey the answers I received. I must preface this by saying that it's puzzling that you are receiving luporolide injections…. It's a very costly way of blocking natal hormones. Do you know the rationale for administering this rather than something more typical, e.g. Spironolactone? Are you receiving estrogen? What type? How is it administered? I can ask a more specific question about hormones prior to surgery if you tell me everything you are receiving currently.



You will definitely require ████████████████████████████████ ████████████████████. Otherwise, there will be ██████████████████████

I hope this answers your questions…I'm happy to help!



Dear Mr. Burrowes,

    Please take this letter from ███████████, Ph.D., and my letter to Thomas Groblewski, M.D. dated 12-1-12 when you next go to G.I.D. Supervision. If Drs. Diener and Groblewski make a sincere attempt to arrange my gender-affirming surgery by contacting ███████████, Ph.D., the ███████████ (anyone they are referred to) will confirm the two facts they need to act on to prevent further costly litigation: 1. ███████████ is medically-necessary, and that the only reason to not complete it is cost; 2. ███████████ is also medically-necessary to prevent ███████ after surgery or ████████████████████. It should be started ASAP.

Please give the medicaid info to      1-8-13      Michelle Lynne Kosilek

Diener & Groblewski.

They can say will lies.

Exhibit C

**Massachusetts Department of Correction**
**Health Services**

## Medical Results Notice

```
                                    ·RRECTION INSTITUTIONAL USE ONLY                          3
        KOSILEK, MICHELLE
          W53865
NAME: __   MCI-NORFOLK          ___ INSTITUTION: _____
ID NUMBER: _____  D.O.B._____  DATE: 3/21/13  TIME: 3 30p
```

WARNING:   This notice is for your information only.  It may not be used to gain access to
HSU.  Do not bring it up to the HSU control Desk.  If you do so, a sick slip charge may apply,
*and* you will be put on the waiting list to be seen like all other sick slip requests.

This note is to inform you that the recent tests you had done were:

☐ Within the range of <u>normal</u> and no additional treatment is needed.

☐ Improved from previous tests.

☐ Not improved to the level needed.  Please continue to work on diet, exercise to best of your
ability, medication compliance and the other things we talked about during your visit.  We will
discuss this further at your next chronic visit or as stated below.

☐ Require additional testing. (see below)  You will be scheduled for a follow-up appointment.

☐ Require follow up in health services. (see below)  You will be called up for your appointment.

☐ HCV Treatment NOT Approved:
   ☐   Will not be in DOC system long enough to complete treatment
   ☐   Not eligible at this time due to Disciplinary Report (will re-evaluate in 12 months)
   ☐   Other_____

☑ Other:  ████████████████
_____
_____

NOTE:  Michelle
I have received a response from her legal team.
They have no court order to start your ████████
Please follow up with your attorney about
this matter.

PROVIDER NAME: _____ ~~Linda Booth, NP~~

January 2009
8064

HSU Results Notice

Exhibit D

Luis S. Spencer - DOC Commissioner

Dear Luis,                                                    4-6-13

Long time no see - hope you are well. I've received your March Status Report and I'm grateful for the progress. I thought you should also be aware of the following issues.

I've been in contact with Dr. ████ and almost every other SRS surgeon in the country since my surgery was recommended in 2006 by the U/Mass consultants, Drs. Kapila & Kaufman from Fenway. Dr ████ was one of the surgeons who responded, displaying a willingness to travel here. So I had my best friend - who is also my healthcare proxy and legally exempt from confidentiality laws and agreements - send an e-mail to Dr. ████ for me. I asked that he notify DOC and ████ about his opinion regarding the medical necessity of ████████ before surgery, to prevent ████████ and/or ████████████████. This information was transmitted via e-mail to doctors Weiner, Reiner and Groblewski by my therapist Maria Burrows on 1-18-13, yet no one is paying attention to this requirement that could delay my surgery by several months because of the six-week delay between ████ treatments. Please follow up. "Reasonable step"? Perhaps we should ask Judge Wolf.

You may also want to give some thought to the requirements of common decency - and the legal mandate of Aquino v DuBois - when choosing the in-room COs to guard me. When they wheel me out of that operating room, I will finally be legally female according to 103 DOC 652. I should no longer be seen by male staff while undressed.

cc Frances Cohen                                Sincerely
                                       Michelle Lynne Kosilek

Exhibit E



Paul D. Romary
Chief Executive Officer

THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVIC
DEPARTMENT OF PUBLIC HEALTH
LEMUEL SHATTUCK HOSPITAL

*1*

October 14, 2011

Michelle Kosilek
c/o Health Office
Box 43
Norfolk, MA 02056

Dear Michelle Kosilek:

After careful consideration, I have decided that it is best for you to receive your endocrinology care from a more experienced GID provider. The issues involved in your medical care are very complicated, and I do not have the expertise for treating this condition.

The UMass Correctional Health Medical Director, Dr. Thomas Groblewski, is in the process of arranging alternative clinical coverage for your GID care.

It has been my pleasure to try to serve you.

Sincerely,

Padma Balasubramanian, M.D.

CC:    Thomas Groblewski, MD (UMass Correctional Health Medical Director)
       Ken Freedman, MD (LSH Medical Director)

*Nubologh MD*
*20.11*

**RECEIVED** OCT 1 7 2011

Exhibit F

**Massachusetts Department of Correction**
**Health Services**

**Medical Results Notice**

KOSILEK, MICHELLE
W53865 ████
MCI-NORFOLK

CORRECTION INSTITUTIONAL USE ONLY

NAME: _____   INSTITUTION: _____   2

ID NUMBER: _____ D.O.B. _____ DATE: 4/9/13 TIME: 3 Pm

---

**WARNING**: This notice is for your information only. It may not be used to gain access to HSU. Do not bring it up to the HSU control Desk. If you do so, a sick slip charge may apply, *and* you will be put on the waiting list to be seen like all other sick slip requests.

---

This note is to inform you that the recent tests you had done were:

☐ Within the range of _normal_ and no additional treatment is needed.

☐ _Improved_ from previous tests.

☐ _Not improved_ to the level needed. Please continue to work on diet, exercise to best of your ability, medication compliance and the other things we talked about during your visit. We will discuss this further at your next chronic visit or as stated below.

☐ Require _additional testing_. (see below) You will be scheduled for a follow-up appointment.

☐ _Require follow up_ in health services. (see below) You will be called up for your appointment.

☐ HCV Treatment NOT Approved:
    ☐ Will not be in DOC system long enough to complete treatment
    ☐ Not eligible at this time due to Disciplinary Report (will re-evaluate in 12 months)
    ☐ Other_____

☐ Other:
_____
_____
_____

NOTE: Michelle -

The results of your 3/12/13 labs were as follows:
( N Range )

Total Testosterone ████
Sex Hormone Binding Glob. ████ ████

PROVIDER NAME: _____

Exhibit G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHELLE LYNNE KOSILEK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action |
| LUIS S. SPENCER, in his official capacity as | ) No. 00-12455-MLW |
| Commissioner of the Massachusetts Department of | ) **FILED UNDER SEAL** |
| Correction, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**AFFIDAVIT OF FRANCES S. COHEN IN SUPPORT OF PLAINTIFF'S
RESPONSE TO THE COURT'S MAY 3, 2013 ORDER AND
THE DOC'S APRIL 30, 2013 STATUS REPORT**

I, Frances S. Cohen, being duly sworn, deposes and states as follows:

1.     I am a member of the bar of this Court and the Commonwealth of Massachusetts and of the firm Bingham McCutchen LLP, One Federal Street, Boston, MA 02110.

2.     I have been lead counsel to Michelle Lynne Kosilek since this Court appointed me early in 2000.

3.     My secretary prepared the attached transcript of the First Circuit Court of Appeals' oral argument hearing for *Kosilek v. Spencer*, C.A. No. 12-2194, on April 2, 2013 (Exhibit A). An official recording of the argument is available on the First Circuit Court of Appeals' website at: http://media.ca1.uscourts.gov/files/audio/audiorss.php.

Executed under penalty of perjury this 23rd day of May, 2013.

/s/Frances S. Cohen
Frances S. Cohen

1

INFORMAL TRANSCRIPT
APPEALS COURT / FIRST CIRCUIT
ORAL ARGUMENT
APRIL 2, 2013

KOSILEK V. SPENCER
12-2194

Before Judges Juan Torruella, Ojetta Thompson, William Kayatta

**Judge Torruella:**  Good morning Mr. McFarland.


**McFarland:**  Good morning your honors.  Richard McFarland on behalf of the Commissioner of

Corrections and Luis S. Spencer.  The Commissioner's appeal challenges the District Court's

determination that the failure to provide inmate Michelle Kosilek with sex reassignment surgery

constitutes deliberate indifference in violation of the Eighth Amendment.  This appeal challenges

both the objective and subjective components of the district court's finding of deliberate

indifference.  With regard to the objective components the District Court errs that as matter of

law determining that the Eighth Amendment requires that inmates receive minimally adequate

treatment that mandates that Ms. Kosilek receive treatment necessarily to cure her gender

dysphoria.  The trial is undisputed that Ms. Kosilek receives GID treatment in the form of female

hormones subs….


**Judge Thompson:**  When did Judge Wolf ever say anything about cure as opposed to adequate

treatment?


**McFarland:**  Well, the judge talked about the fact that you are treating symptoms that is not

sufficient, so the judge clearly was indicating that you needed to resolve this disorder once and

Exhibit A

for all and the judge thought that by SRS according to the testimony would eliminate the dysphoria and thus eliminate the threats of suicide on the part of Kosilek. So, in sense if you are not addressing symptoms then you are curing the disorder. That was a large part of his...

**Judge Thompson:** But, the judge didn't make that finding, that's your spin on it. The judge indicated that in order to treat underlying GID which he said required this surgery that that was what constituted adequate treatment, not that it was a cure.

**McFarland:** But, it is in a sense a cure, your honor. That's what the experts testified that by providing Ms. Kosilek with the surgery that would cure the dysphoria which is the hallmark of gender dysphoria.

**Judge Thompson:** But, if someone is suffering from cancer, if you provide them with chemotherapy, that may cure the cancer, but it is also treating the cancer. And, it's adequately treating the cancer as opposed to just giving them morphine to treat the pain.

**McFarland:** Well, this is very different. In this case, the evidence was clear that by giving Ms. Kosilek the hormone treatments, laser hair removal and access to female clothing and canteen as well as the psychotherapy there was an effective treatment for that disorder. The experts were all in agreement that Ms. Kosilek had reduced significantly the depression, her irritability, her anxiety. Those things were all reduced by the current treatment. In fact in 20 years there was not one incident of self-injurious behavior, not one attempted self castration, not one attempted

2

suicide, in 20 years in MCI custody.  Moreover, Michelle Kosilek was highly functional in the

prison.  She was able to maintain numerous jobs throughout many, many years of the prison.


**Judge Thompson:**  But, Judge Wolf made different findings of fact based upon the conflicting

testimony of expert witnesses.  I would just note that your brief doesn't even discuss our

standard of review when there's been complete findings of fact with an opinion rendered by the

judge as to who is the more credible and which expert testimony should be accepted.


**McFarland:**  Our position is that by expanding the definition of the adequacy of treatment for

individuals in prison this is become an issue of law.  The judge, in effect, has used the Standards

of Care to establish what the constitutional minimums are for GID inmates or mental health

inmates.


**Judge Kayatta:**  When you say the judge used the Standard of Care, wasn't it your own doctors

and their consultants and another qualified medical expert who all testified that there was a

substantial risk of serious harm, indeed, death, if the surgery were not provided and the trial

judge then find us a matter of fact that he credited that testimony and did not credit the opposite

testimony.


**McFarland:**  It's clear that if the Standards of Care were to play a major role in this whole

decision.  The judge discredited our experts, because they had some qualms with the Standards

of Care, that were being used to establish the minimum treatment in the Eighth Amendment, then

3

when the treatment according with Judge Wolf was that you must provide this individual, Ms. Kosilek, with SRS....

**Judge Kayatta:**  What difference does it make what your experts said when the other experts who are medically qualified you did not challenge a Daubert motion, their professional credentials or the adequacy of their opinion and in accordance with the Standard of Care they said something different than you are now telling us.  We are obligated to defer to the District Court's fact finding.

**McFarland:**  We did file a Daubert motion in this case early on which was denied.

**Judge Kayatta:**  But, you haven't appealed that.

**McFarland:**  No, we haven't.

**Judge Kayatta:**  So, it's not before us and we are now back to how can we set aside fact finding by the District Court on this issue.

**McFarland:**  We believe, your honor, that certainly when you are looking at a case that expands the Eighth Amendment to new heights by placing new demands on the DOC or any DOC as to the level of treatment required, it is an issue of law.  Certainly, where an inmate has spent 20 years in prison and by all accounts is doing quite well, is able to maintain this dysphoria in prison then that's typically a factor when you look at the community...

4

**Judge Torrruella:** When you say new heights, are there some circuits that have granted this type of relief.

**McFarland:** A number of any circuit that is granted an order, a State to be provided with SRS. There was a decision in the *Fields* case in the Seventh Circuit which talks about, which nullifies a state statute in which prohibited the state DOC from giving inmates in their system hormones and surgery. That decision did not say that, did not provide or order that inmates be given SRS. The fact that in the Fields case the court found that providing the inmates with hormone treatment was an effective treatment for their GID which is the same thing happening to Ms. Kosilek.

**Judge Torruella:** Changing the subject slightly, what do you have to say about your opponent's and the District Court's challenge to your position about the security concern?

**McFarland:** Well, we believe that security concerns were made reasonably and they were not influenced by fear of public controversy or political controversy. In fact, we have asked the court to look specifically at the testimony of Commissioner Clarke who was the last person to testify in this case, the court ordered him to testify and Commissioner Clarke who was new to the system, new to the DOC, had spent three years as the Commissioner of Correction for the State of Washington as well as fifteen years in the State of Nebraska. A highly experienced correctional professional and the judge brought him in and said "give me your opinion, give me your fresh opinion as to whether or not you think these are credible, reasonable security concerns

raised by those below you". And Commissioner Clarke spent time, he reviewed the record as identified by plaintiff's counsel, he prepared a report and he testified. Based on his thirty-four years of experience he came across as very similar concerns that were raised by those below you, other commissioners and other staff people. He relied upon and he believed the testimony from Supt. Bissonnette of the women's prison, he looked at the testimony of Luis Spencer who also found that there was strong security concerns placing Ms. Kosilek back into the state of Norfolk as an anatomical female, Supt. Bissonnette had strong concerns in her testimony about placing Kosilek post-surgery within a female facility, concerns in affecting the climate of the majority of the women there are victims of sex abuse and violent PST sufferers and she felt there was a large concern that this would affect the climate.

**Judge Kayatta:** So, if a post-surgical transgender patient committed a serious crime in MA and was convicted and turned over to your client's care and custody would they set her free or would they have a place for her?

**McFarland:** A post-surgical transsexual who committed a crime?

**Judge:** Yes

**McFarland:** They would probably be sent to MCI Framingham, but of course the difference is the notoriety of inmate, Ms. Kosilek, who was well known to the population at MCI Framingham as someone who has killed a spouse, so that is also a factor that you may not have with another individual, that doesn't have the same notoriety or the same impact on the facility. Supt.

6

Bissonnette talked about hearing from other female inmates and offenders in the prison who are very concerned about having Ms. Kosilek come to their facility post-surgery. So, there are a number of issues that were raised. She was concerned that the less secure facility at MCI Framingham compared to the much greater security of MCI Norfolk which is where Ms. Kosilek has been housed for twenty years might lead to a potential for an escape risk. There were concerns about sending Ms. Kosilek to a less security DMH facility for a mental health treatment should that be necessary.

**Judge Kayatta:** How would that be, an escape risk any different from a female prisoner who murdered a spouse?

**McFarland:** The testimony was that Kosilek having grown up as a male and being stronger than a lot of the females, would have a different desire. Would have different abilities. This is the testimony of Commissioner Bissonnette who worked for some twenty years at MCI Framingham and also worked at male facilities. She was quite concerned that the facility there while sufficient to handle the normal female offenders who are there just nine to ten months on average with handling an individual like Ms. Kosilek who could be there for life might be a difficult situation.

**Judge Kayatta:** What is the plaintiff's age currently?

**McFarland:** I believe the plaintiff is 63.

7

**Judge Kayatta:**  So, by the time of the surgery she would be 64 or 65 post-hormonal treatment and the concern your client has is that she would pose an unusual escape risk, because of her strength.

**McFarland:**  That was the testimony in 2006, your honor.  That Ms. Kosilek did pose, present an unusual risk of escape at that facility.  It's clear that Commissioner, there was also the concern about the judge's determination that Commissioner Clarke was biased and was affected by fear of other controversy.  There was absolute no hints in the record that Commissioner Clarke was subject to any kind of fear of her political controversy.  He did receive two letters unsolicited from members of the legislature, but he did not respond to them, and he made it clear in his testimony that they had no impact on him.  He testified that he neither talked about this case to any senior officials in the dept. or in the states, he made it clear that he was going to do this his own way, provide a fresh perspective based on his extensive experience, he did not want to talk to other correctional professionals, get their opinions.  This is the man who was the president elect of the largest association of correctional staff and administrators in the world at ACA, many, many years as an auditor of other prison systems, a consultant to the Federal Bureau of Prisons, so he clearly was, and the judge noticed this, a very well-qualified individual and a perfect individual to address these issues and to look, provide a fresh look at the concerns.

**Judge Thompson:**  Are you arguing that the court had to disregard the earlier testimony of Commissioner Dennehy who testified, if I recall, that she would rather retire than be the Commissioner at the time the court ordered such surgery?

8

**McFarland:** Commissioner Dennehy felt very strongly that this situation would create all kinds of problems in the correctional world. She felt very strongly and maybe shouldn't have said so strongly that she would resign, but certainly...

**Judge Thompson:** But, this is an official capacity suit, so the question is are you arguing that we should disregard her testimony or that the district court should have disregarded her testimony in making his findings of fact.

**McFarland:** No, not a question of disregarded testimony, but certainly we feel that the testimony of Commissioner Spencer and Commissioner Clarke is much more relevant, is closer in time and he had the benefit of looking at this issue through his own perspective, not having any impact with any other state legislators or other state bodies. He was the individual that the judge picked out and ordered him to testify. So, while we don't conceive that Commissioner Dennehy was acting in, with regard to fear or of controversy or political retaliation, we do feel that the court would have been better to look entirely at the testimony that was closer in time to its decision and had the benefit of looking at other testimony and the benefit of really using national experiences to address this issue.

**Judge Thompson:** I think the problem what I'm having and probably a problem shared with my colleagues, is that to the extent that this case involves mixed questions of law and fact, we are bound by a clear error standard as far as reviewing the trial judge's findings.

9

**McFarland:** I understand your honor.  But, we do feel strongly that with regard to the objective

opponent especially, the judge did create or carve out, what we say is a new exception to the

Eighth Amendment, requiring this treatment that would in the sense cure it and by relying on

professional standards which the Supreme Court has admonished for us not to rely on for

professional standards to establish constitutional minimums.  That was in the case of *Rhodes v.*

*Chapman* and also recently *Vladan v. Brown.*  So, in this case the Court puts entirely standards of

care, this is what they require, this is what I'm going to report in the Eighth Amendment and the

failure to provide Ms. Kosilek with SRS as is put on in the standards of care is a violation of the

Eighth Amendment.  That is an issue of law in this court in address.  Thank you very much


**Judge Torruella:** Good morning Ms. Cohen.


**Cohen:** Good morning.  May it please the court, I represent Michelle Lynne Kosilek who is

serving a life sentence at MCI Norfolk.

She is transsexual, she will be 64 next week on April 10th, she was born anatomically male, but

her gender identity is entirely female.  She suffers, as the expert testimony overwhelmingly

stated, mental anguish on a daily basis as a result of the dissonance between her physical body

and her mental state.

Severe GID as this court has already acknowledged is a debilitating condition.  It's characterized

not only by mental anguish, but by genital mutilation, self castration, and by suicide.  In this case,

as the questions have already pre essayed Kosilek is seeking the very treatment that was

recommended for her by the prison medical staff, by the vendor, UMass Correctional Medical

Health Services, and by the staff clinician.

One of the key witnesses at trial was Dr. Kenneth Appelbaum who is the chief psychiatrist for the vendor, Massachusetts Correctional Health Services. He is a psychiatrist on the staff of UMass and he coordinated the review and testified in court and reviewed all of the medical experts' testimony at the request of the trial court judge. He testified that the only adequate treatment for Michelle Kosilek's serious GID disorder is sexual reassignment surgery.

The DOC has not challenged that sexual reassignment surgery would cure, or it would, excuse me, we've heard a lot of discussion about "cure" and I don't want to use that word in this context, but the DOC does not challenge that SRS is an adequate treatment for the severe gender identity disorder that Ms. Kosilek faces. Instead they have two different claims. First, they claim that they have an alternative treatment which would also be adequate and that would be continuing the hormone therapy and the psychotherapy that she has had as well as physical restraints if she becomes suicidal or anti-depressants. They claim that that treatment is also adequate to the same extent that SRS would be adequate. And second, they claim that security concerns preclude Ms. Kosilek from receiving SRS. The district court found against them on both issues and made rulings of fact.

The same district court judge has had the opportunity to preside over these proceedings for twelve years. There is an initial decision, *Kosilek v. Maloney* in 2002, the second trial lasted 28 days, the court heard testimony from 17 witnesses and reviewed more than 100 exhibits in coming to the conclusion that SRS was the only adequate treatment for Ms. Kosilek's condition.

This appeal presents two narrow issues. First, did the district court err in finding, as a matter of fact, that SRS is the only adequate treatment for Ms. Kosilek's severe GID. And second, did the

11

trial court err, as a matter of fact, in finding that the DOC has been deliberately indifferent to her condition and the questions have touched on this morning…

**Judge Torruella:** Is that a question of fact, whether it was meant to be deliberate indifference. I would have thought that was a legal standard.

**Cohen:** The question of the subsidiary factual findings are what are in dispute. There is no dispute with regard to the legal standard here. The legal standard is whether there was deliberate indifference and that has two prongs, an objective prong, which goes to the seriousness of the medical condition, and the adequacy of the treatment, and a subjective of prong, which is whether the defendant disregarded a known risk. It is not necessary to have intent to harm, it's simply enough to be aware of the risk of harm. And, on each of those…

**Judge Thompson:** Does the adequacy prong have a security concern?

**Cohen:** Yes.

**Judge Thompson:** How do you address their argument that if they respond to threats of suicide by allowing for this type of surgery in this instance that they would be held hostage in the future by similarly situated prisoners with medical conditions or any other demands if they don't succumb to the threats of suicide.

**Cohen:** The district court…

12

**Judge Thompson:** ....hostage

**Cohen:** Oh, excuse me your honor, the district court made two findings on that issue. First, the district court found that these are not threats of suicide. The district court found that it was incredible, simply not believable as a factual matter, that anyone would be willing to engage in SRS and give up the male characteristics and male organs as a pretext in order to get this surgery. The district court did not agree with that as a factual finding and found that Michelle Kosilek was not feigning any condition in manipulation. Second, the medical providers recommended this treatment for Michelle Kosilek. This is not an issue of anyone being held hostage, this is a case where the very treatment providers that were selected by the DOC to provide medical services to Michelle Kosilek determined that that was the appropriate treatment and so under the objective of prong in terms of adequacy, these are based on findings by the clinicians that were hired by the DOC by Dr. Appelbaum of UMass Correctional Services, by the staff clinician, Mark Burrowes, who is the person who is in daily contact with Michelle Kosilek at MCI Norfolk, and it was also the conclusion of Kosilek's medical experts that this was the appropriate treatment.

**Judge Kayatta:** Didn't Dr. Levine testify that the science was not there yet to reach conclusions as to, that was sufficient to negate the view that the surgery was not necessary?

**Cohen:** Dr. Levine testified that a prudent professional would not withhold SRS for Michelle Kosilek. He expressed some...

13

**Judge Kayatta:**  He testified that it would imprudent not to require it.


**Cohen:**  That's right.  And, Dr. Levine testified that the science had not yet addressed, validated

some aspects of SRS and in that regard his testimony was contradictory to that of Dr. Randi

Kaufman and Dr. Appelbaum and the district court, as where there were two permissible views

of the evidence, was properly entitled to credit the testimony of Dr. Kaufman and Dr.

Appelbaum and not to agree with Dr. Levine in that respect.


**Judge Torruella:**  One of the sequence of treatments of the Benjamin Standard of Care is a

documented real life experience of living as a member of the opposite sex.  Can you tell me what

that means, and can you tell me how that can be met in a prison environment?


**Cohen**:  Yes, Judge Torruella, this is the subject that Judge Wolf took up at the first trial of

*Kosilek v. Maloney* and there was also testimony about it in *Kosilek v. Spencer*.  What the

Benjamin Standards of Care, which are what prudent professionals use to treat GID provide for

is that prior to making an irreversible commitment to SRS that a patient who is suffering with

severe GID have a year of living in the desired role.  And, what the district court found was that

it is possible to have a real life experience in prison.  That was what the testimony was of various

clinicians including Dr. Kaufman, Dr. Brown and Dr. Appelbaum.  The prison really is Michelle

Kosilek's life, that she has faced what Dr. Kaufman said, were unusual odds in her real life

experience, because she has lived in a male facility where there is, I think, Dr. Brown testified,

daily monitoring of her conduct and she has met those challenges by behaving and living in the

14

female role at all times. So, not only has she had a classic real life experience, the evidence was, but it was an unusually challenging one where she actually corrects the corrections officers and the inmates who are derisory with regard to her GID and she has had an unusually strong gender identity during her real life experience. I wanted to speak briefly to the security concern...

**Judge Torruella:** If I want to read more about this in the record, is that available? In the record?

**Cohen:** Yes, it is in the record and we have cited it, the real life experience evidence and it is in our brief, the citations to the record where the evidence is discussed and in particular, Dr. Kaufman and Dr. Brown testified. Dr. Kaufman was the consultant to the DOC health team and Dr. Brown was our litigation expert for Michelle Kosilek and they both testified in that regard. I want to talk briefly about the security concerns and specifically with regard to the two security "reviews" that were done. We used the term in quotation marks in our brief, because both reviews were purpose made, the district court found that they were drafted largely by trial counsel, hastily done in response to the court requirements, the relevant superintendents were not consulted, that would be the superintendent of the facility which Kosilek is confined or the superintendent of the women's facility when the security review was done. When Commissioner Clarke testified that it would be an insurmountable barrier to security to have SRS, he was unfamiliar with Kosilek's age, he was unfamiliar with her classification history that she had never had an escape attempt and he was unfamiliar with her disciplinary record that she has been a model prisoner.

**Judge Kayatta:** Ms. Cohen, if we accept the judge's factual finding that the security testimony was in bad faith and improperly motivated in the like, does that litigate the possibility though that the testimony albeit in bad faith was correct and where in the record does the district court rely on a determination that one of the four options for housing the plaintiff after the surgery will, in fact, not pose a security risk?

**Cohen:** It is in the record when the district court discusses Commissioner Clarke's testimony and Commissioner Clarke specifically acknowledged on cross examination in response to questions from the court that Ms. Kosilek could be housed in a highly restricted setting, if necessary…

**Judge Kayatta:** Didn't the judge find that itself could be a violation of the Eighth Amendment?

**Cohen:** No, he did not. That question was not before the court and what the judge did in difference to the prison officials was he left it up to the prison officials to decide how to house Michelle Kosilek in the hopes that they would act in good faith in that regard.

**Judge Kayatta:** And, my question though was how could the court order the surgery without also having something in the record that would support a finding, that there is at least one way that will work as to oppose to ordering the surgery and then saying we will figure it out afterwards.

**Cohen:** There was one way which is housing in a more restricted setting and there was no indication in the record that that was an Eighth Amendment violation. The court also found out that there were other ways including the possibility of a transfer to another state under the interstate compact and there was evidence in the record of other transsexuals, in particular the transsexual in Washington state having been transferred to the state of Washington which accepter her and where she has been a model prisoner, although Commissioner Clarke wasn't aware of her, she was a prisoner in Washington State during her ten year. One…

**Judge Torruella:** Along those grounds is there any evidence in the record as to any transsexuals being presently in prison or at any point being in prison here in Massachusetts.

**Cohen:** I don't believe there is evidence in the record that there were transsexuals in the prison. My memory may be faulty on this, there may have been some testimony by Commissioner Bissonnette that there had been transsexuals at Framingham from time to time, but I don't recall specifically. I just want to say that there is also present in the record that…

**Judge Thompson:** Wasn't there some testimony of the record that when Commissioner Dennehy came on board that she stopped hormone treatment not only for your client, but others?

**Cohen:** That's correct. This is not the only case involving this issue. This court has had the same defendant and the same issues in *Battista v. Clarke*. The district court has…

17

**Judge Thompson:** I think, so to the extent that there were other people were on hormone treatment, I mean I know they haven't had the surgery, but there are other people suffering from this disorder who are currently housed at the facilities and receiving this treatment.

**Cohen:** That is correct. I had understood the question to refer to post-surgical transsexuals, but certainly there are cases in the district court and *Battista v. Clarke* in this court involving other transsexuals. There is *Sonneya v. Spencer*, is one of the other cases and the case of Battista and there is one other. I also want to say that following *Kosilek v. Maloney* which was the case in which the DOC, the first case here maintains throughout the trial that there would be an insurmountable security barrier if Michelle Kosilek was given hormones. And the district court with due respect for state officials did not enter an Order for Relief, but outlines the relevant legal principles and after that decision the DOC did commission a bona fide security review and the security review found no concerns with maintaining Michelle Kosilek on hormones, even though that was directly contrary to what the testimony had been throughout the trial and for the years previous and she was put on hormones and has lived at MCI Framingham without incident since then. And, I see that my time is up. Thank you.

**Judge Kayatta:** Thank you

18